UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **BOVEE & THILL LLC,** | |
| Plaintiff, | |
| -against- | **08-CV-00119 (MGC)** |
| | **ECF Case** |
| **PEARSON EDUCATION, INC. and PRENTICE HALL INC.,** | |
| Defendants. | |

### DECLARATION OF DAVID LEICHTMAN

I, David Leichtman, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, as follows:

1.    I am a partner at Lovells LLP, attorneys for defendant Pearson Education, Inc. ("Pearson") and Prentice Hall Inc. ("Prentice Hall") (collectively "Pearson") in the above-captioned proceeding.  I am a member in good standing of the Bar of the State of New York and of this Court.

2.    I submit this declaration in support of Pearson's motion to dismiss Bovee & Thill LLC's ("B&T") complaint for failure to state a claim upon which relief may be granted pursuant to Fed. R. Civ. Proc. 12(b)(6), and in order to put relevant documents before the Court.

3.    Attached hereto as Exhibit A is a true and correct copy of the complaint filed by B&T against Pearson on August 8, 2005 in the Nevada district court.

4.    Attached hereto as Exhibit B is true and correct copy of the amended complaint filed by B&T against Pearson on September 13, 2005 in the Nevada district court.

5.    Attached hereto as Exhibit C is a true and correct copy of the standstill agreement between B&T and Pearson filed on October 27, 2005 in the Nevada district court (the "Standstill Agreement").

6.    Attached hereto as Exhibit D is a true and correct copy of a letter dated May 8, 2006 from Wendy Rogovin of Constantine Cannon, former counsel to B&T, to David Leichtman, stating that the Standstill Agreement will expire on May 19, 2006.

7.    Attached hereto as Exhibit E is a true and correct copy of an author agreement, as amended, dated April 18, 1997 between Courtland L. Bovee and John V. Thill (the "Authors") on the one hand, and Prentice Hall on the other, concerning a work entitled "Business Communication Today."

8.    Attached hereto as Exhibit F is a true and correct copy of an author agreement dated April 18, 1997 between the Authors and Prentice Hall concerning a work entitled "Excellence in Business Communication."

9.    Attached hereto as Exhibit G is a true and correct copy of an author agreement dated July 25, 1997 between the Authors and Prentice Hall concerning a work entitled "Business Today."

10.    Attached hereto as Exhibit H is a true and correct copy of an author agreement dated March 23, 1999 between B&T and Prentice Hall concerning a work entitled "Excellence in Business."

11.    Attached hereto as Exhibit I is a true and correct copy of an author agreement dated October 12, 2001 between B&T and Prentice Hall concerning a work entitled "Essentials of Business Communication."

12.   Attached hereto as Exhibit J is a true and correct copy of the foreign reprint edition of "Business Communication Today" published by Dorling Kindersley (India) Pvt. Ltd., licensees of Pearson in South Asia.

13.   Attached hereto as Exhibit K is a true and correct copy of the US edition of "Business Communication Today" published by Pearson in the United States.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 29, 2009 at New York, New York.

_____
David Leichtman (DL-7233)

# EXHIBIT A

1  G. MARK ALBRIGHT, ESQ.
   Nevada Bar No. 001394
2  DUSTIN A. JOHNSON, ESQ.
   Nevada Bar No. 009306
3  **ALBRIGHT, STODDARD, WARNICK & ALBRIGHT**
4  801 South Rancho Dr., Suite D-4
   Las Vegas, NV  89106
5  (702) 384-7111

6  *Attorneys for Plaintiff*
   *BOVEE & THILL  LLC*

7

8                    **UNITED STATES DISTRICT COURT**
9                         **DISTRICT OF NEVADA**

10                                              CV-S-05-0940-JCM-PAL
11  **BOVEE & THILL LLC, a Nevada limited**
    **liability company,**
12
13                          **Plaintiff,**
14  VS.                                          **COMPLAINT**

15  **PEARSON EDUCATION, INC., a Delaware**     *JURY TRIAL DEMANDED*
    **corporation,**
16
                            **Defendant.**
17

18

19        COMES NOW, Plaintiff, BOVEE & THILL LLC, a Nevada limited liability company

20  (hereinafter "Plaintiff"), by and through its attorneys of record, ALBRIGHT, STODDARD,

21  WARNICK & ALBRIGHT, and hereby brings forth its complaint against Defendant PEARSON

22  EDUCATION, INC, a Delaware corporation (hereinafter "Pearson" or "Defendant"), alleging as

23  follows:

24                         **NATURE OF THE ACTION**

25        1.    This action seeks redress for Plaintiff, which has had its books published and

26  marketed by Defendant Pearson pursuant to its form contract entitled "Author Agreement", which

27  granted Pearson the sole and exclusive right to print, manufacture, publish, sell and distribute

28

Plaintiff's manuscripts or books ( hereinafter "Work") in book form, as well as certain other rights, including, but not limited to, the following titles:

      A.    *BUSINESS COMMUNICATION TODAY;*

      B.    *EXCELLENCE IN BUSINESS COMMUNICATION;*

      C.    *BUSINESS COMMUNICATION ESSENTIALS;*

      D.    *EXCELLENCE IN BUSINESS (BUSINESS TODAY);*

      E.    *BUSINESS IN ACTION;*

      F.    *ACTIVEBOOK EXCELLENCE IN BUSINESS COMMUNICATION;*

      G.    *ACTIVEBOOK BUSINESS TODAY;* and

      H.    *BUSINESS COMMUNICATION ACTIVEBOOK.*

2.     In return for these contract rights, Pearson, in its Author Agreement, agreed to pay to Plaintiff certain royalties.

3.     The Author Agreement further gave Pearson the right to develop derivative works, called "subsidiary rights," such as foreign translations and audio media, and provided for a different royalty amount to the Plaintiff on such derivative works.

4.     As particularized below, Pearson has systematically breached its contractual obligations to Plaintiff through two schemes to circumvent its full royalty obligations to Plaintiff. Fist, Pearson "sold" Plaintiff's books to wholly owned and controlled affiliates abroad, after artificially setting the sale price well below market value, so as to pay Plaintiff less than it would have received had the sales been at market price. Second, Pearson formed wholly-controlled foreign subsidiaries to print identical versions of the Work, and then took the false position that its foreign sales, if made by a foreign subsidiary, were "subsidiary rights" subject to reduced royalty rates under the Author Agreement. These schemes deprived Plaintiff of hundreds of thousands of dollars in royalties.

## PARTIES TO THE ACTION

5.    Plaintiff BOVEE & THILL LLC, is a Nevada limited liability company having its principal place of business in Clark County, Nevada.

6.    PEARSON EDUCATION, INC., is a Delaware corporation with its principal place of business in Upper Saddle River, New Jersey. At all relevant times, Pearson was and continues to be engaged in the business of publishing books, specializing in nonfiction, educational books.

7.    Plaintiff is informed and believes that PEARSON EDUCATION, INC., is and at all times relevant hereto was the real party in interest in the Author Agreements entered into between Prentice-Hall and Plaintiff.

8.    Plaintiff is informed and believes that Prentice-Hall is an imprint or label of PEARSON EDUCATION, INC., since such time as Prentice-Hall and PEARSON EDUCATION, INC. merged into one company, thereby assigning the Author Agreements to PEARSON EDUCATION, INC.

## JURISDICTION AND VENUE

9.    This Court has personal jurisdiction over the parties herein, because Plaintiff is a Nevada limited liability company located in, and conducts the majority of its business, in the County of Clark, State of Nevada. Defendant Pearson purposefully and intentionally directed its marketing, publishing and other corporate activities into the State of Nevada and directly recruited the rights to publish Plaintiff's Work.

10.    Furthermore, this Court has subject matter jurisdiction pursuant to 28 U.S.C. §1332 because there is complete diversity of citizenship between the parties and the amount in controversy between Plaintiff and Defendant is more than the statutory minimum of $75,000.00, exclusive of interest and costs.

1

## FACTS COMMON TO ALL CLAIMS FOR RELIEF

2      11.    On or about April 18, 1997, Courtland L. Bovee and John V. Thill entered into an

3    Author Agreement with Prentice-Hall to license the first through fourth editions of a textbook they

4    had written entitled *BUSINESS COMMUNICATION TODAY.* Over time, they licensed a total of

5    five works to Prentice-Hall. See Author Agreements attached hereto as "Exhibit 1 through 5."

6      12.    On or about March 16, 1998, Courtland L. Bovee and John V. Thill assigned to

7    Plaintiff BOVEE & THILL LLC, their rights under their Author Agreements with Prentice-Hall.

8    See Assignment attached hereto as "Exhibit 6."

9

10      13.    Pursuant to these Author Agreements Plaintiff assigned to Pearson the sole and

11    exclusive right to print, use, manufacture, publish and distribute Plaintiff's Work in book form, as

12    well as certain other specifically-defined derivative works called "subsidiary rights."

13      14.    The Author Agreements entered into between Courtland L. Bovee and John V.

14    Thill, which were subsequently assigned to Plaintiff, set forth and govern the calculation,

15    distribution and payment to Plaintiff of royalties for the sale of its Work.

16      15.    The Pearson Author Agreements provide that Pearson shall pay to Plaintiff a

17    specified amount as an advance against royalties and establish the royalty rate to Plaintiff for the

18    sale of each Work.

19

20      16.    Plaintiff is paid a certain percentage on sales of its Work in the United States, and a

21    different, usually lower, percentage on foreign sales.

22      17.    Additionally, the Author Agreements contain a provision entitled "Subsidiary

23    Rights," which allows Pearson to develop derivative versions of the Work and sell them directly,

24    or license them to third parties.

25      18.    The Subsidiary Rights in the Author Agreements are defined in Paragraph I, to

26    include, but are not limited to, the following:

27

28

1

A.    Publishing in all languages, broadcasting by radio, and making audio and

2

video recordings; and

3

B.    Publishing book club editions and making foreign or other adaptations or

4

derivative works and other versions.

5

19.    The terms with respect to Pearson's exercise of the Subsidiary Rights as they

6

appear in Paragraph I. are as follows:

7

The Publisher shall pay the Author royalties as follows on the exercise of
Subsidiary Rights: (i) If the Publisher itself exercises a Subsidiary Right in the
Work, 10% of the net cash received from such use. (ii) If the Publisher licenses any
of the Subsidiary Rights, 50% of the net amount of royalty compensation received
from such license.

8

9

10

11

20.    As a publisher, Pearson owed Plaintiff contractual duties to use its best efforts to

12

actively promote Plaintiff's Work and fully exploit the Work for the benefit of both parties to the

13

Author Agreements.

14

21.    Instead of acting in the best interest of Plaintiff, Pearson violated the terms of the

15

Author Agreements entered into with Plaintiff by engaging in the following two schemes:

16

A.    Pearson artificially manipulated sales prices to its foreign affiliates; and

17

B.    Misappropriation of Plaintiff's Work as a disguised derivative work.

18

22.    Pearson sold Plaintiff's books at artificially discounted prices to affiliated foreign

19

publishing companies it controlled, after unilaterally setting these prices. Pearson thereby

20

wrongfully reduced the royalties payable to Plaintiff from the sale of books in foreign countries.

21

23.    To implement this scheme, Pearson directs its foreign affiliated entities to buy the

22

books from Pearson and contrives "agreements" by which those entities pay less than the fair

23

market value, thereby (1) increasing profits to the affiliated entity, and (2) reducing the royalties

24

25

which Pearson must pay to Plaintiff.

26

24.    The second device used by Pearson to underpay Plaintiff is to claim that the

27

publication of identical versions of the Work is a "Subsidiary Right" within the meaning of

28

Paragraph I if printed and sold abroad by one of Pearson's foreign subsidiaries. By way of example, Pearson has arranged for its foreign subsidiary, Pearson Singapore Ltd., to print identical paperback versions of *BUSINESS COMMUNICATION TODAY* and to pay Pearson a small percentage of the foreign sales price (2%). Wrongly relying on Paragraph I, Pearson then pays Plaintiff 1% of the foreign sales price obtained by Pearson Singapore Ltd., instead of the 15% of the foreign market price to which Plaintiff is entitled under Paragraph I of the Author Agreement. Pearson's fallacious interpretation of "derivative work" could not be further distorted from how the term is actually defined both under federal copyright law and in Paragraph I(a) of the Prentice-Hall Author Agreements.

25.    Paragraph I defines "Subsidiary Rights" as "publishing in all languages, broadcasting by radio, making audio and video recordings, publishing book club editions, making foreign or other adaptations or derivative works and other versions; ..." "Derivative work" is defined in 17 USC §101, as:

> [A] work based upon one or more preexisting works, such as a translation, musical arrangement, dramatization, fictionalization, motion picture version, sound recording, art reproduction, abridgment, condensation, or any other form in which a work may be recast, transformed, or adapted.

26.    The exact duplication of Plaintiff's books does not constitute a derivative work as a "foreign or other adaptation" simply because the duplicate editions were printed abroad by a corporate subsidiary. Any sales of these editions clearly constitute the sale of the Work as defined in Paragraphs 1 and 3 of the Prentice-Hall Author Agreements.

27.    Pearson has thus misappropriated identical copies of Plaintiff's Work under the guise of a "subsidiary right" or "derivative work" in order to circumvent the payment of the proper royalty due to Plaintiff.

28.    Pearson's repeated violations of Plaintiff's Author Agreements by implementing these two schemes has caused Plaintiff to receive significantly less in royalties than it was entitled to under the Author Agreements.

-6-

29.    In all instances, Pearson's self-dealing and miscalculation has resulted in an underpayment to Plaintiff from the sale of its Work.  Furthermore, where the "negotiated" rates with its affiliates are particularly low or where Pearson fully abuses its subsidiary licensing rights, Plaintiff has received almost no royalties from foreign sales as a result of Pearson's wrongful conduct.

30.    Pearson has been fully aware and on notice that the misappropriation of Plaintiff's Work as disguised "derivative works" and the artificially discounted foreign sales prices it has used and continues to use with its affiliates is improper and in breach of its contractual obligations.

31.    At all relevant times, Pearson has had a duty and obligation under the Author Agreements, to account properly and accurately for royalties. Pearson, however, systematically and intentionally underpaid royalties due and owing to Plaintiff and consistently misrepresented the proper amount of royalties due to Plaintiff. Consequently, Pearson underpaid Plaintiff, while retaining substantial financial benefits for itself.

## FIRST CLAIM FOR RELIEF
### (Breach of Contract)

32.    Plaintiff repeats, realleges and incorporates by reference all of the foregoing paragraphs as if fully set forth at length herein.

33.    Pearson has knowingly and materially breached its express and implied contractual obligations under the Author Agreements and has disregarded the rights of Plaintiff by, inter alia, failing to pay Plaintiff monies to which it is entitled on sales of its Work in foreign countries by entering into agreements for the sale of Plaintiff's Work with affiliated entities on terms that are unreasonable, unjust, and inequitable and do not represent the fair market price for the Work in question.

34.    Moreover, by systematically misusing the "Subsidiary Rights" provision in the Author Agreements, Pearson has also underpaid Plaintiff on royalties it was due on foreign sales.

-7-

35.    To date, Pearson has failed and/or refused to cure these breaches of contract, after repeated demands by Plaintiff.

36.    As a direct and proximate result of the foregoing, Plaintiff has been damaged in an amount well in excess of the jurisdictional minimum and in an amount to be proved at trial.

### SECOND CLAIM FOR RELIEF
**(Breach of Implied Duty of Good Faith and Fair Dealing)**

37.    Plaintiff repeats, realleges and incorporates by reference all of the foregoing paragraphs as if fully set forth at length herein.

38.    The Plaintiff's Agreements with Pearson contain an implied covenant under law that Pearson will act toward Plaintiff in good faith and fair dealing.

39.    The implied covenant of good faith and fair dealing imposed upon Pearson prohibits Pearson from taking any action to interfere with and prohibit Plaintiff's enjoyment and exercise of its rights under its Author Agreements.

40.    By reason of the foregoing acts, practices and course of deceptive conduct outlined above, Pearson has breached the covenant of good faith and fair dealing implied in the Pearson Author Agreements with Plaintiff, and has acted in an egregious manner and in bad faith to frustrate and destroy the enjoyment and exercise of the Plaintiff's rights to receive the benefits of the Author Agreements.

41.    Pearson engaged in deceptive self-dealing with affiliated entities, thereby depriving Plaintiff of royalties earned and owing.

42.    By reason of the foregoing acts, Plaintiff has been damaged in an amount in excess of the jurisdictional minimum and in an amount to be proven at trial.

/ / / /

/ / / /

/ / / /

- 8 -

1

## THIRD CLAIM FOR RELIEF
### (Breach of Fiduciary Duty)

2

3      43.    Plaintiff repeats, realleges and incorporates by reference all of the foregoing

4   paragraphs as if fully set forth at length herein.

5      44.    Pearson owed a fiduciary duty to Plaintiff in that Pearson was required to act for

6   the benefit of another person on all matters within the scope of their relationship.

7      45.    Pearson's duties owed to Plaintiff included the duties of good faith, trust,

8   confidence, and candor.

9      46.    Pearson owed to Plaintiff duties to give Plaintiff a proper accounting of the

10  royalties owed to Plaintiff, to license, sell and distribute Plaintiff's Work for the benefit of

11  Plaintiff and Pearson, and to properly pay Plaintiff the royalties earned on Plaintiff's Work.

12      47.    Pearson, by failing to properly compensate, account to, and license, sell, and

13  distribute for the benefit of Plaintiff, as well as misrepresenting to Plaintiff the amounts that

14

15  Plaintiff was to be paid in accordance with the Author Agreements between the parties violated

16  said fiduciary duties as owed to Plaintiff.

17      48.    By reason of the foregoing acts, Plaintiff has been damaged in an amount in excess

18  of the jurisdictional minimum and in an amount to be proven at trial.

19

20

## FOURTH CLAIM FOR RELIEF
### (Unjust Enrichment)

21

22      49.    Plaintiff repeats, realleges and incorporates by reference all of the foregoing

23  paragraphs as if fully set forth at length herein.

24      50.    Pearson has benefited and been enriched by its illegal conduct. Pearson has secretly

25  profited, and continues to secretly profit and unjustly reap benefits by miscasting its foreign

26  publication of identical Work as "subsidiary" or "derivative" works, as well as by selling

27  Plaintiff's Work at artificially discounted rates to affiliated publishing companies, thereby

28

1    wrongfully reducing the royalties earned from the sale of the books that Pearson must share with

2    Plaintiff.

3        51.    Pearson has knowledge of these secret profits.

4        52.    Pearson voluntarily accepted and retains these secret profits.

5        53.    The circumstances, as described herein, including the breaches of contract and

6    covenant of good faith and fair dealing to Plaintiff, are such that it would be inequitable for

7    Pearson to retain the ill-gotten secret profits without paying the value thereof to Plaintiff.

8        54.    Plaintiff is entitled to the amount of Pearson's ill-gotten secret and deceptive

9    profits, including interest, resulting from its secret, deceptive, unjust, unfair and inequitable

10   conduct from the sale of Plaintiffs books at abnormally discounted rates to foreign affiliated

11   companies. Plaintiff is therefore entitled to restitutionary disgorgement.

12

13

14                    **FIFTH CLAIM FOR RELIEF**
                        **(Unfair Trade Practices)**

15

16       55.    Plaintiff repeats, realleges and incorporates by reference all of the foregoing

17   paragraphs as if fully set forth at length herein.

18       56.    Plaintiff, upon information and belief, alleges that Pearson intentionally sold to its

19   foreign subsidiaries Plaintiff's Work at an artificially low price.

20       57.    Plaintiff, upon information and belief, alleges that Pearson intentionally sold

21   Plaintiff's Work to its foreign subsidiaries at below fair market value, and that Pearson's foreign

22   subsidiaries would then sell Plaintiff's Work at fair market value, creating an enormous profit for

23   Pearson and improperly reducing the amount of royalties payable to Plaintiff.

24

25       58.    Pearson intentionally conducted the above-described conduct in violation of unfair

26   trade practices under the laws of the State of New York and pursuant to Chapter 598A of Nevada

27   Revised Statute.

28

                                    - 10 -

59.    As a direct and proximate result of the foregoing, Plaintiff has been damaged in an amount well in excess of the jurisdictional minimum and in an amount to be proved at trial

60.    Plaintiff is entitled to the recovery of treble damages as a result of Pearson's conduct, as well as an award of its attorneys' fees and costs in this action, as permitted by law.

## SIXTH CLAIM FOR RELIEF
### (Declaratory Relief)

61.    Plaintiff repeats, realleges and incorporates by reference all of the foregoing paragraphs as if fully set forth at length herein.

62.    Plaintiff contends that pursuant to the Author Agreements, the only appropriate and proper calculation of Plaintiff's royalties is based on the sale of Plaintiff's Work at fair market value alone.

63.    Furthermore, by its practices, Pearson has contended, in effect, that pursuant to the "Subsidiary Rights" provision, a "derivative" work includes the duplication of exact copies of Plaintiff's Work so long as the duplicates are printed by a Pearson corporate subsidiary abroad.

64.    Additionally, by its practices, Pearson has contended, in effect, that it is entitled to apply the royalty percentage rate to any arbitrary sale price of Plaintiff's Work, including the sale at abnormally discounted rates to Defendant's foreign subsidiary publishing companies, thereby reducing the royalties earned from the sale of the books that Defendant must share with Plaintiff.

65.    By reason of the foregoing, there is a present justifiable controversy between Plaintiff on the one hand, and Pearson on the other, with respect to which a declaratory judgment should be entered determining the proper methodology for calculating royalties under the Author Agreements.

## SEVENTH CLAIM FOR RELIEF
### (Demand for Accounting)

66.    Plaintiff repeats, realleges and incorporates by reference all of the foregoing paragraphs as if fully set forth at length herein.

67.    Pursuant to the Author Agreements, Pearson is required to pay Plaintiff a stipulated royalty based upon domestic, foreign, and subsidiary rights sales of Plaintiff's Work.

68.    As stipulated in each and every Author Agreement with Plaintiff, Pearson is required to render an accounting of domestic, foreign and export sales and pay Plaintiff's royalties computed on these sales figures. As alleged more fully above, Pearson has failed to pay Plaintiff these duly earned royalties. Its breaches of the Author Agreements have been carried out, in part, through deception as to the real market value of Plaintiff's Work abroad.

69.    Pearson's violations of the law and breaches of contract and the covenant of good faith and fair dealing, and the effects thereof, are continuing and will continue unless halted by the Court.

70.    As such, Plaintiff demands an accounting for all foreign sales for all of Plaintiff's published Work, including information as to the prices at which Pearson's foreign subsidiaries have been selling the Work in foreign countries.

///

///

///

///

///

///

///

///

///

-12-

WHEREFORE, as to each of the seven claims for relief herein stated, Plaintiff prays for judgment and relief against Defendant as follows:

1.    For disgorgement, according to proof, including prejudgment interest thereon as allowed by law, of Defendant's illegal and unduly obtained profits;

2.    For general and compensatory damages for monies owed by Pearson on sales of published Work, including all consequential and incidental damages allowed by law, with interest thereon;

3.    For interest at the legal rate of interest on the foregoing sum;

4.    For an accounting as to Defendant's foreign sales of Plaintiff's Work;

5.    For an award of costs of suit, and reasonable attorneys' fees;

6.    For treble and/or punitive damages as permitted by law; and

7.    For such other and further relief as the Court deems just and proper.

Dated this _3 rd_ day of August 2005.

