LOVELLS LLP
David Leichtman (DL-7233)
Gonzalo S. Zeballos (GZ-5994)
Ilanit Dodiuk (ID-2072)
590 Madison Avenue
New York, New York 10027
Telephone: (212) 909-0600
Facsimile: (212) 909-0660
david.leichtman@lovells.com

*Attorneys for Defendants Pearson Education, Inc.,
and Prentice Hall Inc.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **BOVEE & THILL LLC,** | |
| Plaintiff, | |
| -against- | **08-CV-00119 (MGC)**<br>**ECF Case** |
| **PEARSON EDUCATION, INC. and PRENTICE HALL INC.,** | |
| Defendants. | |

**MEMORANDUM OF LAW IN SUPPORT OF PEARSON EDUCATION, INC.
AND PRENTICE HALL INC.'S MOTION TO DISMISS BOVEE & THILL LLC'S
COMPLAINT FOR FAILURE TO STATE A CLAIM**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..........................................................................................................ii

PRELIMINARY STATEMENT ..................................................................................................1

STATEMENT OF THE CASE.....................................................................................................2

STATEMENT OF FACTS ...........................................................................................................6

ARGUMENT .................................................................................................................................9

      I.      THE PLAIN LANGUAGE OF THE CONTRACTS
               EXPRESSLY GRANTS PEARSON THE UNQUALIFIED
               RIGHT TO SET THE PRICE OF THE  BOOKS FATALLY
               UNDERMINING B&T'S HIGH DISCOUNT CLAIMS ...................................10

      II.     THE PLAIN LANGUAGE OF THE CONTRACTS
               EXPRESSLY GRANTS PEARSON AN UNQUALIFIED
               RIGHT TO PUBLISH CUSTOM BOOKS .........................................................12

      III.    B&T'S CLAIMS REGARDING PEARSON'S PAYMENT
               OF ROYALTIES ON CERTAIN FOREIGN SALES UNDER
               THE SUBSIDIARY RIGHTS CLAUSE ARE DEMONSTRABLY
               FALSE AND SHOULD BE DISMISSED...........................................................13

      IV.    THE COMPLAINT SHOULD BE DIMISSED BECAUSE
               IT DOES NOT PLEAD A PLAUSIBLE CAUSE OF ACTION........................16

      V.     TO THE EXTENT ANY OF B&T'S CLAIMS SURVIVE
               THE ANALYSIS ABOVE, THE INCONTESTABILITY
               CLAUSES CONTAINED IN THE CONTRACTS  BAR
               THE RECALCULATION OF PAST ROYALTIES ..........................................20

CONCLUSION.............................................................................................................................22

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Allman v. UMG Recordings*,
   --- F. Supp. 2d---, No. 06 Civ. 8327 (VM),
   2008 WL 131216 (S.D.N.Y. Jan. 10, 2008) .................................................. 21, 22

*ATSI Commn'cns, Inc. v. Shaar Fund, Ltd.*,
   493 F.3d 87 (2d Cir. 2007) ................................................................................ 16

*Bell Atlantic Corp. v. Twombly*,
   --- U.S. ---, 127 S. Ct. 1955 (2007) ............................................................... 9, 16

*Berkshire Life Ins. v. Fernandez*,
   124 A.D.2d 120, 511 N.Y.S.2d 348 (2d Dep't 1987) ........................................ 20

*Cal. Distrib. Inc. v. Cadbury Schweppes Ams. Beverages, Inc.*,
   No. 06 Civ. 0496, 2007 WL 54534 (S.D.N.Y. Jan. 5, 2007) ........................... 6, 14

*Desiderio v. Nat'l Ass'n of Sec. Dealers, Inc.*,
   191 F.3d 198 (2d Cir. 1999) ................................................................................. 6

*Franconero v. Universal Music Corp.*,
   No. 02 Civ. 1963 (LAK) (DFE), 2002 WL 31682648 (S.D.N.Y. Nov. 27, 2002).................... 21

*Franconero v. Universal Music Group.*,
   No. 02 Civ. 1963 (RO), 2003 WL 22990060 (S.D.N.Y. Dec. 19, 2003) ............... 10, 13, 16, 21

*Hishon v. King & Spalding*,
   467 U.S. 69 (1984) ............................................................................................... 9

*Holowecki v. Fed. Express Corp.*,
   440 F.3d 558 (2d Cir. 2006) ................................................................................. 9

*In re Livent, Inc. Noteholders Sec. Litig.*,
   151 F. Supp. 2d 371 (S.D.N.Y. 2001) .................................................................. 11

*International Audiotext Network, Inc. v. Am. Tel. and Tel. Co.*,
   62 F.3d 69 (2d Cir. 1992) ..................................................................................... 9

*Keene Corp. v. Bogan*,
   No. 88 Civ. 0217 (MBM), 1990 WL 1864 (S.D.N.Y. Jan. 11, 1990)..................... 18

*Mangiafico v. Blumenthal*,
   471 F.3d 391 (2d Cir. 2006) ................................................................................. 9

*Miller v. Columbia Records*,
   70 A.D. 2d 517, 415 N.Y.2d 869 (1st Dep't 1979) ............................................. 21

*Papasain v. Allain*,
   478 U.S. 265 (1986) ............................................................................................. 9

*Reddington v. Staten Island Univ. Hospital*,
    511 F.3d 126 (2d Cir. 2007) ................................................................................ 16

*Teachers Ins. Annuity Assoc. of Am. v. Wometco Enter., Inc.*,
    834 F. Supp. 344 (S.D.N.Y. 1993) .................................................... 11, 12, 13, 16

*VTR, Inc. v. Goodyear Tire & Rubber Co.*,
    303 F. Supp. 773 (S.D.N.Y. 1969) ........................................................ 11, 13, 16

*Zilg v. Prentice Hall Inc.*,
    717 F.2d 671 (2d Cir. 1983) ....................................................................... 15, 19

## **Rules**

Fed. R. Civ. P. 8(a)(2) ......................................................................................... 16

Fed. R. Civ. Proc. 12(b)(6) ........................................................................... 1, 9, 14

Fed. R. Evid. 201(b)(2) ........................................................................................ 14

Pearson Education, Inc. ("Pearson") and Prentice Hall Inc. (collectively "Pearson"),[1] by and through their undersigned counsel, respectfully submit this memorandum of law, together with the Declaration of David Leichtman (the "Leichtman Decl."), in support of Pearson's motion to dismiss Bovee & Thill LLC's ("B&T") complaint for failure to state a claim upon which relief may be granted pursuant to Fed. R. Civ. Proc. 12(b)(6).

