Bijan Amini (BA 3533)
Lita Beth Wright (LW 0442)
Jason Levin (JL 8009)
STORCH AMINI & MUNVES PC
Two Grand Central Tower
140 East 45th Street, 25th Floor
New York, New York 10017
(212) 490-4100
*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x
BOVEE & THILL LLC, a Nevada limited  :
liability company,                   :
                                     :
      Plaintiff,                    :    08-CV-00119 (MGC)
                                     :
      v.                            :    ECF CASE
                                     :
PEARSON EDUCATION, INC.,             :    **DECLARATION OF**
A Delaware corporation and PRENTICE- :    **JASON LEVIN**
HALL, INC., A Delaware Corporation   :
                                     :
      Defendants.                   :
-------------------------------------------------------x

      JASON LEVIN, hereby declares, pursuant to 28 U.S.C. § 1746, under penalty of perjury, as follows:

      1.    I am an attorney associated with the law firm of Storch Amini & Munves PC, counsel to plaintiff, Bovee & Thill LLC ("Plaintiff"). I am a member in good standing of the Bar of the State of New York and of this Court. I submit this declaration in opposition to defendants Pearson Education, Inc. and Prentice Hall, Inc's motion to dismiss the complaint.

      2.    A true and correct copy of Plaintiff's complaint, filed on or about January 7, 2008, is attached hereto as Exhibit A.

Dated: April 2, 2008
      New York, New York

                                                  _____
                                                        Jason Levin (JL 8009)

Bijan Amini (BA 3533)
Lita Beth Wright (LW 0442)
Benjamin L. Felcher Leavitt (BL 7363)
STORCH AMINI & MUNVES PC
140 E. 45th St., 25th Floor
New York, New York 10017
(212) 490-4100
Attorneys for Plaintiff
Bovee & Thill LLC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------x
BOVEE & THILL LLC, a Nevada limited  :
liability company,                                       :
                                                                 :
            Plaintiff,                                      :         08-CV-_____
                                                                 :
            v.                                                  :
                                                                 :         **COMPLAINT**
PEARSON EDUCATION, INC.,                    :         **(With Jury Demand)**
A Delaware corporation and PRENTICE-  :
HALL, INC., A Delaware Corporation       :
                                                                 :
            Defendants.                                   :
------------------------------------------------------x

Plaintiff Bovee & Thill LLC ("B&T" or "Plaintiff"), by and through its attorneys Storch Amini & Munves PC, as and for its Complaint in this action alleges as follows:

### Nature of the Action

1.  This action seeks monetary damages for the systematic breaches and bad faith performance of contracts whereby Defendant Pearson Education, Inc. ("Pearson"), through its wholly owned subsidiary and predecessor in interest, Prentice-Hall, Inc. ("Prentice Hall," collectively with Pearson hereinafter "Defendants") has withheld, at a minimum, hundreds of thousands of dollars of royalty income generated by the sale of its textbooks.

- 2 -

2. Plaintiff is the beneficiary of several author contracts with Prentice-Hall for the sale and distribution of academic texts in the field of business communication and introduction to business.

3. Seeking to maximize its own profits at the expense of Plaintiff, Defendants have interpreted contract provisions in bad faith and breached those same contracts so as to minimize the royalties it pays to Plaintiff.

4. Seeking to take advantage of contractual provisions that provide for lower royalty rates to be paid for certain categories of sales, Defendants manipulate the price of Plaintiff's books, systematically assign certain sales to incorrect categories and simply fail to report other sales. By their accounting practices, Defendants purposefully distort and underreport Plaintiff's royalty income.

5. Among the specific practices detailed below, Defendants (i) sell Plaintiff's works to Pearson's subsidiary companies for sale in foreign markets and, when sales are made by those subsidiaries, rather than apply the royalty rate applicable to sales effectuated by its subsidiary companies, Defendants apply lower rates applicable to the sub-licensing of ancillary rights in Plaintiff's works; (ii) create arbitrary "list prices" with no intention of selling books at such price, but with the purpose of taking unfair advantage of lower royalty rates applicable to "high discount sales" when, as intended all along, the works are sold at steep markdowns (a portion of such sales are to Pearson's subsidiaries, increasing the benefit Defendant reaps from shortchanging Plaintiff); (iii) create "custom published" editions of Plaintiff's work (whereby customers are able to purchase select chapters of particular works, including works by other authors or their own material which are then bound in book format) and attribute a lower royalty rate for

these sales based upon a rate purportedly applicable to "abridgements," thereby distorting the nature of such "custom published" works to apply a lower royalty rate to their sale; and (iv) simply fail to accurately report all sales of Plaintiff's works.

