Bijan Amini (BA 3533)
Lita Beth Wright (LW 0442)
Jason Levin (JL 8009)
STORCH AMINI & MUNVES PC
140 East 45th St., 25th Floor
New York, New York 10017
(212) 490-4100
Attorneys for Plaintiff
Bovee & Thill LLC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------x

BOVEE & THILL LLC, a Nevada limited   :
liability company,         :
        :
    Plaintiff,         :    08-CV-00119 (MGC)
        :    ECF CASE
    v.         :
        :    **AMENDED**
PEARSON EDUCATION, INC.,   :    **COMPLAINT**
A Delaware corporation and PRENTICE-   :
HALL, INC., A Delaware Corporation   :    **(With Jury Demand)**
        :
    Defendants.     :

------------------------------------------------------x

    Plaintiff Bovee & Thill LLC ("B&T" or "Plaintiff"), by and through its attorneys

Storch Amini & Munves PC, as and for its Amended Complaint in this action, alleges as

follows:

<u>**NATURE OF ACTION**</u>

    1.    This action seeks monetary damages for the systematic breaches and bad

faith performance of author agreements whereby defendant Pearson Education, Inc.

("Pearson"), through its wholly owned subsidiary and predecessor in interest, Prentice-

Hall, Inc. ("Prentice Hall," collectively with Pearson hereinafter "Defendants"), has

withheld, at a minimum, hundreds of thousands of dollars of royalty income generated by

the sale of Plaintiff's academic texts in the fields of business communication and introduction to business.

2.    This action concerns three improper accounting practices employed by Defendants to reduce Plaintiff's royalties and to increase Defendants' profits. As explained in more detail below, Defendants (i) applied a drastically reduced royalty rate to sales of Plaintiff's works through Defendants' foreign affiliates and subsidiaries which would only apply if those foreign affiliates and subsidiaries were third parties (which they are not) who entered into license agreements with Defendants, instead of the contractually required royalty rates of 15% and 10% on such sales; (ii) unilaterally altered their method of calculating high discount sales several years after the execution of the author agreements in order to capture more sales as high discounts, on which a reduced royalty rate of 5% was paid instead of the default royalty rates of 17% to 18.75%, depending on the work; and (iii) applied a reduced royalty rate of 10% to custom published works (i.e., works in which Defendants' customers customize books by combining portions of several different textbooks or original material into one book or electronic work) as if such works were "other versions" or "abridgements" (which they are not), instead of the proper royalty rate—the default rates (between 17% and 18.75%) or the 17.75% royalty rate for sales of electronic versions of the works.

3.    In derogation of their contractual obligations, Defendants have refused to provide Plaintiff with adequate access to Defendants' books and records, thereby denying Plaintiff its contractual right to review relevant records and the opportunity to discover the true nature and extent of Defendants' improprieties.

4.      Defendants' improper accounting practices have resulted in Defendants retaining untold sums for their own account, to Plaintiff's detriment.

## PARTIES

5.      B&T is a limited liability company duly organized and existing under the laws of the State of Nevada, with its principal place of business in Clark County, Nevada.

6.      Pearson is a corporation organized under the laws of the State of Delaware, with its principal place of business in Upper Saddle River, New Jersey. Pearson is the parent company of Prentice-Hall and the successor in interest to all of Plaintiff's contracts with Prentice-Hall.

7.      Prentice Hall is a corporation organized under the laws of the State of Delaware, with its principal place of business in Upper Saddle River, New Jersey. Prentice Hall is a wholly owned subsidiary of Pearson.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000 exclusive of interests and costs.

9.      This Court has personal jurisdiction over Pearson and Prentice Hall as both entities regularly conduct business within this judicial district.

10.      Venue in this judicial district is proper as the parties to this action have contractually agreed to the Southern District of New York as the sole venue for any disputes between them.

## FACTUAL ALLEGATIONS

11.     John Thill ("Thill") and Courtland Bovee ("Bovee") are prominent authors of business communication and introduction to business textbooks.

12.     Thill and Bovee have authored more than five textbooks together on business communication and introduction to business.

13.     All of those works have been published by Defendants pursuant to various iterations of Defendants' form contract entitled "Author Agreement."  By these Author Agreements, Plaintiff granted Prentice-Hall the right to print, publish, sell and distribute multiple editions of Plaintiff's works, including but not limited to Business Communication Today, Excellence in Business Communication, Business Today (later renamed Excellence in Business), Excellence in Business (later renamed Business in Action), Essentials of Business Communication (later renamed Business Communication Essentials), Activebook Excellence in Business Communication, Activebook Business Today, and Business Communication Activebook (collectively the "Works").

14.     Plaintiff, on an ongoing basis, reviews, revises and updates the Works, resulting in new editions of the Works being issued regularly.

**The Author Agreements**

**A.  The 1997 Agreements**

15.     On or about April 18, 1997, Bovee and Thill entered into an Author Agreement with Prentice-Hall for the work entitled "Business Communication Today." Pursuant to that agreement, Bovee and Thill granted Prentice-Hall, among other things, the exclusive right to print, publish and sell the work.  In exchange, Prentice-Hall agreed to pay Bovee and Thill royalties on sales of the work.  Pursuant to paragraph 3 of the

agreement, the royalty rate is 18.75% of the net cash received by Prentice-Hall for sales of the work, except as otherwise provided in paragraph I.  Paragraph I of the agreement provides different royalty rates for certain types of sales of the work, as set forth in greater detail below.  Paragraph O of the agreement also provides a different royalty rate for electronic versions of the work.

