LOVELLS LLP
David Leichtman (DL-7233)
Gonzalo S. Zeballos (GZ-5994)
Lani Questembert (LQ-2072)
590 Madison Avenue
New York, New York 10027
Telephone: (212) 909-0600
Facsimile: (212) 909-0660
david.leichtman@lovells.com

*Attorneys for Defendants Pearson Education, Inc.,*
*and Prentice Hall Inc.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**BOVEE & THILL LLC,**

Plaintiff,

-against-

**PEARSON EDUCATION, INC. and PRENTICE
HALL INC.,**

Defendants.

**08-CV-00119 (MGC)
ECF Case**

**MEMORANDUM OF LAW IN SUPPORT OF PEARSON EDUCATION, INC.
AND PRENTICE HALL INC.'S MOTION TO PARTIALLY DISMISS BOVEE & THILL
LLC'S AMENDED COMPLAINT FOR FAILURE TO STATE A CLAIM**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................................ii

PRELIMINARY STATEMENT ............................................................................................1

STATEMENT OF FACTS .....................................................................................................2

ARGUMENT ..........................................................................................................................4

I.    B&T's Claim Concerning Custom Publishing Fails as a Matter of Law .........................5

    A.    THE 1997 CONTRACTS ....................................................................................6

    B.    THE 1999 AND 2001 CONTRACTS ..................................................................8

II.   B&T's Claims Concerning Foreign Sales of Derivative Works Through Subsidiaries or Affiliates Should Be Dismissed .........................................................................................10

III.  B&T's Custom Publishing and Foreign Sales Claims Should Be Dismissed With Prejudice ...........................................................................................................................16

CONCLUSION......................................................................................................................18

## TABLE OF AUTHORITIES

**Page**

**Cases**

*Bell Atlantic Corp. v. Twombly,*
   --- U.S. ---, 127 S. Ct. 1955 (2007) .................................................................... 4, 8, 10

*Cal. Distrib. Inc. v. Cadbury Schweppes Ams. Beverages, Inc.,*
   No. 06 Civ. 0496 (RMB), 2007 WL 54534 (S.D.N.Y. Jan. 5, 2007)........................ 3

*Carte Blanche (Singapore) Pte. Ltd. v. Diners Club Int'l, Inc.,*
   2 F.3d 24, 26 (2d Cir. 1993) ............................................................................... 13-14

*De Jesus v. Spears,*
   87 F.3d 65 (2d Cir. 1996) ......................................................................................... 16

*Desiderio v. Nat'l Ass'n of Sec. Dealers, Inc.,*
   191 F.3d 198 (2d Cir. 1999) ...................................................................................... 3

*Enron Creditors Corp. v. Martin,*
   376 B.R. 442 (Bankr. S.D.N.Y. 2007) ..................................................................... 14

*Hishon v. King & Spalding,*
   467 U.S. 69 (1984) ..................................................................................................... 4

*Holowecki v. Fed. Express Corp.,*
   440 F.3d 558 (2d Cir. 2006) ...................................................................................... 5

*In re Livent, Inc. Noteholders Sec. Litig.,*
   151 F. Supp. 2d 371 (S.D.N.Y. 2001) ...................................................................... 15

*In re Merrill Lynch Ltd. Partnerships Litigation,*
   7 F. Supp. 2d 256 (S.D.N.Y. 1997) ................................................................... 16, 17

*International Audiotext Network, Inc. v. Am. Tel. and Tel. Co.,*
   62 F.3d 69 (2d Cir. 1992) .......................................................................................... 4

*Mangiafico v. Blumenthal,*
   471 F.3d 391 (2d Cir. 2006) ...................................................................................... 4

*Papasain v. Allain,*
   478 U.S. 265 (1986) ................................................................................................... 4

*Sadler v. Brown,*
   793 F. Supp. 87 (S.D.N.Y. 1992) ............................................................................. 18

*Siepel v. Bank of American N.A.,*
   239 F.R.D. 558 (E.D. Mo. 2006).............................................................................. 17

*Solar Travel Corp. v. Nachtomi,*
   Case No. 00 CIV 3564, 2001 WL 641151 (S.D.N.Y. June 8, 2001) .................. 16-17

*Teachers Ins. Annuity Ass'n of Am. v. Wometco Enter., Inc.,*
   833 F. Supp. 344 (S.D.N.Y. 1993) ........................................................................... 15

*VTR, Inc. v. Goodyear Tire & Rubber Co.*,
   303 F. Supp. 773 (S.D.N.Y. 1969) ...................................................................................... 15-16

*Zim v. Western Publishing Co.*,
   573 F.2d 1318 (5th Cir. 1978) ............................................................................................... 14

## **<u>Rules</u>**

Rule 10 of the Federal Rules of Civil Procedure .......................................................................... 1

Pearson Education, Inc. ("Pearson") and Prentice Hall Inc. (collectively "Pearson"),[1] by and through their undersigned counsel, respectfully submit this memorandum of law, which incorporates by reference pursuant to Rule 10 of the Federal Rules of Civil Procedure the Declaration of David Leichtman dated February 29, 2008 (the "Leichtman Decl.") (D.I. No. 10), together with the Declaration of Gonzalo S. Zeballos dated May 22, 2008 (the "Zeballos Decl.") in support of Pearson's motion to dismiss Bovee & Thill LLC's ("B&T") amended complaint as it relates to certain sales of "Custom Published"[2] works and certain "Sales Through Foreign Subsidiaries and Affiliates"[3] for failure to state a claim upon which relief may be granted pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