Respectfully submitted,

**ALBRIGHT, STODDARD, WARNICK & ALBRIGHT**

_____
G. MARK ALBRIGHT, ESQ.
Nevada Bar No. 001394
DUSTIN A. JOHNSON, ESQ.
Nevada Bar No. 009306
801 South Rancho Dr., Suite D-4
Las Vegas, NV 89106
(702) 384-7111

_Attorneys for Plaintiff BOVEE & THILL LLC_

# EXHIBIT B

# ORIGINAL

1  G. MARK ALBRIGHT, ESQ.
   Nevada Bar001394
2  DUSTIN A. JOHNSON, ESQ.
   Nevada Bar 009306
3  ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
   801 So. Rancho Dr. Ste. D-4
4  Las Vegas NV 89106
   Tel: (702) 384-7111
5  Fax: (702) 384-0605

6  BLUMENTHAL & MARKHAM
   Norman B. Blumenthal, Esq.
7  David R. Markham, Esq.
   Cathy K. Kazemi, Esq.
8  2255 Calle Clara
   La Jolla, CA 92037
9  Tel: 858/551-1223
   Fax: 858/551-1232

10

   (Pro Hac Application Pending)
11
   *Attorneys for Plaintiff*
12

13              UNITED STATES DISTRICT COURT

14                  DISTRICT OF NEVADA

15

16                                    CV-S-05-0940-JCM-PAL
17  BOVEE & THILL LLC, a Nevada limited
    liability company, on behalf of itself and all
18  persons similarly situated,                  **CLASS ACTION**

19              Plaintiff,
                                              **AMENDED COMPLAINT FOR (1)**
20  vs.                                       **BREACH OF CONTRACT; (2) BREACH**
                                              **OF IMPLIED COVENANT OF GOOD**
21  PEARSON EDUCATION, INC., a Delaware        **FAITH AND FAIR DEALING; (3)**
    corporation, and PRENTICE-HALL, INC., a    **UNJUST ENRICHMENT; (4)**
22  Delaware corporation,                      **DECLARATORY RELIEF; AND (5)**
                                              **ACCOUNTING AND**
23              Defendants.                    **DEMAND FOR JURY TRIAL**

24

25

26

27              Plaintiff alleges as follows:

28                                    1

## NATURE OF THE ACTION

1.      This action seeks redress for Plaintiff Bovee & Thill, LLC, and a class of similarly situated authors and their successors in interest who have had their books published and marketed by Defendant Prentice-Hall, Inc., and its affiliate, Pearson Education, Inc.(collectively "Prentice-Hall") pursuant to its form contract entitled "Author Agreement" which granted Prentice-Hall the sole and exclusive right to print, manufacture, publish, sell and distribute Plaintiff's manuscripts or books ("Work") in book form as well as certain other rights. In return for these contract rights, Prentice-Hall, in its Author Agreement, agreed to pay Plaintiff and the class members certain royalties. The Author Agreements further gave Prentice-Hall the right to develop derivative works, called "subsidiary rights," such as foreign translations and audio media, and provided for a different royalty for the authors on such derivative works. This case arises from Prentice-Hall's two schemes to inflate its net income by bamboozling its authors out of their royalties.

2.      As particularized below, during the class period and through the present, Prentice-Hall has systematically breached its contractual obligations to the Plaintiff and members of the Class through two schemes to circumvent its full royalty obligations. First, Prentice-Hall "sold" the authors' books to wholly-owned and controlled affiliates abroad, after artificially setting the sale price well below market value, so as to pay the authors less than they would receive had the sales been at market price. Second, Prentice-Hall formed wholly-controlled foreign subsidiaries to print identical versions of the Works. and then took the false position that its foreign sales, if made by a foreign subsidiary, were "subsidiary rights" subject to reduced royalty rates under the Author Agreements. These schemes deprived Plaintiff of hundreds of thousands of dollars in royalties during the class period, while depriving the class members of many millions of dollars of royalties.

3.      This action is filed on behalf of Plaintiff Bovee & Thill LLC ("Plaintiff"), individually, and on behalf of all members of the class defined in ¶ 30 below ("Plaintiff Class").

4.      This action is properly maintainable as a class action under the provisions of the Federal Rules of Civil Procedure 23. for the reasons set forth in ¶¶ 30 - 38 below.

2

## PARTIES TO THE ACTION

5.    Plaintiff Bovee & Thill L.L.C. is a Nevada limited liability company having its principal place of business in Las Vegas, Nevada. On or about April 18, 1997, Courtland L. Bovee and John V. Thill entered into an Author Agreement with Prentice-Hall to license the first through fourth editions of a textbook they had written entitled *Business Communication Today*. Over time, they entered into additional agreements and licensed a total of eight works to Prentice-Hall. The other seven works are *Excellence in Business Communication, Business Communication Essentials, Excellence in Business (Business Today), Business in Action, Activebook Excellence in Business Communication, Activebook Business Today* and *Business Communication Activebook*. On or about March 16, 1998, they assigned to Plaintiff Bovee & Thill LLC their rights under their Author Agreements with Prentice-Hall. One Agreement has been amended once over the years. Copies of Plaintiff's original Author Agreements, and the amendment thereto, are attached to this complaint as Exhibits 1 through 5. The class consists of about 1,500 persons or entities, all of whom have entered into Prentice-Hall form Author Agreements on terms substantially identical to Plaintiff, and as to whom Prentice-Hall has engaged in either or both of the illegal schemes alleged below.

6.    Prentice-Hall, Inc., and Pearson Education, Inc., are Delaware corporations with their principal places of business in Upper Saddle River, New Jersey. At all relevant times, Prentice-Hall was and continues to be engaged in the business of publishing books, specializing in nonfiction books.

7.    Prentice-Hall is referred to herein as "Defendant."

## JURISDICTION AND VENUE

8.    This Court has personal jurisdiction over Prentice-Hall which does substantial business within the State of New York and the Southern District of New York. Venue is proper in this District pursuant to Section M of the Author Agreement, which provides that in the event of a dispute between the parties, exclusive jurisdiction shall be had in federal court or state court in New York County. The Agreement further provides, in the same section, that it shall be construed and interpreted under New York law.

3

1    9.    Furthermore, this Court has subject matter jurisdiction because there is complete diversity

2    of citizenship between the parties and the amount in controversy between Plaintiff and Defendant is more

3    than the statutory minimum of $75,000.00, exclusive of interest and costs.

4    10.    This case is also a class action within the meaning of 28 USC §1332(d), as amended by the

5    Class Action Fairness Act of 2005, because at least one class member is a citizen of a state different from

6    Defendants.  The amount in controversy with respect to the claims for the entire class as alleged herein

7    exceeds $5,000,000, exclusive of interest and costs.

8                            **FACTS COMMON TO ALL CAUSES OF ACTION**

9    11.    Prentice-Hall entered into Author Agreements ("Agreements") with

10    authors, such as Plaintiff and members of the class, who have written or are engaged in writing manuscripts

11    or books (called "Works" in the Author Agreements).  The terms and conditions of the Prentice-Hall

12    Author Agreements entered into with the class members are substantially identical in all material respects

13    except that the particular royalty rate due a class member for a particular work may vary.

14    12    Pursuant to these Author Agreements, the class members grant and assign to Prentice-Hall

15    the sole and exclusive right to print, use, manufacture, publish and distribute the author's Work in book

16    form, as well as certain other specifically-defined derivative works called "subsidiary rights."

17    13.    Each Prentice-Hall Author Agreement sets forth and governs the calculation,

18    distribution and payment to each class member of royalties for the sale of his or her Work.

19    14.    The Prentice-Hall Author Agreements establish the royalty rate due the Author for the sale

20    of each Work.

21    15.    The royalty rate ("Royalty") a class member receives depends on the manner in which the

22    Work is distributed or sold.  The author is paid a certain percentage on sales of his Work in the United

23    States, and a different, usually lower, percentage on foreign sales.

24    16.    Additionally, the Agreement contains a provision entitled "Subsidiary Rights," Section I(a),

25    which allows Prentice-Hall to develop derivative versions of the Work and sell them directly, or license

26    them to third parties.

27

28                                            4

1      17.    The Subsidiary Rights in the Agreement are defined in Section I(a) to include, but are not

2  limited to, the following:

3              -     publishing in all languages;

                  -     broadcasting by radio;

4              -     making audio and video recordings;

                  -     publishing book club editions; and

5              -     making foreign or other adaptations or derivative works and other versions.

6      18.    The terms with respect to Prentice-Hall's exercise of the Subsidiary Rights as they

7  appear in Section I(a) are as follows:

8             The Publisher shall pay the Author royalties as follows on the exercise of Subsidiary Rights:

             (I)    If the Publisher itself exercises a Subsidiary Right in the Work, 10% of the net cash

9                  received.

             (ii)   If the Publisher licenses any of the Subsidiary Rights, 50% of the net amount of

10                royalty compensation received from the license.

11      19.    As a publisher, Prentice-Hall owed Plaintiff and Members of the Class contractual duties

12  to use its best efforts to actively promote its authors' Works and fully exploit the copyright in the Works

13  for benefit of both parties to the Author Agreements.

14      20.    Instead of acting in the best interest of Plaintiff and members of the class, Prentice-Hall

15  violated its contracts with its authors by engaging in the following two schemes:

16      **Prentice-Hall's Artificial Manipulation of Sales Prices to its Foreign Affiliates**

17      21.    Prentice-Hall sold Plaintiff's and the Class' books at artificially discounted prices to

18  affiliated foreign publishing companies it controlled, after unilaterally setting these prices. Prentice-Hall

19  thereby wrongfully reduced the royalties payable to Plaintiff and the class members from the sale of books

20  in foreign countries.

21      22.    On information and belief, to implement this scheme, Prentice-Hall directs its foreign

22  affiliated entities to buy the books from Prentice-Hall and contrives "agreements" by which those entities

23  pay less than the fair market value, thereby (1) increasing profits to the affiliated entity, and (2) reducing

24  the royalties which Prentice-Hall must pay to Prentice-Hall's authors. In reality, all such sales are covered

25  under Section I(d) which provides that for all copies sold by subsidiaries, Plaintiff is entitled to 15% of the

26  net cash received.

27

28

## Misappropriation of Plaintiff Work as a Disguised Derivative Work

23.    The second device used by Prentice-Hall to underpay its authors is to claim that publication of identical versions of the Work are "Subsidiary Rights" within the meaning of Section 1 if printed and sold abroad by one of Prentice-Hall's foreign subsidiaries. By way of example, Prentice-Hall has arranged for its foreign subsidiary, Pearson Singapore Ltd., to print identical paperback versions of *Business Communication Today* and to pay Prentice-Hall a small percentage of the foreign sales price (2%). Wrongly relying on Section I, Prentice-Hall then pays Plaintiff 1% of the foreign sales price obtained by Pearson Singapore Ltd., instead of the 15% of the foreign market price to which Plaintiff is entitled under Section I(b) of the Author Agreement. Prentice-Hall's fallacious interpretation of "derivative work" could not be further distorted from how the term is actually defined both under federal copyright law and in Section 1 (a) of the Prentice-Hall Publishing Agreements.

24.    Section I(a) defines "Subsidiary Rights" as

- publishing in all languages;
- broadcasting by radio;
- making audio and video recordings;
- publishing book club editions; and
- making foreign or other adaptations or derivative works and other versions.

"Derivative work" is defined in 17 USC 101, as follows:

A "derivative work" is a work based upon one or more preexisting works, such as a translation, musical arrangement, dramatization, fictionalization, motion picture version, sound recording, art reproduction, abridgment, condensation, or any other form in which a work may be recast, transformed, or adapted.

25.    The exact duplication of Plaintiff books does not constitute a derivative work as a "foreign or other adaptation" simply because the duplicate editions were manufactured and printed abroad by a corporate subsidiary. Any sales of these editions clearly constitute the sale of the Work as defined in Paragraphs 1 and 3 of the Prentice-Hall Author Agreements.

26.    Prentice-Hall has thus misappropriated identical copies of Plaintiff's Work under the guise of a "subsidiary right" or "derivative work" in order to circumvent the payment of the proper royalty due the author.

6

1    27.    Prentice-Hall's repeated violations of Plaintiff's contracts, using these two schemes, has

2   caused Plaintiff and the class members to receive significantly less in royalties than they were entitled to

3   under the Author Agreements.

4    28.    In all instances, Prentice-Hall's self-dealing and miscalculation has resulted in an

5   undercredit or underpayment to Plaintiff and members of the class from the sale of their books.

6   Furthermore, where the "negotiated" rates with its affiliates is particularly low or where Prentice-Hall

7   abuses its subsidiary licensing rights, certain class members have received almost no royalties from foreign

8   sales as a result of Prentice-Hall's wrongful conduct.

9    29.    Prentice-Hall has been fully aware and on notice that the misappropiation of Plaintiff's

10   Works as disguised "derivative works" and the artificially discounted foreign sales prices  it has used and

11   continues to use with its affiliates is improper and in breach of its contractual obligations.

12    30.    At all relevant times, Prentice-Hall has had a duty and obligation under the

13   Prentice-Hall Author Agreements, to account properly and accurately for royalties. Prentice-Hall, however,

14   has systematically and intentionally underpaid royalties due and owing to class members and has

15   consistently misrepresented the proper amount of royalties due to the class members.  Consequently,

16   Prentice-Hall has undercredited and underpaid each class member, while retaining substantial financial

17   benefits for itself.

18                      **CLASS ACTION ALLEGATIONS**

19    31.    Plaintiff brings this lawsuit as a class action pursuant to Fed.R.Civ.P. 23.  The Class is

20   composed of:

21              All persons or entities, their agents, successors in interest, assigns, heirs,
               executors and administrators, who are or were parties to Prentice-Hall
22             Author Agreements entered into at any time within six years prior to the
               filing of this Complaint up until the time of the end of the Class Period
23             (the "Class"), and who were paid royalties based on a percentage of (1)
               Prentice-Hall's sales to its foreign affiliates, and/or (2) Prentice-Hall's
24             licensing revenues from its foreign subsidiaries for identical hardcover or
               paperback versions of their books.
25
   Excluded from the Class are all Defendants and all parents, subsidiaries, affiliates, agents, attorneys,
26
   directors and employees of Defendants; and all members of the federal judiciary sitting in judgment of
27
   this case.
28
                                  7

32. The Class is so numerous and geographically dispersed that joinder of all Class Members is impracticable. While Plaintiff does not know the exact number and identity of Class Members, Plaintiff believes that there are about 1,500 Class Members, and that their identities can be ascertained from Prentice-Hall's books and records. Joining and naming each Class Member as co-plaintiff would be unreasonable and impracticable.

33. The claim of Plaintiff is typical of the claim of the members of the Class. Like the Class Members, the named Plaintiff was underpaid and undercredited for royalties due as a result of Prentice-Hall's wrongful acts, including but not limited to self-dealing.

34. Plaintiff will fairly and adequately represent and protect the interests of the Class and has retained counsel competent and experienced in class action litigation. The interests of the Class coincide with, and are not antagonistic to, those of the Plaintiff.

35. A class action is superior to other methods for the fair and efficient adjudication of this controversy and will provide substantial benefit both to the parties and to the court system. Since the practices Prentice-Hall engages in is uniform and common to all members of the Class, judicial economy will be promoted by treating this case as a class action. It would not be economically practicable for Plaintiff or class members to maintain individual actions because of the relatively small amounts at issue in a given transaction.

36. The expenses and burdens of litigation would make it costly and inefficient for class Members to seek redress on an individual basis for the wrongs done to them. When the liability of Prentice-Hall has been adjudicated, the claims of all class Members can be administered efficiently and/or determined by the courts.

37. This action will promote an orderly and expeditious administration of class claims; promote economies of time, effort and resources; and promote uniformity of decisions. A multitude of individual actions would work a hardship on the court system and would be impractical to coordinate by any means other than a class action. Further, the monies received and retained by Prentice-Hall resulting from self-dealing can be quantified objectively by reference to discoverable business records in the custody of Defendant and/or third parties.

8

38.    There are questions of law and fact common to the class, which predominate over any questions affecting only individual class members. These questions arise from Prentice-Hall's common, standardized practices and procedures. Among others, the issues include but are not limited to:

(a) whether Prentice-Hall has breached its Prentice-Hall Publishing Agreements and/or contract with members of the class;

(b) whether Prentice-Hall has failed to pay Plaintiff and the class members the royalties to which they are entitled on sales of their books;

(c) whether Prentice-Hall's representations and conduct regarding Plaintiff's and class' royalty and account statements were false and misleading as to any material fact;

(d) whether Prentice-Hall benefitted financially through its wrongful acts;

(e) whether Plaintiff and the members of the class have been damaged by Prentice-Hall's actions;

(f) whether Prentice-Hall will continue to breach its contractual obligations to Plaintiff and the Class, absent the declaratory judgment relief sought by Plaintiff; and

(g) whether Plaintiff and the members of the class are entitled to restitution as a result of Prentice-Hall's wrongdoing, and if so, what is the proper measure and appropriate formula to be applied in determining such damages and restitution.

39.    There will be no difficulty in the management of this lawsuit as a Class action. Class members may be identified by Prentice-Hall's records and such Class members may be notified of the pendency of this action by mail, using techniques and a form of notice customarily used in class actions.

40.    Class-wide resolution of these claims is the superior method for their fair and efficient resolution.

**FIRST COUNT**
**(Breach of Contract)**

41.    Plaintiff realleges and incorporates all of the above allegations as though fully set forth herein.

42.    Prentice-Hall has knowingly and materially breached its express and implied contractual obligations under the Prentice-Hall Author Agreement and has disregarded the rights of Plaintiff and the class members by, inter alia, failing to pay Plaintiff and the class monies to which they are entitled on sales

9

1  of their published books in foreign countries by entering into agreements for sale of Plaintiff and the Class'

2  books with affiliated entities on terms that are unreasonable, unjust, and inequitable and do not represent

3  the fair market price for the books in question.

4     43.    Moreover, by systematically misusing the "Subsidiary Rights" provision in the Author

5  Agreements, Prentice Hall has also underpaid Plaintiffs and class members on royalties they were due on

6  foreign sales.

7     44.    To date, Prentice-Hall has failed to cure these breaches of contract.

8     45.    As a direct and proximate result of the foregoing, Plaintiff and members of the class have

9  been damaged in an amount well in excess of the jurisdictional minimum and in an amount to be proved

10  at trial.

11                            SECOND COUNT
                (Breach of Implied Duty of Good Faith and Fair Dealing)
12
      46.    The allegations of the preceding paragraphs are incorporated by reference as if fully set
13
   forth herein.
14
      47.    The Plaintiff's and the class' Author Agreements with Prentice-Hall contain an implied
15
   covenant under law that Prentice-Hall will act toward Plaintiff and the class in good faith and fair dealing.
16
      48.    The implied covenant of good faith and fair dealing imposed upon Prentice-Hall prohibits
17
   Prentice-Hall from taking any action to frustrate Plaintiff and the Class' enjoyment and exercise of their
18
   rights under their Agreements.  By reason of the foregoing acts, practices and course of deceptive conduct
19
   outlined above, Prentice-Hall has breached the covenant of good faith and fair dealing implied in the
20
   Prentice-Hall Publishing Agreements with Plaintiff and the class and has acted in an egregious manner and
21
   in bad faith to frustrate and destroy the enjoyment and exercise of the Plaintiff and the class' rights to
22
   receive the benefits of the Author Agreements.
23
      49.    Prentice-Hall engaged in deceptive self-dealing with affiliated entities, thereby depriving
24
   Plaintiff and the Class of royalties earned and owing.
25
      50.    By reason of the foregoing acts, Plaintiff and the class have been damaged in amount in
26
   excess of the jurisdictional minimum and to be determined at trial.
27

28                                    10

## THIRD COUNT
### (Unjust Enrichment)

51.    The allegations of the preceding paragraphs are incorporated by reference as if fully set forth herein.

52.    Prentice-Hall has benefitted and been enriched by its illegal conduct. Prentice-Hall has secretly profited, and continues to secretly profit and unjustly reap benefits by miscasting its foreign publication of identical books as "subsidiary" or "derivative" works, as well as by selling Plaintiff's and the class members' books at artificially discounted rates to affiliated publishing companies, thereby wrongfully reducing the royalties earned from the sale of the books that Prentice-Hall must share with Plaintiff and class members.

53.    Prentice-Hall has knowledge of these secret profits.

54.    Prentice-Hall voluntarily accepted and retains these secret profits.

55.    The circumstances, as described herein, including the breaches of contract and covenant of good faith and fair dealing to Plaintiff, are such that it would be inequitable for Prentice-Hall to retain the ill-gotten secret profits without paying the value thereof to Plaintiff and the class.

56.    Plaintiff and the Class are entitled to the amount of Prentice-Hall's ill-gotten secret and deceptive profits, including interest, resulting from its secret, deceptive, unjust, unfair and inequitable conduct from the sale of Plaintiff's books at abnormally discounted rates to foreign affiliated companies. Plaintiff and the class are entitled to restitutionary disgorgement.

## FOURTH COUNT
### (Declaratory Relief)

57.    The allegations of the preceding paragraphs are incorporated by reference as if fully set forth herein.

58.    Plaintiff contends that pursuant to the Prentice-Hall Author Agreements, the only appropriate and proper calculation of Plaintiff's and the class members' royalties is based on the sale of Plaintiff's and the class members' work at fair market value alone.

59.    Furthermore, by its practices Prentice-Hall has contended, in effect, that pursuant to the Subsidiary Rights provision, a "derivative" work includes the duplication of exact copies of Plaintiff's and

11

1   the Class' books so long as the duplicates are printed by a Prentice-Hall corporate subsidiary abroad.

2        60.    Additionally, by its practice, Prentice-Hall has contended, in effect, that pursuant to the

3   Prentice-Hall Author Agreement, it is entitled to apply the royalty percentage rate to any arbitrary sale price

4   of Plaintiff's or Class' books, including the sale at abnormally discounted rates to Defendant's affiliated

5   foreign publishing companies, thereby reducing the royalties earned from the sale of the books that

6   Defendant must share with Plaintiff and members of the Class.

7        61.    By reason of the foregoing, there is a present justifiable controversy between Plaintiff and

8   the Class on one hand, and Prentice-Hall on the other, with respect to which a declaratory judgment should

9   be entered determining the proper methodology for calculating royalties under the Author Agreements.

**FIFTH COUNT**
**(Demand for Accounting)**

10

11        62.    The allegations of the preceding paragraphs are incorporated by reference as if fully set

12   forth herein.

13        63.    Pursuant to the Prentice-Hall Author Agreements, Prentice-Hall is required to pay

14   Plaintiff and the Class a stipulated royalty based upon domestic, foreign and subsidiary rights sales of

15   Plaintiff's and Class' published books.

16        64.    As stipulated in each and every Agreement with Plaintiff and the Class, Prentice-Hall is

17   required to render an accounting of domestic, and export sales and pay Plaintiff and the Class royalties

18   computed on these sales figures. As alleged more fully above, Prentice-Hall has failed to pay Plaintiff or

19   the Class these duly earned royalties. Its breaches of the author agreement have been carried out, in part,

20   through deception as to the real market value of Plaintiff's and class members' books abroad.

21        65.    Prentice-Hall's violations of the law and breaches of contract and the covenant of good faith

22   and fair dealing, and the effects thereof, are continuing and will continue unless halted by the Court.