## PRELIMINARY STATEMENT

B&T has filed its deeply flawed Complaint in an effort to renegotiate a series contracts under which Pearson has, in good faith, fully performed its obligations to B&T for more than ten years. Although its books have earned B&T millions of dollars throughout the lifespan of its contracts with Pearson, due in no small part to Pearson's successful marketing of B&T's books throughout the world and across a broad spectrum of media, B&T now seeks to extract an even greater profit through its unfounded and hyperbolic allegations of breach of contract.

This is not the first time B&T has resorted to the courts as a means of renegotiating its contracts—Pearson is B&T's third successive publisher for some of the books at issue—with the previous two choosing to abrogate their contracts with B&T rather than endure years of harassing and baseless litigation. In its most recent campaign against this publisher, B&T has retained and released three prior sets of lawyers before finding one willing to pursue B&T's claims. The reluctance of B&T's previous lawyers to pursue B&T's claims was well-founded. Not only are B&T's claims either precluded or flatly contradicted by the plain language of the underlying contracts themselves, B&T's claims do not plead remotely plausible claims, failing utterly to state a claim that can survive the pleading requirements of the Federal Rules.

---

[1]    In 2001, Prentice Hall's corporate name was changed to Pearson Education and thus the two named defendants are in reality a single party. Pearson continues to use the "Prentice Hall" imprint for B&T's books and other books.

## STATEMENT OF THE CASE

**The Prior Litigation**

On August 8, 2005, B&T filed a complaint in the Nevada district court against Pearson alleging seven separate causes of action (the "Nevada Complaint").  (*See* Nevada Complaint, Ex. A to Leichtman Decl.)  Three weeks later, on September 13, 2005, B&T filed an amended class action complaint, this time alleging five causes of action against Pearson (the "Amended Nevada Complaint," together with the Nevada Complaint, the "Nevada Actions").  (*See* Amended Nevada Complaint, Ex. B. to Leichtman Decl.)  Each of these complaints cobbled together a confused and virtually incomprehensible fairy tale of conspiracy-theories and imaginary schemes regarding Pearson's payment of royalties on certain foreign sales.  The Amended Nevada Complaint was voluntarily withdrawn pursuant to a standstill agreement among the parties that expired in May 2006.  (*See* Exs. C and D to Leichtman Decl.)

**The Current Complaint**

Three law firms later, B&T filed this lawsuit on January 7, 2008.  Although the most recent complaint ("Complaint" or "Compl.") suffers from the same hyperbole as its predecessors, in essence it asserts just two separate causes of action—one for breach of contract, and a second for breach of New York's implied duty of good faith and fair dealing.  Both of these counts rest on the same operative factual allegations:  (1) that since 1997, the parties have entered into a series of five separate contracts (the "Contracts") for the publication of five different business communications books (the "Books") written by authors Courtland Bovee and John Thill (collectively, the "Authors"), whose rights have been assigned to B&T;[2] (2) that Pearson has allegedly performed the Contracts in derogation of the duty of good faith and fair dealing with

---

[2]     According to the Complaint, the Authors assigned all of their rights under the April 1997 Contracts to B&T.  (Compl. at ¶ 32.)

respect to one category of sales called "High Discount Sales;" and (3) that Pearson has breached

the Contracts by underpaying royalties to the Authors under two other theories, described in

further detail below.

**The Allegations Against Pearson**

B&T alleges that Pearson is in breach of the Contracts or New York's implied duty of

good faith and fair dealing with regard to three separate streams of royalty payments. These

areas relate to what B&T defines as "high discount sales," "custom publishing," and "false

designation of subsidiary rights." Each of these is described in turn below.

**High Discount Sales**

B&T alleges that Pearson has set the single copy "list prices" of the Books at an

"artificially" high rate for the sole purpose of benefiting from certain provisions in the Contracts

that provide for reduced royalty rates for books sold at a discount off the single copy price of

50% or greater. (Compl. at ¶ 59.) The alleged reason for this so-called "scheme" is to pay to

B&T the high-discount royalty rate of 5%, as compared to a royalty rate of 17-18.75% for

regular sales of the works. (*Id*.) B&T further claims that this supposed "scheme" is directed at

"sales to third-parties, such as college book stores" but that the greatest benefit comes from

"sales to [Pearson'] own affiliated companies" particularly for overseas sales. (*Id*. at ¶¶ 63-64.)

The damages to B&T arising from this alleged scheme are claimed to be "no less than

$500,000." (*Id*. at ¶ 70.) This is an allegation that was not raised in the Nevada Actions and that

is made for the first time against Pearson in this Complaint.[3] B&T does not claim that this

---

[3]    Of no moment to this motion, this allegation is completely false. First, Pearson sets the single copy price in a completely independent manner from the group that enters into agreements for high volume sales at high discounts. These high volume sales are primarily to adult career education institutions and are sales that Pearson would otherwise not ever make were it not for offering them at a high discount. Second, Pearson is not aware of any sales to its foreign affiliates that were or could be categorized as "High Discount" sales on B&T's royalty statements.

supposed "scheme" resulted in a breach of the Contracts, but only that Pearson breached the duty of good faith and fair dealing in performance of the Contracts with respect to "High Discount Sales." (*Id*. at ¶¶ 69-70; 97-100.)