6. Adding insult to injury, and in derogation of its contractual obligations, Defendants have consistently refused Plaintiff adequate access to their books and records, denying Plaintiff its contractual right to an audit and an opportunity to discover the true nature and extent of Defendants' failure to accurately report Plaintiff's royalties.

7. As detailed below, these coordinated accounting practices have resulted in Defendants retaining untold sums for their own account, amounting to at the very least hundreds of thousands of dollars rightfully due Plaintiff under its contracts with Defendants.

## PARTIES

8. B&T is a Nevada limited liability company with its principal place of business in Clark County, Nevada.

9. Pearson is a Delaware Corporation with its principal place of business in Upper Saddle River, New Jersey. Pearson is the parent company of Prentice-Hall and the successor in interest to all of Plaintiff's contracts with Prentice-Hall.

10. Prentice Hall is a Delaware Corporation with its principal place of business in Upper Saddle River, New Jersey. Prentice Hall is a wholly owned subsidiary of Pearson.

## JURISDICTION AND VENUE

11. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000 exclusive of interests and costs.

12. This Court has personal jurisdiction over Pearson and Prentice Hall as both entities regularly conduct business within this judicial district.

13. Venue in this Judicial District is proper as the parties to this action have contractually agreed to the Southern District of New York as the sole venue for any disputes between them.

## FACTUAL ALLEGATIONS

14. John Thill ("Thill") and Courtland Bovee ("Bovee") are prominent authors of business communication and introduction to business textbooks.

15. Together they have authored more than five textbooks on business communication and introduction to business. Thill and Bovee entered into eight contracts with Defendant Prentice-Hall for the distribution of their textbooks. Subsequent to the year 1998, contracts pertaining to works authored by Thill and Bovee are between Plaintiff and Defendant Prentice-Hall. All of the rights to the earlier contracts between Thill and Bovee on the one hand and Prentice-Hall on the other have been assigned to Plaintiff.

16. All of Plaintiff's works have been published by Defendants pursuant to Defendants' form contract entitled "Author Agreement." By these Author Agreements, Plaintiff granted Prentice-Hall the right to print, manufacture, publish, sell and distribute multiple editions of Plaintiff's works, including but not limited to Business

Communication Today, Excellence in Business Communication, Business Communication Essentials, Excellence in Business (Business Today), Business in Action, Activebook Excellence in Business Communication, Activebook Business Today, and Business Communication Activebook (collectively the "Works"). Plaintiff, on an ongoing basis, reviews, revises and updates the Works, resulting in new editions of the Works being issued regularly.

**The Agreements**

 **A. The April 1997 Agreements**

 17. On April 18, 1997, Bovee and Thill entered into identical Author Agreements with Prentice-Hall for the works entitled "Business Communication Today" and "Excellence in Business Communication." These Author Agreements contain identical provisions (the "April 1997 Agreements").

 18. Pursuant to the April 1997 Agreements, Plaintiff granted Defendant Prentice-Hall the exclusive right to publish "Business Communication Today" and "Excellence in Business Communication."

 19. In exchange, Prentice-Hall agreed, unless otherwise provided for in the April 1997 Agreements, to pay Plaintiff a royalty on all sales of "Business Communication Today" and "Excellence in Business Communication" of 18.75%.

 20. Other provisions for royalty rates are contained in paragraph "I" of the April 1997 Agreements.

 21. Paragraph I(a) defines "Subsidiary Rights" as "publishing in all languages, broadcasting by radio, making audio and video recordings; publishing book club editions, making foreign or other adaptations or derivative works and other versions; inclusion in

anthologies; showing by motion picture or by television; syndicating, quoting and otherwise utilizing the Work; and material based on the Work."