16.    Also on or about April 18, 1997, Bovee and Thill entered into an Author Agreement with Prentice-Hall for the work entitled "Excellence in Business Communication."  Pursuant to that agreement, Bovee and Thill granted Prentice-Hall, among other things, the exclusive right to print, publish and sell the work.  In exchange, Prentice-Hall agreed to pay Bovee and Thill royalties on sales of the work.  Pursuant to paragraph 3 of the agreement, the royalty rate is 18.75% of the net cash received by Prentice-Hall for sales of the work, except as otherwise provided in paragraph I. Paragraph I of the agreement provides different royalty rates for certain types of sales of the work, as set forth in greater detail below.  Paragraph O of the agreement also provides a different royalty rate for electronic versions of the work.

17.    On or about July 25, 1997, Bovee and Thill entered into an Author Agreement with Prentice-Hall for the work entitled "Business Today," which was later renamed "Excellence in Business."  Pursuant to that agreement, Bovee and Thill granted Prentice-Hall, among other things, the exclusive right to print, publish and sell the work. In exchange, Prentice-Hall agreed to pay Bovee and Thill royalties on sales of the work. Pursuant to paragraph 3 of the agreement, the royalty rate is 17% of the net cash received by Prentice-Hall for sales of the work, except as otherwise provided in paragraph I. Paragraph I of the agreement provides different royalty rates for certain types of sales of

the work, as set forth in greater detail below.  Paragraph O of the agreement also provides a different royalty rate for electronic versions of the work.

18.    Collectively, the three Author Agreements executed in 1997 are referred to herein as the "1997 Agreements."

19.    On or around March 16, 1998, Bovee and Thill assigned all of the rights to the 1997 Agreements to Plaintiff.

**B.  The 1999 Agreement**

20.    On or about March 23, 1999, Plaintiff entered into an Author Agreement with Prentice-Hall for the work entitled "Excellence in Business," which was later renamed "Business in Action" (the "1999 Agreement").  Pursuant to that agreement, Bovee and Thill granted Prentice-Hall, among other things, the exclusive right to print, publish and sell the work.  In exchange, Prentice-Hall agreed to pay Bovee and Thill royalties on sales of the work.  Pursuant to paragraph 3 of the agreement, the royalty rate is 17.75% of the net cash received by Prentice-Hall for sales of the work, except as otherwise provided in paragraph H.  Paragraph H of the agreement provides different royalty rates for certain types of sales of the work, as set forth in greater detail below.

**C.  The 2001 Agreement**

21.    On or about October 12, 2001, Plaintiff entered into an Author Agreement with Prentice-Hall for the work entitled "Essentials of Business Communication," which was later renamed "Business Communication Essentials" (the "2001 Agreement").  Pursuant to that agreement, Bovee and Thill granted Prentice-Hall, among other things, the exclusive right to print, publish and sell the work.  In exchange, Prentice-Hall agreed to pay Bovee and Thill royalties on sales of the work.  Pursuant to paragraph 3 of the

agreement, the royalty rate is 17% of the net cash received by Prentice-Hall for sales of the work, except as otherwise provided in paragraph H.  Paragraph H of the agreement provides different royalty rates for certain types of sales of the work, as set forth in greater detail below.

22.    Pearson is the successor in interest to all of the Author Agreements.

23.    Prentice-Hall continues to be an active corporation.

24.    All of the Author Agreements contain merger clauses, which provide that each agreement constitutes the entire understanding of the parties relating to the subject matter therein and shall not be changed or amended in whole or in part except by a writing signed by the parties.  The merger clauses also provide that no course of dealing between the parties and no delay or failure of a party in exercising any rights shall operate as a waiver of that party's rights.

**The Royalty Statements**

25.    Under paragraph 4 of each of the Author Agreements, Defendants agreed to report on the sales of the Works by March 31 and September 30 of each year for the six month period ending in December and June of each respective year.  With each report of sales, Defendants agreed to remit all amounts then owed to Plaintiff.

26.    Defendants prepare the royalty statements based on information exclusively in their possession.  Plaintiff does not play any role in the preparation of the royalty statements.

27.    The royalty statements prepared exclusively by the Defendants contain summary sales information for each of the Works.  Typically, the statements provide the gross units, return units, net units and net revenue for various categories of sales of the

Works, such as "US Regular," "Canada," "Export," "High Discount" and "Subsidiary Rights." The statements also provide the royalty rate and Plaintiff's royalty payment attributable to each category of sales.

28.    Each of the Author Agreements provides a mechanism for Plaintiff to object to the royalty statements. That mechanism is embodied in Paragraph I(i) of the 1997 Agreements and Paragraph H(c) of the 1999 and 2001 Agreements, which state, in pertinent part:

> The Publisher will maintain relevant records with respect to any royalty statement provided to the Author under the Agreement for a two year period from the date of the statement. Royalty statements will be final and binding upon the Author unless, within two years from the date of the statement, the Author objects to such statement in a writing which states the specific objection and the basis for such objection.

29.    As explained in greater detail below, Plaintiff sent numerous written objections to the royalty statements concerning Defendants' improper royalty accounting practices. Plaintiff's objections that could not be resolved informally with Defendants form the basis of this action.

**Defendants' Improper Royalty Accounting Practices**

30.    Through three improper royalty accounting practices described below, Defendants routinely remitted fewer royalties to the Plaintiff than required under the Author Agreements.

A.    **Sales Through Foreign Subsidiaries and Affiliates**

31.    One of the benefits available to authors such as Plaintiff who enter into publishing agreements with Defendants is access to international markets.

32.    According to filings with the Securities and Exchange Commission (the "SEC"), Pearson Education is the most profitable operating division of England-based

Pearson PLC, a "global media company with its principal operations in the education, business information and consumer publishing markets." According to Pearson PLC's Form 20-F for the fiscal year ended December 31, 2000, which was filed with the SEC on or about June 7, 2001, "Pearson Education is one of the world's largest publishers of textbooks and paper and online teaching materials… Pearson Education has three principal operating divisions—US school, US higher education and professional and international." Pearson PLC's Form 20-F also states:

> Pearson Education has sales, distribution and publishing operations in 35 countries throughout the world. We produce textbooks, English language teaching materials (in which we are a global leader) and professional publications. Our international division also offers translations and imprints of our US higher education and professional publications.