## PRELIMINARY STATEMENT

In B&T's fourth attempt to state viable claims, the Amended Complaint asserts a new theory regarding "Custom Published" works and "Sales through Foreign Subsidiaries and Affiliates." These claims fare little better than B&T's previous three failures to state cognizable claims against Pearson. Despite strenuous efforts to concoct issues of fact where none exist, B&T's claim concerning "custom publishing" is still undone by the plain terms of the underlying contracts, which clearly and unambiguously set forth the royalty provisions that Pearson has, in

---

[1]    In 2001, Prentice Hall Inc.'s corporate name was changed to Pearson Education, Inc. and thus the two named defendants are in reality a single party. Pearson continues to use the "Prentice Hall" imprint for B&T's works and other works.

[2]    The term "Custom Published" is used herein as described in ¶¶ 51-69 of Plaintiff's Amended Complaint as sales made by Pearson and which are reflected on B&T's royalty statements as Abridgement sales under paragraph I(a)(i) of the 1997 Contracts and H(a)(iv) of the 1999 and 2001 Contracts. (*See* Exs. E-G and H-I to Leichtman Decl. at ¶ I(a)(i) and ¶ H(a)(iv), respectively.)

[3]    The phrase "Sales through Foreign Subsidiaries and Affiliates" is used as described in ¶¶ 31-50 of Plaintiff's Amended Complaint as sales made by Pearson through license with its foreign affiliates (and what B&T alleges falsely are also subsidiaries) and which sales are reflected on B&T's royalty statements as Subsidiary Rights sales under paragraph I(a)(ii) of the 1997 Contracts and paragraph H(a)(vii) of the 1999 and 2001 Contracts. In fact, there were no such sales made under the 1999 and 2001 Contracts. (*See* Exs. E-G and H-I to Leichtman Decl. at ¶ I(a)(ii) and ¶ H(a)(vii), respectively.)

good faith, applied.  B&T's claims regarding sales through foreign affiliates, meanwhile, are based on a tortured and implausible reading of the contracts.  Despite its strained readings of the underlying agreements, B&T's claims relating to "Custom Published" versions of the Works[4] and "Sales through Foreign Subsidiaries and Affiliates," raises no issues of fact outside the four corners of its contracts with Pearson.  Accordingly, the Court should have little difficulty disposing of those claims once and for all, with prejudice, because B&T's repeated attempt at a sufficient pleading fails to state a claim as a matter of law.

## STATEMENT OF FACTS

Between 1997 and 2001 Pearson and B&T entered into five separate contracts (the "Contracts") for the publication of five different books.[5]  Each of the Contracts grants exclusive rights to Pearson and provide for royalty payments in the same basic format.  First, the Contracts provide a rate for the U.S. sales of the "Work" being written by the author pursuant to the Agreement.  The Contracts then state that this rate does not apply to other sales and uses of the Work and other versions of the Work to the extent that explicit clauses set forth in later paragraphs of the Contracts apply to those sales and uses.

Two of the Contracts were entered into on April 18, 1997 (the "April 1997 Contracts") and a third was entered into as of July 25, 1997 (the "July 1997 Contract") (collectively, the "1997 Contracts").  The relevant terms of these three contracts (other than the base royalty rate), are identical.  (*See* April 1997 Contracts and July 1997 Contract, Exs. E-F and G, respectively, to Leichtman Decl.)  The fourth contract was entered into as of March 23, 1999 (the "March 1999

---

[4]    Capitalized terms used herein but not otherwise defined are used as those terms are defined in the underlying contracts, unless otherwise indicated.

[5]    Although some of the Contracts were entered into by the Authors, and others were entered into by B&T, because the Authors have assigned their rights under the Contracts to B&T, for the purposes of this motion B&T is referred to as the counterparty to each of the Contracts.

Contract"), and the last contract as of October 12, 2001 (the "October 2001 Contract").

(Collectively, the March 1999 and October 2001 Contracts are referred to as the "1999 and 2001

Contracts."). The relevant terms of the 1999 and 2001 Contracts (other than the base royalty

rate) are identical. (*See* March 1999 Contract and October 2001 Contract, Exs. H and I,

respectively, to Leichtman Decl.) Despite the fact that the entirety of B&T's claims arise from

the Contracts, B&T has once again neglected to append copies of the Contracts to its complaint.[6]

B&T fails to provide these essential documents for the Court's consideration for good reason.

The plain language of those Contracts wholly contradicts B&T's claims.

B&T claims that Pearson's payments for "Custom Published" editions and certain "Sales

Through Foreign Subsidiaries and Affiliates" are in breach of the agreements. But on their face,

all the Contracts contradict that claim. As a threshold matter, all of the Contracts include an

assignment to Pearson "solely and exclusively" of "all rights in the Work throughout the world."