23        66.    As such, Plaintiff and the Class demand an accounting for all foreign sales

24   of all of Plaintiff's and the Class' published books, including information as to the prices at which Prentice-

25   Hall's foreign subsidiaries have been selling the books in foreign countries.

26

27

28                            12

**PRAYER FOR RELIEF**

Plaintiff, on behalf of itself, and on behalf of the Class, prays for judgment and relief against Defendants as follows:

1. For an order certifying that this action may be maintained as a class action against Prentice-Hall, appointing Plaintiff and their counsel to represent the class, as alleged herein, and directing the reasonable notice of this action to be given by Prentice-Hall to the members of the Class;

2. For disgorgement, according to proof, including prejudgment interest thereon as allowed by law, of Defendant's illegal profits;

3. For compensatory damages for monies owed by Prentice-Hall on sales of published books, including all consequential and incidental damages allowed by law, with interest thereon;

4. For interest at the legal rate of interest on the foregoing sum;

5. For an accounting as to Defendant's domestic and foreign sales of Plaintiff's and the Class members' works;

6. For an award of costs of suit, and reasonable attorneys' fees; and

7. For such other and further relief as the Court deems proper.

Dated this ___13th___ day of September, 2005.

ALBRIGHT, STODDARD, WARNICK & ALBRIGHT

G. MARK ALBRIGHT. ESQ.
Nevada Bar 001394
DUSTIN A. JOHNSON, ESQ.
Nevada Bar 009306
801 So. Rancho Dr. Ste. D-4
Las Vegas NV 89106
(702) 384-7111/Fax: (702) 384-0605

BLUMENTHAL & MARKHAM
Norman B. Blumenthal, Esq.
David R. Markham, Esq.
Cathy K. Kazemi, Esq.
2255 Calle Clara
La Jolla, CA 92037
Tel: 858/551-122/Fax: 858/551-1232

13

1
2
3
4

### DEMAND FOR JURY TRIAL

Plaintiff demands trial by jury of all issues triable to a jury.

Dated this ____13th____ day of September, 2005.

5
6
7
8

                              ALBRIGHT, STODDARD, WARNICK & ALBRIGHT


                              _____
                              G. MARK ALBRIGHT, ESQ.
                              Nevada Bar 001394
9                             DUSTIN A. JOHNSON, ESQ.
                              Nevada Bar 009306
10                            801 So. Rancho Dr. Ste. D-4
                              Las Vegas NV 89106
11                            (702) 384-7111

12                            BLUMENTHAL & MARKHAM
                              Norman B. Blumenthal. Esq.
13                            David R. Markham, Esq.
                              Cathy K. Kazemi. Esq.
14                            2255 Calle Clara
                              La Jolla, CA 92037
15                            Tel: 858/551-1223
                              Fax: 858/551-1232
16
                              (Pro Hac Application Pending)
17
                              *Attorneys for Plaintiff*
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT C

**ORIGINAL**

1   Gary R. Goodheart, Esq.
    JONES VARGAS
2   3773 Howard Hughes Parkway
    Third Floor South
3   Las Vegas, NV 89109
    702-862-3330 (telephone)
4   702-737-7705 (facsimile)

5   David Leichtman, Esq.
    MORGAN, LEWIS & BOCKIUS LLP
6   101 Park Avenue
    New York, New York 10178
7   (212) 309-6000 (telephone)
    (212) 309-6001 (facsimile)
8   *admitted pro hac vice*

9   Attorneys for Defendant, Pearson Education, Inc.

10

11              **UNITED STATES DISTRICT COURT**
                    **DISTRICT OF NEVADA**
12

13   ------------------------------------------X
14                                             :    CV-S-05-0940-JCM-PAL
     BOVEE & THILL LLC, a Nevada limited liability  :
15   company,                                  :
                                               :
16                      Plaintiff,             :
                                               :
17                                             :
            VS.                                :
18                                             :
                                               :
19   PEARSON EDUCATION, INC., a Delaware       :
     corporation,                              :
20                                             :
                        Defendant.             :
21                                             :
     ------------------------------------------X
22

23              **STANDSTILL AGREEMENT**

24          THIS STANDSTILL AGREEMENT ("Standstill Agreement") is made and entered into as

25   of October ___, 2005, by and between Bovee & Thill LLC ("B&T"), and Pearson Education, Inc.

26   f/k/a Prentice-Hall, Inc. ("Pearson").

27   . . .

28   . . .

1

WITNESSETH:

WHEREAS, B&T and Pearson are the parties in the action captioned <u>Bovee & Thill LLC v.</u> <u>Pearson Education, Inc. and Prentice-Hall, Inc.</u>, Civ. No. S-05-0940 (D. Nev.) (the "Action");

WHEREAS, Pearson has moved to dismiss or transfer the Action to the United States District Court For The Southern District of New York (the "Dismissal/Transfer Motion");

WHEREAS, the parties desire to end the Action without prejudice to engage in settlement discussions to determine whether their dispute can be amicably resolved and to also resolve the dispute between the parties concerning the proper venue of the Action;

NOW, THEREFORE, in consideration of the mutual promises and covenants set forth herein and other good and valuable consideration, the parties agree as follows:

1.    <u>Dismissal Without Prejudice</u>.   Concurrently with the execution of this Standstill Agreement, the parties, through their counsel, shall execute a stipulation of dismissal without prejudice of the Action (including the Complaint filed on August 3, 2005 and the Amended Complaint filed on September 13, 2005), in the form annexed as <u>Exhibit A</u> (the "Dismissal Stipulation"), and thereafter shall cause the Dismissal Stipulation to be filed promptly in the United States District Court for the District of Nevada.

2.    <u>Settlement Period</u>.   After the Court in the District of Nevada enters the Dismissal Stipulation, the parties shall engage in settlement discussions for a period of sixty (60) days from the date of entry of the Dismissal Stipulation, during which they will attempt to resolve the dispute, which time period may be extended by mutual agreement in writing (the "Settlement Period").

3.    <u>Re-Filing Of Claims</u>.   If, at the conclusion of the Settlement Period, a settlement is not reached and B&T determines to re-file its claims against Pearson, it shall do so only in the United States District Court For The Southern District of New York, or in the Supreme Court Of The State of New York, County of New York if federal jurisdiction is determined to be lacking. While the Settlement Period is in effect, and until the complaint may be re-filed under this Paragraph, no party shall take any steps to litigate the parties' dispute, including the filing with any court of any complaints, claims, counterclaims, motions or petitions of any kind.

JONES VARGAS
3773 Howard Hughes Parkway - Third Floor South
Las Vegas, Nevada 89109
Tel: (702) 862-3300    Fax: (702) 737-7705

2

4. <u>Parties To Bear Own Costs</u>. The parties agree that, as long as B&T complies with Paragraphs 2 and 3 hereof, each party shall bear its own costs and expenses in connection with the Dismissal/Transfer Motion.

5. <u>Statute Of Limitations Tolling</u>. During the Settlement Period, the statute of limitations of any cause of action that was brought or could have been brought in the Action shall be tolled.

6. <u>No Use Of This Standstill Agreement</u>. This Standstill Agreement is not intended to be and shall not be construed or deemed an admission adverse to any of the parties hereto of (a) liability to or of any person and/or entity, (b) the commission of any act or wrong which was or could have been alleged by either party, or (c) any violation of any law or regulation. This Standstill Agreement shall not be introduced by any party in any proceeding for any purpose, other than to enforce its terms.

7. <u>Amendments In Writing</u>. Any amendment or modification of any provision of this Standstill Agreement must be in writing.

8. <u>Governing Law and Venue</u>. This Standstill Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, without reference to choice of laws principles. All disputes arising hereunder shall be resolved by the United States District Court for the Southern District of New York, or by the Supreme Court Of The State of New York, County of New York if federal jurisdiction is determined to be lacking.

9. <u>Counterparts</u>. This Standstill Agreement may be executed in any number of counterparts and each such counterpart shall be deemed to be an original. Any party which transmits an executed copy of this Standstill Agreement by facsimile machine or e-mail shall promptly provide the other party with a copy of this Standstill Agreement that includes an original signature.

10. <u>Confidentiality</u>. This Standstill Agreement, including its existence, and any information provided by either party to the other for the purpose of settlement discussions shall be treated with the utmost confidence and shall not be disclosed by the recipient to any other person or entity except in the following circumstances:

JONES VARGAS
3773 Howard Hughes Parkway · Third Floor South
Las Vegas, Nevada 89109
Tel: (702) 862-3300   Fax: (702) 737-7705

3

1    a)    As required by law;

2    b)    By written consent of the disclosing party; or

3    c)    As necessary for any accounting or tax purposes.

4         In addition, neither party shall seek to publicize anything about the Action during the

5    Settlement Period.

6         IN WITNESS WHEREOF, the parties have executed this Standstill Agreement as of the date

7    set forth on page one hereof.

8    ALBRIGHT, STODDARD, WARNICK &          JONES VARGAS
     ALBRIGHT
9

10

11   By: G. MARK ALBRIGHT, ESQ.             By: GARY R. GOODHEART, ESQ.
     Nevada Bar No. 001394                  Nevada Bar No. 001203
12   801 South Rancho Dr., Suite D-4        3773 Howard Hughes Parkway
     Las Vegas, NV 89106                    Third Floor South
13   (702) 384-7111                         Las Vegas, NV 89109
                                            (702) 862-3330
14   DAVID R. MARKHAM, ESQ.
     BLUMENTHAL & MARKHAM
15   2255 Calle Clara                       DAVID LEICHTMAN, ESQ.
     La Jolla, CA 92037                     MORGAN, LEWIS & BOCKIUS LLP
16   (858) 551-1223                         101 Park Avenue
                                            New York, New York 10178-0060
17   Attorneys for Plaintiff Bovee & Thill LLC   (212) 309-6000
                                            admitted pro hac vice
18

19                                          Attorneys for Defendants Pearson Education,
                                            Inc. and Prentice-Hall, Inc.
20

21

22

23

24

25

26

27

28

4

EXHIBIT A

**UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA**

-------------------------------------------------------X

BOVEE & THILL LLC, a Nevada limited liability company,

               Plaintiff,

v.

PEARSON EDUCATION, INC., a Delaware corporation, and PRENTICE-HALL INC., a Delaware corporation,

               Defendants.

:
:
:
:
:
:
:
:
:
:
:
:

CV-S-05-0940-JCM-PAL

-------------------------------------------------------X

**STIPULATION OF VOLUNTARY DISMISSAL AND ORDER THEREON**

    Pursuant to Fed. R. Civ. P. 41(a)(1), the parties hereby stipulate that all claims which were raised or could have been raised in this action shall be dismissed without prejudice.

ALBRIGHT, STODDARD, WARNICK & ALBRIGHT

By:  G. MARK ALBRIGHT, ESQ.
Nevada Bar No. 001394
801 South Rancho Dr., Suite D-4
Las Vegas, NV 89106
(702) 384-7111

DAVID R. MARKHAM, ESQ.
BLUMENTHAL & MARKHAM
2255 Calle Clara
La Jolla, CA 92037
(858) 551-1223

Attorneys for Plaintiff Bovee & Thill LLC

JONES VARGAS

By:  GARY R. GOODHEART, ESQ.
Nevada Bar No. 001203
3773 Howard Hughes Parkway
Third Floor South
Las Vegas, NV 89109
(702) 862-3330

DAVID LEICHTMAN, ESQ.
MORGAN, LEWIS & BOCKIUS LLP
101 Park Avenue
New York, New York 10178-0060
(212) 309-6000
*admitted pro hac vice*

Attorneys for Defendants Pearson Education, Inc. and Prentice-Hall, Inc.

*(left margin, rotated text)* JONES VARGAS  3773 Howard Hughes Parkway - Third Floor South  Las Vegas, Nevada 89109  Tel: (702) 862-3300  Fax: (702) 737-7705

1    SO ORDERED.                    Dated: Nov 18 2005

2

3

4                                  UNITED STATES DISTRICT JUDGE

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

JONES VARGAS
3773 Howard Hughes Parkway · Third Floor South
Las Vegas, Nevada 89109
Tel: (702) 862-3300  Fax: (702) 737-7705

2

ORIGINAL

_FILED    _RECEIVED
_ENTERED _SERVED ON
COUNSEL/PARTIES OF RECORD

EXHIBIT A

2005 OCT 27  P  UNITED STATES DISTRICT COURT
                     DISTRICT OF NEVADA

CLERK US DISTRICT COURT
DISTRICT OF NEVADA

BY:                    DEPUTY

| FILED          RECEIVED |
| ENTERED        SERVED ON |
| COUNSEL/PARTIES OF RECORD |

NOV - 3 2005

CLERK US DISTRICT COURT
DISTRICT OF NEVADA

BY:                    DEPUTY

-----------------------------------------X

BOVEE & THILL LLC, a Nevada limited liability
company,

                    Plaintiff,                    CV-S-05-0940-JCM-PAL

v.

PEARSON EDUCATION, INC., a Delaware
corporation, and PRENTICE-HALL INC., a
Delaware corporation,

                    Defendants.

-----------------------------------------X

## STIPULATION OF VOLUNTARY DISMISSAL AND ORDER THEREON

Pursuant to Fed. R. Civ. P. 41(a)(1), the parties hereby stipulate that all claims which were raised or could have been raised in this action shall be dismissed without prejudice.

ALBRIGHT, STODDARD, WARNICK &
ALBRIGHT

By: G. MARK ALBRIGHT, ESQ.
Nevada Bar No. 001394
801 South Rancho Dr., Suite D-4
Las Vegas, NV 89106
(702) 384-7111

DAVID R. MARKHAM, ESQ.
BLUMENTHAL & MARKHAM
2255 Calle Clara
La Jolla, CA 92037
(858) 551-1223

Attorneys for Plaintiff Bovee & Thill LLC

JONES VARGAS

By: GARY R. GOODHEART, ESQ.
Nevada Bar No. 001203
3773 Howard Hughes Parkway
Third Floor South
Las Vegas, NV 89109
(702) 862-3330

DAVID LEICHTMAN, ESQ.
MORGAN, LEWIS & BOCKIUS LLP
101 Park Avenue
New York, New York 10178-0060
(212) 309-6000
*admitted pro hac vice*

Attorneys for Defendants Pearson Education,
Inc. and Prentice-Hall, Inc.

JONES VARGAS
3773 Howard Hughes Parkway - Third Floor South
Las Vegas, Nevada 89109
Tel: (702) 862-3300    Fax: (702) 737-7705

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

12

1    SO ORDERED.                              Dated: Nov. 1, 2005

2

3

4                                            UNITED STATES DISTRICT JUDGE

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

JONES VARGAS
3773 Howard Hughes Parkway - Third Floor South
Las Vegas, Nevada 89109
Tel: (702) 862-3300  Fax: (702) 737-7705

2

# EXHIBIT D

## CONSTANTINE | CANNON

**Wendy M. Rogovin**
Attorney at Law
212-350-2742
wrogovin@cpny.com

NEW YORK | WASHINGTON

May 8, 2006

**BY HAND**

David Leichtman
Partner
Morgan, Lewis & Bockius LLP
101 Park Avenue
New York, NY 10178-0060

Re:    <u>Bovee & Thill v. Pearson</u>

Dear David:

Bovee & Thill LLC ("B&T") does not intend to further extend the Standstill Agreement between B&T and Pearson Education, Inc. and Prentice-Hall, Inc. (the "Pearson Parties").  The Fourth Extension of the Standstill Agreement will expire on May 19, 2006.

Yours truly,

Wendy M. Rogovin

cc:    John Thill

75079.1

# EXHIBIT E

# *A*uthor Agreement

AN AGREEMENT made between <u>Courtland L. Bovee</u>, a citizen of <u>the U.S.</u>
whose address is:
2950 East Flamingo Rd. Suite B
Las Vegas, Nevada 89121
and
<u>John V. Thill</u> a citizen of the U.S.
whose address is:
2950 East Flamingo Rd. Suite B
Las Vegas, Nevada 89121
(the "Author") and

PRENTICE-HALL, INC. (the "Publisher") with offices at One Lake Street, Upper Saddle River, New Jersey 07458
on <u>April 18.1997</u>.

THE AUTHOR AND THE PUBLISHER AGREE THAT

*Grant of Rights*  1.  The Author has prepared the First through Fourth Editions of a work currently entitled <u>BUSINESS COMMUNICATION TODAY</u> and will prepare the Fifth and any subsequent editions of such work for publication (all editions shall hereinafter be referred to collectively as the "Work" ).  The Author grants this Work and assigns solely and exclusively to the Publisher all rights in the Work throughout the world, in all languages for the full term of copyright and all renewals and extensions thereof.  This grant includes, but is not limited to, the exclusive right to print, publish and sell the Work, under the Publisher's own name and under other imprints or trade names; to secure copyright in the Author's name which shall not affect the grant of rights to the Publisher hereunder; to use the Work as a basis for derivative works in all formats and by all media; and to license others to exercise any and all rights in and to the Work.

*Delivery of Manuscript*  2.  The Author agrees to prepare a Fifth Edition of the Work, containing about <u>304,200</u> words or their equivalent, which will be delivered by the Author to the Publisher by April ___,1997. The Publisher and the Author agree that the Work will consist of approximately <s>676</s> printed book pages.
768

*Royalties*  3.  The Publisher will pay the Author a royalty on sales of the Work, except as otherwise provided in Paragraph I, based on the net cash received by the Publisher from sales of the Work of <u>18 3/4%</u>

*Payments*  4.  The Publisher will report on the sale of the Work by March 31 and September 30 of each year for the six-month period ending in December and June of each year respectively.  With each report of sales, the Publisher will make settlement for any balance due.

*Entire Agreement*  5.  Paragraphs A-X inclusive are parts of this Agreement as though placed before the signatures.

552 - 62 - 0095
U.S. Taxpayer Identification No.

395 - 52 - 7398
U.S. Taxpayer Identification No.

_____
Author

_____
Author

*PRENTICE HALL, INC.*

by _____

NJ32618.1

*Submission of*
*Work/Changes*
*in Proofs*

A. (i)   The Author will deliver the Fifth and any subsequent editions of the Work in hard copy form, double-spaced on 8 1/2" X 11" sheets on one side only, and, if the Publisher and the Author agree in writing, in electronic or other format. The Author will retain a complete duplicate copy of the Work. The Work will be of such content, form, and length as the Publisher is willing to publish.

(ii)   If the Author is unable or unwilling to deliver the Fifth Edition of the Work on time or if the Fifth Edition of the Work is not acceptable to the Publisher, in its editorial and marketing judgment, in length, form or content, the Publisher may elect either to (a) terminate the Agreement and recover from the Author any and all monies paid to or on behalf of the Author in connection with the Work or (b) have the Fifth and any subsequent editions of the Work prepared by others and charge the cost, including, without limitation, fees and royalties, against any amounts otherwise due the Author including, without limitation, the Author's royalties. In such event, the Author will receive no less than 50% of the royalties that would otherwise be due to the Author on the sale of the first such revised edition, 25% of such royalties on the second such revised edition, and 15% of such royalties on the third such revised edition. The Author shall not be entitled to receive royalties on any such subsequent revised editions of the Work. The Author may not have the Work published elsewhere unless and until the Publisher terminates this Agreement, the Author repays all monies paid to or on behalf of the Author in connection with the Work, and the Publisher expressly reverts all rights in the Work to the Author.

(iii)   The Author will read and correct the proofs and promptly return one set to the Publisher. If the Author   has not returned a corrected proof of the Work to the Publisher within a reasonable time period to be specified by the Publisher at the time the material is sent to the Author for correction, such material will be considered approved as is. The Author will be responsible for the completeness and accuracy of corrections and will bear the costs of alterations in the proofs (other than those resulting from printer's errors) exceeding 15% of the cost of typesetting. These costs will be deducted from payments otherwise due the Author.

*Items Furnished*
*by the Author*

B.   The Author is responsible for furnishing the following items as part of the Fifth and any subsequent editions of the Work: title page; preface; foreword (if any); table of contents; index; and suggestions and drafts for all photographs, illustrations and other art (collectively, "art work"). The Publisher will be responsible for obtaining the photographs or for the preparation of the illustrations for illustrating the Fifth and any subsequent edition of the Work. As between the Publisher and the Author, the Publisher shall possess the rights in and to such art work, without any restrictions, reservations or limitations whatsoever. The Author shall not have any right or interest in such art work before or after termination of the Agreement.

At Publisher's request, the Author will also prepare and furnish to the Publisher, within a reasonable time from such request, any instructional aids and other ancillary materials for the Fifth and any subsequent editions of the Work, including, up to the equivalent of five pages of content for a web site that relates to, or is on the same or similar subject as, the Work (collectively, the "Ancillaries"). The Publisher will bear the cost of manufacturing any Ancillaries. If the Author fails to deliver any requested Ancillaries (including the web site content) to the Publisher within the time specified, the Publisher may have such items prepared and charge the costs of preparation against any sums otherwise due to the Author under this Agreement or otherwise.

The Author hereby assigns and transfers to the Publisher all of rights, title and interest in any and all art work and any and all Ancillaries contained within the Work.

NJ32618.1

*The Author's Warranty*   C.   (i) The Author warrants that the Author (a) has full authority to make this Agreement; (b) that the Work will be original; (c) that the Fifth Edition of the Work has not been published; (d) that the Author is the sole owner of the Work and has full power and authority to copyright it (except for material in the public domain or material for which permission has been obtained from the copyright owner); (e) that the Work will not infringe any copyright, violate any property rights, or contain any scandalous, libelous, or unlawful matter or any formula or instruction that is inaccurate or injurious to the user, (f) that nothing set forth in the Settlement Agreement and General Release dated January 6, 1997 ("Settlement Agreement") or any other document limits or restricts in any way the rights granted or assigned to the Publisher hereunder; (g) no disposition of rights in the Work have been made or approved or are still effective: (h) no third party, including, without limitation, McGraw-Hill, Inc. has, or will have, the right to dispose of any copies of the Work (including, without limitation, bound or unbound copies of the Work), except by destruction or purchase by the Publisher, or to exercise any other rights, or to license any rights, in the Work; (i) the Author is not a party to, subject to, or bound by, any judgment, injunction or decree of any agreement or court or government authority which may restrict or interfere with the performance of this Agreement; (j) the Author is the sole proprietor of the Work, none of which is in the public domain;(k) all permissions required for any copyrighted materials contained in the Work have been obtained from the copyright proprietors of such materials, all permissions fees have been paid and all permissions are assignable to the Publisher; (l) all expenses related to the Items (as defined in paragraph R) have been fully paid; (m) except for those that were the subject of the Settlement Agreement, there have not been, nor are there now, any demands, actions, suits, claims, proceedings inquiries or investigations pending or threatened with respect to the Work, at law or in equity, nor does the Author know of any facts which would provide a justifiable basis for any such demand, action, suit, claim, proceeding , investigation or inquiry; (n) other than the Settlement Agreement, there are no orders, judgments or decrees of any United States or foreign, federal, state or local court or governmental authority or agency which apply to the Work; (o) other than any notice required to be sent to third parties to obtain the Items (as defined in paragraph R), no approval or consent of any person or entity is needed which has not been obtained, and no notice to any person or entity is required to be sent, in order to execute this Agreement and perform its obligations; (p) except as specifically set forth in this Agreement, there are no obligations to pay any monies, including, without limitation, royalties in connection with the Work.

(ii) The Author will indemnify and hold harmless the Publisher against all claims, suits, costs, damages, and expenses, including reasonable attorneys' fees, that the Publisher may sustain or incur by reason of any breach or alleged breach of the foregoing warranties. The Publisher will have the right to assume and control the defense of any and all claims, and until a claim or suit has been settled or withdrawn, the Publisher may withhold any sums due the Author under this Agreement. The Author will cooperate with the Publisher and provide reasonable assistance in defending against any such claim.

(iii) Notwithstanding the foregoing sentence, except as set forth in paragraph C (iv), in the event a claim is brought by a third party against the Publisher for which the Publisher is entitled to indemnification, the Publisher agrees to be responsible for the first $5,000 in Costs. The Author shall be responsible for all Costs in excess of $5,000. As used herein, "Costs" shall mean all judgments, settlements, and costs of defense, including reasonable attorneys' fees and other costs of such claim.