**False Designation of "Subsidiary Rights" on Certain Foreign Sales**

B&T's breach of contract allegations start with a discussion of the manner in which Pearson sells books in certain foreign markets, as discussed more fully below. B&T's allegations arise from the contractual provisions regarding "subsidiary rights."[4] The essence of B&T's subsidiary rights argument is that Pearson licenses the overseas publication of other editions of the Books—allegedly to entities B&T incorrectly claims are Pearson's subsidiaries[5]—which editions are allegedly *identical* to those sold in the United States. B&T alleges that this licensing of rights for the preparation of low-cost editions for sale in emerging markets where consumers otherwise would not be able to purchase the US books, results in a lower royalty payment to B&T than it would otherwise receive under the Contracts for sales of the US editions of the Books. Essentially, B&T is alleging that Pearson should be selling the high priced US editions in these markets, but instead is licensing the sale of the lower priced books simply to pay B&T a lower royalty. B&T then claims it is entitled to a 15% royalty for these sales under a clause in certain of the Contracts that provide for a 15% royalty rate for sales made through a Pearson "subsidiary," rather than the royalty it alleges it is being paid—a 50%

---

[4]    B&T alleges that three of the Contracts (those dating from 1997), contain provisions defining "subsidiary rights." (*Id*. at ¶¶ 20-30; 36.) The two remaining Contracts (from 1999 and 2001) each contain identical provisions entitled "Licenses of Subsidiary Rights," but the term "subsidiary rights" is not itself defined in those Contracts. (*Id*. at ¶¶ 47 and 54.)

[5]    Again, of no moment for decision on this motion, this is completely false. Pearson licenses a small number of editions of some of B&T's books in India and Asia to foreign affiliates (not subsidiaries) who print, for sale in those territories only, extremely low cost versions of the works that, far from identical, bear little physical resemblance to the US versions of those works in terms of production, paper, print and binding quality. These low cost editions are sold at extremely low prices in emerging markets where consumers would otherwise not be able to afford the US versions at the price for which such US works typically sell.

share of the license fees Pearson itself receives from the licensee that publishes such editions. (*Id*. at ¶¶ 71-76.)  B&T claims that this licensing results in its receipt of approximately a 1% royalty, instead of 15% (*Id*. at ¶¶ 71-76).[6]  B&T alleges "no less than $400,000" of damages for this supposed breach of contract.  (*Id*. at ¶ 78.)  This allegation is similar to those first made in the Nevada Actions; it was meritless then, and it is meritless today.

**"Custom Publishing" Sales**

B&T's third area of discontent regards sales resulting from Pearson's "custom publishing" program.  The Complaint does not specify any Books improperly categorized as "custom," nor does it state what royalty rates it is disputing.  The basis of B&T's claim, however, appears to be that Pearson is improperly paying a reduced "abridgement rate" for sales of custom books, rather than a rate B&T has not specified, but that it apparently believes would be more favorable to it.  (*Id*. at ¶¶ 79-84).  Unfortunately for B&T, and fatal to its claims, the Contracts contain no such hypothetical "custom" royalty rate.  B&T alleges damages of "no less than $400,000" from these alleged acts of breach of contract.  (*Id*. at ¶ 85.)  This is an allegation that was not raised in the Nevada Actions and is made for the first time against Pearson in this Complaint.

---

[6]    Again, while not relevant to deciding this motion, this allegation is also untrue.  There is no instance in which B&T received a royalty as low as 1% or anything close to that based on the price at which the book sold in foreign markets.  In fact, B&T generally received a royalty of 8.5% or 5% of sales to the end purchaser.  Even if the use of those rates was an incorrect interpretation of the Contracts, which it was not, the difference in the amount of money between the 8.5% or 5% B&T generally has been receiving and the 15% B&T claims it is entitled to, is only approximately $17,000 over the entire life of the Contracts.

## STATEMENT OF FACTS[7]

Between 1997 and 2001 Pearson and B&T entered into five separate contracts for the publication of five different books.[8]  Two of these contracts were entered into on April 18, 1997 (the "April 1997 Contracts") and a third was entered into as of July 25, 1997 (the "July 1997 Contract") (collectively, the "1997 Contracts").  The relevant terms of these three contracts (other than the base royalty rate), are identical.  (*See* April 1997 Contracts and July 1997 Contract, Exs. E-F and G, respectively, to Leichtman Decl.)  The fourth contract was entered into as of March 23, 1999 (the "March 1999 Contract"), and the last contract as of October 12, 2001 (the "October 2001 Contract").  The relevant terms of the March 1999 Contract and the October 2001 Contract (other than the base royalty rate) are identical.  (*See* March 1999 Contract and October 2001 Contract, Exs. H and I, respectively, to Leichtman Decl.)  Despite the fact that the entirety of B&T's claims arise from the Contracts, B&T neglected to append copies of the Contracts to its complaint.  It did so for good reason.  The plain language of the Contracts wholly contradicts B&T's claims.

All of the Contracts cede to Pearson the unqualified right to set prices and determine how to publish and market the Books.  As a threshold matter, all of the Contracts include an assignment to Pearson "solely and exclusively" of "all rights in the Work throughout the world."

---

[7]    For the purposes of this motion to dismiss, the allegations of the Complaint are generally assumed to be true.  *See Desiderio v. Nat'l Ass'n of Sec. Dealers, Inc.*, 191 F.3d 198, 202 (2d Cir. 1999).  An important exception to this rule, however, exists where (as here) B&T's allegations are contradicted by the documents upon which it claims to rely, in which case those allegations are not assumed to be true or even accorded favorable inferences.  *See Cal. Distrib. Inc. v. Cadbury Schweppes Ams. Beverages, Inc.*, No. 06 Civ. 0496 (RMB), 2007 WL 54534, at *5-6 (S.D.N.Y. Jan. 5, 2007) (citation omitted).  In this case, the Contracts upon which B&T relies, a copy of a Foreign Reprint of one of the Books alleged by B&T to be "identical" to the US edition of that Book, and a copy of the US edition of that Book were deliberately left out of the Complaint.  Accordingly, this brief statement of facts is meant to remedy that omission.

[8]    Although some of the Contracts were entered into by the Authors, and others were entered into by B&T, because the Authors have assigned their rights under the Contracts to B&T, for the purposes of this motion B&T is referred to as the counterparty to each of the Contracts.  (*See* Compl. at ¶ 32.)