22.     Paragraph I(a)(i) provides that if Defendant Prentice-Hall itself exercises a "subsidiary right," it would pay Plaintiff 10% of all net cash received as a result of such sales.

23.     Paragraph I(a)(ii) provides that if Defendant Prentice-Hall licensed any of the "subsidiary rights," it would pay Plaintiff 50% of the net amount of royalty compensation received from such license.

24.     Paragraph I(b) provides that sales by the publisher of book versions of the Work sold by the publisher outside the United States would be compensated with a royalty payment of 10%, unless otherwise provided for in the April 1997 Agreements.

25.     Paragraph I(c) provides for royalty payments for two types of sales. Plaintiff would receive a royalty payment of 15% of net money received from sales made directly to consumers by Defendant Prentice-Hall. In addition, paragraph I(c) provides that any sales by Defendant Prentice-Hall "at a discount of 50% or greater off the single copy price" would result in a payment of a 5% royalty to Plaintiff.

26.     Paragraph I(d) provides that sales of "Business Communication Today" or "Excellence in Business Communication" to elementary or secondary schools would be compensated with a royalty of 15% of such sales to Plaintiff. Paragraph I(d) also provides that for "copies of book versions of the Work sold through any of the Publisher's subsidiaries," a royalty of 15% would be paid to Plaintiff.

27.     Paragraph I(e) provides that if Defendant Prentice-Hall "packages or sells the entire work or any part of the Work together with other products or as a segment of

another product, in determining the net price of the Work for purposes of calculating royalty payments, Publisher will allocate to the Work that portion of the proceeds of the sale which it determines to be the Work's fair value to the entire product sold.

28. Paragraph I(f) provides that if Defendant Prentice-Hall sold the works at below manufacturing cost plus royalties, no royalty whatsoever would be paid.

29. Paragraph I(g) provides that if after 2 years the sales of the Work in any calendar year did not exceed a total of 500 copies, the royalty paid would be one half of the stipulated royalty.

30. Paragraph I(i) provides that Plaintiff is entitled to review "relevant records" in order to verify all royalty payments made pursuant to the April 1997 Agreements.

31. Finally, paragraph O provides that sales of "electronic, electromagnetic, or by analog or digital signal" (including CD-ROMs, floppy disks, but excluding electronic versions included in I(a) (i.e., tv, video broadcast) would be compensated at a royalty rate of 18% of net sales if these rights were exercised by Defendant Prentice-Hall, but at a rate of 50% of net proceeds of any license Defendant Prentice-Hall issued to a third party for these rights.

32. On or around March 16, 1998, Bovee and Thill assigned all of the rights to the April 1997 Agreements to Plaintiff.

**B. The July 1997 Agreement**

33. On July 25, 1997, Bovee and Thill entered into a contract with Defendant Prentice-Hall concerning a textbook entitled "Business Today" (the "July 1997 Agreement").

34. Pursuant to the July 1997 Agreement, Plaintiff granted Defendant Prentice-Hall the exclusive right to publish "Business Today."

35. Defendant Prentice-Hall agreed, unless otherwise provided for in the July 1997 Agreement, to pay Plaintiff a royalty on all sales of "Business Today" of 17%.

36. Other than this difference in the base royalty rate, all of the other royalty provisions were the same as those contained in the April 1997 Agreements.

37. On or around March 16, 1998, Bovee and Thill assigned all of the rights to the July 1997 Agreement to Plaintiff.

C. **The 1999 Agreement**

38. On March 23, 1999, Plaintiff and Defendant Prentice-Hall entered into an Agreement for the publication of "Excellence in Business," now known under the title "Business in Action" (the "1999 Agreement").

39. In exchange for the exclusive right to publish "Excellence in Business," Defendant Prentice-Hall agreed, unless otherwise provided for in the agreement, to pay Plaintiff a royalty on all sales of "Excellence in Business" of 17.75%.

40. While the majority of the provisions in the 1999 agreement are identical to those in the April and July 1997 Agreements, the form of the 1999 Agreement used by Defendant Prentice-Hall changed to include titles for the various royalty provisions.