33.     Pearson's international presence has grown significantly since 2000. At the time of the filing of this Amended Complaint, Pearson advertises on its web-site: "Educating 100 million people worldwide, Pearson is the global leader in educational publishing…" From Pearson's home-page, a computer user who clicks the tab labeled "International Customers" is led to a web-page that reads, in part: "Pearson Education is the world's leading education company. The International group has offices in over 55 countries around the world." That web-page goes on to identify seven "Pearson International Group Regions," including Canada, India, Asia and Benelux (Netherlands).

34.     Consistent with Defendants' growing presence in international book publishing markets, the Author Agreements authorize Defendants to publish and sell the Works not only in the United States, but in other countries, as well. For example, in Paragraph 1 of the Author Agreements, Plaintiff granted to Defendants, among other things, all rights in the Works throughout the world. As made explicitly clear in the 1997

Agreements, "[t]his grant includes, but is not limited to, the exclusive right to print, publish and sell the Work, under the Publisher's own name and under other imprints or trade names."

35.    Defendants do, in fact, publish and sell the Works in countries other than the United States under their own names, or under other imprints or trade names.

36.    The royalty rates applied to sales in countries other than the United States vary in the Author Agreements. The proper royalty rate for such sales is a function of which agreement governs and the particulars of the sales.

37.    For example, under the 1997 Agreements, there are at least three royalty provisions that may be applied to sales outside of the United States. Those provisions are:

    a.    Paragraph I(d): "On copies of book versions of the Work sold through any of the Publisher's subsidiaries…the Publisher will pay the Author a royalty of 15% of the net cash received from such sales."

    b.    Paragraph I(b): "On copies of book versions of the Work or sheets sold by the Publisher outside the United States, the Publisher will pay the Author a royalty of 10% of the net cash received by the Publisher from such sales."

    c.    Paragraph I(a): "The rights granted to the Publisher under this Agreement include, but are not limited to, the following subsidiary rights: publishing in all languages; broadcasting by radio; making audio and video recordings; publishing book club editions; making foreign or other adaptations or derivative works and other versions; inclusion in anthologies; showing by motion picture or by television; syndicating, quoting and otherwise utilizing the Work; and material based on the Work ("Subsidiary Rights"). The Publisher shall pay the Author royalties as follows on the exercise of Subsidiary Rights:

        i.    If the Publisher itself exercises a Subsidiary Right in the Work, 10% of the net cash received from such use.

        ii.    If the Publisher licenses any of the Subsidiary Rights, 50% of the net amount of royalty compensation received from such license."

38.    Under the 1999 and 2001 Agreements, there are also at least three royalty provisions that may be applied to sales outside of the United States (but those three provisions are somewhat different than the ones contained in the 1997 Agreements). Those provisions are:

a.    Paragraph H(a)(i): "Export Sales: 10%, for the sale of copies of the Work by the Publisher or its affiliate outside the United States and its possessions and territories, except as set forth below."

b.    Paragraph H(a)(iv): "Other Print Versions, Adaptations and Derivative Works: 10%, for the sale of copies of special print editions of the Work by the publisher or its affiliate, including, without limitation, book club editions, large print editions, and print adaptations or derivative works of the Work, including, without limitation, translations, abridgements, and adaptations for export markets."

c.    Paragraph H(a)(vii): "Licenses of Subsidiary Rights: 50% of the net amount received by the Publisher from (a) any license permitting a third party to publish and sell or otherwise commercially exploit a version of the Work in any format or medium, where the Publisher has no involvement in modifying, enhancing, or marketing the Work for or with such third party; or (b) any license permitting a third party to use or quote portions of the Work for use in the third party's publication."

39.    In summary, under the 1997 Agreements, Plaintiff's royalty rate on sales of the Works outside of the United States is either 15% from sales through the Publisher's subsidiaries, 10% on sales by the Publisher outside the United States or where the Publisher itself exercises a Subsidiary Right, or 50% of the license fee if the Publisher licenses a Subsidiary Right.  Under the 1999 and 2001 Agreements, Plaintiff's royalty rate on sales of the Works outside of the United States is either 10% on sales by the Publisher or its affiliate outside of the United States or for sales of translations, abridgements, and adaptations for export markets, or where the Publisher itself exercises a Subsidiary Right, or 50% of the license fee if the Publisher licenses a Subsidiary Right to a third party.

40.    Defendants misapplied these royalty rate provisions to a certain category of sales outside of the United States in order to take advantage of the lowest available royalty rate.  Indeed, Defendants purport to have entered into licensing arrangements with their own foreign affiliates and subsidiaries for sales of the Works or for the exercise of Subsidiary Rights.  On account of those transactions, Defendants remitted 50% of the license fees to Plaintiff, rather than 15% or 10% of the net cash received from sales of the Works or for the exercise of Subsidiary Rights.  Defendants kept for themselves the remainder of the amounts owed to Plaintiff.

41.    The statements prepared by Defendants for the royalty periods between January 2003 and December 2007 contain at least 44 entries in which Defendants claim to have licensed the exercise of a Subsidiary Right to their own affiliates and subsidiaries—entities with names such as "Pearson Education Canada," "Pearson Education Asia" and "Pearson Education Benelux BV."  These are some of the very entities contained on Pearson's web-site as being "Pearson International Group Regions."

42.    The 44 entries on the royalty statements between January 2003 and December 2007 account for sales of at least 80,034 net units of the Works (inexplicably, six of the 44 entries do not indicate the number of units sold).