(*See* 1997 Contracts at ¶ 1, Exs. E-G to Leichtman Decl.; *see also*, 1999 and 2001 Contracts at ¶

1, Exs. H-I, to Leichtman Decl.) Under the 1997 Contracts, the rights granted include but are

not limited to "the exclusive right to print, publish and sell the Work. . . <u>to use the Work as a</u>

<u>basis for derivative Works</u> in all formats and by all media." (Emphasis added.) (*See* 1997

Contracts at ¶ 1, Exs. E-G to Leichtman Decl.) Similarly, the 1999 and 2001 Contracts grant the

publisher all rights to "the Work and <u>all derivative works</u>." (Emphasis added.) (*See* 1999 and

2001 Contracts at ¶ 1, Exs. H-I, to Leichtman Decl.) All of the Contracts then spell out different

royalty rates for regular U.S. sales of the entire Work (different for each contract), derivative

---

[6]     For the purposes of this motion to dismiss, the allegations of the Complaint are generally assumed to be true. *See Desiderio v. Nat'l Ass'n of Sec. Dealers, Inc.*, 191 F.3d 198, 202 (2d Cir. 1999). An important exception to this rule, however, exists where (as here) B&T's allegations are contradicted by the documents upon which it claims to rely, in which case those allegations are not assumed to be true or even accorded favorable inferences. *See Cal. Distrib. Inc. v. Cadbury Schweppes Ams. Beverages, Inc.*, No. 06 Civ. 0496 (RMB), 2007 WL 54534, at *5-6 (S.D.N.Y. Jan. 5, 2007) (citation omitted).

works (10% in all cases at issue on this motion), export sales, and other grants of rights. Given these explicit clauses, neither B&T's broad brush challenge to the rate paid for "Custom Published" works, nor its challenge to sales of derivative works made through foreign subsidiaries and affiliates, can be sustained.

## ARGUMENT

Courts will grant motions to dismiss for failure to state a claim under Rule 12(b)(6) when "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984). However, in considering a motion to dismiss, courts "are not bound to accept as true a legal conclusion couched in a factual allegation." *Papasain v. Allain*, 478 U.S. 265, 286 (1986). Rather, the factual allegations in the complaint "must be enough to raise a right to relief above the speculative level, on assumption that all of the allegations in the complaint are true (even if doubtful in fact)." *Bell Atlantic Corp. v. Twombly*, --- U.S. ---, 127 S. Ct. 1955, 1965 (2007) (citations omitted).

In considering a motion to dismiss, a court may refer to any documents attached or incorporated into the Complaint. *See, e.g., Int'l Audiotext Network, Inc. v. Am. Tel. and Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1992). This is so regardless of whether such documents are expressly incorporated into the Complaint. It is well-settled in this circuit that where a complaint "relies heavily upon [the] terms and effect of a document, such as a contract," it is considered "integral" to the complaint. *Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006) (holding that court may properly deem complaint to include any "documents incorporated in it by reference"). *See also Holowecki v. Fed. Express Corp.*, 440 F.3d 558, 565-66 (2d Cir. 2006) (holding that even if plaintiff does not attach to complaint or incorporate by reference "a document upon which it solely relies and which is integral to the complaint the court may nevertheless take the

4

document into consideration in deciding the defendant's motion to dismiss, without converting the proceeding to one for summary judgment") (citation omitted). Accordingly, in adjudicating this motion to dismiss, the Court may consider the Contracts and other materials relied upon or incorporated by B&T into its Amended Complaint, even though B&T declined to physically include such documents with its Amended Complaint.

## I.    B&T's Claim Concerning Custom Publishing Fails as a Matter of Law

The terms "Custom Publishing" and "Custom Edition" are not used in the royalty rate provisions in any of the Contracts now before the Court, or in Pearson's royalty statements to B&T. Rather, the Contracts refer to "derivative works" and the company's royalty statements use and have long used the term "Abridgement" to refer to the derivative works that are now commonly called "custom editions." B&T makes much of the absence of the word "custom," claiming as a result that no specific contractual rate applies to custom editions and that, therefore, Pearson should be paying the same rates for a custom edition of a Work that are payable for the Work itself. But that contention makes no sense. Assuming only for purposes of this motion that B&T's description of Pearson's practice of "custom publishing" as set forth in ¶¶ 51-55 of the Amended Complaint is accurate, it is clear that a "custom published" version of a Work is not itself the "Work" but a distinct derivative version that is addressed separately in the Contracts. The "Work," as defined on the first page of each Contract, is the particular title named in paragraph 1, to be prepared by the author and described in paragraph 2 in terms of numbers of words, pages and dates of delivery. A "custom version" of a work, by definition and plain meaning, is something other than that non-customized regular Work. For example, as B&T states, a "custom book" may contain only chapters or "portions" of different Works resulting in a "customized" book created to satisfy a customer, who in the case of B&T's textbooks is an instructor with a particular pedagogical method of presenting his or her course, and who wants

Pearson to create a custom version of a textbook for all the students in the class to purchase. (*See*, *e.g.*, Am. Compl. at ¶¶ 58, 62).