(iv) The terms set forth in paragraph C(iii) shall not apply to any and all claims, suits, costs, damages, and expenses, including reasonable attorneys' fees, that the Publisher may sustain or incur by reason of any breach or alleged breach of the warranties set forth in paragraph (c) (i)(k) or the inclusion of third party materials in the Fourth Edition of the Work, all of which the Author shall be entirely responsible for as set forth in paragraph C(ii).

(v) The warranties and indemnities contained in this paragraph will survive termination of this Agreement.

*Copyrighted Material*   D.   The Author will not include in the Fifth and any subsequent editions of the Work material from other copyrighted works without both the Publisher's consent and the written consent of the owner of such copyrighted material. The Publisher will be responsible, in connection with each edition, for obtaining the

written consents and for paying permission fees in an amount not to exceed an aggregate of $7,500. The Publisher will pay on the Author's behalf the permission fees which exceed $7,500 and will recover such amounts so paid from amounts otherwise payable to the Author under this Agreement or otherwise.

*Editing*   E.   The Publisher will have the right to edit the Work for the first printing and for any reprinting, provided that the meaning of the text is not materially altered.

*Publishing Details*   F.   After acceptance of the manuscript, the Publisher will have the right to make final determinations concerning publication and marketing of the Work based upon editorial and marketing concerns, including selecting suitable styles of paper, printing, and binding, and fixing for altering the title, cover content, and presentation, and price and other terms of sale. The Publisher agrees to consult with the Author in connection with the preparation of the interior and cover design of the book version of the Work, provided that the Publisher shall have the right to make the final determinations in connection therewith. The Publisher may display the name and likeness of the Author on the Work and in any promotional materials used to market the Work.

*Author's Copies*   G.   The Publisher will furnish fifty copies of the Work to the Author without charge. Additional copies may be purchased at the Publisher's net price. The Author shall not resell the copies provided or purchased hereunder.

*Revisions*   H.   The Author agrees to revise the Work as requested by the Publisher if the Publisher considers it in the best interests of the Work. Except as expressly set forth herein, the provisions of this Agreement shall apply to each revision of the Work by the Author as though that revision were the Work being published for the first time under this Agreement. If, in the Publisher's reasonable judgment, the Author is unable or unwilling to provide a satisfactory revision within the time period established by the Publisher, the Publisher may have such revision (and any subsequent revisions) prepared and charge the cost, including, without limitation, fees or royalties, against the Author's royalties. The Publisher agrees to consult with the Author about the time period in which the revision must be provided, although the Publisher shall have the right to make the final determination in connection therewith. In the event the Publisher has a revision prepared by another or others as set forth herein, the Author will receive no less than 50% of the royalties that would otherwise be due to the Author on the sale of the first such revised edition, 25% of such royalties on the second such revised edition, and 15% of such royalties on the third such revised edition. The Author shall not be entitled to receive royalties on any such subsequent revised editions of the Work. The Publisher reserves the right to display the Author's name and the name of the person or persons who revise the Work in revised editions of the Work and in promotional materials.

*Additional Royalty Provisions*   I.   (a)   The rights granted to the Publisher under this Agreement include, but are not limited to, the following subsidiary rights: publishing in all languages; broadcasting by radio; making audio and video recordings; publishing book club editions; making foreign or other adaptations or derivative works and other versions; inclusion in anthologies; showing by motion picture or by television; syndicating, quoting, and otherwise utilizing the Work; and material based on the Work ("Subsidiary Rights"). The Publisher shall pay the Author royalties as follows on the exercise of Subsidiary Rights:

   (i) If the Publisher itself exercises a Subsidiary Right in the Work, 10% of the net cash received from such use.
   (ii) If the Publisher licenses any of the Subsidiary Rights, 50% of the net amount of royalty compensation received from such license.

The Publisher may itself exercise any Subsidiary Right without compensation to the Author and may license such use by others without compensation to the Author if, in the Publisher's judgment, such use may benefit sales of the Work and the Publisher does not charge for such use.

(b) On copies of book versions of the Work or sheets sold by the Publisher outside the United States, the Publisher will pay the Author a royalty of 10% of the net cash received by the Publisher from such sales.

(c) On copies of book versions of the Work sold by mail order or coupon advertising direct to the consumer, or by radio or television; on copies sold by any means at a discount of 50% or greater off the single copy price, the Publisher will pay the Author a royalty of 5% of the net cash received from such sales.

*15%*

(d) On copies of book versions of the Work sold through any of the Publisher's subsidiaries, or to elementary and secondary schools and school districts, the Publisher will pay the Author a royalty of 15% of the net cash received from such sales.

(e) If the Publisher packages or sells the entire Work or any part of the Work together with other products or as a segment of another product, in determining the net price of the Work for purposes of calculating royalty payments, the Publisher will allocate to the Work that portion of the proceeds of the sale which it determines to be the Work's fair value to the entire product sold.

(f) If the Publisher sells any stock of the Work at a price below manufacturing cost plus royalties, no royalties shall be paid.

(g) If the balance due the Author for any settlement period is less than fifty dollars, the Publisher will make no accounting or payment until the next settlement period at the end of which the cumulative balance has reached fifty dollars. If, after the expiration of two years following publication, the sales in any calendar year do not exceed a total of 500 copies, the royalty on such sales shall be one-half the stipulated royalty, this reduction in royalty being agreed upon to enable the Publisher to keep the Work in print as long as possible.

(h) The Publisher may deduct from any funds due the Author, under this or any other agreement between the Author and the Publisher, any sum that the Author may owe the Publisher under this or any other agreement.

(i) The Publisher will maintain relevant records with respect to any royalty statement provided to the Author under the Agreement for a two year period from the date of the statement. Royalty statements will be final and binding upon the Author unless, within two years from the date of the statement, the Author objects to such statement in a writing which states the specific objection and the basis for such objection. The Author, at the Author's expense, may review such records no more than once each calendar year at a mutually convenient time to the Author and the Publisher, during regular business hours, for the purpose of verifying the accuracy of such royalty statement. The Author agrees to keep confidential all information relating to the business affairs of the Publisher and to impose such obligation on the Author's representatives.

*Discontinuing*
*Manufacture*

J. When the Publisher decides that the public demand for the Work no longer warrants its continued publication in a format or medium, the Publisher may discontinue or suspend such publication, and destroy such format or medium of the Work without liability to the Author, and without prejudice to any license or other arrangement. If the Publisher ceases to publish the Work in all formats and media and does not publish the Work in any format or medium, now known or hereafter known, within six months of the Author's written request for the Publisher to publish the Work, this Agreement will terminate and the Publisher will revert to the Author all rights granted to the Publisher herein by the Author (except as to the art work prepared or obtained at the Publisher's expense, which shall remain the property of the Publisher for its own use and benefit), subject to the Publisher's right to sell-off or otherwise dispose of any inventory of the Work and to all licenses previously granted.

**Competing Publications**  K.  During the term of this Agreement the Author will not agree to publish or furnish to any other publisher any work on the same subject which, in the Publisher's judgment, will conflict or interfere with the sale of the Work.

**Amendments and Waivers**  L.  This Agreement constitutes the entire understanding of the parties relating to its subject matter and shall not be changed or amended, in whole or in part, except in a writing signed by the parties. No course of dealing between the Publisher and the Author and no delay or failure of a party in exercising any rights hereunder shall operate as a waiver of that party's rights.

**Construction, Heirs**  M.  This Agreement shall be construed and interpreted according to the laws of the State of New York as if executed and fully performed therein, and exclusive jurisdiction over all disputes hereunder shall be in the federal and state courts of the State of New York located in New York County. This Agreement shall be binding upon the parties hereto, their heirs, successors, assigns, and personal representatives; and references to the Author and to the Publisher shall include their heirs, successors, assigns, and personal representatives. The Author may not delegate any duty hereunder without the prior written consent of the Publisher.

**Joint Authors**  N.  For purposes of this Agreement, whenever the term "the Author" refers to more than one person, all such persons are collectively referred to as the "Author." Unless otherwise indicated in this Agreement, the rights and liabilities of the Author are joint and several. Further, whenever the term "the Author" refers to more than one person, those persons will be deemed to share equally in the grants, advances, royalties and expenses arising under this Agreement, until written notice to the contrary, signed by each person referred to as "Author" under this Agreement, has been actually received by the Publisher. The Publisher may exercise any or all of its rights and remedies with respect to the authors individually or collectively. Any one Author (and an alternate) may be designated under this Agreement to act on behalf of all the Authors jointly, and the Publisher may rely on the acts of the Author or the alternate so designated as representative of and binding upon all the Authors. In the absence of such designation, the Publisher may deal with any one of the Authors as the agent and representative of all, and may rely on the acts of such as representative as binding on all the Authors. Any such designation may be modified only upon written notice to the Publisher, signed by each person referred to as "Author" under this Agreement.

**Electronic Versions**  O.  The rights granted to the Publisher under this Agreement include (in addition to all other rights described herein) the right to prepare, publish, reproduce, sell and otherwise distribute electronic versions of the Work. As used herein, the term "electronic versions" shall mean any and all methods of copying, recording, storage, retrieval, or delivery of all or any portion of the Work, alone or in combination with other works, including in any multimedia work or electronic book; by any means now known or hereafter devised, including, without limitation, by electronic or electromagnetic means, or by analog or digital signal; whether in sequential or non-sequential order, on any and all physical media, now known or hereafter devised including, without limitation, magnetic tape, floppy  disks, CD-I, CD-ROM, laser disk, optical disk, IC card or chip, and any other human or machine readable medium, whether or not permanently affixed in such media (excluding the electronic versions specifically described in paragraph I (a)); and the broadcast and/or transmission of the foregoing by any and all means now known or hereafter devised.

The Publisher shall pay the Author royalties as follows on the electronic versions:

    (i)  If the Publisher itself creates and sells that electronic version, 18% [_15%_] of the net cash received from such use.

    (ii)  If the Publisher licenses the right to create and sell the electronic version, 50% of the net amount of royalty compensation received from such license.

P.  <u>Grant</u>.  The Publisher agrees to pay the Author a grant in the amount of $400,000, upon the written request of the Author, subject to the following payment schedule and terms and conditions. The terms of

this paragraph regarding the payment of the grant shall not apply to any revised, subsequent or new editions of the Work.

(i) $150,000 upon execution of this Agreement by the Author and the Publisher and the delivery of all of the Items (as defined in paragraph R) to the Publisher as set forth herein.

(ii) $100,000 on or about January 31, 1998.

(iii) $100,000 on or about June 1, 1999.

(iv) $50,000 on or about June 1, 2000.

Q.  Advance.  The Publisher agrees to pay the Author an advance in the amount of $100,000, on or about June 1, 2000.  The amount of the advance shall be fully recoverable by the Publisher from any amounts otherwise due the Author.  The terms of this paragraph regarding the payment of the advance shall not apply to any revised, subsequent or new editions of the Work.

R.  Delivery of Items.  Upon execution of this Agreement by the Author and the Publisher, the Author shall deliver to the Publisher, at the address or location designated by the Publisher, at the Authors expense, the items relating to the Work and to the Study Guide, Instructor's Manual, Text Banks, Videocassette, and Overhead Transparencies (collectively, the "Supplementary Materials"), all as set forth in subparagraphs (i) through (vi) below (collectively, the "Items").  The Author hereby assigns and transfers to the Publisher all of rights, title and interest in any and all Supplementary Materials (including, without limitation, a transfer of all copyrights) and any and all trademarks relating to the Work and Supplementary Materials, except for the McGraw Hill marks ("Trademarks").  The terms and conditions set forth in paragraphs B and C of this Agreement shall apply with equal force and effect to the Supplementary Materials and the Trademarks as if the words "Supplementary Materials" and "Trademarks" were substituted therein for the word "Work".

one (1)
(i)  With respect to the Work: ~~two (2)~~ copies of the Work; 4/c Film RRED Negatives for the text and cover; book blues or Ekta prints (or equivalent 4/c film proof) for the text; film proofs for the cover; electronic files for the text and cover; all permission files, including but not limited to, all contracts, agreements, licenses, instruments, understandings and other legally binding arrangements with third party copyright owners whose material is included in the Work; copyright records; supplier lists; "adoption" lists and any other similar files and records; and any and all other contracts, agreements, licenses, instruments, understandings, and other legally binding arrangements arising from or related to the Work and the Supplements (including, without limitation, all unfilled customer orders, and contracts with Publishers, licensees and other third parties with respect to the exploitation or disposition of rights in and to the Work including translation rights and other subsidiary rights).

(ii)  With respect to the Study Guide: ~~two (2) copies of the Study Guide~~; electronic files or camera ready copy or film for the Study Guide; all permission files, including but not limited to, all contracts, agreements, licenses, instruments, understandings and other legally binding arrangements with third party copyright owners whose material is included in the Study Guide; and copyright records.

(iii)  With respect to the Instructor's Manual: ~~two (2) copies of the Instructor's Manual~~; electronic files or camera ready copy or film for the Instructor's Manual; all permission files, including but not limited to, all contracts, agreements, licenses, instruments, understandings and other legally binding arrangements with third party copyright owners whose material is included in the Instructor's Manual; and copyright records.

one (1)
(iv)  With respect to the Test Banks: ~~two (2)~~ copies of each version of the computerized Text Bank and ~~two (2)~~ copies of the printed Test Bank; masters for each version of the computerized Test Bank and electronic files or camera ready copy or film for the printed Test Bank; all permission files, including

but not limited to, all contracts, agreements, licenses, instruments, understandings and other legally binding arrangements with third party copyright owners whose material is included in the computerized or printed Test Banks; and copyright records.

(v) With respect to the Videocassette: ~~two (2) copies of the Videocassette,~~ master for the Videocassette; all permission files, including but not limited to, all contracts, agreements, licenses, instruments, understandings and other legally binding arrangements with third party copyright owners, artists, talent, and other performers whose material, image, performance, or voice is included in the Videocassette; and copyright records.

(vi) With respect to the Overhead Transparencies: ~~two (2)~~ one (1) copies of each Overhead Transparency; electronic files or camera ready copy or film for the Overhead Transparencies; all permission files, including but not limited to, all contracts, agreements, licenses, instruments, understandings and other legally binding arrangements with third party copyright owners whose material is included in the Overhead Transparencies; and copyright records.

In the event the Author shall fail to deliver any or all of the Items to the Publisher, at such location or address designated by the Publisher, upon execution of this Agreement by the Parties, the Author shall not receive, and the Publisher shall have no obligation to make the payments described in paragraph (P) (i) of both this Agreement and the Agreement dated April 18,1997 between the Author and the Publisher covering the work entitled <u>Excellence in Business Communication</u> ("Excellence Contract"), thereby reducing the total amount of the grant payable to the Author under this Agreement and the Excellence Contract by $300,000 ($150,000 under this Agreement and $150,000 under the Excellence Contract).

S. <u>Other Works</u>. The Author hereby grants to the Publisher a right of first refusal with respect to any new ✱ works created by the Author, or each of them, whether with or without the cooperation or assistance of a third party (the "New Work(s)"). The Author shall offer each New Work to the Publisher in writing, at the earliest time reasonable, in the form of a detailed proposal. The Publisher shall have ninety days from its receipt of such written proposal to consider it and communicate to the Author the rights, if any it wishes to acquire. If the Publisher notifies the Author in writing that it desires to acquire rights to the New Work, the Author shall negotiate exclusively and in good faith with the Publisher, for a period of no less than ninety days from the Authors receipt of such written notice, commercially reasonable terms for the Publisher's acquisition thereof. In the event that, following such ninety-day period, the Publisher determines that it does not wish to acquire rights to the New Work or the Author and the Publisher are unable to agree upon the terms of an agreement, the Author may offer the New Work to a third party, subject to the terms of paragraph K of this agreement, provided that the terms made available to the third party are not more favorable to such third party than those made available to the Publisher. If the Author does desire to enter into an agreement on terms more favorable to such third party, The Author shall submit such terms to the Publisher and the Publisher shall have a right, but not an obligation, to match with respect thereto.

T. <u>Inventory</u>. The Publisher agrees to purchase from McGraw-Hill the Then-Current Inventory of the Fourth Edition of the Work, at their Printing Invoice Cost, provided that the Publisher shall have the right to recover the Total Cost of such purchase from any royalties otherwise due the Author. The Author acknowledges and agrees that the Publisher shall have the right to dispose of such Inventory in any manner it sees fit (including without limitation by destruction), provided that the name and mark of McGraw-Hill on the outside cover or jacket of the book version of the Fourth Edition of the Work is covered or not otherwise displayed to customers As used herein, "Then-Current Inventory" shall mean McGraw-Hill's inventory of the book version of the Fourth Edition of the Work, as of the date of execution of this Agreement, that is in saleable condition; "Printing Invoice Cost" shall mean the actual invoiced printing cost for the printing of each unit of the book version of the Work; and "Total Cost" shall mean the Printing Invoice Cost for all of the Then-Current Inventory of the Fourth Edition of the Work plus the costs associated with transporting such Inventory from a McGraw-Hill location to a location designated by the Publisher including, without limitation, shipping, handling and insurance costs.

✱ post-secondary education market

U. Returns. The Author shall obtain McGraw-Hill's binding agreement that McGraw-Hill will promptly destroy any and all of its inventory of the Work not purchased by the Publisher including, without limitation, any and all returns that McGraw-Hill may receive following the Publisher's purchase of the Then-Current Inventory. If McGraw-Hill refuses to enter into such binding agreement, the Author shall petition a court of competent jurisdiction to require McGraw-Hill to do so.

V. Future Orders. The Author will require McGraw-Hill to provide prompt notice to any individual, entity, potential adopter, retailer or wholesaler or other potential customer ("Customer") that inquires about obtaining a complimentary copy of the Work or any Supplementary Materials or placing an order therefor that such Customer should contact the Publisher's Faculty and Field Services at (800)526-0485 to do so.

W. Mailing List. Upon execution of this Agreement, the Author will provide to the Publisher all of the names contained on McGraw-Hill's internal Bovee-Thill business communication update newsletter mailing list

X. Newsletter. If the Publisher, in its reasonable judgment, believes it is a productive use of resources, it will publish a newsletter about the Work no more than two time each year in form, content and length determined by the Publisher, in its discretion.

Y. Overnight Mail. If the Publisher requests that the Author deliver materials due under this Agreement via overnight carrier, the Publisher agrees to reimburse the Author such expense, upon receipt of adequate documentation evidencing such expenditure.

AMENDMENT
TO THE AGREEMENT
DATED APRIL 18, 1997

This Amendment, dated as of November 18, 2002, between PEARSON EDUCATION, INC. (the "Publisher"), publishing as Prentice Hall and Bovee & Thill, LLC (the "Author") will serve to amend the agreement between the Publisher and the Author dated April 18, 1997 (the "Agreement") for the preparation and publication of the work entitled *Business Communication Today* (the "Work").

Whereas the Publisher and the Author are parties to the Agreement for the preparation and publication of the Work; and

Now Therefore, in consideration of the mutual premises and other good and valuable consideration, the receipt of which is hereby acknowledged, the parties hereby agree and the Agreement is hereby amended as follows:

1.    Capitalized terms used herein and not otherwise defined shall have their respective meanings specified in the Agreement.

2.    Pursuant to Paragraph Q of the Agreement, the parties acknowledge and agree that the Publisher paid, and the Author received, an advance in the amount of $100,000 (the "Advance"). Notwithstanding anything set forth in the Agreement to the contrary, the Publisher hereby agrees that it will recover the Advance from amounts otherwise payable to the Author in connection with the Seventh Edition of the Work ("Seventh Edition"); *provided, however*, that if, within the three-year period immediately following the Publisher's initial publication of the Seventh Edition, the Publisher has not so recovered the total amount of the Advance, the Publisher shall have the right to recover, in addition to any other amounts recoverable by the Publisher pursuant to the Agreement, that portion of the Advance that has not been recovered from any amounts otherwise payable to the Author in connection with the Agreement (including, but not limited to, other editions of the Work) or any other agreement between the parties. The parties acknowledge and agree that in order to implement the terms of this Paragraph 2, the Publisher has repaid, and the Author has received, the sum of $53,080.95 (the "Re-stored Advance"), which constitutes the amount of the Advance recovered by the Publisher from sources other than the Seventh Edition, which Restored Advance shall be recoverable by the Publisher pursuant to the terms of this Paragraph 2.

3.    Except as set forth herein, the terms and conditions of the Agreement shall remain in full force and effect and each party hereto agree to be bound to the terms thereof.

IN WITNESS WHEREOF, the parties hereto have executed this Amendment as of the day and year first above written.

PEARSON EDUCATION, INC.

By: _____
Title: _____ EIC _____

BOVEE & THILL, LLC

By: _____
Title: _President_____

By: _____
Title: _Vice President_____

1076613

# EXHIBIT F

# *A*uthor Agreement

AN AGREEMENT made between <u>Courtland L. Bovee</u>, a citizen of <u>the U.S.</u>
whose address is:
2950 East Flamingo Rd. Suite B
Las Vegas, Nevada 89121
and
<u>John V. Thill</u> a citizen of the U.S.
whose address is:
2950 East Flamingo Rd. Suite B
Las Vegas, Nevada 89121
(the "Author") and

PRENTICE-HALL, INC. (the "Publisher") with offices at One Lake Street, Upper Saddle River, New Jersey 07458
on <u>April 18,1997</u>.

### THE AUTHOR AND THE PUBLISHER AGREE THAT

*Grant of Rights*  1.  The Author has prepared the First through Third Editions of a work currently entitled **EXCELLENCE IN BUSINESS COMMUNICATION** and will prepare the Fourth and any subsequent editions of such work for publication (all editions shall hereinafter be referred to collectively as the "Work"). The Author grants this Work and assigns solely and exclusively to the Publisher all rights in the Work throughout the world, in all languages for the full term of copyright and all renewals and extensions thereof. This grant includes, but is not limited to, the exclusive right to print, publish and sell the Work, under the Publisher's own name and under other imprints or trade names; to secure copyright in the Author's name which shall not affect the grant of rights to the Publisher hereunder; to use the Work as a basis for derivative works in all formats and by all media; and to license others to exercise any and all rights in and to the Work.

*Delivery of Manuscript*  2.  The Author agrees to prepare a Fourth Edition of the Work, containing about <u>232,200</u> words or their equivalent, which will be delivered by the Author to the Publisher by **December 15, 1997**. The Publisher and the Author agree that the Work will consist of approximately ~~510~~ printed book pages.
608

*Royalties*  3.  The Publisher will pay the Author a royalty on sales of the Work, except as otherwise provided in Paragraph I, based on the net cash received by the Publisher from sales of the Work of <u>18 3/4%</u>

*Payments*  4.  The Publisher will report on the sale of the Work by March 31 and September 30 of each year for the six-month period ending in December and June of each year respectively. With each report of sales, the Publisher will make settlement for any balance due.

*Entire Agreement*  5.  Paragraphs A-X inclusive are parts of this Agreement as though placed before the signatures.

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
_____
U.S. Taxpayer Identification No.

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
_____
U.S. Taxpayer Identification No.

*PRENTICE HALL, INC.*

*Courtland L. Bovee*
_____
Author

*John V. Thill*
_____
Author

by _____

NJ32698-1

APR.18.1997   1:01PM   PH BUSINESS PUB 201 236 7172

**Submission of Work/Changes in Proofs**

A. (i)    The Author will deliver the Fourth and any subsequent editions of the Work in hard copy form, double-spaced on 8 1/2" X 11" sheets on one side only, and, if the Publisher and the Author agree in writing, in electronic or other format. The Author will retain a complete duplicate copy of the Work. The Work will be of such content, form, and length as the Publisher is willing to publish.