(*See* 1997 Contracts at ¶ 1, Exs. E-G to Leichtman Decl.; *see also*, March 1999 Contract and

October 2001 Contract at ¶ 1, Exs. H-I, to Leichtman Decl.)  Those rights include, but are not

limited to, "the exclusive right to print, publish and sell the Work. . . to use the Work as a basis

for derivative Works in all formats and by all media; and to license others to exercise any and all

rights in and to the Work."  (*Id.*)

>   In relevant part, each of the 1997 Contracts also provides:

>> [T]he Publisher will have the right to make final determinations
>> concerning publication and marketing of the Work based upon editorial
>> and marketing concerns, including selecting suitable styles of paper,
>> printing, and binding, and fixing for altering the title, cover content, and
>> presentation, and price and other terms of sale.

(1997 Contracts at ¶ F, Exs. E-G, to Leichtman Decl.)  The March 1999 Contract and the

October 2001 Contract each similarly provide:

>> The Publisher will have the right, with respect to the Work, including
>> reprints, revisions and new editions, to  . . . (d) fix . . . the prices at which
>> the Work shall be sold and the quantities printed or produced; and (e)
>> determine the methods and means of advertising, marketing and selling
>> the Work.

(March 1999 Contract and October 2001 Contract, at ¶¶ E(d) and (e), Exs. H-I, respectively, to

Leichtman Decl.)

>   All of the Contracts also include identical incontestability clauses, which provide that

"[r]oyalty statements will be final and binding upon the Author unless, within two years from the

date of the statement, the Author objects to such statement in writing which states the specific

objection and the basis for such objection."  (*See* 1997 Contracts at ¶ I(i), Exs. E-G to Leichtman

Decl.; March 1999 Contract and October 2001 Contract at ¶ H(c), Exs. H and I, respectively, to

Leichtman Decl.)

>   B&T's "subsidiary rights" claim relies in its entirety upon the false allegation that the

books Pearson sells abroad are "identical" to those sold in the United States.  In fact, the versions

of the Books sold under license by Pearson's foreign affiliates are very different from those sold in the United States, and, as discussed below, the Court may take judicial notice of the actual books.

As set forth in footnote 5 above, Pearson's foreign affiliates in India and Asia print and sell foreign reprint editions of some of B&T's works ("Foreign Reprints"). While the US Editions of B&T's books generally are full-color hardcover editions, Foreign Reprints are extremely low-cost black and white paperback reprints printed on lower-quality paper with lower-quality print and bindings. The publication of these low cost versions is licensed by Pearson in the US to foreign affiliates (not subsidiaries) who manufacture the books in Asia or India. These editions are sold by vendors and/or affiliates only within those territories, and at extremely low local-market prices. (*See* Comparison of Foreign Reprint Edition exemplar with US Book exemplar, Exs. J and K, respectively, to Leichtman Decl.)

## ARGUMENT

Courts will grant motions to dismiss for failure to state a claim under Rule 12(b)(6) when "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984). However, in considering a motion to dismiss, courts "are not bound to accept as true a legal conclusion couched in a factual allegation." *Papasain v. Allain*, 478 U.S. 265, 286 (1986). Rather, the factual allegations in the complaint "must be enough to raise a right to relief above the speculative level, on the assumption that all of the allegations in the complaint are true (even if doubtful in fact)." *Bell Atlantic Corp. v. Twombly*, --- U.S. ---, 127 S. Ct. 1955, 1965 (2007) (citations omitted).

In considering a motion to dismiss, a court may refer to any documents attached or incorporated into the Complaint. *See, e.g., International Audiotext Network, Inc. v. Am. Tel. and Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1992). This is so regardless of whether such documents are expressly incorporated into the Complaint. It is well-settled in this circuit that where a complaint "relies heavily upon [the] terms and effect of a document, such as a contract, it is considered "integral" to the complaint. *Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006) (holding that court may properly deem complaint to include any "documents incorporated in it by reference"). *See also Holowecki v. Fed. Express Corp.*, 440 F.3d 558, 565-66 (2d Cir. 2006) (holding that even if plaintiff does not attach to complaint or incorporate by reference "a document upon which it solely relies and which is integral to the complaint the court may nevertheless take the document into consideration in deciding the defendant's motion to dismiss, without converting the proceeding to one for summary judgment") (citation omitted). Accordingly, in adjudicating this motion to dismiss, the Court may consider the Contracts and

other materials relied upon or incorporated by B&T into its Complaint, even though B&T

declined to physically include such documents with its Complaint.

I.     **THE PLAIN LANGUAGE OF THE CONTRACTS EXPRESSLY GRANTS PEARSON THE UNQUALIFIED RIGHT TO SET THE PRICE OF THE BOOKS FATALLY UNDERMINING B&T'S HIGH DISCOUNT CLAIMS**

As set forth more fully above, each one of the Contracts at issue expressly grants Pearson

the exclusive right to determine the price and marketing of the Books at Defendant's sole

discretion.  In relevant part, the April 1997 Contracts and the July 1997 Contract provide:

> [T]he Publisher will have the right to make final determinations concerning publication and marketing of the Work . . .  including . . . price and other terms of sale.

(1997 Contracts at ¶ F, Exs. E-G to Leichtman Decl.)  The March 1999 Contract and the October

2001 Contract each similarly provide:

> The Publisher will have the right, with respect to the Work, including reprints, revisions and new editions, to  . . . (d) fix . . . the prices at which the Work shall be sold and the quantities printed or produced; and (e) determine the methods and means of advertising, marketing and selling the Work.

(March 1999 Contract and October 2001 Contract at ¶¶ E(d) and (e), Exs. H-I, respectively, to

Leichtman Decl.)  Accordingly, Pearson has an unqualified right, pursuant to the express terms

of the Contracts to fix prices and make final determinations regarding marketing of the Books.