41. Thus, paragraph H(a)(i) is entitled "Export Sales" and provides that sales by Defendant Prentice-Hall outside of the United States would be paid a royalty rate of 10%.

42. Paragraph H(a)(ii) is entitled "Direct Marketing to Consumers" and, like the April and July 1997 Agreements, provides that all such sales would be paid a royalty rate of 15%.

43. Also similar to the April and July 1997 Agreements, paragraph H(a)(iii), titled "Special Sales," provides a 15% royalty rate for sales to elementary or secondary schools and a 5% royalty rate for sales by Defendant Prentice-Hall "or its affiliate" "at a discount of 51% or greater off the single copy price."

44. Paragraph H(a)(iv) of the 1999 Agreement, entitled "Other Print Versions," provides for a royalty of 10% to be paid on sales of special print editions.

45. Paragraph H(a)(v), entitled "Electronic Transmissions," provides for a 17.75% royalty to be paid on transmissions of "Excellence in Business" by television, on line or "other electronic or electromagnetic transmission."

46. Paragraph H(a)(vi), entitled "Other Media Versions," also provides a 17.75% royalty rate for the sale or license of audio, video, or multimedia versions of "Excellence in Business."

47. Paragraph H(a)(vii), entitled "Licenses of Subsidiary Rights," provides for a 50% rate to be paid to Plaintiff for (a) any license to a "third party" for publishing, selling, or otherwise exploiting the versions of "Excellence in Business" where the publisher "has no involvement in modifying, enhancing or marketing" "Excellence in Business" or (b) any license allowing a third party to quote "Excellence in Business." Unlike the April and July 1997 Agreements, however, the term "subsidiary right" is not defined in the 1999 Agreement.

48. Paragraph H(b) of the 1999 Agreement is entitled "Accounting" and concerns uses of "portions of" "Excellence in Business" "in a collective work or custom published work, and for sales of the Work as part of a package together with other works, or in electronic products or transmissions incorporating other works" (defined in the 1999 Agreement as the "Package").

49. In the case of Package sales, Defendant Prentice-Hall "shall determine the net cash received for the Work on which the applicable royalty will be paid by allocating to the Work that portion of the proceeds for the Package which it determines to be the proportionate and fair value of the Work to the entire Package."

50. Paragraph H(b) also provides, however, that if only a "small portion or quote" was used in a Package, then Plaintiff would receive royalties pursuant to paragraph H(a)(vii).

### D. The 2001 Agreement

51. On October 12, 2001, Plaintiff and Defendant Prentice-Hall entered into an agreement for the publication of "Essentials of Business Communication," now known under the title "Business Communication Essentials" (the "2001 Agreement," collectively with the April 1997 Agreements, the July 1997 Agreement and the 1999 Agreement sometimes referred to collectively herein as the "Author Agreements").

52. Pursuant to the 2001 Agreement, Plaintiff granted and assigned all its rights to Defendant Prentice-Hall.

53. Defendant Prentice-Hall agreed, unless otherwise provided for in the 2001 Agreement, to pay Plaintiff a royalty on all sales of "Essentials of Business Communication" of 17%.

54.     All of the other provisions of the 2001 Agreement are the same as those contained in the 1999 Agreement.

**Defendants' Accounting and Sales Practices**

55.     Pearson is the successor in interest to all of the Author Agreements.

56.     All of the royalty statements, since at least the year 2000, have been provided to Plaintiff by Pearson.

57.     Prentice-Hall continues to be an active corporation.

**A. The "High Discount Sales."**

58.     Defendants have engaged in systematic discounting of the Works to increase their own profits under the Author Agreements to the detriment of Plaintiff.

59.     Under the Author Agreements, Plaintiff is to be paid a reduced rate of royalty in the event that Defendant engages in sales of the Works for a discount of 50% or greater (or 51% in the 1999 and 2001 Agreements) off the "single copy price" (5% as opposed to anywhere between 17% and 18.75% for "regular" sales of the Works).

60.     In contravention of these contractual provisions, Defendants do not calculate the discount from any "single copy price," but rather from an artificially determined (and unreasonably high) "list price" for the Works.