43.    According to the royalty statements prepared by Defendants, the licenses corresponding with those 80,034 units generated $108,009.57 in license fee revenue. Defendants remitted 50% of those license fees, or $54,004.79, to Plaintiff, claiming that the applicable royalty provisions were paragraph I(a)(ii) of the 1997 Agreements and paragraph H(a)(vii) of the 1999 and 2001 Agreements.

44.    Defendants applied the wrong provisions to those sales. For example, paragraph H(a)(vii) of the 1999 and 2001 Agreements only applies where the license is with a "third party." The licenses associated with the 44 entries on the royalty statements were not with third parties—they were with Defendants' affiliates and subsidiaries or, as Pearson's web-site states, with "Pearson International Group Regions."

45.    Defendants' sale of the Works through their own affiliates and subsidiaries is consistent with the right granted by Plaintiff to Defendants in paragraph 1 of the Author Agreements to print, publish and sell the Works anywhere in the world under other imprints or trade names, such as "Pearson Education Asia," but Defendants cannot plausibly claim that those other imprints or trade names are third parties.

46.    Indeed, in a letter dated April 22, 2005 to Bovee and Thill, Harriet L. Goldberg, Pearson's Vice President and Deputy General Counsel, explicitly referred to Pearson's "international affiliates" and its "Asian subsidiaries."

47.    Not only were the licenses associated with the 44 entries on the royalty statements not with third parties, but Pearson's editors represented to Plaintiff that the same Pearson employee, Will Ethridge, had oversight and approval authority for the purported licenses on behalf of both the alleged licensor (Pearson) and the alleged licensee (Pearson's affiliate or subsidiary). That was because Mr. Ethridge held senior positions with both Pearson US Publishing and Pearson International Publishing. Thus, the licensing arrangements at issue were not made at arms' length.

48.    The royalty rates that should have been applied to those sales are 15% and 10% (depending on the particulars of each transaction which must be provided by

Defendants) of the net revenues received by Defendants' affiliates and subsidiaries from sales of the Works.

49.    As a result of Defendants' improper accounting practice for sales through foreign affiliates and subsidiaries, Plaintiff has been damaged in the amount of the difference between what it should have received on account of such sales (15% or 10% of the net revenues received by Defendants' affiliates and subsidiaries) and what it actually received (50% of the so-called license fees).

50.    Plaintiff requires more specific information from Defendants about the sales at issue to plead a precise damages figure. As described in greater detail below, Plaintiff previously requested from Defendants access to information that would be helpful in determining those damages, but Defendants refused to provide the specific information that was requested. As Defendants have conceded, should Plaintiff prevail on this claim, Defendants owe Plaintiff at least an additional $73,000 in royalties. Plaintiff believes the actual damages may be far in excess of that figure.

### B.  <u>Custom Published Books</u>

51.    Defendants' practice of "custom publishing" enables their customers, such as educational institutions and professors, to electronically "customize" course books or textbooks to fit their teaching needs.

52.    To facilitate custom publishing, Defendants provide their customers with access to digital information stored on an electronic database using Pearson's custom publishing web-site (www.pearsoncustom.com).

53.    To create custom published books, customers access Defendants' electronic database of existing books and chapters published by Defendants. Customers

then search the database and select the books or chapters published by Defendants which the customers would like to customize. Customers may select certain chapters of a particular book, combine several chapters of several different books, or combine books with chapters of other books. Customers may then re-order and/or combine those books and chapters with original customer material or third party content (content prepared by non-Pearson authors). Once customers choose the order of the content and determine the cover design and layout, Defendants publish the customized products and make them available in hard copy, electronic formats (such as on the internet or on CD-ROM or DVD), and in other media. All of these actions are performed electronically.

54.    At any point in the process, customers may save their customized product on Defendants' database and log back into the system at a later time to finish preparing the customized product or completing their order.

55.    Custom published books are prepared, modified, retrieved, stored and published electronically.

56.    According to information provided by representatives of the Defendants, they have calculated Plaintiff's royalties for custom published work at a rate of 10%. Under the 1997 Agreements, Defendants contend the relevant provision is paragraph I(a)(i), which provides the 10% royalty rate for, among other things, "making foreign or other adaptations or derivative works and other versions" (even though the royalty statements do not report any sales under the category of "other versions"). Under the 1999 and 2001 Agreements, Defendants contend the relevant provision is paragraph H(a)(iv), which provides the 10% royalty rate for, among other things, "print adaptations

or derivative works of the Works, including, without limitation, translations, abridgements, and adaptations for export markets."

57.    Defendants applied the wrong royalty rate provisions to sales of custom published books. For example, custom published works are not "abridgements." In the publishing industry, the term "abridgement" generally means a shortened or condensed version of a book. The decision of which content goes into the abridged version is made by the publisher and the editors. By way of illustration of what an abridgement is, consider Leo Tolstoy's classic novel *War and Peace*, which originally exceeded 1300 pages. Due to the length and complexity of the novel, some publishers and editors determined to prepare shorter versions of it. One such example is a condensed version of *War and Peace* that is approximately 500 pages shorter than Tolstoy's original work. Copies of these abridged versions were printed and sold by the publishers to bookstores and the public.

58.    Custom published books, however, are typically combinations of chapters of different books and original material from the customer, all of which are selected by the customer and published by a publishing company only for the purpose of filling that particular customer's order. With custom publishing, the customer is empowered to make critical decisions about the content of the book, and also has the ability to control the cover, design and layout of the custom book. That is how the customer "customizes" the book. Thus, there are clear and significant differences between abridged versions of books and custom published books.