While conceding that this custom work is not the same as the Work, as it must, B&T then turns the argument on its head, alleging that the publisher is obligated to pay the same rate for custom versions of a work that the Contracts provide for regular U.S. sales of the whole Work. In large part, B&T hangs this argument on the fact that the royalty statements use the line labeled as "abridgements" to display sales and earnings for custom works. This type of custom work is not a simple "abridgement," B&T says, so it alleges that the publisher must pay for custom works at the same rate paid for the Work: either the front page rate for the Work in printed form (*See* Contracts, Exs. E-I to Leichtman Decl. at 1 and ¶ 3) or the rate for electronic versions of that Work. (See 1997 Contracts, Exs. E-G to Leichtman Decl. at ¶ O; 1999 and 2001 Contracts, Exs. H and I, respectively, to Leichtman Decl. at ¶ H(a)(v)).

That argument fails—whether applied to an electronic or a print custom work—for the same reason: the Contracts affirmatively provide specific rates for derivative or other versions of a Work, and a custom edition, as described by Plaintiff itself, is another "version of the Work."

**A. The 1997 Contracts**

In the 1997 Contracts, the governing provision is found in the paragraph on "Subsidiary Rights":

> I.(a)  The rights granted to the Publisher under this Agreement include, but are not limited to, the following subsidiary rights: . . . *making* foreign or *other adaptations or derivative works and other versions* . . . . The Publisher shall pay the Author royalties as follows on the exercise of Subsidiary Rights:
>
> (i)  If the Publisher itself exercises a Subsidiary Right to the Work, 10% of the net cash received from such use.

(1997 Contracts, Exs. E-G to Leichtman Decl. at ¶ I(a)(i) (emphasis added).)  As B&T concedes,

"custom published works" are specially created for a customer.  Therefore, by definition, they

are "other adaptations or derivative works and other versions" of the Work and the 10% royalty

rate applies for any and all such sales.  (*Id.*)

        B&T wrongly relies (in paragraph 61 of the Amended Complaint) on the "accounting

clause" found in Paragraph I(e) of the 1997 Contracts as proof that the "default" royalty rate

applies to "custom" published versions.  But on its face Paragraph I(e) does not speak to royalty

*rates* at all.  It speaks only to apportionment of revenue received for  sales of a Work that

contains portions of several separate works or a package sold as a unit, but containing several

separate works:

> If the Publisher packages or sells the entire Work or any part of the
> Work together with other products or as a segment of another
> product, *in determining the net price* of the Work for purposes of
> calculating royalty payments, the Publisher will *allocate* to the
> Work *that portion of the proceeds* of the sale which it determines
> to be the Work's *fair value to the entire product sold.*

(*Id.*, at ¶ I(e) (emphasis added).)   Plainly, this paragraph has nothing to do with which rate

applies; it speaks only to what portion of the combined product's sale price should be allocated

to each component work contained within a product that combines two or more works.  Once the

revenue is properly allocated, one must look elsewhere in the Contracts to determine which

royalty rate should be applied to the revenue allocated to each work under Paragraph I(e).

        B&T also attempts to circumvent the provisions of ¶ I(a)(i) by arguing that paragraph O

of the 1997 Contracts, which provides for an 18% royalty rate for "electronic versions of the

Work" should apply to electronic custom editions.  (*Id.* at ¶ 64.)  But this argument cannot stand.

B&T's allegations, accepted as true only for purposes of this motion, are that the process of

creating a custom work allows customers to access Pearson's electronic database of books and

chapters and that ultimately, the finished custom book is created by actions that "are performed electronically." *See*, *e.g.*, Am. Compl. at ¶¶ 53-55).  Therefore, B&T argues, the custom works are "electronic versions."

This argument ignores the plain language of paragraph O, which explicitly provides that the definition of electronic versions "exclud[es] the electronic versions specifically described in paragraph I(a)."  (1997 Contracts, Exs. E-G to Leichtman Decl. at ¶ O).  In other words, paragraph O by its plain terms requires that the 18% rate of paragraph O does not apply to the electronic "adaptations, derivative works or other versions" of the Works addressed by the Subsidiary Rights clause.  Accordingly, pursuant to the 1997 Contracts, the 10% royalty rate of the Subsidiary Rights clause straightforwardly applies to sales of custom published versions of the works regardless of whether published and/or sold in print or electronic format.  B&T's argument also proves too much.  In this digital age, electronic means are used to carry out many aspects of the publishing process, but that fact does not turn a printed book into an electronic product.

In sum, B&T's "factual" allegations are nothing but legal contentions dressed up as "facts."  In addition, its arguments are defied by the Contracts, and for B&T to succeed, an implausible legal construction would have to be adopted that cannot be sustained; accordingly, the claim respecting custom works published under the 1997 Contracts fails as a matter of law. *Bell Atlantic Corp.*, 127 S. Ct. at 1965.

### B.  The 1999 and 2001 Contracts

B&T's custom publishing claim fares no better in connection with the 1999 and 2001 Contracts.  The March 1999 Contract and the October 2001 Contract specifically provide the royalty rate applicable to other versions of the Work:

H.(a) Other Royalty Rates: The following royalty rates shall apply to the net cash received by the Publisher (or its corporate affiliates, if the sale is made by an affiliate) with respect to the following sales and uses of the Work:

iv.  Other Print Versions, Adaptations and Derivative Works: 10% for the sale of copies of special print editions of the Work by the Publisher or its affiliate, including, without limitation, book club editions, large print editions, and print adaptations *or other derivative works of the Work, including, without limitation*, translations, *abridgements*, and adaptations for export markets.