(ii)   If the Author is unable or unwilling to deliver the Fourth Edition of the Work on time or if the Fourth Edition of the Work is not acceptable to the Publisher, in its editorial and marketing judgment, in length, form or content, the Publisher may elect either to (a) terminate the Agreement and recover from the Author any and all monies paid to or on behalf of the Author in connection with the Work or (b) have the Fourth and any subsequent Editions of the Work prepared by others and charge the cost, including, without limitation, fees and royalties, against any amounts otherwise due the Author including, without limitation, the Author's royalties. In such event, the Author will receive no less than 50% of the royalties that would otherwise be due to the Author on the sale of the first such revised edition, 25% of such royalties on the second such revised edition, and 15% of such royalties on the third such revised edition. The Author shall not be entitled to receive royalties on any such subsequent revised editions of the Work. The Author may not have the Work published elsewhere unless and until the Publisher terminates this Agreement, the Author repays all monies paid to or on behalf of the Author in connection with the Work, and the Publisher expressly reverts all rights in the Work to the Author.

(iii) The Author will read and correct the proofs and promptly return one set to the Publisher. If the Author has not returned a corrected proof of the Work to the Publisher within a reasonable time period to be specified by the Publisher at the time the material is sent to the Author for correction, such material will be considered approved as is. The Author will be responsible for the completeness and accuracy of corrections and will bear the costs of alterations in the proofs (other than those resulting from printer's errors) exceeding 15% of the cost of typesetting. These costs will be deducted from payments otherwise due the Author.

**Items Furnished by the Author**

B.    The Author is responsible for furnishing the following items as part of the Fourth and any subsequent editions of the Work: title page; preface; foreword (if any); table of contents; index; and suggestions and drafts for all photographs, illustrations and other art (collectively, "art work"). The Publisher will be responsible for obtaining the photographs or for the preparation of the illustrations for illustrating the Fourth and any subsequent edition of the Work. As between the Publisher and the Author, the Publisher shall possess the rights in and to such art work, without any restrictions, reservations or limitations whatsoever. The Author shall not have any right or interest in such art work before or after termination of the Agreement.

At Publisher's request, the Author will also prepare and furnish to the Publisher, within a reasonable time from such request, any instructional aids and other ancillary materials for the Fourth and any subsequent editions of the Work, including, up to the equivalent of five pages of content for a web site that relates to, or is on the same or similar subject as, the Work (collectively, the "Ancillaries"). The Publisher will bear the cost of manufacturing any Ancillaries. If the Author fails to deliver any requested Ancillaries (including the web site content) to the Publisher within the time specified, the Publisher may have such items prepared and charge the costs of preparation against any sums otherwise due to the Author under this Agreement or otherwise.

The Author hereby assigns and transfers to the Publisher all of rights, title and interest in any and all art work and any and all Ancillaries contained within the Work.

NJ32698-1

*The Author's Warranty*

C. (i) The Author warrants that the Author (a) has full authority to make this Agreement; (b) that the Work will be original; (c) that the Fourth Edition of the Work has not been published; (d) that the Author is the sole owner of the Work and has full power and authority to copyright it (except for material in the public domain or material for which permission has been obtained from the copyright owner); (e) that the Work will not infringe any copyright, violate any property rights, or contain any scandalous, libelous, or unlawful matter or any formula or instruction that is inaccurate or injurious to the user, (f) that nothing set forth in the Settlement Agreement and General Release dated January 6, 1997 ("Settlement Agreement") or any other document limits or restricts in any way the rights granted or assigned to the Publisher hereunder; (g) no disposition of rights in the Work have been made or approved or are still effective: (h) no third party, including, without limitation, McGraw-Hill, Inc. has, or will have, the right to dispose of any copies of the Work (including, without limitation, bound or unbound copies of the Work), except by destruction or purchase by the Publisher, or to exercise any other rights, or to license any rights, in the Work; (i) the Author is not a party to, subject to, or bound by, any judgment, injunction or decree of any agreement or court or government authority which may restrict or interfere with the performance of this Agreement; (j) the Author is the sole proprietor of the Work, none of which is in the public domain;(k) all permissions required for any copyrighted materials contained in the Work have been obtained from the copyright proprietors of such materials, all permissions fees have been paid and all permissions are assignable to the Publisher; (l) all expenses related to the Items (as defined in paragraph R) have been fully paid; (m) except for those that were the subject of the Settlement Agreement, there have not been, nor are there now, any demands, actions, suits, claims, proceedings inquiries or investigations pending or threatened with respect to the Work, at law or in equity, nor does the Author know of any facts which would provide a justifiable basis for any such demand, action, suit, claim, proceeding , investigation or inquiry; (n) other than the Settlement Agreement, there are no orders, judgments or decrees of any United States or foreign, federal, state or local court or governmental authority or agency which apply to the Work; (o) other than any notice required to be sent to third parties to obtain the Items (as defined in paragraph R), no approval or consent of any person or entity is needed which has not been obtained, and no notice to any person or entity is required to be sent, in order to execute this Agreement and perform its obligations; (p) except as specifically set forth in this Agreement, there are no obligations to pay any monies, including, without limitation, royalties in connection with the Work.

(ii) The Author will indemnify and hold harmless the Publisher against all claims, suits, costs, damages, and expenses, including reasonable attorneys' fees, that the Publisher may sustain or incur by reason of any breach or alleged breach of the foregoing warranties. The Publisher will have the right to assume and control the defense of any and all claims, and until a claim or suit has been settled or withdrawn, the Publisher may withhold any sums due the Author under this Agreement. The Author will cooperate with the Publisher and provide reasonable assistance in defending against any such claim.

(iii) Notwithstanding the foregoing sentence, except as set forth in paragraph C (iv), in the event a claim is brought by a third party against the Publisher for which the Publisher is entitled to indemnification, the Publisher agrees to be responsible for the first $5,000 in Costs. The Author shall be responsible for all Costs in excess of $5,000. As used herein, "Costs" shall mean all judgments, settlements, and costs of defense, including reasonable attorneys' fees and other costs of such claim.

(iv) The terms set forth in paragraph C(iii) shall not apply to any and all claims, suits, costs, damages, and expenses, including reasonable attorneys' fees, that the Publisher may sustain or incur by reason of any breach or alleged breach of the warranties set forth in paragraph (c) (i)(k) or the inclusion of third party materials in the Third Edition of the Work, all of which the Author shall be entirely responsible for as set forth in paragraph C(ii).

(v) The warranties and indemnities contained in this paragraph will survive termination of this Agreement.

*Copyrighted Material*

D. The Author will not include in the Fourth and any subsequent editions of the Work material from other copyrighted works without both the Publisher's consent and the written consent of the owner of such copyrighted material. The Publisher will be responsible, in connection with each edition, for obtaining the

NJ32698-1

written consents and for paying permission fees in an amount not to exceed an aggregate of $7,500. The Publisher will pay on the Author's behalf the permission fees which exceed $7,500 and will recover such amounts so paid from amounts otherwise payable to the Author under this Agreement or otherwise.

*Editing*    E.   The Publisher will have the right to edit the Work for the first printing and for any reprinting, provided that the meaning of the text is not materially altered.

*Publishing Details*    F.   After acceptance of the manuscript, the Publisher will have the right to make final determinations concerning publication and marketing of the Work based upon editorial and marketing concerns, including selecting suitable styles of paper, printing, and binding, and fixing for altering the title, cover content, and presentation, and price and other terms of sale. The Publisher agrees to consult with the Author in connection with the preparation of the interior and cover design of the book version of the Work, provided that the Publisher shall have the right to make the final determinations in connection therewith. The Publisher may display the name and likeness of the Author on the Work and in any promotional materials used to market the Work.

*Author's Copies*    G.   The Publisher will furnish fifty copies of the Work to the Author without charge. Additional copies may be purchased at the Publisher's net price. The Author shall not resell the copies provided or purchased hereunder.

*Revisions*    H.   The Author agrees to revise the Work as requested by the Publisher if the Publisher considers it in the best interests of the Work. Except as expressly set forth herein, the provisions of this Agreement shall apply to each revision of the Work by the Author as though that revision were the Work being published for the first time under this Agreement. If, in the Publisher's reasonable judgment, the Author is unable or unwilling to provide a satisfactory revision within the time period established by the Publisher, the Publisher may have such revision (and any subsequent revisions) prepared and charge the cost, including, without limitation, fees or royalties, against the Author's royalties. The Publisher agrees to consult with the Author about the time period in which the revision must be provided, although the Publisher shall have the right to make the final determination in connection therewith. In the event the Publisher has a revision prepared by another or others as set forth herein, the Author will receive no less than 50% of the royalties that would otherwise be due to the Author on the sale of the first such revised edition, 25% of such royalties on the second such revised edition, and 15% of such royalties on the third such revised edition. The Author shall not be entitled to receive royalties on any such subsequent revised editions of the Work. The Publisher reserves the right to display the Author's name and the name of the person or persons who revise the Work in revised editions of the Work and in promotional materials.

*Additional Royalty Provisions*    I.   (a)   The rights granted to the Publisher under this Agreement include, but are not limited to, the following subsidiary rights: publishing in all languages; broadcasting by radio; making audio and video recordings; publishing book club editions; making foreign or other adaptations or derivative works and other versions; inclusion in anthologies; showing by motion picture or by television; syndicating, quoting, and otherwise utilizing the Work; and material based on the Work ("Subsidiary Rights"). The Publisher shall pay the Author royalties as follows on the exercise of Subsidiary Rights:

(i) If the Publisher itself exercises a Subsidiary Right in the Work, 10% of the net cash received from such use.
(ii) If the Publisher licenses any of the Subsidiary Rights, 50% of the net amount of royalty compensation received from such license.

The Publisher may itself exercise any Subsidiary Right without compensation to the Author and may license such use by others without compensation to the Author if, in the Publisher's judgment, such use may benefit sales of the Work and the Publisher does not charge for such use.

(b) On copies of book versions of the Work or sheets sold by the Publisher outside the United States, the Publisher will pay the Author a royalty of 10% of the net cash received by the Publisher from such sales.

15%

(c) On copies of book versions of the Work sold by mail order or coupon advertising direct to the consumer, or by radio or television; or on copies sold by any means at a discount of 50% or greater off the single copy price, the Publisher will pay the Author a royalty of 5% of the net cash received from such sales.

(d) On copies of book versions of the Work sold through any of the Publisher's subsidiaries, or to elementary and secondary schools and school districts, the Publisher will pay the Author a royalty of 15% of the net cash received from such sales.

(e) If the Publisher packages or sells the entire Work or any part of the Work together with other products or as a segment of another product, in determining the net price of the Work for purposes of calculating royalty payments, the Publisher will allocate to the Work that portion of the proceeds of the sale which it determines to be the Work's fair value to the entire product sold.

(f) If the Publisher sells any stock of the Work at a price below manufacturing cost plus royalties, no royalties shall be paid.

(g) If the balance due the Author for any settlement period is less than fifty dollars, the Publisher will make no accounting or payment until the next settlement period at the end of which the cumulative balance has reached fifty dollars. If, after the expiration of two years following publication, the sales in any calendar year do not exceed a total of 500 copies, the royalty on such sales shall be one-half the stipulated royalty, this reduction in royalty being agreed upon to enable the Publisher to keep the Work in print as long as possible.

(h) The Publisher may deduct from any funds due the Author, under this or any other agreement between the Author and the Publisher, any sum that the Author may owe the Publisher under this or any other agreement.

(i) The Publisher will maintain relevant records with respect to any royalty statement provided to the Author under the Agreement for a two year period from the date of the statement. Royalty statements will be final and binding upon the Author unless, within two years from the date of the statement, the Author objects to such statement in a writing which states the specific objection and the basis for such objection. The Author, at the Author's expense, may review such records no more than once each calendar year at a mutually convenient time to the Author and the Publisher, during regular business hours, for the purpose of verifying the accuracy of such royalty statement. The Author agrees to keep confidential all information relating to the business affairs of the Publisher and to impose such obligation on the Author's representatives.

*Discontinuing*      J.   When the Publisher decides that the public demand for the Work no longer warrants its continued
*Manufacture*        publication in a format or medium, the Publisher may discontinue or suspend such publication, and destroy such format or medium of the Work without liability to the Author, and without prejudice to any license or other arrangement. If the Publisher ceases to publish the Work in all formats and media and does not publish the Work in any format or medium, now known or hereafter known, within six months of the Author's written request for the Publisher to publish the Work, this Agreement will terminate and the Publisher will revert to the Author all rights granted to the Publisher herein by the Author (except as to the art work prepared or obtained at the Publisher's expense, which shall remain the property of the Publisher for its own use and benefit), subject to the Publisher's right to sell-off or otherwise dispose of any inventory of the Work and to all licenses previously granted.

NJ32698-1

**Competing Publications**    K. During the term of this Agreement the Author will not agree to publish or furnish to any other publisher any work on the same subject which, in the Publisher's judgment, will conflict or interfere with the sale of the Work.

**Amendments and Waivers**    L. This Agreement constitutes the entire understanding of the parties relating to its subject matter and shall not be changed or amended, in whole or in part, except in a writing signed by the parties. No course of dealing between the Publisher and the Author and no delay or failure of a party in exercising any rights hereunder shall operate as a waiver of that party's rights.

**Construction, Heirs**    M. This Agreement shall be construed and interpreted according to the laws of the State of New York as if executed and fully performed therein, and exclusive jurisdiction over all disputes hereunder shall be in the federal and state courts of the State of New York located in New York County. This Agreement shall be binding upon the parties hereto, their heirs, successors, assigns, and personal representatives; and references to the Author and to the Publisher shall include their heirs, successors, assigns, and personal representatives. The Author may not delegate any duty hereunder without the prior written consent of the Publisher.

**Joint Authors**    N. For purposes of this Agreement, whenever the term "the Author" refers to more than one person, all such persons are collectively referred to as the "Author." Unless otherwise indicated in this Agreement, the rights and liabilities of the Author are joint and several. Further, whenever the term "the Author" refers to more than one person, those persons will be deemed to share equally in the grants, advances, royalties and expenses arising under this Agreement, until written notice to the contrary, signed by each person referred to as "Author" under this Agreement, has been actually received by the Publisher. The Publisher may exercise any or all of its rights and remedies with respect to the authors individually or collectively. Any one Author (and an alternate) may be designated under this Agreement to act on behalf of all the Authors jointly, and the Publisher may rely on the acts of the Author or the alternate so designated as representative of and binding upon all the Authors. In the absence of such designation, the Publisher may deal with any one of the Authors as the agent and representative of all, and may rely on the acts of such as representative as binding on all the Authors. Any such designation may be modified only upon written notice to the Publisher, signed by each person referred to as "Author" under this Agreement.

**Electronic Versions**    O. The rights granted to the Publisher under this Agreement include (in addition to all other rights described herein) the right to prepare, publish, reproduce, sell and otherwise distribute electronic versions of the Work. As used herein, the term "electronic versions" shall mean any and all methods of copying, recording, storage, retrieval, or delivery of all or any portion of the Work, alone or in combination with other works, including in any multimedia work or electronic book; by any means now known or hereafter devised, including, without limitation, by electronic or electromagnetic means, or by analog or digital signal; whether in sequential or non-sequential order, on any and all physical media, now known or hereafter devised including, without limitation, magnetic tape, floppy disks, CD-I, CD-ROM, laser disk, optical disk, IC card or chip, and any other human or machine readable medium, whether or not permanently affixed in such media (excluding the electronic versions specifically described in paragraph I (a)); and the broadcast and/or transmission of the foregoing by any and all means now known or hereafter devised.

The Publisher shall pay the Author royalties as follows on the electronic versions: 18%

     (i) If the Publisher itself creates and sells that electronic version, ~~15%~~ of the net cash received from such use.

     (ii) If the Publisher licenses the right to create and sell the electronic version, 50% of the net amount of royalty compensation received from such license.

P. <u>Grant</u>. The Publisher agrees to pay the Author a grant in the amount of $400,000, upon the written request of the Author, subject to the following payment schedule and terms and conditions. The terms of

this paragraph regarding the payment of the grant shall not apply to any revised, subsequent or new editions of the Work.

(i) $150,000 upon execution of this Agreement by the Author and the Publisher and the delivery of all of the Items (as defined in paragraph R) to the Publisher as set forth herein.

(ii) $100,000 on or about January 31, 1998.

(iii) $100,000 on or about June 1, 1999.

(iv) $50,000 on or about June 1, 2000.

Q.  Advance.  The Publisher agrees to pay the Author an advance in the amount of $100,000, on or about June 1, 2000.  The amount of the advance shall be fully recoverable by the Publisher from any amounts otherwise due the Author.  The terms of this paragraph regarding the payment of the advance shall not apply to any revised, subsequent or new editions of the Work.

R.  Delivery of Items.  Upon execution of this Agreement by the Author and the Publisher, the Author shall deliver to the Publisher, at the address or location designated by the Publisher, at the Authors expense, the items relating to the Work and to the Study Guide, Instructor's Manual, Text Banks, and Overhead Transparencies (collectively, the "Supplementary Materials"), all as set forth in subparagraphs (i) through (v) below (collectively, the "Items").  The Author hereby assigns and transfers to the Publisher all of rights, title and interest in any and all Supplementary Materials (including, without limitation, a transfer of all copyrights) and any and all trademarks relating to the Work and Supplementary Materials, except for the McGraw Hill marks ("Trademarks").  The terms and conditions set forth in paragraphs B and C of this Agreement shall apply with equal force and effect to the Supplementary Materials and the Trademarks as if the words "Supplementary Materials" and "Trademarks" were substituted therein for the word "Work".

(i) With respect to the Work: ~~two (2)~~ one (1) copies of the Work; 4/c Film RRED Negatives for the text and cover; book blues or Ekta prints (or equivalent 4/c film proof) for the text; film proofs for the cover; electronic files for the text and cover; all permission files, including but not limited to, all contracts, agreements, licenses, instruments, understandings and other legally binding arrangements with third party copyright owners whose material is included in the Work; copyright records; supplier lists; "adoption" lists and any other similar files and records; and any and all other contracts, agreements, licenses, instruments, understandings, and other legally binding arrangements arising from or related to the Work and the Supplements (including, without limitation, all unfilled customer orders, and contracts with Publishers, licensees and other third parties with respect to the exploitation or disposition of rights in and to the Work including translation rights and other subsidiary rights). 

(ii)  With respect to the Study Guide: ~~two (2) copies of the Study Guide;~~ electronic files or camera ready copy or film for the Study Guide; all permission files, including but not limited to, all contracts, agreements, licenses, instruments, understandings and other legally binding arrangements with third party copyright owners whose material is included in the Study Guide; and copyright records. 

(iii) With respect to the Instructor's Manual: ~~two (2) copies of the Instructor's Manual;~~ electronic files or camera ready copy or film for the Instructor's Manual; all permission files, including but not limited to, all contracts, agreements, licenses, instruments, understandings and other legally binding arrangements with third party copyright owners whose material is included in the Instructor's Manual; and copyright records.

(iv) With respect to the Test Banks: ~~two (2)~~ one (1) copies of each version of the computerized Text Bank ~~and two (2) copies of the printed Test Bank;~~ masters for each version of the computerized Text Bank and electronic files or camera ready copy or film for the printed Test Bank; all permission files, including 

but not limited to, all contracts, agreements, licenses, instruments, understandings and other legally binding arrangements with third party copyright owners whose material is included in the computerized or printed Test Banks; and copyright records.

(v) With respect to the Overhead Transparencies: two (2) copies of each Overhead Transparency, electronic files or camera ready copy or film for the Overhead Transparencies; all permission files, including but not limited to, all contracts, agreements, licenses, instruments, understandings and other legally binding arrangements with third party copyright owners whose material is included in the Overhead Transparencies; and copyright records.

In the event the Author shall fail to deliver any or all of the Items to the Publisher, at such location or address designated by the Publisher, upon execution of this Agreement by the Parties, the Author shall not receive, and the Publisher shall have no obligation to make the payments described in paragraph (P) (i) of both this Agreement and the Agreement dated April 18,1997 between the Author and the Publisher covering the work entitled Business Communication Today ("Business Communication Contract"), thereby reducing the total amount of the grant payable to the Author under this Agreement and the Business Communication Contract by $300,000 ($150,000 under this Agreement and $150,000 under the Business Communication Contract).

S. Other Works. The Author hereby grants to the Publisher a right of first refusal with respect to any new works created by the Author, or each of them, whether with or without the cooperation or assistance of a third party (the "New Work(s)"). The Author shall offer each New Work to the Publisher in writing, at the earliest time reasonable, in the form of a detailed proposal. The Publisher shall have ninety days from its receipt of such written proposal to consider it and communicate to the Author the rights, if any it wishes to acquire. If the Publisher notifies the Author in writing that it desires to acquire rights to the New Work, the Author shall negotiate exclusively and in good faith with the Publisher, for a period of no less than ninety days from the Authors receipt of such written notice, commercially reasonable terms for the Publisher's acquisition thereof. In the event that, following such ninety-day period, the Publisher determines that it does not wish to acquire rights to the New Work or the Author and the Publisher are unable to agree upon the terms of an agreement, the Author may offer the New Work to a third party, subject to the terms of paragraph K of this agreement, provided that the terms made available to the third party are not more favorable to such third party than those made available to the Publisher. If the Author does desire to enter into an agreement on terms more favorable to such third party, The Author may submit such terms to the Publisher and the Publisher shall have a right, but not an obligation, to match with respect thereto.

T. Inventory. The Publisher agrees to purchase from McGraw-Hill the Then-Current Inventory of the Third Edition of the Work, at their Printing Invoice Cost, provided that the Publisher shall have the right to recover the Total Cost of such purchase from any royalties otherwise due the Author. The Author acknowledges and agrees that the Publisher shall have the right to dispose of such Inventory in any manner it sees fit (including without limitation by destruction), provided that the name and mark of McGraw-Hill on the outside cover or jacket of the book version of the Third Edition of the Work is covered or not otherwise displayed to customers As used herein, "Then-Current Inventory" shall mean McGraw-Hill's inventory of the book version of the Third Edition of the Work, as of the date of execution of this Agreement, that is in saleable condition; "Printing Invoice Cost" shall mean the actual invoiced printing cost for the printing of each unit of the book version of the Work; and "Total Cost" shall mean the Printing Invoice Cost for all of the Then-Current Inventory of the Third Edition of the Work plus the costs associated with transporting such Inventory from a McGraw-Hill location to a location designated by the Publisher including, without limitation, shipping, handling and insurance costs.

U. Returns. The Author shall obtain McGraw-Hill's binding agreement that McGraw-Hill will promptly destroy any and all of its inventory of the Work not purchased by the Publisher including, without limitation, any and all returns that McGraw-Hill may receive following the Publisher's purchase of the

* post-secondary education market

Then-Current Inventory. If McGraw-Hill refuses to enter into such binding agreement, the Author shall petition a court of competent jurisdiction to require McGraw-Hill to do so.

V. Future Orders. The Author will require McGraw-Hill to provide prompt notice to any individual, entity, potential adopter, retailer or wholesaler or other potential customer ("Customer") that inquires about obtaining a complimentary copy of the Work or any Supplementary Materials or placing an order therefor that such Customer should contact the Publisher's Faculty and Field Services at (800) 536-0485 to do so.

W. Mailing List. Upon execution of this Agreement, the Author will provide to the Publisher all of the names contained on McGraw-Hill's internal Bovee-Thill business communication update newsletter mailing list

X. Newsletter. If the Publisher, in its reasonable judgment, believes it is a productive use of resources, it will publish a newsletter about the Work no more than two time each year in form, content and length determined by the Publisher, in its discretion.

Y. Overnight Mail. If the Publisher requests that the Author deliver materials due under this Agreement via overnight carrier, the Publisher agrees to reimburse the Author such expense, upon receipt of adequate documentation evidencing such expenditure.