Pearson is therefore contractually free to price the Books to meet the market demands, without

interference from B&T.  *See Franconero v. Universal Music Group.*, No. 02 Civ. 1963 (RO),

2003 WL 22990060, at *3 (S.D.N.Y. Dec. 19, 2003) (holding that contractual provision granting

"exclusive rights" to musical compositions meant that the defendant could do as it saw fit absent

specific contractual restrictions to the contrary).  This applies to setting single copy prices and

discounts as well as setting the prices for which the Books are sold abroad.

Furthermore, a party cannot be in breach of a contract or of New York's implied duty of good faith and fair dealing for doing precisely what a contract expressly allows that party to do. *See Teachers Ins. Annuity Assoc. of Am. v. Wometco Enter., Inc.*, 834 F. Supp. 344, 349 (S.D.N.Y. 1993) (holding that where the express terms of a contract grant an unqualified right, such right is not limited by an implied duty of good faith and fair dealing); s*ee also VTR, Inc. v. Goodyear Tire & Rubber Co.*, 303 F. Supp. 773, 778 (S.D.N.Y. 1969) (holding that there can be no breach of New York's implied covenant of good faith and fair dealing "where a party to a contract has done what the provisions of the contract expressly give him the right to do"). As such, B&T's claims relating to "High Discount" sales, which rely on their entirety on the allegation that Pearson set the single copy price too high in derogation of its duty of good faith and fair dealing, must fail. *See id.*; *see also In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 405-07, 427, 441 (S.D.N.Y. 2001) (dismissing claims directly contradicted by admissions, contracts, and public findings).

B&T's "High Discount" claim relating to the payment of a 5% royalty on copies of the Books sold for "less than 50% of the single copy price" (Compl. at ¶¶ 59-63)—completely relying as it does on the necessary predicate (but false allegation) of Pearson "wrongfully" setting the Books' single copy price—accordingly does not state a claim for breach of the duty of good faith and fair dealing for which relief can be granted. Even if the false allegations of such practices were true—which they are not—the Contracts clearly and unequivocally contemplate high discount sales and require that on copies of the Book sold by any means at a discount of 50% or greater off the single copy price (51% for the March 1999 Contract and the October 2000 Contract), "Pearson will pay B&T a royalty of 5% of the net cash received from the sale." (1997 Contracts at (I)(c), Exs. E-G to Leichtman Decl.; and March 1999 Contract and October 2001

Contract at H(iii), Exs. H and I to Leichtman Decl.)  B&T pleads acts that fall squarely within the heartland of permissible conduct within the four corners of the Contracts.  Such claims cannot state a cause of action for breach of the implied duty of good faith and fair dealing.  *See VTR*, 303 F. Supp. at 778.  *See also Teachers Ins.*, 834 F. Supp. at 349.  This doctrine is also applicable to B&T's two claims for breach of contract as discussed more fully below.

## II.     THE PLAIN LANGUAGE OF THE CONTRACTS EXPRESSLY GRANTS PEARSON AN UNQUALIFIED RIGHT TO PUBLISH CUSTOM BOOKS

While it is unclear exactly what specific editions of the Books B&T is referring to in its allegations concerning "custom publishing," it is important to note that B&T does not appear to be complaining about the price at which such editions are sold.  Nor could it, since it is clear that when Pearson publishes custom made works, coupled with the "all rights" clauses discussed in Section I, *supra*, Pearson, in its sole discretion, has the unqualified contractual right to set the net price at which such custom works will be sold, and, by extension, the net price upon which the royalty will be calculated for such sales.  (1997 Contracts at ¶ I(e), Exs. E-G to Leichtman Decl.; March 1999 Contract and October 2001 Contract at ¶ H(b)(i), Exs. H and I to Leichtman Decl.).

Accordingly, while B&T does not seem to question Pearson's right to publish custom versions, or Pearson's right to set the price of such works, B&T vaguely argues that Pearson has selected an inappropriate royalty rate under the Contracts.  Each of the 1997 Contracts provides, as part of the definition of "Subsidiary Rights," that Pearson may publish "other versions" of the Books, including portions of the Books in anthologies, and that Pearson may quote or otherwise utilize the Books.  (1997 Contracts at ¶ I(a), Exs. E-G to Leichtman Decl.)  The 1999 and 2001 Contracts specifically include "abridgments" in the equivalent provision.  (March 1999 Contract and October 2001 Contract at ¶ H(a)(iv), Exs. H and I to Leichtman Decl.)  In each case, the applicable royalty rate is 10%.  Again, it is unclear exactly which sales or Books B&T is

challenging here—and therefore impossible for Pearson to respond to such an incomplete claim—but B&T inexplicably and conclusorily alleges that Pearson's use of these clear contractual provisions in reporting B&T's royalties, "does not reflect the true nature of these products." (Compl. at ¶ 84.) Yet B&T does not state how or why this is the case, or what royalty provision purportedly should be used instead. Under such circumstances, B&T has not stated a claim upon which relief can be granted; rather, it has once again pled nothing more than an act by Pearson that the Contracts expressly give Pearson the unqualified right to do; to wit, to determine within its discretion how the Books should be published and used. As discussed above this cannot give rise to a cause of action for breach of contract. *See Franconero*, 2003 WL 2299060, at *3; s*ee also VTR*, 303 F. Supp. at 778; *Teachers Ins.*, 834 F. Supp. at 349. Accordingly, B&T's breach of contract claim relating to "custom publishing" must fail.

## III.    B&T'S CLAIMS REGARDING PEARSON'S PAYMENT OF ROYALTIES ON CERTAIN FOREIGN SALES UNDER THE SUBSIDIARY RIGHTS CLAUSE ARE DEMONSTRABLY FALSE AND SHOULD BE DISMISSED

B&T's claim for breach of contract alleging that Pearson "falsely designates" certain sales made by foreign affiliates as sales of subsidiary rights must also fail. At bottom, B&T's allegations are again opaque and non-specific, but they are wholly anchored in and completely dependent upon the demonstrably false allegation that Pearson "provides these subsidiary companies with versions of the Works *identical* to those sold in the United States." (Compl. at ¶ 73 (emphasis added).) B&T provides the specific example of an edition of "Business Communication Today" (the "Singapore Edition") sold by Pearson Singapore Ltd. Putting aside the factual misstatement that Pearson Singapore is a subsidiary of Pearson (which it is not), B&T nevertheless neglects to attach an exemplar of such a Foreign Reprint to the Complaint, despite the fact that its claims related to that work rely upon its allegation that these are "identical" versions to the works sold in the United States.