61.     This practice brings a greater number of sales within the discount provisions of the Author Agreements, thus putting such sales within the 5% royalty rate.

62.     The "list price" is arbitrarily set by Defendants, bears no relationship to the market value of the Works and Defendants sell a negligible number of the Works for this "list price."

63. Although Defendants make such "high discount" sales to third parties, such as college book stores, Defendants reap the greatest benefit from this scheme when they make such sales to their own affiliated companies.

64. To effectuate sales overseas, Defendants interact with several affiliated foreign publishing companies they control.

65. In the sales to these affiliated companies, Defendants engage in the same type of artificial pricing and "discounting" outlined above.

66. In this part of the scheme, however, Defendants profit both by reducing the royalty rate paid to Plaintiff and by the increased profits reaped by its affiliated companies.

67. Prior to the year 2000, Plaintiff did not have high discount sales reported on any of its royalty statements.

68. Over the past 5 years, the number of high discount sales has risen dramatically.

69. The manipulation of sales to qualify them within the high discount provisions of the Author Agreements constitutes a bad faith performance of the Author Agreements.

70. As a result of this bad faith performance, Plaintiff has been damaged in an amount to be proven at trial, but in no event less than $500,000.

**B. False Designation of "Subsidiary Rights."**

71. In addition to using these affiliated companies to further their artificial pricing practice, Defendants also use their foreign affiliates to further diminish the

amount of royalties they pay to Plaintiff by disingenuously (and in violation of the Author Agreements), designating sales by such companies as sales of "subsidiary rights."

72. As noted above, under the April and July 1997 Author Agreements, "subsidiary rights" is a defined term comprising "publishing in all languages; broadcasting by radio; making audio or video recordings; publishing book club editions; making foreign or other adaptations or derivative works and other versions; inclusion in anthologies; showing by motion picture or television; syndicating, quoting, and otherwise utilizing the Work[s] and material based on the Work[s]."

73. Defendants provide these subsidiary companies with versions of the Works identical to those sold in the United States. Rather than categorize the sales as sales by an affiliate, Defendants categorize these sales as licensing of "subsidiary rights."

74. Under the Author Agreements, Plaintiff is to receive 15% of any sales made by Defendant's subsidiaries outside the United States.

75. Rather than apply this contractual rate to the sales of identical copies of the Works by Defendants' affiliated companies, Defendants calculate these sales as if they were a license of a "subsidiary right," thereby drastically reducing its royalty obligation to Plaintiff.

76. By way of example, Pearson has arranged for its foreign subsidiary, Pearson Singapore Ltd., to print identical paperback versions of "Business Communication Today" and agreed to a flat license fee. Rather than the 15% of all foreign sales that Plaintiff is entitled to receive, by this deceptive accounting device, Defendant remits only approximately 1% (50% of what Defendant receives under the "license").

77. As a result of this latter device, despite relatively robust foreign sales, Plaintiff receives almost no royalties whatsoever.

78. Due to these breaches of the Author Agreements, Plaintiff has suffered damages in an amount to be proven at trial, but in no event less than $400,000.

**C. Custom Publishing.**

79. The practice of "custom publishing" permits professors or other educators to "customize" textbooks to particular teaching needs.

80. Thus, the Pearson custom publishing program permits users to have books published with only certain chapters of a given work or even to combine wholly distinct Pearson products into one book.

81. Once the chapter and/or work selections are made, Defendants bind the individualized book and sell these editions of the Works for a price dependent upon the nature of the newly created edition of the Works.

82. Without reason, justification or basis in fact, Defendants calculate royalties due to Plaintiff upon the reduced rate supposedly applicable to "abridgements" of the Works.

83. In fact, however, the term "abridgement" is never defined or even mentioned in the Author Agreements.

84. By assigning a royalty rate to custom published materials that does not reflect the true nature of these products, and does not even comport with any terms of the Author Agreements, Defendants have unjustly and without right falsely reported and reduced the amount of royalties it has paid to Plaintiff from revenues it has received from sales of the Works.

85. By this breach of the Author Agreements, Plaintiff has been damaged in an amount to be proven at trial but in no event less than $400,000.