59.    In an effort to revise the Author Agreements without the consent of Plaintiff, and in violation of the merger clauses contained in the Author Agreements,

Defendants attempted to change the plain meaning of the term "abridgement" in the 1999 and 2001 Agreements (Defendants also attempted to change the meaning of "abridgement" in the 1997 Agreements, but since that term does not appear in those agreements, their attempt was completely futile). Thus, at a time not precisely known but believed by Plaintiff to be in 2005, Defendants began appending a "Glossary" to Plaintiff's royalty statements. The Glossary purports to change the definition of Abridgement to include custom published books. Defendants' attempt to change the meaning of "abridgement" in the 1999 and 2001 Agreements, several years after the execution of the agreements, violates the merger clauses.

60.     As explained below, the proper royalty rate provisions for custom books vary depending upon whether the finished product was sold in print or as an electronic version. Defendants' royalty statements, however, do not provide Plaintiff with any information about how many custom books were sold in print and how many were sold as electronic versions.

61.     Since custom published books are combinations of portions of multiple works usually prepared by multiple authors, the Author Agreements provide that Defendants must determine the fair value of each work to the finished product as a whole, and then apply the applicable royalty rates to those values to determine each author's royalty payment. That provision is found in paragraph I(e) of the 1997 Agreements and paragraph H(b)(i) of the 1999 and 2001 Agreements. The royalty statements prepared by Defendants do not contain sufficient information to determine whether Defendants performed this function.

62.     With respect to custom published books that contain portions of the Works, Defendants must determine the fair value of Plaintiff's Works to the overall product. Once that determination is made, Defendants must apply the contractual royalty rates to determine Plaintiff's royalty payment.

63.     Under the 1997 Agreements, the proper royalty rate for sales of print versions of custom published books is the default rate. The default royalty rate applies unless otherwise specified in the agreements. No other provision in the 1997 Agreements provides a royalty rate for custom published books, which is a well-known industry term the Defendants could have included in the royalty rate provisions but did not do so.

64.     Under the 1997 Agreements, the proper royalty rate for sales of electronic versions of custom published books is 18% under paragraph O, which states:

> The rights granted to the Publisher under this Agreement include (in addition to all other rights described herein) the right to prepare, publish, reproduce, sell and otherwise distribute electronic versions of the Work. As used herein, the term "electronic versions" shall mean any and all methods of copying, recording, storage, retrieval, or delivery of all or any portion of the Work, alone or in combination with other works, including in any multimedia work or electronic book; by any means now known or hereafter devised, including, without limitation, by electronic or electromagnetic means, or by analog or digital signal; whether in sequential or non-sequential order, on any and all physical media, now known or otherwise devised including, without limitation, magnetic tape, floppy disks, CD-I, CD-ROM, laser disk, optical disk, IC card or chip, and any other human or machine readable medium, whether or not permanently affixed in such media (excluding the electronic versions specifically described in paragraph I(a)); and the broadcast and/or transmission of the foregoing by any and all means now known or hereafter devised.

> The Publisher shall pay the Author royalties as follows on the electronic versions:

> (i)     If the Publisher itself creates and sells that electronic version, 18% of the net cash received from such use.

(ii)    If the Publisher licenses the right to create and sell the electronic version, 50% of the net amount of royalty compensation received from such license.

65.    Under the 1999 and 2001 Agreements, the proper royalty rate for sales of print versions of custom published books is the default rate provided in each of those agreements. That default royalty rate applies unless otherwise specified in the agreements. No other provision in those agreements provides a royalty rate for custom published books, which is a well-known industry term the Defendants could have included in the royalty rate provisions but did not do so. In fact, the Defendants included the term "custom published work" in another part of the agreements but chose not to provide a royalty rate other than the default rate for such books.

66.    Under the 1999 and 2001 Agreements, the proper royalty rate for sales of electronic versions of custom published books is 17.75% under paragraph H(a)(v). That paragraph provides the 17.75% rate for "transmission of the Work via radio or television broadcast, cable, satellite, on-line or other electronic or electromagnetic transmission."

67.    As a result of Defendants' improper accounting practice for custom published books, Plaintiff has been damaged in the amount of the difference between what it should have received on account of such sales (anywhere between 17% and 18.75% of the net revenues received by Defendants, which are the default royalty rates and the rates for electronic versions of the Works) and what it actually received (10% of the net revenues).

68.    Plaintiff requires more specific information from Defendants about the sales at issue to plead a precise damages figure. For example, the royalty statements prepared by Defendants do not provide the number of units that were sold as custom

published works, other versions or abridgements, even though the statements provide

those figures for all other sales categories. While the royalty statements contain a net

revenue figure for sales of abridged versions of the Works, the statements provide no

information about those abridged versions that would enable Plaintiff to make reliable

determinations of which sales were of custom published books. Also excluded from the

royalty statements is information about the number of custom books that were sold in

print and the number that were sold as electronic versions. As described in greater detail

below, Plaintiff previously requested from Defendants access to information that would

be helpful in determining Plaintiff's damages, but Defendants refused to provide the

specific information that was requested.

69.    Additionally, Plaintiff is entitled to damages for all sales of the Works

under the 1997 Agreements that were classified by Defendants as sales of abridged

versions. There is simply no provision in the 1997 Agreements for a 10% royalty rate for

abridgements—indeed, the term "abridgements" does not even appear in those

agreements. The appropriate royalty rate for such sales should have been the default rate,

which is either 17% or 18.75% depending on which Works covered by the 1997

Agreements were sold. Based on the royalty statements prepared by Defendants,

between January 2003 and December 2007, Defendants earned more than $780,000 on

sales of abridgements of the Works covered by the 1997 Agreements. Plaintiff earned a

royalty of approximately $77,000 on those sales. Applying the two relevant default

royalty rates for Works covered by the 1997 Agreements, Plaintiff should have received

royalty payments between $132,600 and $146,250. Taking into account the

approximately $77,000 already received by Plaintiff, Plaintiff's damages for sales of

abridged versions of Works covered by the 1997 Agreements are approximately between $55,600 and $69,250.