(March 1999 Contract and October 2001 Contract, Exs. H and I, respectively, to Leichtman Decl. at ¶ H(a)(iv) (emphasis added).)  Accordingly, these contracts unambiguously set forth Pearson's unqualified right to sell abridged and other custom and derivative versions of the Works, in exchange for a duty to remit a 10% royalty on net sales to B&T.  There is no question that sales of "custom published" works as described by B&T in its Amended Complaint fall under paragraph H(a)(iv) of the 1999 and 2001 Contracts as a matter of law.

Again, however, B&T attempts to muddle the issue by relying on the Accounting Clause, paragraph H(b), in the 1999 and 2001 Contracts.  Like paragraph I(e) in the 1997 Contracts discussed above, the Accounting Clause in the 1999 and 2001 Contracts merely provides how Pearson must apportion the revenue received when the Work or a portion of it are sold with other products:

For uses of portions of, or quotations from, the Work, including in a collective work or custom published work, and for sales of the Work as part of a package together with other works… (the "Package"), . . . the Publisher shall *determine the net cash received for the Work* on which the applicable royalty will be paid *by allocating to the Work that portion of the proceeds* for the Package which it determines to be to be the *proportionate and fair value of the Work to the entire Package*. . . .

(*Id.*, at ¶ H(b) (emphasis added).)  As with the 1997 Contracts, this apportionment process plainly has nothing to do with what *rate* applies if the Work is abridged or excerpted, or

9

otherwise modified into a derivative work; it relates only to what portion of the price should be allocated to each part of the combined product before the *applicable* royalty rate is applied.  In other words, this clause simply does not address royalty *rates* at all.

Also as with the 1997 Contracts, B&T attempts to argue that paragraph H(a)(v) of the 1999 and 2001 Contracts which provides for a 17.75% royalty rate for "transmissions of the Work via radio or television broadcast, cable satellite, on-line or other electronic or electromagnetic transmission" is applicable to sales of "electronic versions of custom published books."  (Am. Compl. at ¶ 66.)  But this contention again proves too much.  It would turn every Work or derivative version—even a totally print product—created using electronic technology into an "electronic transmission of the Work."  Plaintiff has no basis for alleging such a tortured reading of ¶ H(a)(v).  Nor is such a reading plausible.  The contractual terms of  ¶ H(a)(iv) apply to all "*derivative works of the Work,  including. . . abridgements.*"  Simply put, the royalty rate for "derivative works" is plainly and unambiguously the 10% rate set forth in paragraph H(a)(iv) of the 1999 and 2001 Contracts, and that term clearly includes custom works as alleged by B&T in the Amended Complaint.

Again, B&T's argument respecting custom published works under the 1999 and 2001 Contracts is a nonsensical and implausible legal construction that cannot be sustained.  *Bell Atlantic Corp.* 127 S. Ct. at 1965.

## II.    B&T's Claims Concerning Foreign Sales of Derivative Works Through Subsidiaries or Affiliates Should Be Dismissed

B&T's current version of its claims concerning "sales through foreign subsidiaries and affiliates" (Am. Compl. at ¶¶ 31-50 and 105-107) (the "Foreign Sales Claims") remains

10

somewhat unclear.[7]  B&T appears to raise objections to Pearson's licensing to Pearson's foreign affiliates of the rights to publish and sell derivative works in foreign countries, and to Pearson's application of the contractual subsidiary rights royalty provisions (1997 Contracts, Exs. E-G to Leichtman Decl. at ¶ I(a)(ii) and 1999 and 2001 Contracts, Exs. H-I to Leichtman Decl. at ¶ H(a)(vii)), to the revenue received by Pearson from such licenses.  (Am. Compl. at ¶ 40).  Breach of contract is the sole claim raised with respect to these contentions.  But this allegation can state a claim for relief only if the royalty calculation method used by Pearson in fact constitutes a breach of its obligations under the agreements.

B&T can make no such showing regarding the 1997 Contracts as a matter of law, because those Contracts unequivocally provide that if the Publisher licenses a subsidiary right, author royalties are payable under the subsidiary rights licensing clause, paragraph I(a)(ii) of the 1997 Contracts.[8]

But B&T fails to allege any facts showing a breach of the 1999 and 2001 Contracts.  The 1999 and 2001 Contracts expressly delineate a rate payable to authors for derivative works sold by the "Publisher *or its affiliate.*" (1999 and 2001 Contracts, Exs. H and I, respectively, to Leichtman Decl. at ¶ H(a)(iv) (emphasis added).)  Since the 1999 and 2001 Contracts contain

---

[7] As somewhat opaquely referenced in the Complaint, this claim seems to relate to derivative works created under a license from Pearson and published by licensees, including translations and adaptations (such as where an adapting author alters and localizes the text so as to adapt it for sale within foreign markets). (Am. Compl., at ¶ 39).  Pearson also licenses foreign reprints in low-cost international versions such as those attached to the Leichtman Declaration at Ex. J and discussed more fully during oral argument on Pearson's first motion to dismiss.  (April 10, 2008 Tr., Ex. A to Zeballos Decl. at 19:16-20:2 (D.I. No. 17).)