# EXHIBIT G

# *A*uthor Agreement

AN AGREEMENT made between **Courtland L. Bovee**, a citizen of **the U.S.**
whose address is:
2950 East Flamingo Rd. Suite B
Las Vegas, Nevada 89121
and
**John V. Thill** a citizen of **the U.S.**
whose address is:
2950 East Flamingo Rd. Suite B
Las Vegas, Nevada 89121
(the "Author") and
PRENTICE-HALL, INC. (the "Publisher") with offices at One Lake Street, Upper Saddle River, New Jersey 07458
on July 25, 1997.

THE AUTHOR AND THE PUBLISHER AGREE THAT

*Grant of Rights*
1.  The First through Eighth Editions of a work currently entitled **BUSINESS TODAY** have been prepared and the Authors will prepare the Ninth and any subsequent editions of such work for publication (all editions shall hereinafter be referred to collectively as the "Work" ). The Author grants this Work and assigns solely and exclusively to the Publisher all rights in the Work throughout the world, in all languages for the full term of copyright and all renewals and extensions thereof. This grant includes, but is not limited to, the exclusive right to print, publish and sell the Work, under the Publisher's own name and under other imprints or trade names; to secure copyright in the Author's name which shall not affect the grant of rights to the Publisher hereunder; to use the Work as a basis for derivative works in all formats and by all media; and to license others to exercise any and all rights in and to the Work.

*Delivery of Manuscript*
2.  The Author agrees to prepare a Ninth Edition of the Work, containing about 360,000 words or their equivalent, which will be delivered by the Author to the Publisher by October 1, 1998. The Publisher and the Author agree that the Work will consist of approximately 800 printed book pages.

*Royalties*
3.  The Publisher will pay the Author a royalty on sales of the Work, except as otherwise provided in Paragraph I, based on the net cash received by the Publisher from sales of the Work of 17% unless sales of a particular edition of the Work exceed 45,000 copies within the first copyright year, in which event, the royalty rate on all copies of such edition of the Work sold pursuant to this paragraph 3 shall be 18.5%. As used herein, "the first copyright year" shall commence as of the date of first distribution of each edition of the Work and shall continue until December 31st of the copyright year of such edition of the Work.

*Payments*
4.  The Publisher will report on the sale of the Work by March 31 and September 30 of each year for the six-month period ending in December and June of each year respectively. With each report of sales, the Publisher will make settlement for any balance due.

*Entire Agreement*
5.  Paragraphs A-U inclusive are parts of this Agreement as though placed before the signatures.

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
U.S. Taxpayer Identification No.

*Courtland L. Bovee*
*Author*



395-52-789 X
U.S. Taxpayer Identification No.                        Author

PRENTICE HALL, INC.                                      by

**Submission of Work/Changes in Proofs**

*A.* (i)   The Author will deliver the Ninth and any subsequent editions of the Work in hard copy form, double-spaced on 8 1/2" X 11" sheets on one side only, and, if the Publisher and the Author agree in writing, in electronic or other format. The Author will retain a complete duplicate copy of the Work. The Work will be of such content, form, and length as the Publisher is willing to publish.

(ii)  If the Author is unable or unwilling to deliver the Ninth Edition of the Work on time or if the Ninth Edition of the Work is not acceptable to the Publisher, in its editorial and marketing judgment, in length, form or content, the Publisher may elect either to (a) terminate the Agreement and recover from the Author any and all monies paid to or on behalf of the Author in connection with the Work or (b) have the Ninth and any subsequent editions of the Work prepared by others and charge the cost, including, without limitation, fees and royalties, against any amounts otherwise due the Author including, without limitation, the Author's royalties. The Author may not have the Work published elsewhere unless and until the Publisher terminates this Agreement, the Author repays all monies paid to or on behalf of the Author in connection with the Work, and the Publisher expressly reverts all rights in the Work to the Author.

(iii)  The Author will read and correct the proofs and promptly return one set to the Publisher. If the Author has not returned a corrected proof of the Work to the Publisher within a reasonable time period to be specified by the Publisher at the time the material is sent to the Author for correction, such material will be considered approved as is. The Author will be responsible for the completeness and accuracy of corrections and will bear the costs of alterations in the proofs (other than those resulting from printer's errors) exceeding 15% of the cost of typesetting. These costs will be deducted from payments otherwise due the Author.

**Items Furnished by the Author**

*B.*   The Author is responsible for furnishing the following items as part of the Ninth and any subsequent editions of the Work: title page; preface; foreword (if any); table of contents; index; and suggestions and drafts for all photographs, illustrations and other art (collectively, "art work"). The Publisher will be responsible for obtaining the photographs or for the preparation of the illustrations for illustrating the Ninth and any subsequent edition of the Work. As between the Publisher and the Author, the Publisher shall possess the rights in and to such art work, without any restrictions, reservations or limitations whatsoever. The Author shall not have any right or interest in such art work before or after termination of the Agreement.

At Publisher's request, the Author will also prepare and furnish to the Publisher, within a reasonable time from such request, any instructional aids and other ancillary materials for the Ninth and any subsequent editions of the Work, including, up to the equivalent of five pages of content for a web site that relates to, or is on the same or similar subject as, the Work (collectively, the "Ancillaries"). The Publisher will bear the cost of manufacturing any Ancillaries. If the Author fails to deliver any requested Ancillaries (including the web site content) to the Publisher within the time specified, the Publisher may have such items prepared and charge the costs of preparation against any sums otherwise due to the Author under this Agreement or otherwise.

The Author hereby assigns and transfers to the Publisher all of rights, title and interest in any and all art work and any and all Ancillaries contained within the Work.

*The Author's*
*Warranty*

C.   (I) The Author warrants that the Author (a) has full authority to make this Agreement;(b) that the Work will be original;(c) that the Ninth edition of the Work has not been published;(d) that the Author is the sole owner of the Work and has full power and authority to copyright it (except for material in the public domain or material for which permission has been obtained from the copyright owner);(e) That David Rachman and Michael Mescon, and each of them, have relinquished any rights they or each of them, may have in the work to the Author pursuant to a separate written agreement and that the Author is solely responsible for any compensation to Messrs. Rachman and Mescon, if any (f) that the Work will not infringe any copyright, violate any property rights, or contain any scandalous, libelous, or unlawful matter or any formula or instruction that is inaccurate or injurious to the user, (g). That nothing set forth in the Settlement Agreement and General Release dated January 6, 1997 ("Settlement Agreement") or any other document limits or restricts in any way the rights granted or assigned to the Publisher hereunder; (h) no disposition of rights in the Work have been made or approved or are still effective;(i) no third party, including, without limitation, Mcgraw Hill, Inc. has, or will have, the right to dispose of any copies of the Work (including, without limitation, bound or unbound copies of the work), except by destruction or purchase by Publisher, or to exercise any other rights, or to license any rights, in the work; (j) the Author is not a part to, subject to. or bound by, any judgment, injunction or decree of any agreement or court or government authority which may restrict or interfere with the performance of this Agreement; (k) the author is the sole proprietor of the Work, non of which is in the public domain, (l) all permissions required for any copyrighted materials contained in the Work have been obtained from the copyright proprietors of such material, all permissions fees have been paid and all permissions are assignable to the Publisher; (m) all expenses related to the Items (as defined in paragraph P) have been fully paid; (n) except fro those that were the subject of the Settlement Agreement, there have not been, nor are there now, any demands, actions, suits, claims, proceedings inquiries or investigations pending or threatened with respect to the Work, at law or in equity, nor does the Author know of any facts which would provide a justifiable basis for any such demand, action, suit, claim, proceeding, investigation or inquiry; (o) other than the Settlement Agreement, there are no orders, judgments or decrees of any United States or foreign, federal, state or local court or governmental authority or agency which apply to the Work; (p) other than any notice required to be sent to third parties to obtain the Items (as defined in paragraph P), no approval or consent of any person or entity is needed which has not been obtained, and no notice to any person or entity is required to be sent, in order to execute this Agreement and perform its obligations; (q) except as specifically set forth in the Agreement, there are no obligations to pay any monies, including, without limitation, royalties in connection with the Work.

(ii) The Author will indemnify and hold harmless the Publisher against all claims, suits, costs, damages, and expenses, including reasonable attorneys` fees, that the Publisher may sustain or incur by reason of any breach or alleged breach of the foregoing warranties. The Publisher will have the right to assume and control the defense of any such claim, and until such claim or suit has been settled or withdrawn, the Publisher may withhold any sums due the Author under this Agreement. The Author will cooperate with the Publisher and provide reasonable assistance in defending against any such claim.

(iii) Notwithstanding the foregoing sentence, except as set forth in paragraph C (iv), in the event a claim in brought by a third party against the Publisher for which the Publisher is entitled to indemnification, the Publisher agrees to be responsible for the first $5,000 in Costs. The Author shall be responsible for all Costs in excess of $5,000. As used herein, "Costs" shall mean all judgments, settlements, and costs of defense, including reasonable attorney' fees and other costs of such claim.

(iv) The terms set forth in paragraph c(iii) shall not apply to any and all claims, suits, costs, damages, and expenses, including reasonable attorney' feed, that the Publisher may sustain or incur by reason of any breach or alleged breach of the warranties set forth in paragraph (c) (i) (l) or the inclusion of third party

materials in the Ninth Edition of the Work, all of which the Author shall be entirely responsible for as set forth in paragraph C(ii).

(v) The warranties and indemnities contained in this paragraph will survive termination of this agreement.

*Copyrighted Material*   D.   The Author will not include in the Ninth and any subsequent edition of the Work material from other copyrighted works without both the Publisher's consent and the written consent of the owner of such copyrighted material. The Publisher will be responsible, in connection with each edition, for obtaining the written consents and paying permission fees in an amount not to exceed an aggregate of $7,500. The Publisher will pay on the author's behalf the permission fees which exceed $7,500 and will recover such amounts so paid from amounts otherwise payable to the Author under this agreement or otherwise.

*Editing*   E.   The Publisher will have the right to edit the Work for the first printing and for any reprinting, provided that the meaning of the text is not materially altered.

*Publishing Details*   F.   After acceptance of the manuscript, the Publisher will have the right to make final determinations concerning publication and marketing of the Work based upon editorial and marketing concerns, including selecting suitable styles of paper, printing, and binding, and fixing for altering the title, cover content, and presentation, and price and other terms of sale. The Publisher agrees to consult with the Author in connection with the preparation of the interior and cover design of the book version of the Work, provided that the Publisher shall have the right to make the final determinations in connection therewith. The Publisher may display the name and likeness of the Author on the Work and in any promotional materials used to market the Work.

*Author's Copies*   G.   The Publisher will furnish fifty copies of the Work to the Author without charge. Additional copies may be purchased at the Publisher's net price. The Author shall not resell the copies provided or purchased hereunder.

*Revisions*   H.   The Author agrees to revise the Work as requested by the Publisher if the Publisher considers it in the best interests of the Work. Except as expressly set forth herein, the provisions of this Agreement shall apply to each revision of the Work by the Author as though that revision were the Work being published for the first time under this Agreement. If, in the Publisher's reasonable judgment, the Author is unable or unwilling to provide a satisfactory revision within the time period established by the Publisher, the Publisher may have such revision (and any subsequent revisions) prepared and charge the cost, including, without limitation, fees or royalties, against the Author's royalties. The Publisher reserves the right to display the Author's name and the name of the person or persons who revise the Work in revised editions of the Work and in promotional materials.

*Additional Royalty Provisions*   I.   (a)   The rights granted to the Publisher under this Agreement include, but are not limited to, the following subsidiary rights: publishing in all languages, broadcasting by radio; making audio and video recordings; publishing book club editions; making foreign or other adaptations or derivative works and other versions; inclusion in anthologies; showing by motion picture or by television; syndicating, quoting, and otherwise utilizing the Work ;and material based on the Work ("Subsidiary Rights"). The Publisher shall pay the Author royalties as follows on the exercise of Subsidiary Rights:

   (i)   If the Publisher itself exercises a Subsidiary Right to the Work, 10% of the net cash received from such use.
   (ii)   If the Publisher licenses any of the Subsidiary Rights, 50% of the net amount of royalty compensation received from such license.

The publisher may itself exercise any Subsidiary Right without compensation to the Author and may license such use by others without compensation to the Author if, in the Publisher's judgment, such use may benefit sales of the Work and the Publisher does not change for such use.

(b) On copies of book versions of the Work or sheets sold by the Publisher outside the United States, the Publisher will pay the Author a royalty of 10% of the net cash received by the Publisher from such sales.

(c) 15% on copies of book versions of the Work sold by mail order or coupon advertising direct to the consumer, or by radio or television. On copies sold by any means at a discount of 50% or greater off the single copy price; ~~or on copies sold through any of the Publisher's subsidiaries, or to elementary and secondary schools and school districts,~~ the Publisher will pay the Author a royalty of 5% of the net cash received from such sales.

(d) On copies of the book versions of the Work sold through any of the Publisher's subsidiaries or to elementary and secondary schools and school districts, the Publisher will pay the Author a royalty of 15% of the net cash received from such sales.

(e) If the Publisher packages or sells the entire Work or any part of the Work together with other products or as a segment of another product, in determining the net price of the Work for purposes of calculating royalty payments, the Publisher will allocate to the Work that portion of the proceeds of the sale which it determines to be the Work's fair value to the entire product sold.

(f) If the Publisher sells any stock of the Work at a price below manufacturing cost plus royalties, no royalties shall be paid.

(g) If the balance due the Author for any settlement period is less than fifty dollars, the Publisher will make no accounting or payment until the next settlement period at the end of which the cumulative balance has reached fifty dollars. If, after the expiration of two years following publication, the sales in any calendar year do not exceed a total of 500 copies, the royalty on such sales shall be one-half the stipulated royalty, this reduction in royalty being agreed upon to enable the Publisher to keep the Work in print as long as possible.

(h) The Publisher may deduct from any funds due the Author, under this or any other agreement between the Author and the Publisher, any sum that the Author may owe the Publisher under this or any other agreement.

(i) The Publisher will maintain relevant records with respect to any royalty statement provided to the Author under the Agreement for a two year period from the date of the statement. Royalty statements will be final and binding upon the Author unless, within two years from the date of the statement, the Author objects to such statement in a writing which states the specific objection and the basis for such objection. The Author, at the Author's expense, may review such records no more than once each calendar year at a mutually convenient time to the Author and the Publisher, during   regular business hours, for the purpose of verifying the accuracy of such royalty statement.  The Author agrees to keep confidential all information relating to the business affairs of the Publisher and to impose such obligation on the Author's representatives.

**Discontinuing Manufacture**   J.   When the Publisher decides that the public demand for the Work no longer warrants its continued publication, in a format or medium, the Publisher may discontinue or suspend such publication, and destroy such format or medium of the Work without liability to the Author, and without prejudice to any license or other arrangement. If the Publisher ceases to publish the Work in all formats and media and does not publish the Work in any format or medium, now known or hereafter known, within six months of the Author's written request for the Publisher to publish the Work, this Agreement will terminate and the Publisher will revert to the Author all rights granted to the Publisher herein by the Author (except as to the art work prepared or obtained at the Publisher's expense which shall remain the property of the Publisher for its own use and benefit), subject to the Publisher's right to sell off or otherwise dispose of any inventory of the Work and to all licenses previously granted.

**Competing Publications**   K.   During the term of this Agreement the Author will not agree to publish or furnish to any other publisher any work on the same subject which, in the Publisher's judgment, will conflict or interfere with the sale of the Work.

**Amendments and Waivers**  L.  This Agreement constitutes the entire understanding of the parties relating to its subject matter and shall not be changed or amended, in whole or in part, except in a writing signed by the parties. No course of dealing between the Publisher and the Author and no delay or failure of a party in exercising any rights hereunder shall operate as a waiver of that party's rights.

**Construction, Heirs**  M.  This Agreement shall be construed and interpreted according to the laws of the State of New York as if executed and fully performed therein, and exclusive jurisdiction over all disputes hereunder shall be in the federal and state courts of the State of New York located in New York County. This Agreement   shall be binding upon the parties hereto, their heirs, successors, assigns, and personal representatives; and references to the Author and to the Publisher shall include their heirs, successors, assigns, and personal representatives. The Author may not delegate any duty hereunder without the prior written consent of the Publisher.

**Joint Authors**  N.  For purposes of this Agreement, whenever the term "the Author" refers to more than one person, all such persons are collectively referred to as the "Author." Unless otherwise indicated in this Agreement, the rights and liabilities of the Author are joint and several. Further, whenever the term "the Author" refers to more than one person, those persons will be deemed to share equally in the grants, advances, royalties and expenses arising under this Agreement, until written notice to the contrary, signed by each person referred to as "the Author" under this Agreement, has been actually received by the Publisher. The Publisher may exercise any or all of its rights and remedies with respect to the Authors individually or collectively. Any one author "and an alternate" may be designated under this Agreement to act on behalf of all the authors jointly, and the Publisher may rely on the acts of the Author or the alternate so designated as representative of and binding upon all the Authors. In the absence of such designation the Publisher may deal with any one of the Authors as the agent and representative of all and may rely on the acts of such as representative as binding on all the Authors. Any such designation may be modified only upon written notice to the Publisher, signed by each person referred to as "Author" under this Agreement.

**Electronic Versions**  O.  The rights granted to the Publisher under this Agreement include (in addition to all other rights described herein) the right to prepare, publish, reproduce, sell and otherwise distribute electronic versions of the Work. As used herein, the term "electronic versions" shall mean any and all methods of copying, recording, storage, retrieval, or delivery of all or any portion of the Work, alone or in combination with other works, including in any multimedia work or electronic book; by any means now known or hereafter devised, including, without limitation, by electronic or electromagnetic means, or by analog or digital signal; whether in sequential or non-sequential order, on any and all physical media, now known or hereafter devised including, without limitation, magnetic tape, floppy   disks, CD-I, CD-ROM, laser disk, optical disk, IC card or chip, and any other human or machine readable medium, whether or not permanently affixed in such media( excluding the electronic versions specifically described in paragraph I (a)); and the broadcast and/or transmission of the foregoing by any and all means now known or hereafter devised.

The Publisher shall pay the Author royalties as follows on the electronic versions:
  (i)  If the Publisher itself creates and sells that electronic version, _18_ % of the net cash received from such use.
  (ii)  If the Publisher licenses the right to create and sell the electronic version, 50% of the net amount of royalty compensation received from such license.

P. _Delivery of items_. Upon execution of this Agreement by the Author and the Publisher, the Author shall deliver to the Publisher, at the address or location designated by the Publisher, at the Authors expense, the items relating to the work and to the Study Guide, Instructors Manual, Test Banks,

Q. Other Works. The Author hereby grants to the Publisher a right of first refusal with respect to any new ⋆ works created by the Author, or each of them, whether with or without the cooperation or assistance of a third party (the "New Work(s)"). The Author shall offer each New Work to the Publisher in writing, at the earliest time reasonable, in the form of a detailed proposal. The Publisher shall have ninety days from its receipt of such written proposal to consider it and communicate to the Author the rights, if any it wishes to acquire. If the Publisher notifies the Author in writing that it desires to acquire rights to the New Work, the Author shall negotiate exclusively and in good faith with the Publisher, for a period of no less than ninety days from the Authors receipt of such written notice, commercially reasonable terms for the Publisher's acquisition thereof. In the event that, following such ninety-day period, the Publisher determines that it does not wish to acquire rights to the New Work or the Author and the Publisher are unable to agree upon the terms of an agreement, the Author may offer the New Work to a third party, subject to the terms of paragraph K of this agreement, provided that the terms made available to the third party are not more favorable to such third party than those made available to the Publisher. If the Author does desire to enter into an agreement on terms more favorable to such third party, The Author shall submit such terms to the Publisher and the Publisher shall have a right, but not an obligation, to match with respect thereto.

R. Inventory. The Publisher agrees to purchase from McGraw-Hill the Then-Current Inventory of the Eighth Edition of the Work, at their Printing Invoice Cost, provided that the Publisher shall have the right to recover the Total Cost of such purchase from any royalties otherwise due the Author. The Author acknowledges and agrees that the Publisher shall have the right to dispose of such Inventory in any manner it sees fit (including without limitation by destruction), provided that the name and mark of McGraw-Hill on the outside cover or jacket of the book version of the Eighth Edition of the Work is covered or not otherwise displayed to customers. As used herein, "Then-Current Inventory" shall mean McGraw-Hill's inventory of the book version of the Eighth Edition of the Work, as of the date of execution of this Agreement, that is in saleable condition; "Printing Invoice Cost" shall mean the actual invoiced printing cost for the printing of each unit of the book version of the Work; and "Total Cost" shall mean the Printing Invoice Cost for all of the Then-Current Inventory of the Eighth Edition of the Work plus the costs associated with transporting such Inventory from a McGraw-Hill location to a location designated by the Publisher including, without limitation, shipping, handling and insurance costs.

S. Returns. The Author shall obtain McGraw-Hill's binding agreement that McGraw-Hill will promptly destroy any and all of its inventory of the Work not purchased by the Publisher including, without limitation, any and all returns that McGraw-Hill may receive following the Publisher's purchase of the Then-Current Inventory. If McGraw-Hill refuses to enter into such binding agreement, the Author shall petition a court of competent jurisdiction to require McGraw-Hill to do so.

T. Future Orders. The Author will require McGraw-Hill to provide prompt notice to any individual, entity, potential adopter, retailer or wholesaler or other potential customer ("Customer") that inquires about obtaining a complimentary copy of the Work or any Supplementary Materials or placing an order therefor that such Customer should contact the Publisher's Faculty and Field Services at (800) 526-0485 or such other telephone number provided by the Publisher to do so.

U. Overnight Mail. If the Publisher requests that the Author deliver materials due under this Agreement via overnight carrier, the Publisher agrees to reimburse the Author such expense, upon receipt of adequate documentation evidencing such expenditure.

⋆ Post-secondary education market

# EXHIBIT H

*Title changed to : Business in Action*

# AUTHOR AGREEMENT

THIS AGREEMENT, made and entered into as of this __23__ day of __March__ 199_9_, by and between

PRENTICE-HALL, INC. ("Publisher"), a Delaware corporation having offices at One Lake Street,

Upper Saddle River, NJ 07458 and __Bovee & Thill LLC__ a limited liability company ~~xxxxxxxxxxxxxxxxxxxxxx~~ of

__Nevada__ residing at __2950 E. Flamingo Road, Suite B__
__Las Vegas, Nevada 89121__

are hereinafter collectively referred to as "the parties".

**GRANT OF RIGHTS**

1. The Author will prepare a work on __EXCELLENCE IN BUSINESS__ (the "Work"). The Author grants and assigns solely and exclusively to the Publisher this Work and all rights in the Work and all derivative works throughout the world, in all languages, for the full term of copyright and all renewals and extensions thereof, and the right to secure copyright in the ~~Publisher's~~ name __of Bovee + Thill LLC__ ~~or Publisher's nominee~~. This grant includes, but is not limited to, the exclusive rights to reproduce, print, distribute, market, promote, publish, sell, license, broadcast, or transmit, in all channels of distribution, the Work and derivative works, in whole or in part, in all forms, formats, media and versions, now known or hereafter developed, including, without limitation, by any electronic or electromagnetic means or analog or digital signal, or on any human or machine readable medium, including as part of an electronic database, and to license others to exercise any and all such rights. This grant of rights includes, without limitation, all rights specified in Paragraphs E and H below.

**DELIVERY**

2. The Work, containing about __175,000__ words or their equivalent, will be delivered by the Author in acceptable final form by __November 30, 1999__. The Publisher and the Author agree that, in print form, the Work will consist of approximately. __500__ printed book pages.