The Court of course may take judicial notice of these books, an exemplar of which is attached to the Leichtman Declaration as Ex. J, together with a copy of the U.S. edition (Ex. K to Leichtman Decl. ), for the purposes of this motion.  Although it is customary on a Motion to Dismiss to generally assume the plaintiff's allegations to be true, an important exception exists where, as here, B&T's allegations are contradicted by the very documents upon which it purports to rely. *See Cal. Distrib. Inc. v. Cadbury Schweppes Ams. Beverages, Inc.*, No. 06 Civ. 0496, 2007 WL 54534, at *5-6 (S.D.N.Y. Jan. 5, 2007) (citation omitted).  Moreover, in considering a motion to dismiss under Rule 12(b)(6) for failure to state a claim, although the court is generally confined to consideration of the allegations in the pleadings, it may take judicial notice of facts not reasonably susceptible to dispute, and that "are capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2). Here the edition at issue is now physically before the Court; its accuracy as representative of itself cannot reasonably be questioned and the Court can accurately and readily determine its frank contradiction of B&T's allegation of identicality.  Because these exemplars are the actual Foreign Reprints publicly sold in open markets, their authenticity transcends verification and B&T cannot reasonably dispute their legitimacy.  Pearson respectfully requests that the Court take judicial notice of the exemplar of the Foreign Reprints for the purposes of deciding this motion to dismiss.[9]

---

[9]       In Paragraph 76 of B&T's Complaint, it references in particular a "Singapore" version of one of its books, Business Communications Today.  In fact, that version of the book was published in India by a Pearson foreign affiliate called Pearson Education (Singapore) Pte Ltd., Indian Branch, now known as Dorling Kindersley (India) Pvt. Ltd.  As can be readily seen from the exemplar, the cover is marked "Low Price Edition," and clearly states "This edition is manufactured in India and is authorized for sale only in India, Bangladesh, Bhutan, Pakistan, Nepal, Sri Lanka and the Maldives.  Circulation of this edition outside of these territories is UNAUTHORIZED."  The copyright page again makes this clear and shows the edition is published by the Indian affiliate as a licensee of Pearson in South Asia, and that it is printed in India by Baba Barkha Nath Printers.  (Ex. J to Leichtman Decl.).

Also, the Foreign Reprints published and sold by Pearson's foreign affiliates in India and Asia are not "provided" by Pearson in the US to Pearson in India and Asia as alleged in paragraph 73 of the Complaint.  As the copyright page of the exemplar demonstrates, they are licensed by Pearson in the US to a foreign affiliate and then printed in the territory of publication.  (Ex. J to Leichtman Decl. at iv.)  These books are obviously <u>very</u> different from the US edition of the works.  (Compare Ex. J to Leichtman Decl. with Ex. K thereto.)  They are published on extremely low-cost, low-quality paper.  They are paperbacks (rather than hard covers), and are printed in black and white only (rather than full color).  The books are published within these markets in the form of low quality reprints because only extremely low priced editions are saleable in emerging markets (which parenthetically is the *actual* gravamen of B&T's claims: they are simply unhappy with the prices their books fetch within emerging markets).  These books are unquestionably "other versions" designed for sale into the foreign markets: other versions the preparation of which the Contracts expressly contemplate and fully provide for.  In fact, these editions can <u>only</u> be legally sold in markets outside the United States, and it says so clearly on the cover and copyright pages of each Foreign Reprint edition.  (*See* Ex. J to Leichtman Decl.)  The purpose of such limitations clearly is to protect sales of the US edition (and thus B&T's US royalties) from sales of the Foreign Reprint editions in the US.  B&T's desire to question the wisdom of that business judgment by Pearson is not a legal claim upon which relief can be granted as a matter of law.  *Zilg v. Prentice Hall Inc.,* 717 F.2d 671 (2d Cir. 1983).

Since these books are other editions designed and published for sale in foreign markets, and result from licenses to foreign publishers—either affiliates or third-parties—in the case of the three 1997 Contracts, there is no question that revenues received by Pearson for sales of these

works are properly treated under those contracts as resulting from the sale of subsidiary rights. (*See* 1997 Contracts at ¶ I(a)(ii), Exs. E-G to Leichtman Decl.)[10]  Similarly, because the Contracts grant to Pearson the express right to sell, license and set the price for the Books worldwide, no legal challenge can be made regarding these subsidiary rights licenses as such claims are unavoidably predicated on and indissolubly anchored in the exercise of rights expressly granted under the plain terms of the Contracts.  *See Franconero*, 2003 WL 2299060, at *3; s*ee also VTR*, 303 F. Supp. at 778; *Teachers Ins.*, 834 F. Supp. at 349.  The Court should thus dismiss B&T's claims relating to the allegations concerning royalties paid on Foreign Reprints under the subsidiary rights clause of the Contracts.

## IV.    THE COMPLAINT SHOULD BE DIMMISSED BECAUSE IT DOES NOT PLEAD A PLAUSIBLE CAUSE OF ACTION

The Supreme Court in *Twombly* held that at the pleading stage, the allegations set forth in a party's complaint must plausibly state a claim in order to satisfy the threshold requirement of Fed. R. Civ. P. 8(a)(2) that "the plain statement possess enough heft to show that the pleader is entitled to relief."  *Twombly*, 127 S. Ct. at 1966.  Although *Twombly*  was decided in the context of an antitrust claim brought under § 1 of the Sherman Act, the Second Circuit has explicitly declined to read "*Twombly's* flexible 'plausibility standard' as relating only to antitrust cases." *ATSI Commn'cns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 n.2 (2d Cir. 2007) (citation omitted). *See also Reddington v. Staten Island Univ. Hospital*, 511 F.3d 126, 131 (2d Cir. 2007) (applying *Twombly* in context of action for breach of contract).