### AS AND FOR A FIRST CLAIM FOR RELIEF
(Breach of Contract)

86. Plaintiff repeats and reasserts all allegations contained in prior paragraphs as if fully set forth herein.

87. Plaintiff entered into the Author Agreements with Prentice-Hall for the sale, distribution and other exploitation of the Works. Pearson is the successor in interest to Prentice-Hall.

88. Plaintiff has performed all of its obligations under the Author Agreements.

89. In derogation of their obligations under the Author Agreements, Defendants have systematically breached their obligations to pay Plaintiff royalties pursuant to the terms of the Author Agreements.

90. Specifically, in derogation of paragraph I(a) of the April 1997 Agreement and the July 1997 Agreement and paragraph H(a)(vii) of the 1999 Agreement and the 2001 Agreement, Defendants have falsely designated certain sales as an exercise of "subsidiary rights" thereby reducing the royalty rate they applied to sales of Plaintiff's Works.

91. In further derogation of the contractual obligations, Defendants fail to properly allocate royalties applicable to "custom published" versions of the Works.

92. Thus, in violation of paragraph I(e) of the 1997 Agreements and the July 1997 Agreement and paragraph H(b) of the 1999 Agreement and the 2001 Agreement, Defendants falsely designate sales of custom published versions of the Works as

Case 1:08-cv-00119-MGC   Document 13-2   Filed 04/02/2008   Page 16 of 17

"abridgments," thereby incorrectly applying a lower royalty rate to such sales of Plaintiff's Works.

93. Finally, in derogation of its contractual obligations, and despite repeated requests from Plaintiff, Defendants have denied Plaintiff adequate access to Defendants' books and records to permit Plaintiff to exercise its contractual right, under paragraph I(i) of the April 1997 Agreements and the July 1997 Agreement, to such access.

94. As a result of these breaches of the Author Agreements, Plaintiff has been damaged in an amount to be determined at trial of this matter but in no event less than $800,000.

**AS AND FOR A SECOND CLAIM FOR RELIEF**
**(Breach of the Covenant of Good Faith and Fair Dealing)**

95. Plaintiff repeats and realleges each of the allegations contained in the prior paragraphs as if fully set forth herein.

96. Pursuant to the Author Agreements, Defendants have rendered royalty statements to Plaintiff.

97. The royalty statements contain calculations of monies due Plaintiff from the exploitation of the Works not based upon a good faith interpretation of the Author Agreements.

98. Specifically, the Author Agreements provide for reduced rates of royalties for sales that occur at 50% or more off the "single copy price" of the Works.

99. Although Defendants are entitled to perform the calculation of the 50% discounts under the terms of the Author Agreements, rather than producing a fair calculation based upon a published "single copy price," Defendants use an artificially high "list price" as the standard from which the discount is calculated.

100. Defendants, in bad faith, thereby deprive Plaintiff of its bargained for benefits and frustrate the purpose of the Author Agreements, in order to reap benefits for itself at the expense of Plaintiff.

101. By reason of Defendants aforementioned acts and conduct, Plaintiff has been damaged in an amount to be proven at trial in this matter, but in no event less than $500,000.

WHEREFORE, Plaintiff respectfully requests judgment of the following:

a. On the First and Second Claims for Relief, damages in an amount to be proven at trial in this matter, but in no event less than $1,300,000;

b. On all Causes of Action, that Defendant be Ordered to pay Plaintiff's reasonable attorney's fees associated with this action;

c. On all Causes of Action, other such further relief as is just and proper, including attorneys' fees and costs associated with this action.

## JURY DEMAND

Plaintiff hereby demands a trial by Jury.

Dated: New York, New York  
January 7, 2008

STORCH AMINI & MUNVES PC

By: *[signature]*  
Bijan Amini (BA 3533)  
Lita Beth Wright (LW 0422)  
Benjamin L. Felcher Leavitt (BL 7363)  
140 E. 45th St., 25th Floor  
New York, New York 10017  
(212) 490-4100  
Fax: (212) 490-4208  
Attorneys for Plaintiff Bovee & Thill LLC