### C. **High Discount Sales**

70.    High discount sales are sales of the Works at steep discounts. Typically, high discount sales are made of remaindered books, or books that remained unsold in the publisher's warehouse for a long period of time and are sold in bulk at greatly reduced prices in order to liquidate old inventory.

71.    Under paragraph I(c) of the 1997 Agreements, high discount sales are sales of copies of the Works by any means at a discount of 50% or greater off the single copy price. Plaintiff is entitled to a royalty payment of 5% of the net revenues generated by high discount sales.

72.    Under paragraph H(a)(iii) of the 1999 and 2001 Agreements, high discount sales are sales of copies of the Work by the Publisher or its affiliate by any means and channel at a discount of 51% or greater off the single copy price. Plaintiff is entitled to a royalty payment of 5% under the 1999 Agreement and 15% under the 2001 Agreement of the net revenues generated by high discount sales.

73.    High discount sales of the Works were extremely rare until 2004. Based on the royalty statements prepared by Defendants, from 1997 through June 2004, a total of only 360 units of the Works were sold at high discounts. That amount of high discount sales is negligible (approximately 0.086% of net reported units sold) in comparison to the net reported total of more than 420,000 units of the Works sold during the same period.

74.    Suddenly, beginning in July 2004, the number of high discount sales of the Works changed dramatically.

75.     Based on the royalty statement prepared by the Defendants for the period of July 2004 through December 2004, there were 5,164 high discount sales in that six-month period (approximately 7.18% of net reported units sold in that period).  In comparison to the high discount sales made over approximately the prior seven years, the high discount sales in that six-month period increased exponentially to 1400%.

76.     Shortly after receiving the royalty statement for the second-half of 2004, Plaintiff noticed the dramatic increase in the number of high discount sales and contacted Defendants to inquire into the situation.

77.     As a result, on April 5, 2005, Thill sent an email to Jeff Shelstad, who is believed to have been at that time the Editorial Director of Prentice Hall Business Publishing.  In that email, Thill objected to, among other things, the high discount sales contained in the royalty statement.  Thill challenged Defendants' calculation of high discounts.  Specifically, Thill noted that certain high discount sales were made at less than the 50% discount required for a high discount sale.  Thill also asked for an explanation why newer editions of the Works were being sold at high discounts.

78.     Subsequently, Shelstad telephoned Thill.  Shelstad expressed uncertainty about the precise calculation of high discounts, but he used the term "list price."  During that conversation, Shelstad threatened Thill that if he did not stop asking questions about the high discount sales, Pearson would simply sell more of the Works at high discounts or treat more of the sales as high discount sales in order to reduce the amount of royalties paid to Plaintiff.

79.     At some point subsequent to the call with Shelstad, Thill reviewed the Author Agreements and did not find any mention of the phrase "list price."  Instead, he

observed that the Author Agreements state that the high discount calculation is based on the "single copy price."

80.    Subsequently, Thill contacted David Parker.  Parker is believed to have been at that time either an Editor or Acquisitions Editor at Prentice Hall Business Publishing.  Over the prior several years, Thill and Parker had developed a trusting relationship.

81.    In that conversation, and in follow-up conversations, Thill expressed to Parker his concerns about the drastically increased high discount sales.  Thill and Parker discussed the confusion surrounding the calculation of high discount sales.  During those conversations, Parker informed Thill that the reason high discount sales of the Works increased dramatically was that management had recently decided that the term "single copy price" in the Author Agreements meant the "list price."  Thus, by basing the high discount calculation on the list price instead of the single copy price, Defendants captured many more sales as high discounts.  Consequently, Plaintiff received a reduced royalty rate on far more sales of the Works than ever before.

82.    In subsequent periods, perhaps making good on Shelstad's threat, Defendants continued to report extremely high numbers of high discount sales on Plaintiff's royalty statements.

83.    The following chart shows the trend of dramatically increasing high discount sales of the Works that began in July 2004:

| Net Units Sold at High Discount by Period | |
| --- | --- |
| Period | Net Units Sold at High Discount |
| Jul-Dec 1997 | 0 |
| Jan-Jun 1998 | 0 |
| Jul-Dec 1998 | 15 |
| Jan-Jun 1999 | 0 |
| Jul-Dec 1999 | 14 |
| Jan-Jun 2000 | 0 |
| Jul-Dec 2000 | 0 |
| Jan-Jun 2001 | 0 |
| Jul-Dec 2001 | 2 |
| Jan-Jun 2002 | 130 |
| Jul-Dec 2002 | 140 |
| Jan-Jun 2003 | 33 |
| Jul-Dec 2003 | 25 |
| Jan-Jun 2004 | 1 |
| Beginning in July 2004, the number of high discount sales increased dramatically | |
| Jul-Dec 2004 | 5,164 |
| Jan-Jun 2005 | 7,587 |
| Jul-Dec 2005 | 6,854 |
| Jan-Jun 2006 | 6,673 |
| Jul-Dec 2006 | 4,391 |
| Jan-Jun 2007 | 2,787 |
| Jul-Dec 2007 | 3,872 |

← In or about April 2005, Shelstad's threat to Thill

84.    In summary, between July 1997 and June 2004, there were a total of 360 high discount sales of the Works.  Then, Defendants changed their method of calculating high discount sales under the Author Agreements.  As a result of Defendants' changed methodology, between July 2004 and December 2007, there were a total of 37,328 high discount sales.

85.    As a result of Defendants' improper accounting practice for high discount sales, Plaintiff has been damaged in the amount of royalties it should have earned on sales that were improperly classified as high discount sales after Defendants' method of

calculating high discount sales changed.  Based on the information currently available to

Plaintiff, Plaintiff has been damaged in an amount greater than $150,000.