[8] It is not sufficient that B&T does not approve of the approach in the 1997 Contracts of paying authors' royalties for affiliate sales under the subsidiary rights clause.  B&T must show a breach of Pearson's contractual obligations.  It is noteworthy that under the terms of the newer 1999 and 2001 Contracts, Pearson is no longer obligated to pay royalties on affiliate sales under the subsidiary rights clause, but that change does not mean that paying in that manner for derivative works published under the 1997 Contracts is a breach of those contracts which explicitly provide for payment in that manner.  B&T strangely also brings into the mix clauses that apply to exports of the original U.S. Work to countries outside of the United States.  (1997 Contracts, Exs. E-G to Leichtman Decl. at ¶¶ I(b) and I(d), and 1999 and 2001 Contracts, Exs. H and I, respectively, to Leichtman Decl. at ¶ H(a)(i)).  But by their terms, none of these provisions apply to derivative or foreign works.

this specific clause concerning the royalty rate to be paid for affiliate sales of derivative works, paragraph H(a)(vii) of those contracts—the subsidiary rights clause—is simply inapplicable. The conclusory and mysterious allegation that Pearson used paragraph H(a)(vii) is inadequate to support a claim of breach of the 1999 and 2001 Contracts, especially on this, B&T's fourth attempt to allege such a claim.  B&T provides no specific example to support this claim.  The reason is simple:  B&T has <u>not</u> been paid pursuant to the subsidiary rights licensing clause, paragraph H(a)(vii), for any derivative work governed by the 1999 or 2001 Contracts licensed to and sold by an alleged Pearson affiliate or subsidiary.

Thus, only the language of the 1997 Contracts is at issue in this claim, and as noted above, B&T does not and cannot adequately allege any breach of those agreements.  In the 1997 Contracts, "Publisher" is unambiguously defined as "Prentice-Hall, Inc. . . . with offices at One Lake Street, (1997 Contracts, Exs. E-G to Leichtman Decl. at 1).  Paragraph I(a) of the 1997 Contracts expressly includes "publishing in all languages" (*i.e.*, translations) and the "making [of] foreign or other adaptations or derivative works and other versions" of the Works as part of the definition of "Subsidiary Rights":

> The rights granted to the Publisher under this Agreement include, but are not limited to, the following subsidiary rights: publishing in all languages; . . . making foreign or other adaptations . . .

(*Id.* ¶ I(a).)  Paragraph I(a) then specifies the royalty provisions that apply to exercises of subsidiary rights under the 1997 Contracts:

> (i)  If the *Publisher itself* exercises a Subsidiary Right in the Work, 10% of the net cash received from such use.

> (ii)  If the *Publisher licenses any of the Subsidiary Rights*, 50% of the net amount of royalty compensation received from such license.

(*Id.* at ¶¶ I(a)(i) and (ii) (emphasis added)).

B&T acknowledges—as it must—that sales of translations and adaptations (whether by Pearson affiliates or other licensees) fall within the subsidiary rights clauses of the 1997 Contracts (Am. Compl. at ¶ 39).[9]  However, in cases where Pearson has licensed those rights to its foreign affiliates, B&T alleges that these licenses and the royalty provision applicable to them (Paragraph I(a)(ii)) should be disregarded in favor of the 10% rate of paragraph I(a)(i) applicable when the "Publisher itself" exercises the subsidiary rights (*Id*. at ¶ 44-49) or the 15% rate of paragraph I(d) applicable to sales of "copies of book versions of the Work sold through any of the Publisher's Subsidiaries."  (*Id*. at ¶ 37.)

Pearson's subsidiaries and affiliates are self-evidently and as a matter of law not the "Publisher itself," and therefore, neither paragraph I(a)(i) nor paragraph I(d) apply to derivative works sold under license to Pearson's foreign affiliates and subsidiaries.  As noted previously, "Publisher" is expressly and unambiguously defined in the 1997 Contracts as "Prentice-Hall, Inc. . . . with offices at One Lake Street." (1997 Contracts, Exs. E-G to Leichtman Decl. at 1.) Paragraph I(a)(i) therefore, by its plain terms, applies <u>only</u> to sales made directly by Prentice-Hall, Inc. (now renamed Pearson Education, Inc.), and <u>not</u> to sales made by Pearson's affiliates or subsidiaries.  Similarly, paragraph I(d) applies only to sales made of the regular U.S. Work through subsidiaries, not affiliates, and does not apply to derivative works at all.  *See Carte Blanche (Singapore) Pte. Ltd. v. Diners Club Int'l, Inc.*, 2 F.3d 24, 26 (2d Cir. 1993)  ("The