**ROYALTY**

3. Based on the net cash received by the Publisher from the sale of the Work, except as otherwise provided in paragraph H, the Publisher will pay the Author a royalty of ~~XXX~~ __17.75%__.

**ROYALTY STATEMENT**

4. The Publisher will furnish the Author with a royalty statement on or about March 31 and September 30 of each year for the six-month period ending in December and June of each year respectively. With each statement, the Publisher will make settlement for any balance due.

**ADDITIONAL TERMS**

5. Paragraphs A - Q inclusive are part of this Agreement as though placed before the signatures.

__88-0378594__
US Taxpayer Information No.

PRENTICE-HALL, INC.

Bovee & Thill LLC
Author

By: _____
Author

By: _____
AUTHOR

By: _____



**SUBMISSION
OF THE WORK**

*PLEASE
INITIAL*

A. (a) The Author shall deliver the Work, and any required preliminary versions or portions of the Work, in hard copy form, double-spaced on 8-1/2" x 11" paper on one side only, and in an electronic format agreed upon by the parties. The Author will retain at least one copy of each item delivered to the Publisher under this Agreement. The Work will be of such content, form and length as the Publisher is willing to publish. The Publisher may request modifications to the Work, in which event the Author will revise and resubmit the Work, or portion(s) of the Work, within the reasonable period of time requested by the Publisher.

(b) If the Author is unable or unwilling to deliver the Work on time, or if the Work is not acceptable to the Publisher, in its editorial and marketing judgment, in length, form or content, the Publisher may elect to terminate the Agreement and recover from the Author any moneys paid to or on behalf of the Author in connection with the Work. Upon Publisher's termination, and only if the Author repays any and all moneys previously paid to the Author, the Author shall have the right to publish the Work elsewhere.

(c) The Author will read and correct the proofs or other final copy of the Work, if any, and promptly return one set to the Publisher. If the Author does not return a corrected proof of the Work to the Publisher within a reasonable time period to be specified by the Publisher, such material will be considered approved as is. The Author will be responsible for the completeness and accuracy of corrections and will bear the cost of alterations of the proofs or other final copy (other than those resulting from printers or other production errors) exceeding XX%of the cost of typesetting or other formatting. These costs may be deducted from payments otherwise due the Author        15%



**ITEMS FURNISHED
BY THE AUTHOR**

\*suggestions and drafts
for all photographs,
illustrations, and
other art
(collectively, "art
work").

*REVISE
INITIAL*

B. (a) The Author will be responsible for furnishing the following items as part of the Work: information for the title page; a preface; a table of contents or its equivalent; an index or its equivalent; and XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXreferences files as requested by the Publisher, or in any other format XXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

(b) If requested by the Publisher, the Author will (i) furnish the following to the Publisher, in a format agreed upon by the Author and the Publisher, within a reasonable time specified by the Publisher: a foreword; a glossary;XXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX complete art work XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX; and (ii) provide assistance to and consult with the Publisher or any third parties engaged by the Publisher to provide development or production services in connection with the publication of the Work, including the Supplementary Materials or any part(s) of the Work. The Publisher will have all rights to the Supplementary Materials as are granted with respect to the Work.

(c) If the Author fails to deliver any item or perform any service specified in this paragraph within the time specified by the Publisher, the Publisher may have such items prepared or services performed and charge the costs thereof against any sums otherwise due by the Publisher to the Author. The Publisher will pay the cost of manufacture of Supplementary Materials.

**THE AUTHOR'S
WARRANTY**

*PLEASE
INITIAL*

C. The Author warrants that: the Author has full authority to make this Agreement; the Work will be original; the Work has not been published; the Author is the sole owner of the Work; the Author has identified any material in the public domain; the Author has identified XXXXXXXXXXXXXXXXXXXXmaterial from other copyrighted works; the Author is not currently working on any project which may compete with or lessen the value of the Work; the Work, and any part of the Work, will not infringe any copyright or violate any proprietary rights or rights of publicity or privacy, or contain any scandalous, libelous, or unlawful matter or any formula or instruction that is injurious to a person or property. These warranties also apply to other items furnished by the Author pursuant to paragraph B. The Author will hold harmless and indemnify the Publisher against any demand, claim, suit, action, proceeding, cost, damages, and expenses, including reasonable attorneys' fees, arising from any breach or alleged breach of the Author's warranties. The Publisher will have the right to assume and control the defense and settlement of any such claim, and until such claim or suit has been settled or withdrawn, the Publisher may withhold a reasonable amount to cover such claims from any sums due to the Author. The Author will cooperate with the Publisher and provide reasonable assistance in defending against any such claim. The warranties and indemnities contained in this paragraph will survive termination of this Agreement.



**COPYRIGHTED
MATERIALS**

\*\*\* see page 4

*PLEASE
INITIAL*

**EDITING AND
PUBLISHING DETAILS**

D. The Author will not include in the Work material (text or illustrations) from other copyrighted works without both the Publisher's consent and the written permission of the owner of such copyrighted material. The AXXXXXwill be responsible for obtaining the written permission for use of such material in the Work as contemplated by this Agreement and for the costs and fees related to such permissions and will file the permissions with the Publisher by no later than the final submission of the Work. XXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX Publisher to the copy XX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX \*publisher
\*\*  in an amount not to exceed an aggregate of \$7,500

E. The Publisher will have the right, with respect to the Work, including reprints, revisions and new editions, to (a) edit the Work, provided that the meaning of the text is not materially altered; (b) publish the printed Work in one or several volumes and in a style deemed suitable by the Publisher as to paper, printing and binding, under the Publisher's own name and/or under any other imprints; (c) decide on the formats and media in which to publish the Work; (d) fix or alter the wording, format and style of the title, interior design, packaging and/or cover presentation and the prices at which the Work shall be sold and the quantities printed or produced; and (e) determine the methods and means of advertising, marketing and selling the Work. The Publisher will have the right to display the Author's name and likeness in connection with the Work and any part of the Work and in promotional materials.

50

F. The Publisher will furnish to the Author (each author, if there are multiple authors) six copies of the Work as it is first published by the Publisher without charge. Additional copies may be purchased by the Author at the net price.

G. The Author agrees to revise the Work, or any part of the Work, as requested by the Publisher if the Publisher considers it in the best interests of the Work. The provisions of this Agreement shall apply to each revision by the Author as though that revision were the Work being published for the first time under this Agreement. If, in the Publisher's judgment, the Author is *reasonably unable or unwilling to provide a satisfactory revision within the time period established by the Publisher, the Publisher may have such revision (and any subsequent revisions) prepared by others, and charge the cost, including, without limitation, fees and royalties, against the Author's royalties. The Publisher reserves the right to display the Author's name and the name of the person or persons who prepare the revision in connection with the revision and in promotional materials.

H. (a) Other Royalty Rates. The following royalty rates shall apply to the net cash received by the Publisher (or its corporate affiliates, if the sale is made by an affiliate) with respect to the following sales and uses of the Work:

(i) Export Sales: 10%, for the sale of copies of the Work by the Publisher or its affiliate outside the United States and its possessions and territories, except as set forth below.

15%
(ii) Direct Marketing to Consumers: ~~25%~~ for the sale of copies of the Work resulting from direct marketing by the Publisher or its affiliate to the consumer anywhere in the world.

15%
(iii) Special Sales: ~~5%~~, for the sale of copies of the Work by the Publisher or its affiliate to elementary or secondary schools or school districts ~~10%~~ for any sale of copies of the Work by the Publisher or its affiliate by any means and channel at a discount of 51% or greater off the single copy price. *5%

$15\%$ $10\%$ JCB 
(iv) Other Print Versions, Adaptations and Derivative Works: ~~5%~~, for the sale of copies of special print editions of the Work by the Publisher or its affiliate, including, without limitation, book club editions, large print editions, and print adaptations or derivative works of the Work, including, without limitation, translations, abridgments, and adaptations for export markets.

17.75%
(v) Electronic Transmissions of the Work ~~18%~~, based on net cash received by the Publisher or its affiliate for transmission of the Work via radio or television broadcast, cable, satellite, on-line or other electronic or electromagnetic transmission.

17.75%
(vi) Other Media Versions of the Work: ~~54%~~ based on the net cash received by the Publisher or its affiliate for distribution, sale or license of copies of the Work in non-print media, including, without limitation, audio, video, motion picture or multimedia versions.

(vii) Licenses of Subsidiary Rights: 50% of the net amount received by the Publisher from (a) any license permitting a third party to publish and sell or otherwise commercially exploit a version of the Work in any format or medium, where the Publisher has no involvement in modifying, enhancing, or marketing the Work for or with such third party; or (b) any license permitting a third party to use or quote portions of the Work for use in the third party's publication.

(b) Accounting. (i) For uses of portions of, or quotations from, the Work, including in a collective work or custom published work, and for sales of the Work as part of a package together with other works, or in electronic products or transmissions incorporating other works (the "Package"), including, without limitation, for purposes set forth in subsections a(iv) - (vii) above, the Publisher shall determine the net cash received for the Work on which the applicable royalty will be paid by allocating to the Work that portion of the proceeds for the Package which it determines to be the proportionate and fair value of the Work to the entire Package, provided, however, that if only small portions or quotes from the Work are taken, the Author will receive a permission fee comparable to the permission fee the Publisher would have paid to the Author upon the grant of permission to an unrelated third party to use the portion or quote. (ii) If the balance due the Author for any settlement period is less than fifty dollars, the Publisher may make no accounting or payment until the next settlement period at the end of which the cumulative unpaid balance equals at least fifty dollars. (iii) The Publisher may deduct from any amounts due the Author under this or any other agreement any sum that the Author may owe the Publisher under this or any other agreement. (iv) No royalties or other payments will be due to the Author with respect to any copies of the Work, or any part of the Work, furnished by the Publisher to others *free for the purpose of promotion, publicity or for any other similar purpose deemed appropriate by the Publisher; any copies of the Work, or any part of the Work, sold at a price below manufacturing cost plus royalties; ~~any copies of the Work, any part of the Work, for which the Author has received a permission fee~~ ~~xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx~~xxxxx

(c) Records. The Publisher will maintain relevant records with respect to any royalty statement provided to the Author under the Agreement for a two year period from the date of the statement. Royalty statements will be final and binding upon the Author unless, within two years from the date of the statement, the Author objects to such statement in a writing which states the specific objection and the basis for such objection.


AUTHOR'S COPIES
REVISIONS


PLEASE
INITIAL
ADDITIONAL
ROYALTY TERMS

PLEASE
INITIAL

PLEASE
INITIAL


PLEASE
INITIAL

**DISCONTINUING PUBLICATION**

I. If the Publisher decides that continued publication of the Work in any or all particular forms or media is unwarranted, the Publisher may discontinue or suspend such publication, and destroy such copies of the Work without liability to the Author, and without prejudice to other rights the Publisher has in the Work or any then-existing license or other arrangement.

**COMPETING PUBLICATIONS**

J. During the term of this Agreement, the Author will not publish or agree to publish or furnish to any other publisher any work on the same subject matter of the Work which will, in the Publisher's judgment, conflict or interfere with any of the Publisher's rights to sell, distribute or use the Work under this Agreement.

**ENTIRE AGREEMENT AMENDMENTS AND WAIVERS**

K. This Agreement, together with any Addenda and Exhibit(s) annexed to it, constitutes the entire understanding of the parties relating to its subject matter and shall not be changed or amended in whole or in part except by a writing signed by the parties. No waiver or breach of any term or condition of this Agreement shall be deemed a waiver of any other term or condition or any later breach. No course of dealing between the Publisher and the Author and no delay or failure of a party in exercising any rights shall operate as a waiver of that party's rights. Publication and payments to the Author shall not constitute or imply any waiver of the Author's warranties or obligations or the Publisher's defenses, rights or remedies.

**CONSTRUCTION, HEIRS, ASSIGNS**

L. THIS AGREEMENT SHALL BE CONSTRUED AND INTERPRETED ACCORDING TO THE LAWS OF THE STATE OF NEW YORK AS IF EXECUTED AND FULLY PERFORMED THEREIN, AND EXCLUSIVE JURISDICTION OVER ALL DISPUTES ARISING IN CONNECTION WITH THE AGREEMENT SHALL BE IN THE FEDERAL AND STATE COURTS OF THE STATE OF NEW YORK LOCATED IN NEW YORK COUNTY. This Agreement shall be binding upon the parties hereto, their heirs, successors, assigns, and personal representatives. The Author may not delegate any duty hereunder without the prior written consent of the Publisher.

**JOINT AUTHORS**

M. For purposes of this Agreement, all authors are collectively referred to as the "Author." Whenever the term "the Author" refers to more than one person, those persons will be deemed to share equally in the royalties and expenses arising under this Agreement until written notice to the contrary, signed by all authors, has been actually received by the Publisher. The rights, obligations and liabilities of the Author are joint and several, but the Publisher may exercise any or all of its rights and remedies with respect to the authors individually or collectively. If any author does not perform the obligations required, the Publisher shall have the right to proceed with the other author(s) without obligation to the non-performing author.

N. The Author does not, and will not, have any power, right or authority to bind the Publisher, or to assume or create any obligation or responsibility, express or implied, on behalf of the Publisher.

**PARTIES' RELATIONSHIP**

**CONFIDENTIALITY**

O. The Author shall keep confidential and shall not disclose the terms of this Agreement except to the Author's authorized legal and financial representatives with a need to know and then only for purposes of representing the Author's interests hereunder.

**HEADINGS**

P. All titles, subject headings and similar items set forth in this Agreement are provided for the purpose of reference and convenience only and are not intended to be inclusive, definitive or to affect the meaning, content or scope of this Agreement.

**RIGHT OF FIRST REFUSAL**

Q. The Author grants to the Publisher an exclusive option to publish the Author's next textbook. The Author shall deliver a written proposal for the new work to the Publisher, and the Publisher shall have 60 days to give written notice to the Author as to whether the Publisher will exercise the option.


PLEASE INITIAL

```
*** from page 2 COPYRIGHTED MATERIALS D
The publisher will pay on the authors' behalf the permissions fees
which exceed $7,500 and will recover such amounts so paid from the amounts
otherwise payable to the auhtor under this agreement or otherwise.
```

## INDIVIDUAL GUARANTY

In order to induce Publisher to enter the attached
Agreement for publication of a work tentatively entitled

_____ Excellence in Business _____

and in consideration thereof, I,

Courtland Bovee  and _John Thill_____

unconditionally guarantee to Publisher the due performance by

_____ Bovee & Thill _____, LLC

(herein the "Company") of all the terms and conditions thereof on its part to be performed and guarantee that the Company is a validly existing corporation incorporated under the laws of the state of  Nevada_____. This guaranty will be construed as absolute, continuing and unlimited, and shall be enforceable against me, my heirs, and assigns, without the obligation to first proceed against the Company. I waive notice of any and all defaults on the part of Company, and I agree that waiver by Publisher of any rights against the Company under the said Agreement shall not in any way limit or discharge my obligations under this guaranty. To the extent that any provisions in said Agreement affect me, I consent to such provisions and agree to perform and render all services set forth in the Agreement. I represent that there is a valid and subsisting employment agreement between that Company as an employer and me as an employee under the terms of which the Company has the right to enter into the foregoing Agreement and to lend my services as therein provided.

I agree that exclusive jurisdiction for determination of any dispute solely between or among me and any party or parties to the Agreement relating to or arising out of this guaranty is hereby vested in the Supreme Court, New York County, or, at the election of any party if the jurisdictional prerequisites at the time exist, in the United States District Court for the Southern District of New York, and I agree to submit to the jurisdiction of either such court in the City and State of New York for the determination of any such dispute, and hereby consent (in addition to service of process by any other means provided at the time by law) to service of process on me by registered mail, first class postage prepaid, return receipt requested, addressed to me at the address to which notices may be given to the Company pursuant to the Agreement, and that service by mail so given shall be deemed to confer jurisdiction upon such court.

This Guaranty shall be construed in accordance with the laws of the State of New York applicable to agreements made out fully performed therein.

____6/8/99____      By _____
Date

____6/8/99____      By _____
Date

# EXHIBIT I

*Title changed to:*
*Business Communication Essentials*

# Author Agreement

THIS AGREEMENT, made and entered into as of this __12__ day of _October_, 20 _01_, by and between PEARSON

EDUCATION, INC. ("Publisher"), a Delaware corporation, publishing as PRENTICE HALL, having offices at One Lake

Street, Upper Saddle River, NJ 07458 and _Bovee & Thill, LLC_____ ("the Author"), a xxxxx

\* _limited liability company_      _2950 East Flamingo Rd, Suite E-5_
of _Nevada_____ residing at _Las Vegas, NV 89121_____, hereinafter

collectively referred to as "the parties."

## ESSENTIALS OF BUSINESS

Grant of Rights

1. The Author will prepare a work on _COMMUNICATION_____ (the "Work"). The Author grants and assigns solely and exclusively to the Publisher this Work and all rights in the Work and all derivative works throughout the world, in all languages, for the full term of copyright and all renewals and extensions thereof, and the right to secure copyright in the Publisher's name or any other name. This grant includes, but is not limited to, the exclusive rights to reproduce, print, distribute, market, promote, publish, sell, license, broadcast, or transmit, in all channels of distribution, the Work and derivative works, in whole or in part, in all forms, formats, media and versions, now known or hereafter developed, including, without limitation, by any electronic or electromagnetic means or analog or digital signal, or on any human or machine readable medium, including as part of an electronic database, and to license others to exercise any and all such rights. This grant of rights includes, without limitation, all rights specified in Paragraphs E and H below.

Delivery

2. The Work, containing about _212,500_____ words or their equivalent, will be delivered by the Author in acceptable final form by _July 15, 2002_____. The Publisher and the Author agree that, in print form, the Work will consist of approximately _500_ printed book pages.

**PLL** *(initial)*

Royalty

3. Based on the net cash received by the Publisher from the sale of the Work, except as otherwise provided in paragraph H, the Publisher will pay the Author a royalty of XX%. **17%**

INITIAL *(initial)*

Royalty Settlement

4. The Publisher will furnish the Author with a royalty statement on or about March 31 and September 30 of each year for the six-month period ending in December and June of each year respectively. With each statement, the Publisher will make settlement for any balance due.

**PLEASE INITIAL** *(initial)*

**S/page 5**

5. Paragraphs A - XX inclusive are part of this Agreement as though placed before the signatures.

Additional Rights

_88-0427542_
US Taxpayer Information No.

By: _John Thill, President_
**Bovee & Thill, LLC**      Author

PEARSON EDUCATION, INC.

By _[signature]_



(a) The Author shall deliver the Work, and any required preliminary versions or portions of the Work, in hard copy form, double-spaced on 8-1/2" x 11" paper on one side only, and in an electronic format agreed upon by the parties. The Author will retain at least one copy of each item delivered to the Publisher under this Agreement. The Work will be of such content, form and length as the Publisher is willing to publish. The Publisher may request modifications to the Work, in which event the Author will revise and resubmit the Work, or portion(s) of the Work, within the reasonable period of time requested by the Publisher.

(b) If the Author is unable or unwilling to deliver the Work on time, or if the Work is not acceptable to the Publisher, in its editorial and marketing judgment, in length, form or content, the Publisher may elect to terminate the Agreement and recover from the Author any moneys paid to or on behalf of the Author in connection with the Work. Upon Publisher's termination, and only if the Author repays any and all moneys previously paid to the Author, the Author shall have the right to publish the Work elsewhere.

(c) The Author will read and correct the proofs or other final copy of the Work, if any, and promptly return one set to the Publisher. If the Author does not return a corrected proof of the Work to the Publisher within a reasonable time period to be specified by the Publisher, such material will be considered approved as is. The Author will be responsible for the completeness and accuracy of corrections and will bear the cost of alterations of the proofs or other final copy (other than those resulting from printers or other production errors) exceeding ~~10%~~ **15%** of the cost of typesetting or other formatting. These costs may be deducted from payments otherwise due the Author



(. (a) The Author will be responsible for furnishing the following items as part of the Work: information for the title page; a preface; a table of contents or its equivalent; an index or its equivalent; and XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX, XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

*suggestions and drafts for all photographs, illustrations, and other art.

(b) If requested by the Publisher, the Author will (i) furnish the following to the Publisher, in a format agreed upon by the Author and the Publisher, within a reasonable time specified by the Publisher: a foreword; a glossary; XXXXXXXXXXXXXXX. XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX; and (ii) provide assistance to and consult with the Publisher or any third parties engaged by the Publisher to provide development or production services in connection with the publication of the Work, including the Supplementary Materials or any part(s) of the Work. The Publisher will have all rights to the Supplementary Materials as are granted with respect to the Work.

(c) If the Author fails to deliver any item or perform any service specified in this paragraph within the time specified by the Publisher, the Publisher may have such items prepared or services performed and charge the costs thereof against any sums otherwise due by the Publisher to the Author. The Publisher will pay the cost of manufacture of Supplementary Materials.



The Author warrants that: the Author has full authority to make this Agreement; the Work will be original; the Work has not been published; the Author is the sole owner of the Work; the Author has identified any material in the public domain; the Author has identified XXXXXXXXXXXXXXXXXXXXXXXXXX material from other copyrighted works; the Author is not currently working on any project which may compete with or lessen the value of the Work; the Work, and any part of the Work, will not infringe any copyright or violate any proprietary rights or rights of publicity or privacy, or contain any scandalous, libelous, or unlawful matter or any formula or instruction that is injurious to a person or property. These warranties also apply to other items furnished by the Author pursuant to paragraph B. The Author will hold harmless and indemnify the Publisher against any demand, claim, suit, action, proceeding, cost, damages, and expenses, including reasonable attorneys' fees, arising from any breach or alleged breach of the Author's warranties. The Publisher will have the right to assume and control the defense and settlement of any such claim, and until such claim or suit has been settled or withdrawn, the Publisher may withhold a reasonable amount to cover such claims from any sums due to the Author. The Author will cooperate with the Publisher and provide reasonable assistance in defending against any such claim. The warranties and indemnities contained in this paragraph will survive termination of this Agreement.



/Publisher

The Author will not include in the Work material (text or illustrations) from other copyrighted works without both the Publisher's consent and the written permission of the owner of such copyrighted material. The XXXXX will be responsible for obtaining the written permission for use of such material in the Work as contemplated by this Agreement and for the costs and fees related to such permissions and will file the permissions with the Publisher by no later than the final submission of the Work. XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

*in an amount not to exceed an aggregate of $7,500

The Publisher will have the right, with respect to the Work, including reprints, revisions and new editions, to (a) edit the Work, provided that the meaning of the text is not materially altered; (b) publish the printed Work in one or several volumes and in a style deemed suitable by the Publisher as to paper, printing and binding, under the Publisher's own name and/or under any other imprints; (c) decide on the formats and media in which to publish the Work; (d) fix or alter the wording, format and style of the title, interior design, packaging and/or cover presentation and the prices at which the Work shall be sold and the quantities printed or produced; and (e) determine the methods and means of advertising, marketing and selling the Work. The Publisher will have the right to display the Author's name and likeness in connection with the Work and any part of the Work and in promotional materials.

**PLEASE INITIAL**

The Publisher will furnish to the Author (each author, if there are multiple authors) 50 copies of the Work as it is first published by the Publisher without charge. Additional copies may be purchased by the Author at the net price.

**PLEASE INITIAL**

The Author agrees to revise the Work, or any part of the Work, as requested by the Publisher if the Publisher considers it in the best interests of the Work. The provisions of this Agreement shall apply to each revision by the Author as though that revision were the Work being published for the first time under this Agreement. If, in the Publisher's judgment, the Author is *reasonable unable or unwilling to provide a satisfactory revision within the time period established by the Publisher, the Publisher may have such revision (and any subsequent revisions) prepared by others, and charge the cost, including, without limitation, fees and royalties, against the Author's royalties. The Publisher reserves the right to display the Author's name and the name of the person or persons who prepare the revision in connection with the revision and in promotional materials.