---

[10]       Under the newer March 1999 Contract and October 2001 Contract, works sold by Pearson foreign affiliates for foreign markets bear a clear and unambiguous royalty rate (10%) that is paid on sales of Foreign Reprints by Pearson or its affiliates.  (March 1999 Contract and October 2001 Contract at ¶ H(a)(iv), Exs. H and I to Leichtman Decl.)  Pearson does not understand that any Foreign Reprints sold under those two contracts are in dispute since the royalty payments are not calculated by reference to any licenses to a Pearson foreign affiliate, but to the extent B&T intends them to be in issue, any such claims should also be dismissed based on the clear contractual language.

B&T's "high discount" claim that Pearson discounts prices to increase profits is demonstrably implausible since Pearson's profits decrease as a function of price. B&T's oxymoronic allegation that Pearson has "engaged in a systematic discounting of the Works to increase [its] own profits" (Compl. at ¶ 58), cannot form the basis for a valid claim even if one credited the allegation that such pricing is in actuality a scheme to reduce B&T's royalty rates. B&T, after making this bald statement, pleads no facts to that would explain precisely how a "systematic discounting" of the Books would make more money for Pearson at the expense of B&T. This is because it cannot do so.

Pearson has no incentive whatsoever to sell the Books for a discounted price (much less a heavily discounted price) except within special sales channels that permit it to realize additional, incremental income—for both its authors and itself—where such incremental sales will have no effect on the Books' primary market, which is US college bookstores. This becomes undisputable when one considers incontestable simple arithmetic. For example, if one hypothesizes a book with a single copy price of $100 and publishing expenses (other than royalties) of $30, and applies the most favorable royalty rate contained in any of the Contracts for the regular U.S. sale of a Book (18.75%), the sale of one copy at that price would generate net revenue for Pearson of $51.25 from that sale. Where a book is sold for 50% off the "single copy price," it is true that the corresponding royalty is reduced to 5% (Compl. at ¶ 59), but even with the lower rate, Pearson earns substantially less. The $100 book, sold for $50, would generate net revenue for Pearson of only $17.50—significantly less than $51.25. But even if the book sold for $60 (at a discount rate of 40%), which would earn B&T the full 18.75% royalty, Pearson would still make more profit—$18.75—than it would using the heavily discounted royalty rate (5%) for a book sold at a 50% discount ($18.75 versus $17.50). The table below

unequivocally shows, using ten-dollar increments, that Pearson's net revenues decrease as a

function of price irrespective of whether the royalty is 18.75% or 5% up until the Book is

published at a loss.[11]



Thus the notion that Pearson would have any incentive to artificially <u>lower</u> the price of the Books

for the "bad faith" purpose of paying B&T less simply makes no sense. There is clearly no way

this claim could form a plausible cause of action for breach of contract or of New York's implied

duty of good faith and fair dealing.

In *Keene Corp. v. Bogan*, No. 88 Civ. 0217 (MBM), 1990 WL 1864 (S.D.N.Y. Jan. 11,

1990), involving a counterclaim alleging that plaintiff breached the implied covenant of good

faith, the court rejected the counterclaim on grounds, similar to those present here, that the

counterclaimant failed to show any economic incentive for plaintiff to lose money. *Id.* at *15-16.

In order for a jury to return a verdict for counterclaimant, it would have had to have found that

plaintiff acted contrary to its apparent self-interest such that it would lose more money by its

---

[11]       The table utilizes a royalty rate of 18.75% switching to 5% at the $50 price point and hypothesizes
publication costs of $30/book and a "single copy price" of $100.

alleged misconduct than it saved in payments to the counterclaimant. That claim was rejected rightly and the same rationale applies here.

There is no question that when a book sells for less than list price, <u>both</u> the publisher and the author make less money. Accordingly, where a title can be sold for a higher price, it is. But in certain sales channels, where incremental sales that will not interfere with primary sales can be made, but where a book will not sell at the higher price and must be heavily discounted to be sold at all, discounting results in **increased** aggregate revenues for both author and publisher. More simply put, discounted and heavily discounted sales allow the Authors to derive additional royalties that they would not have received at all but for the discounted prices, providing a win-win scenario for all involved.

This analysis holds true for each of B&T's claims concerning the price basis for royalties. Titles that sell for more than $100 dollars in the regular United States market will sell only for a fraction of that price when sold in high volume to a career education school or when, in foreign markets, a customer will only buy a lower cost international edition. The publisher has only two options in these contexts: (1) sell the title at a lower price; or (2) forego sales in those markets. Under the former option, the publishers and the authors are able to at least derive some incremented revenue from a market that would otherwise be closed to them. Under the latter option, everyone loses: no additional incremental income is derived from a potential market, and no royalties are paid on foregone sales.

The Complaint here thus needs to be read in its proper context; the Court has before it a plaintiff that earns millions of dollars from the regular sales of its books. It is merely dissatisfied with royalties on incremental sales that would otherwise not be made. A similar claim was rejected in the leading case of *Zilg,* 717 F.2d at 680. There the contract contained a clause

empowering the publisher to determine promotional expenses.  While the court implied a contractual requirement to make a good faith effort to promote the book including making an adequate first printing and providing an advertising budget sufficient to give the book a reasonable chance of achieving market success, the court held that "once the obligation to undertake reasonable initial promotional activities has been fulfilled, the contractual language dictates that a business decision by the publisher to limit the size of a printing or advertising budget is not subject to second guessing by a trier of fact as to whether it is sound or valid."  *Id.* at 680.  While B&T may wish that the versions of its Books sold in certain markets for higher prices, a wish that Pearson shares, the reality is that the books sell for what the market will bear. Simply put, whether couched in contract or the duty of good faith, there is no plausible right of action that can state a claim for relief based on the facts pled by B&T.