**Plaintiff Interposes Numerous Objections to the Royalty Statements**

86.    Paragraph I(i) of the 1997 Agreements and paragraph H(c) of the 1999 and

2001 Agreements provide, in part, that a royalty statement prepared by Defendants will

be final and binding upon Plaintiff unless, within two years from the date of the

statement, Plaintiff objects to such statement in a writing which states the specific

objection and the basis for such objection.

87.    Plaintiff interposed numerous written objections to the royalty statements

concerning Defendants' improper royalty accounting practices.  Each of these objections

complied with the notice requirements of the Author Agreements.  At various times,

Defendants' own writings and conversations confirm its awareness of Plaintiff's

objections.

88.    For example, as explained above, on April 5, 2005, Thill emailed Jeff

Shelstad after receiving the royalty statement for the period July 2004 through December

2004 to express several objections.  In particular, Thill objected to certain high discount

sales and designations of subsidiary rights (for Works sold through Defendants' foreign

affiliates and subsidiaries).  Shelstad confirmed receipt of that email in a subsequent

telephone call, and Thill had a follow-up telephone call with Parker.

89.    On or about April 22, 2005, Harriet L. Goldberg, Vice President and

Deputy General Counsel of Pearson Education, Inc., sent a letter to Thill and Bovee.

Goldberg acknowledged receipt of an email written by Bovee that objects to the royalties

paid on sales of the Works through Defendants' foreign affiliates and subsidiaries.

90.    On June 15, 2005, Thill sent an email to Parker in response to Parker's inquiry about preparing a new version plan for one of the Works. Thill wrote that Pearson must honor the provision in the Author Agreements governing sales through foreign affiliates and subsidiaries before Thill participates in discussions about new projects. In particular, Thill stated that "[a]s discussed many times, for years now Pearson has refused to pay us our royalties on copies of book versions of our Works sold through any of the Publisher's subsidiaries."

91.    On or about August 3, 2005, Plaintiff commenced an action against Pearson in the United States District Court, District of Nevada (Case No. 1:08-cv-00119-MGC) (the "Nevada Action") objecting to, among other things, sales to foreign affiliates and subsidiaries. On or about September 13, 2005, Plaintiff amended the complaint filed in the Nevada Action, again objecting to, among other things, sales to foreign affiliates and subsidiaries. The complaint and the amended complaint put Defendants on notice of the objections raised therein.

92.    Subsequent to the commencement of the Nevada Action, the royalties paid to Plaintiff increased. The improper accounting practices complained of herein continued, but in varying degrees.

93.    On or about August 16, 2005, Thill sent a letter to Pearson PLC's Board of Directors informing them, among other things, that Pearson was engaging in two different schemes to deprive authors of their royalties. Thill requested that the Board of Directors arrange for an outside audit of how authors' royalties were being calculated and the amount of money that was still owed to authors.

94.    On or about September 2, 2005, counsel for Defendants and Pearson PLC sent a letter to counsel for Plaintiff. Among other things, Defendants' counsel acknowledged Pearson PLC's receipt of Thill's letter to the Board of Directors. Defendants' counsel wrote that Thill's letter "purport[s] to provide notice of Mr. Thill's allegations regarding his view of certain of Pearson Education, Inc.'s business practices in respect of royalties." After noting that the substance of Thill's letter mirrored the allegations made in the Nevada Action, Defendants' counsel further wrote that "[y]our client's concerns have been noted and the allegations will be referred to the Audit Committee of the Board for review and consideration."

95.    At various times throughout 2006 and 2007, there were verbal discussions between Plaintiff and Defendants (or their respective representatives) during which Defendants acknowledged their awareness that Plaintiff objected to sales through foreign affiliates and subsidiaries, high discount sales and custom published books. In a particular communication in May 2006, Defendants' counsel noted Plaintiff's objections concerning certain types of sales, including sales through foreign affiliates and subsidiaries, high discount sales and custom publishing.

96.    On October 17, 2007, Parker sent an email to Bovee and Thill. In that email, Parker specifically referenced Plaintiff's objections to sales through foreign affiliates and subsidiaries and high discount sales.

97.    On October 25, 2007, Parker sent an email to Thill. In that email, Parker specifically referenced Plaintiff's objections to high discount sales.

98.    On December 31, 2007, Thill sent an email to Parker. In that email, Thill objected to high discount sales and custom publishing.

99.    On January 1, 2008, Parker responded to Thill's email from the prior day and specifically referenced Plaintiff's objections to high discount sales and custom publishing.

100.    Beginning in 2005, Plaintiff attempted to exercise its right to review relevant records under the Author Agreements.  In particular, paragraph I(i) permits Plaintiff, at its own expense, to review Defendants' records no more than once each calendar year for the purpose of verifying the accuracy of the royalty statements. Plaintiff and Defendants could not agree on the scope of the records subject to the review. Defendants provided access to certain documents but refused to provide access to the underlying records Plaintiff sought to review.  Indeed, the refusal of Defendants to turn over the underlying sales records of the Works is the reason Plaintiff is unable to plead precise damages figures with respect to certain categories of sales at this time.

101.    By way of example, on or about March 2006, Plaintiff's counsel requested at least seven categories of documents in order to conduct a review of the relevant records.  On or about April 4, 2006, Defendants' counsel objected to the list for a variety of reasons including relevancy (and on the grounds that one category of documents was supposedly already produced) and agreed to provide a sampling of documents in response to only one of the seven categories.

102.    By way of further example, on or about January 17, 2007, Plaintiff's counsel sent a letter to Defendants' counsel objecting that Defendants' refusal to provide back-up sales information is preventing Plaintiff's forensic accountant from performing a meaningful audit that complies with generally accepted accounting principles.