---

[9] To the extent B&T's foreign sales claims relate to translations or adaptations, they must fall under one of these two 1997 Contract sub-sections that provide the exclusive basis for calculating royalty payments for sales involving the exercise of a Subsidiary Right.  In its prior complaint, B&T's appeared to argue that for foreign mass market reprint sales, Paragraph I(d) should apply (a 15% royalty rate) because it claims the foreign reprints are "identical" versions of the Works to those sold in the United States.  Pearson believes that to the extent B&T persists with that claim, it should also be dismissed as a matter of law since those are clearly other foreign versions of the works and because they are sold through affiliates not "subsidiaries."  Nevertheless, if the Court believes that narrow discovery aimed at the limited category of foreign mass market reprints is warranted, Pearson is also prepared to move for summary judgment on that portion of B&T's claim as soon as a protective order is entered that allows Pearson to produce certain documents to Plaintiff demonstrating that sales of foreign mass market reprints also properly fall within Paragraph I(a)(ii) of the 1997 Contracts.  (April 10, 2008 Tr., Ex. A to Zeballos Decl. at 19:16-25:15 (D.I. No. 17).)

parties agree that New York law guides our decision.  Generally speaking, a parent corporation

and its subsidiary are regarded as legally distinct entities and a contract under the corporate name

of one is not treated as that of both.") (citations omitted).  *See also Enron Creditors Corp. v.*

*Martin*, 376 B.R. 442, 468-69 (Bankr. S.D.N.Y. 2007) (rejecting plaintiff's argument that term

"Company" in underlying contract included affiliates and subsidiaries).

Indeed, in another publishing industry case identical claims that subsidiaries and affiliates

fell within the definition of the publisher were rejected on the same basis.  In *Zim v. Western*

*Publishing Co.*, 573 F.2d 1318, 1322-23 (5th Cir. 1978), the Court held that pursuant to the

recitals of the agreement, the term "Western" was unambiguous and meant Western Publishing

Co. alone, and did not include its affiliates and subsidiaries as a matter of law:  Western is "a

definite entity, created by the law and legally distinct from separately incorporated affiliates or

subsidiaries."  *Id.* at 1323.  In addition, in *Zim*, as here, the Court noted that where the parties

wanted to refer to an entity other than Western, they knew how to do so and did so in

"unmistakable terms."  *Id.*  Here also, B&T's arguments are wholly undone within the four

corners of their own 1997 Contracts:  "Publisher" is unambiguously defined as a single entity,

and where the parties intended to make reference to subsidiaries or affiliates, they knew how to

do so and did.  Paragraph I(d), for example, provides a rate for sales of the original U.S. Work

"through any of the Publisher's subsidiaries."  Indeed that clause itself demonstrates that the

term "Publisher" does not include subsidiaries.  If it did include subsidiaries, the additional

clause would have no meaning.

Accordingly, as a matter of law foreign sales of derivative works undertaken by

licensees—whether they be affiliates or otherwise—are by definition not sales by "the Publisher

itself."  Therefore, there is no breach in Pearson's "failure" to pay royalties pursuant to

14

paragraph I(a)(i) of the 1997 Contracts, which governs only sales of derivative works undertaken by the Publisher itself.

Subsection paragraph I(d), which provides a 15% rate for sales of the "Work sold through any of the Publisher's subsidiaries" also does not apply and is not breached. Using as it does the defined term "Work," that clause expressly applies only to sales of the original Work in book form, not to sales of derivative works such as translations, adaptations or other foreign versions published by true subsidiaries (and certainly not those by affiliates) pursuant to a license from the Publisher.

Paragraph I(a)(ii), by contrast, clearly states the rate payable for sales of derivative works published pursuant to a license from the Publisher. That uncomplicated provision does not limit its applicability to certain types of licensees. Rather, it plainly and unequivocally applies to "licenses of any Subsidiary Rights." Accordingly, any derivative work created and sold by a licensee (1) pursuant to a license that (2) granted the licensee the right to exercise a Subsidiary Right such as a translation or adaptation (or other foreign version), by necessity falls under ¶ I(a)(ii) of the 1997 Contracts and it is no breach for Pearson to have paid royalties on that basis.[10] *See In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 405-07, 427, 441 (S.D.N.Y. 2001) (dismissing claims directly contradicted by admissions, contracts, and public findings); *see also See Teachers Ins. Annuity Ass'n of Am. v. Wometco Enter., Inc.*, 833 F. Supp. 344, 349 (S.D.N.Y. 1993) (holding that where the express terms of a contract grant an unqualified right, such right is not limited); s*ee also VTR, Inc. v. Goodyear Tire & Rubber Co.*, 303 F. Supp. 773,

---

[10] As discussed above, while a similar subsidiary rights licensing clause can be found in the 1999 and 2001 Contracts, and each of those agreements also defines "Publisher" as the single US corporate entity, those Contracts differ from the 1997 Contracts in that each goes on to specify that B&T earns the same rate for certain types of sales by affiliates that B&T earns when the Publisher itself makes that type of sale. (1999 and 2001 Contracts, Exs. H-I, respectively, to Leichtman Decl. at ¶¶ H(a) and H(a)(iv) (emphasis added).)

778 (S.D.N.Y. 1969) (holding that there can be no breach "where a party to a contract has done what the provisions of the contract expressly give him the right to do.").