**PLEASE INITIAL**

(a) Other Royalty Rates. The following royalty rates shall apply to the net cash received by the Publisher (or its corporate affiliates, if the sale is made by an affiliate) with respect to the following sales and uses of the Work:

(i) Export Sales: 10%, for the sale of copies of the Work by the Publisher or its affiliate outside the United States and its possessions and territories, except as set forth below.

(ii) Direct Marketing to Consumers: 15%, for the sale of copies of the Work resulting from direct marketing by the Publisher or its affiliate to the consumer anywhere in the world.

(iii) Special Sales: 15%, for the sale of copies of the Work by the Publisher or its affiliate to elementary or secondary schools or school districts, or for any sale of copies of the Work by the Publisher or its affiliate by any means and channel at a discount of 51% or greater off the single copy price.

(iv) Other Print Versions, Adaptations and Derivative Works: 10%, for the sale of copies of special print editions of the Work by the Publisher or its affiliate, including, without limitation, book club editions, large print editions, and print adaptations or derivative works of the Work, including, without limitation, translations, abridgments, and adaptations for export markets.

(v) Electronic Transmissions of the Work: 17%, based on net cash received by the Publisher or its affiliate for transmission of the Work via radio or television broadcast, cable, satellite, on-line or other electronic or electromagnetic transmission.

(vi) Other Media Versions of the Work: 17%, based on the net cash received by the Publisher or its affiliate for distribution, sale or license of copies of the Work in non-print media, including, without limitation, audio, video, motion picture or multimedia versions, or in formats or versions for radio or television broadcast, cable, satellite, or on-line or other electronic or electromagnetic transmission.

(vii) Licenses of Subsidiary Rights: 50% of the net amount received by the Publisher from (a) any license permitting a third party to publish and sell or otherwise commercially exploit a version of the Work in any format or medium, where the Publisher has no involvement in modifying, enhancing, or marketing the Work for or with such third party; or (b) any license permitting a third party to use or quote portions of the Work for use in the third party's publication.

(b) Accounting. (i) For uses of portions of, or quotations from, the Work, including in a collective work or custom published work, and for sales of the Work as part of a package together with other works, or in electronic products or transmissions incorporating other works (the "Package"), including, without limitation, for purposes set forth in subsections a(iv) - (vi) above, the Publisher shall determine the net cash received for the Work on which the applicable royalty will be paid by allocating to the Work that portion of the proceeds for the Package which it determines to be the proportionate and fair value of the Work to the entire Package, provided, however, that if only small portions or quotes from the Work are taken, the Author will receive a permission fee comparable to the permission fee the Publisher would have paid to the Author upon the grant of permission to an unrelated third party to use the portion or quote. (ii) If the balance due the Author for any settlement period is less than fifty dollars, the Publisher may make no accounting or payment until the next settlement period at the end of which the cumulative unpaid balance equals at least fifty dollars. (iii) The Publisher may deduct from any amounts due the Author under this or any other agreement any sum that the Author may owe the Publisher under this or any other agreement. (iv) No royalties or other payments will be due to the Author with respect to any copies of the Work, or any part of the Work, furnished *free by the Publisher to others for the purpose of promotion, publicity or for any other similar purpose deemed appropriate by the Publisher; any copies of the Work, or any part of the Work, sold at a price below manufacturing cost plus royalties; xxxxxxxxxx xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

(c) Records. The Publisher will maintain relevant records with respect to any royalty statement provided to the Author under the Agreement for a two year period from the date of the statement. Royalty statements will be final and binding upon the Author unless, within two years from the date of the statement, the Author objects to such statement in a writing which states the specific objection and the basis for such objection.

**AUTHOR'S COPIES**

**ROYALTIES** *reasonable

**ADDITIONAL ROYALTY TERMS**

<table>
<tr><td>

PRODUCT<br>PROTECTION

COMPETING<br>PUBLICATIONS

ENTIRE<br>AGREEMENT,<br>AMENDMENTS AND<br>WAIVERS

CONSTRUCTION,<br>HEIRS, ASSIGNS

JOINT AUTHORS

PARTIES'<br>RELATIONSHIP

CONFIDENTIALITY

HEADINGS

RIGHT OF<br>FIRST REFUSAL

</td><td>

If the Publisher decides that continued publication of the Work in any or all particular forms or media is unwarranted, the Publisher may discontinue or suspend such publication, and destroy such copies of the Work without liability to the Author, and without prejudice to other rights the Publisher has in the Work or any then-existing license or other arrangement.

During the term of this Agreement, the Author will not publish or agree to publish or furnish to any other publisher any work on the same subject matter of the Work which will, in the Publisher's judgment, conflict or interfere with any of the Publisher's rights to sell, distribute or use the Work under this Agreement.

This Agreement, together with any Addenda and Exhibit(s) annexed to it, constitutes the entire understanding of the parties relating to its subject matter and shall not be changed or amended in whole or in part except by a writing signed by the parties. No waiver or breach of any term or condition of this Agreement shall be deemed a waiver of any other term or condition or any later breach. No course of dealing between the Publisher and the Author and no delay or failure of a party in exercising any rights shall operate as a waiver of that party's rights. Publication and payments to the Author shall not constitute or imply any waiver of the Author's warranties or obligations or the Publisher's defenses, rights or remedies.

THIS AGREEMENT SHALL BE CONSTRUED AND INTERPRETED ACCORDING TO THE LAWS OF THE STATE OF NEW YORK AS IF EXECUTED AND FULLY PERFORMED THEREIN, AND EXCLUSIVE JURISDICTION OVER ALL DISPUTES ARISING IN CONNECTION WITH THE AGREEMENT SHALL BE IN THE FEDERAL AND STATE COURTS OF THE STATE OF NEW YORK LOCATED IN NEW YORK COUNTY. This Agreement shall be binding upon the parties hereto, their heirs, successors, assigns, and personal representatives. The Author may not assign this Agreement or delegate any duty hereunder without the prior written consent of the Publisher. The Publisher may assign this Agreement.

For purposes of this Agreement, all authors are collectively referred to as the "Author." Whenever the term "the Author" refers to more than one person, those persons will be deemed to share equally in the royalties and expenses arising under this Agreement until written notice to the contrary, signed by all authors, has been actually received by the Publisher. The rights, obligations and liabilities of the Author are joint and several, but the Publisher may exercise any or all of its rights and remedies with respect to the authors individually or collectively. If any author does not perform the obligations required, the Publisher shall have the right to proceed with the other author(s) without obligation to the non-performing author.

The Author does not, and will not, have any power, right or authority to bind the Publisher, or to assume or create any obligation or responsibility, express or implied, on behalf of the Publisher.

The Author shall keep confidential and shall not disclose the terms of this Agreement except to the Author's authorized legal and financial representatives with a need to know and then only for purposes of representing the Author's interests hereunder.

All titles, subject headings and similar items set forth in this Agreement are provided for the purpose of reference and convenience only and are not intended to be inclusive, definitive or to affect the meaning, content or scope of this Agreement.

The Author grants to the Publisher an exclusive option to publish the Author's next textbook. The Author shall deliver a written proposal for the new work to the Publisher, and the Publisher shall have 60 days to give written notice to the Author as to whether the Publisher will exercise the option.

</td></tr>
</table>

Agreement dated October 12, 2001
Between Pearson Education, Inc, publishing as Prentice Hall and
Bovee & Thill, LLC
Page 5



R.  The Publisher agrees to pay the Author an advance in the amount of
    $52,000 payable as set forth below.  All such advance payments shall be
fully recoverable by the
    Publisher from amounts otherwise due to the Author:

    i      $26,000 upon execution of this Agreement;

    ii     $26,000 on January 4, 2002.

The obligation to pay an advance shall not apply to revised editions of the
Work.



S.  The Publisher agrees to pay to the Author $2,500 as a grant for direct
    expenses incurred by the Author in the preparation of the Work.  Such
    amount will be paid upon the execution of this Agreement:

The obligation to pay a grant shall not apply to revised editions of the Work.

LOW PRICE EDITION

**PEARSON**
Education
CELEBRATING
10 YEARS
IN INDIA

# Business Communication Today

*Eighth Edition*

**Courtland L. Bovée**
**John V. Thill**



This edition is manufactured in India and is authorized for sale only in India, Bangladesh, Bhutan, Pakistan, Nepal, Sri Lanka and the Maldives. Circulation of this edition outside of these territories is UNAUTHORIZED.

# BUSINESS COMMUNICATION TODAY

# BUSINESS COMMUNICATION TODAY

*Eighth Edition*

## COURTLAND L. BOVÉE

*Professor of Business Communication*
*C. Allen Paul Distinguished Chair*
*Grossmont College*

## JOHN V. THILL

*Chief Executive Officer*
*Communication Specialists of America*



PEARSON
Education



**Pearson Prentice Hall™** is a trademark of Pearson Education, Inc.
**Pearson®** is a registered trademark of Pearson Plc.
**Prentice Hall®** is a registered trademark of Pearson Education, Inc.

Credits and acknowledgments for material borrowed from other sources and reproduced, with permission, in this textbook appear on page AC-1.

Microsoft® and Windows® are registered trademarks of the Microsoft Corporation in the U.S.A. and other countries. Screen shots and icons reprinted with permission from the Microsoft Corporation. This book is not sponsored or endorsed by or affiliated with the Microsoft Corporation.

**Copyright © 2005 by Bovee & Thill LLC.**
**This edition is published by arrangement with Pearson Education, Inc. and Dorling Kindersley Publishing, Inc.**

This book is sold subject to the condition that it shall not, by way of trade or otherwise, be lent, resold, hired out, or otherwise circulated without the publisher's prior written consent in any form of binding or cover other than that in which it is published and without a similar condition including this condition being imposed on the subsequent purchaser and without limiting the rights under copyright reserved above, no part of this publication may be reproduced, stored in or introduced into a retrieval system, or transmitted in any form or by any means (electronic, mechanical, photocopying, recording or otherwise), without the prior written permission of both the copyright owner and the above-mentioned publisher of this book.

ISBN 81-317-1838-7

**First Impression, 2008**

*This edition is manufactured in India and is authorized for sale only in India, Bangladesh, Bhutan, Pakistan, Nepal, Sri Lanka and the Maldives. Circulation of this edition outside of these territories is UNAUTHORIZED.*

Published by Dorling Kindersley (India) Pvt. Ltd., licensees of Pearson Education in South Asia.

Head Office: 482, F.I.E., Patparganj, Delhi 110 092, India.
Registered Office: 14 Local Shopping Centre, Panchsheel Park, New Delhi 110 017, India.

Printed in India by Baba Barkha Nath Printers.

# Contents in Brief

*Preface xv*

## Part 1. Understanding the Foundations of Business Communication  2
1. Achieving Success Through Effective Business Communication  2
2. Communicating in Teams and Mastering Listening and Nonverbal Communication  32
3. Communicating Interculturally  60

## Part 2. Applying the Three-Step Writing Process  86
4. Planning Business Messages  86
5. Writing Business Messages  116
6. Completing Business Messages  150

## Part 3. Writing Letters, Memos, E-Mails, and Instant Messages  180
7. Writing Routine and Positive Messages  180
8. Writing Negative Messages  220
9. Writing Persuasive Messages  262

## Part 4. Finding and Communicating Information  300
10. Finding, Evaluating, and Processing Information  300
11. Communicating Information Through Visuals  330

## Part 5. Planning, Writing, and Completing Reports and Proposals  358
12. Planning Reports and Proposals  358
13. Writing Reports and Proposals  390
14. Completing Reports and Proposals  418

## Part 6. Designing and Delivering Oral Presentations  466
15. Planning, Writing, and Completing Oral Presentations  466
16. Enhancing Presentations with Slides and Transparencies  492

## Part 7. Writing Employment Messages and Interviewing for Jobs  516
17. Building Careers and Writing Résumés  516
18. Applying and Interviewing for Employment  550

**Appendix A.** Format and Layout of Business Documents  A-1
**Appendix B.** Documentation of Report Sources  A-21
**Appendix C.** Correction Symbols  A-27

*Video Guide: Applications and Exercises  VG-1*
*Handbook of Grammar, Mechanics, and Usage  H-1*



**EIGHTH EDITION**

# Business
# **Communication** Today

>> **BOVÉE / THILL**



# How do you want

## Comprehensive



**ISBN: 0-13-147845-1**

CHAPTER 1  Achieving Success Through Effective Business Communication

CHAPTER 2  Communicating in Teams and Mastering Listening and Nonverbal Communication

CHAPTER 3  Communicating Interculturally

CHAPTER 4  Planning Business Messages

CHAPTER 5  Writing Business Messages

CHAPTER 6  Completing Business Messages

CHAPTER 7  Writing Routine and Positive Messages

CHAPTER 8  Writing Negative Messages

CHAPTER 9  Writing Persuasive Messages

CHAPTER 10  Finding, Evaluating, and Processing Information

CHAPTER 11  Communicating Information Through Visuals

CHAPTER 12  Planning Reports and Proposals

CHAPTER 13  Writing Reports and Proposals

CHAPTER 14  Completing Reports and Proposals

CHAPTER 15  Planning, Writing, and Completing Oral Presentations

CHAPTER 16  Enhancing Presentations with Slides and Transparencies

CHAPTER 17  Building Careers and Writing Résumés

CHAPTER 18  Applying and Interviewing for Employment

Appendix A  Format and Layout of Business Documents

Appendix B  Documentation of Report Sources

Appendix C  Correction Symbols

Video Guide:  Applications and Exercises

Handbook of Grammar, Mechanics, and Usage

## Brief Paperback with Grammar Emphasis



**ISBN: 0-13-147245-3**

CHAPTER 1  Understanding Business Communication in Today's Workplace

CHAPTER 2  Communicating in Teams and Mastering Listening and Nonverbal Communication Skills

CHAPTER 3  Planning Business Messages

CHAPTER 4  Writing Business Messages

CHAPTER 5  Completing Business Messages

CHAPTER 6  Working with Letters, Memos, E-Mail, and Instant Messages

CHAPTER 7  Writing Routine Messages

CHAPTER 8  Writing Bad-News Messages

CHAPTER 9  Writing Persuasive Messages

CHAPTER 10  Understanding and Planning Business Reports and Proposals

CHAPTER 11  Writing and Completing Business Reports and Proposals

CHAPTER 12  Preparing and Giving Oral Business Presentations

CHAPTER 13  Searching for Employment and Preparing Employment Messages

CHAPTER 14  Interviewing for Employment and Following Up

Appendix A  Format and Layout of Business Documents

Appendix B  Documentation of Report Sources

Appendix C  Correction Symbols

Video Guide with Exercises

Handbook of Grammar, Mechanics, and Usage

Answer Key to the Level-1 Self-Assessment Exercises

## Interactive Media Edition



**ISBN: 0-13-041786-X**

CHAPTER 1  Understanding Business Communication

CHAPTER 2  Communication in Teams, Collaboration, Listening, Nonverbal, and Meeting Skills

CHAPTER 3  Communicating Interculturally

CHAPTER 4  Planning Business Messages

CHAPTER 5  Writing Business Messages

CHAPTER 6  Completing Business Messages

CHAPTER 7  Writing Routing, Good-news, and Goodwill Messages

CHAPTER 8  Writing Bad-news Messages

CHAPTER 9  Writing Persuasive Messages

CHAPTER 10  Planning Business Reports and Proposals

CHAPTER 11  Writing Business Reports and Proposals

CHAPTER 12  Completing Formal Reports and Proposals

CHAPTER 13  Giving Speeches and Oral Presentations

CHAPTER 14  Writing Résumés and Application Letters

CHAPTER 15  Interviewing for Employment and Following Up

# your Bovée/Thill?

## Balanced Presentation of Fundamentals



**ISBN: 0-13-141965-X**

| | |
|---|---|
| CHAPTER 1 | Achieving Success Through Effective Business Communication |
| CHAPTER 2 | Communicating in Teams and Mastering Listening, Nonverbal Communication, and Business Etiquette Skills |
| CHAPTER 3 | Communicating Interculturally |
| CHAPTER 4 | Planning Business Messages |
| CHAPTER 5 | Writing Business Messages |
| CHAPTER 6 | Completing Business Messages |
| CHAPTER 7 | Writing Routine Messages |
| CHAPTER 8 | Writing Bad-News Messages |
| CHAPTER 9 | Writing Persuasive Messages |
| CHAPTER 10 | Planning Business Reports and Proposals |
| CHAPTER 11 | Writing Business Reports and Proposals |
| CHAPTER 12 | Completing Formal Business Reports and Proposals |
| CHAPTER 13 | Planning, Writing, and Completing Oral Presentations |
| CHAPTER 14 | Writing Résumés and Application Letters |
| CHAPTER 15 | Interviewing for Employment and Following Up |
| Appendix A | Format and Layout of Business Documents |
| Appendix B | Documentation of Report Sources |
| Appendix C | Correction Symbols |

Video Guide and Exercises

Handbook of Grammar, Mechanics, and Usage

Answer Keys

## *Business Communication Today* Custom One-Color Option

### The Core

| | |
|---|---|
| CHAPTER 1 | Achieving Success Through Effective Business Communication |
| CHAPTER 2 | Communicating in Teams and Mastering Listening and Nonverbal Communication |
| CHAPTER 3 | Communicating Interculturally |
| CHAPTER 4 | Planning Business Messages |
| CHAPTER 5 | Writing Business Messages |
| CHAPTER 6 | Completing Business Messages |
| CHAPTER 7 | Writing Routine and Positive Messages |
| CHAPTER 8 | Writing Negative Messages |
| CHAPTER 9 | Writing Persuasive Messages |
| Appendix A | Format and Layout of Business Documents |
| Appendix B | Documentation of Report Sources |
| Appendix C | Correction Symbols |

### Optional Chapters

| | |
|---|---|
| CHAPTER 10 | Finding, Evaluating, and Processing Information |
| CHAPTER 11 | Communicating Information Through Visuals |
| CHAPTER 12 | Planning Reports and Proposals |
| CHAPTER 13 | Writing Reports and Proposals |
| CHAPTER 14 | Completing Reports and Proposals |
| CHAPTER 15 | Planning, Writing, and Completing Oral Presentations |
| CHAPTER 16 | Enhancing Presentations with Slides and Transparencies |
| CHAPTER 17 | Building Careers and Writing Résumés |
| CHAPTER 18 | Applying and Interviewing for Employment |

Handbook of Grammar, Mechanics, and Usage

## $40.⁰⁰ !

### *for the core nine chapters*

● Net price to bookstore

## $5.⁰⁰ !

### *each additional chapter*

● Net price to bookstore

Contact your local PH Rep for more information on the custom/core option.

# BUSINESS COMMUNICATION TODAY

# BUSINESS COMMUNICATION TODAY

## *Eighth Edition*

### COURTLAND L. BOVÉE

*Professor of Business Communication*
*C. Allen Paul Distinguished Chair*
*Grossmont College*

### JOHN V. THILL

*Chief Executive Officer*
*Communication Specialists of America*



PEARSON
Prentice
Hall

Upper Saddle River, New Jersey 07458

**Library of Congress Cataloging-in-Publication**
Bovée, Courtland L.
    Business communication today/Courtland L. Bovée, John V. Thill.—8th ed.
      p. cm.
    Includes bibliographical references and index.
    ISBN 0-13-147845-1
      1. Business communication—United States—Case studies. 2. Communication in
organizations—United States—Case studies. I. Thill, John V. II. Title.

HF5718.B66 2004
658.4'5—dc22
                                       2004024886

**Acquisition Editor:** David Parker
**Editorial Assistant:** Denise Vaughn
**Marketing Manager:** Anke Braun
**Marketing Assistant:** Patrick Dansozo
**Senior Managing Editor (Production):** Judy Leale
**Production Editor:** Cindy Durand
**Permissions Supervisor:** Charles Morris
**Production Manager:** Arnold Vila
**Design Manager:** Maria Lange
**Art Director:** Janet Slowik
**Interior Design:** Liz Harasymczuk

**Cover Design:** Liz Harasymczuk
**Cover Illustration/Photo:** Robert Daly/Image
  Bank/Getty Images, Inc.
**Illustrator (Interior):** ElectraGraphics, Inc.
**Photo Researcher:** Melinda Alexander
**Image Permission Coordinator:** Nancy Seise
**Manager, Print Production:** Christy Mahon
**Composition/Full-Service Project Management:**
  Lynn Steines, Carlisle Communications
**Printer/Binder:** Courier/Kendallville
**Typeface:** Minion 10.5 pt

Credits and acknowledgments for material borrowed from other sources and reproduced, with
permission, in this textbook appear on page AC-1.

Microsoft® and Windows® are registered trademarks of the Microsoft Corporation in the U.S.A. and
other countries. Screen shots and icons reprinted with permission from the Microsoft Corporation. This
book is not sponsored or endorsed by or affiliated with the Microsoft Corporation.

**Copyright © 2005, 2003, 2000, 1998, and 1997 Bovée & Thill LLC.**
All rights reserved. Printed in the United States of America. This publication is protected by copyright
and permission should be obtained from the publisher, Pearson Prentice Hall, prior to any prohibited
reproduction, storage in a retrieval system, or transmission in any form or by any means, electronic,
mechanical, photocopying, recording, or likewise. For information regarding permission(s), write to:
Rights and Permissions Department, Pearson Prentice Hall.

**Pearson Prentice Hall**™ is a trademark of Pearson Education, Inc.
**Pearson**® is a registered trademark of Pearson plc
**Prentice Hall**® is a registered trademark of Pearson Education, Inc.

Pearson Education LTD.
Pearson Education Singapore, Pte. Ltd
Pearson Education, Canada, Ltd
Pearson Education–Japan

Pearson Education Australia PTY, Limited
Pearson Education North Asia Ltd
Pearson Educación de Mexico, S.A. de C.V.
Pearson Education Malaysia, Pte. Ltd



10 9 8 7 6 5 4 3
ISBN 0-13-147845-1

# *Contents in Brief*

*Preface  xv*

## *Part 1. Understanding the Foundations of Business Communication  2*
1. Achieving Success Through Effective Business Communication  2
2. Communicating in Teams and Mastering Listening and Nonverbal Communication  32
3. Communicating Interculturally  60

## *Part 2. Applying the Three-Step Writing Process  86*
4. Planning Business Messages  86
5. Writing Business Messages  116
6. Completing Business Messages  150

## *Part 3. Writing Letters, Memos, E-Mails, and Instant Messages  180*
7. Writing Routine and Positive Messages  180
8. Writing Negative Messages  220
9. Writing Persuasive Messages  262

## *Part 4. Finding and Communicating Information  300*
10. Finding, Evaluating, and Processing Information  300
11. Communicating Information Through Visuals  330

## *Part 5. Planning, Writing, and Completing Reports and Proposals  358*
12. Planning Reports and Proposals  358
13. Writing Reports and Proposals  390
14. Completing Reports and Proposals  418

## *Part 6. Designing and Delivering Oral Presentations  466*
15. Planning, Writing, and Completing Oral Presentations  466
16. Enhancing Presentations with Slides and Transparencies  492

## *Part 7. Writing Employment Messages and Interviewing for Jobs  516*
17. Building Careers and Writing Résumés  516
18. Applying and Interviewing for Employment  550

**Appendix A.** Format and Layout of Business Documents  A-1
**Appendix B.** Documentation of Report Sources  A-21
**Appendix C.** Correction Symbols  A-27

*Video Guide: Applications and Exercises  VG-1*
*Handbook of Grammar, Mechanics, and Usage  H-1*