## V.    TO THE EXTENT ANY OF B&T'S CLAIMS SURVIVE THE ANALYSIS ABOVE, THE INCONTESTABILITY CLAUSES CONTAINED IN THE CONTRACTS  BAR THE RECALCULATION OF PAST ROYALTIES

The five Contracts at issue in this case each contain identical "incontestability" clauses stating that "[r]oyalty statements will be final and binding upon the Author unless, within two years from the date of the statement, the Author objects to such statement in a writing which states the specific objection and the basis for such objection."  (*See* 1997 Contracts at ¶ I(i), Exs. E-G, to Leichtman Decl.; March 1999 Contract and October 2001 Contract at ¶ H(c), Exs. H and I, respectively, to Leichtman Decl. (emphasis added).)  New York courts routinely uphold the enforceability of contractual incontestability provisions and treat them as the functional equivalent of a statute of limitations.  *See Berkshire Life Ins. v. Fernandez*, 124 A.D.2d 120, 511 N.Y.S.2d 348 (2d Dep't 1987) (recognizing that "[i]t is now well settled in New York that an incontestability clause is in the nature of, and serves a similar purpose as a statute of limitation.") (citations omitted).

In *Miller v. Columbia Records*, 70 A.D. 2d 517, 415 N.Y.2d 869, 871 (1st Dep't 1979), the defendant recording company moved for a partial summary judgment claiming that the contractual limitations period contained in the recording agreement barred the plaintiff's claims with respect to certain royalties and other monies owed. The contract at issue in *Miller* contained an incontestability provision that is identical to the one contained in the Contracts at issue in this case, except that the objection period was one year, rather than two. The Appellate Division, First Department, found in *Miller* that: "[t]his provision is binding and bars all claims for any period antedating one year before rendition of each statement." *Id.* (citing cases). "Otherwise, the contract would be without purpose or effect." *Id.*[12] Just last month, this Court held that an incontestability clause served as a complete bar to suit following the untimely delivery of objection letters to royalty statements. *Allman v. UMG Recordings*, --- F. Supp. 2d ---, No. 06 Civ. 8327 (VM), 2008 WL 131216, at *3-5 (S.D.N.Y. Jan. 10, 2008). B&T has not objected to any royalty statements in the Complaint. Since this is a contractual prerequisite to any claim arising from the royalty statements, the Court should dismiss the Complaint.

Moreover, the current Complaint does not satisfy the minimum requirements under the incontestability clauses because such clauses require written notice stating the "specific objection and the basis for such objection." B&T's complaint does not attach any royalty statements, nor does it allege any connection to any specific royalty statement. While B&T takes generalized and facially specious potshots at Pearson's compliance with various royalty provisions, it does

---

[12]    Similarly, in *Franconero v. Universal Music Corp.*, No. 02 Civ. 1963 (LAK) (DFE), 2002 WL 31682648, at * 3 (S.D.N.Y. Nov. 27, 2002), in ruling on a discovery motion, the court held that the plaintiff performer was only entitled to discovery of documentation relating to royalties for the period of time that was permitted by the contractual incontestability clause, noting that the statute of limitations was shortened by the contract, even for allegedly unreported sales. As discussed above, this holding was upheld in a later proceeding in the same case when the court granted summary judgment to defendant on all claims prior to the running of the incontestability clause. *Franconero v. Universal Music Corp.*, No. 02 Civ. 1963 (RO), 2003 WL 22990060, at *3-4 (S.D.N.Y. Dec. 19, 2003).

not provide any specificity as to the actual royalties it is claiming were paid incorrectly or what the basis is in the Contracts for such allegations.  Accordingly, even the Complaint does not properly give notice under the any of the incontestability clauses.  This means that B&T has failed to state a claim for which relief may be granted pursuant to the terms of the Contracts as a matter of law.  If now or at some future time B&T does exercise its rights under the Contracts to specifically challenge a particular aspect of a royalty statement and states the basis for such challenge, it should be strictly held to the two-year limitation it agreed to in the Contracts.[13]

## CONCLUSION

For the reasons set forth above, Pearson respectfully requests that the Court grant Pearson's Motion to Dismiss B&T's claims.

Dated: New York, New York
        February 29, 2008

**LOVELLS LLP**

By:  ___/s/ David Leichtman_____
        David Leichtman (DL-7233)
        Gonzalo S. Zeballos (GZ-5994)
        Ilanit Dodiuk (ID-2072)

590 Madison Avenue
New York, New York
Telephone:  (212) 909-0600
Facsimile:  (212) 909-0660
david.leichtman@lovells.com

*Attorneys for Pearson Education, Inc. and Prentice Hall Inc.*

---

[13]        In *Allman*, Judge Marrero commented in *dicta* that "the specificity requirement [for notice in an incontestability clause] is a material issue of fact that would be inappropriate for the Court to determine on summary judgment."  2008 WL 131216 at *3.  While Pearson does not concede that the issue of whether a communication is sufficiently specific cannot be adjudicated on a motion for summary judgment, Judge Marrero's comments are inapposite here, on a motion to dismiss, because there is not even an allegation as to a specific notice given or to what aspect of a royalty statement it may pertain.

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the Memorandum of Law in support of Pearson Education, Inc.'s and Prentice Hall Inc.'s Motion to Dismiss Bovee & Thill LLC's Complaint for Failure to State a Claim, together with the Declaration of David Leichtman and the exhibits annexed thereto in support thereof and a Notice of Motion was served on this 29th day of February 2008, via the Court's ECF filing system and by hand on the following counsel:

Bijan Amini (BA-3533)
Lita Beth Wright (LW-0442)
Benjamin L. Felcher-Leavitt (BL-7363)
STORCH AMINI & MUNVES PC
140 E. 45th Street, 25th Floor
New York, New York 10017

By:    /s/ Gonzalo Zeballos
       Gonzalo S. Zeballos (GZ-5994)
LOVELLS LLP
590 Madison Avenue
New York, New York
Telephone:  (212) 909-0600
Facsimile:  (212) 909-0660
gonzalo.zeballos@lovells.com

*Attorneys for Pearson Education, Inc. and Prentice Hall Inc.*