## AS AND FOR A FIRST CLAIM FOR RELIEF
### (Breach of Contract)

103.    Plaintiff repeats and reasserts all allegations contained in prior paragraphs as if fully set forth herein.

104.    Plaintiff entered into the Author Agreements with Prentice-Hall for the publishing, sale, distribution and other exploitation of the Works.  Pearson is the successor in interest to Prentice-Hall.

105.    Plaintiff has performed all of its obligations under the Author Agreements.

106.    In derogation of their obligations under the Author Agreements, Defendants have systematically breached their obligations to pay Plaintiff royalties pursuant to the terms of the Author Agreements.

107.    Thus, in order to avoid paying Plaintiff the royalty rates required under paragraphs I(a)(i), I(b) and I(d) of the 1997 Agreements and under paragraphs H(a)(i), H(a)(iv) and H(a)(vii) of the 1999 and 2001 Agreements, Defendants purport to have entered into licenses with their own foreign affiliates and subsidiaries to pay a reduced royalty rate under paragraph I(a)(ii) of the 1997 Agreements and paragraph H(a)(vii) of the 1999 and 2001 Agreements.  The provisions relied on by Defendants do not apply to these transactions, however, because the licenses were with Defendants' own affiliates and subsidiaries.

108.    With respect to custom published books, Defendants applied a 10% royalty rate to such sales (purportedly under paragraph I(a)(i) of the 1997 Agreements and paragraph H(a)(iv) of the 1999 and 2001 Agreements) instead of the royalty rates required under the Author Agreements.  The proper royalty rates, depending upon the specifics of each sale of custom published works which have not been provided by

Defendants, are either the default rates of between 17% and 18.75% in paragraph 3 of the Author Agreements, or the royalty rates for sales of electronic versions of custom published books under paragraph O of the 1997 Agreements (18%) and paragraph H(a)(v) of the 1999 and 2001 Agreements (17.75%).

109.    Defendants also breached the 1997 Agreements by applying the royalty rate for abridgements to sales of the Works covered by those agreements because the 1997 Agreements do not provide a specific royalty rate for abridgement sales.  Indeed, the phrase "abridgement" does not even appear in those agreements.

110.    With respect to high discount sales, several years after the execution of the Author Agreements, Defendants changed their method of calculating high discount sales in order to capture more sales in the high discount category.  Defendants then paid Plaintiff a reduced royalty rate of 5% on such sales, purportedly under paragraph I(c) of the 1997 Agreements and paragraph H(a)(iii) of the 1999 and 2001 Agreements. However, Defendants did not comply with those provisions because they did not base the high discount sales calculation on the "single copy price."

111.    Finally, in derogation of their contractual obligations, and despite repeated requests from Plaintiff, Defendants have denied Plaintiff adequate access to Defendants' books and records to permit Plaintiff to exercise its contractual right to review relevant records.

112.    As a result of these breaches of the Author Agreements, Plaintiff has been damaged in an amount to be determined at trial of this matter but believed to be no less than $278,600.

## AS AND FOR A SECOND CLAIM FOR RELIEF
### (Breach of the Covenant of Good Faith and Fair Dealing)

### (In the alternative to the First Claim for Relief, but only as that claim relates to High Discount Sales)

113.    Plaintiff repeats and realleges each of the allegations contained in the prior paragraphs as if fully set forth herein.

114.    Plaintiff entered into the Author Agreements with Prentice-Hall for the publishing, sale, distribution and other exploitation of the Works.  Pearson is the successor in interest to Prentice-Hall.

115.    As parties to those contracts, Defendants are required to comply with the covenant of good faith and fair dealing.

116.    Under the Author Agreements, Defendants prepare Plaintiff's royalty statements.  Defendants exclusively control the information necessary to perform the royalty calculations.

117.    Several years after the execution of the Author Agreements, Defendants unilaterally changed their method of calculating high discount sales in order to capture more sales in the high discount category.  Defendants then paid Plaintiff a reduced royalty rate of 5% on such sales, purportedly under paragraph I(c) of the 1997 Agreements and paragraph H(a)(iii) of the 1999 and 2001 Agreements.  However, Defendants did not comply with those provisions because they did not base the high discount sales calculation on the "single copy price."

118.    Defendants changed their method of calculating high discount sales in order to deprive Plaintiff of part of its bargain.  When Plaintiff objected to the massive increase in high discount sales and the commensurate reduction in Plaintiff's royalties,

Defendants' employee threatened Plaintiff that Defendants would increase the number of high discount sales that were reported if Plaintiff continued to complain.

119.    Defendants have also refused to permit Plaintiff to review relevant books and records related to the high discount sales.

120.    Defendants failed to act in conformity with the covenant of good faith and fair dealing.

121.    By reason of Defendants aforementioned acts and conduct, Plaintiff has been damaged in an amount to be proven at trial in this matter, but believed to be in excess of $150,000.

**WHEREFORE,** Plaintiff respectfully requests judgment of the following:

a. On the First Claim for Relief, damages in an amount to be proven at trial in this matter, but in no event less than $278,600;

b. On the Second Claim for Relief, damages in an amount to be proven at trial in this matter, but in no event less than $150,000;

c. On all Causes of Action, that Defendant be Ordered to pay Plaintiff's reasonable attorney's fees associated with this action;

d. On all Causes of Action, other such further relief as is just and proper, including attorneys' fees and costs associated with this action.

## JURY DEMAND

Plaintiff hereby demands a trial by Jury.

Dated: New York, New York
      May 8, 2008

STORCH AMINI & MUNVES PC

By: _____

    Bijan Amini (BA 3533)
    Lita Beth Wright (LW 0422)
    Jason Levin (JL 8009)
140 East 45th Street, 25th Floor
New York, New York 10017
Tel: (212) 490-4100
Fax: (212) 490-4208
Attorneys for Plaintiff
Bovee & Thill LLC