Accordingly, B&T's claim that derivative works created by and published by Pearson's foreign affiliates or subsidiaries under license should be paid under paragraph I(a)(i) or I(d) rather than I(a)(ii) of the 1997 Contracts fails as a matter of law and should be dismissed with prejudice. In addition, as discussed above, B&T has not adequately alleged any breach of the 1999 and 2001 Contracts for the simple reason that it was not paid royalties based on paragraph H(a)(vii) for any sales made through a licensed Pearson foreign subsidiary or affiliate.

## III.     B&T's Custom Publishing and Foreign Sales Claims Should Be Dismissed With Prejudice

In sum, B&T's claims concerning sales of custom published versions of the work and sales by license through foreign subsidiaries and affiliates should be dismissed with prejudice. The Amended Complaint represents B&T's *fourth* attempt to state a claim against Pearson.  (*See* Exs. A-B to Leichtman Decl. (D.I. Nos. 1 and 18).)  Four bites at the apple represents the outer limit of what courts in this circuit do and should tolerate. In *In re Merrill Lynch Ltd. Partnerships Litigation*, 7 F. Supp. 2d 256, 276 (S.D.N.Y. 1997), this Court dismissed plaintiff's claims with prejudice following two failed attempts to replead:

> As plaintiff's highly experienced counsel surely are aware, pleading is not an interactive game in which plaintiffs file a complaint, and then bat it back and forth with the Court over a rhetorical net until a viable complaint emerges. Rather, plaintiffs have the responsibility to plead their case without defendants' or the Court's assistance. . . . A court may deny a plaintiff leave to replead "when that party has been given ample prior opportunity to allege a claim."

*Id.* (citing *De Jesus v. Spears*, 87 F.3d 65, 72 (2d Cir. 1996) (affirming denial with prejudice when plaintiffs were accorded four opportunities to plead and the deficiencies in their claims were fundamental)).  *See also Solar Travel Corp. v. Nachtomi*, Case No. 00 CIV 3564, 2001 WL

16

641151 at *11 (S.D.N.Y. June 8, 2001) (dismissing amended complaint with prejudice where

Plaintiff, alleging the same facts and similar claims, still failed to state a viable claim).    That

B&T has filed two of its previous three attempts to state a viable claim in Nevada federal court is

of no moment; regardless of where its previous complaints were filed, B&T has had ample

opportunity to sort out its claims against Pearson.  *See, e.g., Siepel v. Bank of America N.A.*, 239

F.R.D. 558, 570 (E.D. Mo. 2006) (dismissing complaint without leave to replead after two

attempts to plead a viable cause of action and five attempts in another action and citing *Merrill

Lynch*).   If B&T has been unable to do so after four tries, four sets of lawyers, and three years of

honing its argument, it will never be able to do so.  *See Sadler v. Brown*, 793 F. Supp. 87, 90 n.7

(S.D.N.Y. 1992) ("The Court has no basis to believe, given the history of this litigant and the

manner in which he has proceeded thus far, that any amended pleadings will cure the

deficiencies of the present complaint. . . . Because plaintiff has demonstrated his inability over

time to plead any claim for relief, the Court would dismiss this complaint with prejudice even

assuming, *arguendo*, that it was not barred by *res judicata*.").

 Having failed in its most recent attempt to fabricate a claim regarding custom works and

foreign affiliate derivative works sales, where no cognizable claims legally exist, B&T's patent

attempt to have the courts "renegotiate" its contracts with Pearson should be brought to an end;

those claims should be dismissed with prejudice.

**CONCLUSION**

For the reasons set forth above, Pearson respectfully requests that the Court grant

Pearson's Motion to Dismiss B&T's claims relating to sales of "Custom Published" works and

certain "Sales Through Foreign Subsidiaries and Affiliates," with prejudice.

Dated: New York, New York
       May 22, 2008

**LOVELLS LLP**

By: ____/s/ David Leichtman____
    David Leichtman (DL-7233)
    Gonzalo S. Zeballos (GZ-5994)
    Lani Questembert (LQ-2072)

590 Madison Avenue
New York, New York 10022
Telephone:  (212) 909-0600
Facsimile:  (212) 909-0660
david.leichtman@lovells.com

*Attorneys for Pearson Education, Inc. and*
*Prentice Hall Inc.*

18

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the Memorandum of Law in support of Pearson Education, Inc.'s and Prentice Hall Inc.'s Motion to Partially Dismiss Bovee & Thill LLC's Complaint for Failure to State a Claim, together with a Notice of Motion was served on this 22nd day of May 2008, via the Court's ECF filing system on the following counsel:

Bijan Amini (BA-3533)
Lita Beth Wright (LW-0442)
Benjamin L. Felcher-Leavitt (BL-7363)
STORCH AMINI & MUNVES PC
140 E. 45th Street, 25th Floor
New York, New York 10017

By:    /s/ Gonzalo Zeballos
     Gonzalo S. Zeballos (GZ-5994)
LOVELLS LLP
590 Madison Avenue
New York, New York 10022
Telephone:  (212) 909-0600
Facsimile:  (212) 909-0660
gonzalo.zeballos@lovells.com

*Attorneys for Pearson Education, Inc. and Prentice Hall Inc.*