LOVELLS LLP
David Leichtman (DL-7233)
Gonzalo S. Zeballos (GZ-5994)
Lani Questembert (LQ-2072)
590 Madison Avenue
New York, New York 10027
Telephone: (212) 909-0600
Facsimile: (212) 909-0660
david.leichtman@lovells.com

*Attorneys for Defendants Pearson Education, Inc.,
and Prentice Hall Inc.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **BOVEE & THILL LLC,**<br><br>                    Plaintiff,<br><br>      -against-<br><br>**PEARSON EDUCATION, INC. and PRENTICE HALL INC.,**<br><br>                    Defendants. | **08-CV-00119 (MGC)**<br>**ECF Case** |

## DECLARATION OF GONZALO S. ZEBALLOS

I, Gonzalo S. Zeballos, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, as follows:

1.   I am an associate at Lovells LLP, attorneys for Defendants Pearson Education, Inc. ("Pearson") and Prentice Hall Inc. (collectively "Pearson") in the above-captioned proceeding. I am a member in good standing of the Bar of the State of New York and of this Court.

2.   I submit this declaration in support of Pearson's motion to partially dismiss Bovee & Thill LLC's amended complaint for failure to state a claim upon which relief may be granted

pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, and in order to put relevant documents before the Court.

    3.    Attached hereto as Exhibit A is a true and correct copy of an excerpt from the Transcript of the April 10, 2008 hearing before Hon. Miriam Goldman Cedarbaum in the Southern District of New York.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 22, 2008 at New York, New York.

                    /s/ Gonzalo S. Zeballos  
                    Gonzalo S. Zeballos (GZ-5994)

# EXHIBIT A

# In The Matter Of:

*BOVEE & THILL LLC, v.*
*PEARSON EDUCATION,*

---

*April 10, 2008*

---

*CONFERENCE*
*SOUTHERN DISTRICT REPORTERS*
*500 PEARL STREET*
*NEW YORK., NY 10007*
*212-805-0300*

Original File 84a1bovc.txt, Pages 1-44

**Word Index included with this Min-U-Script®**

Page 17

[1] 20-chapter book, or 11 chapters of a 20-chapter book. Pearson
[2] paid a royalty on those sales at the 10 percent rate provided
[3] for in paragraph H(a)(iv), which is for abridgements and other
[4] adaptations, and, in the 1997 contracts, other versions of
[5] work. So it's really apples and oranges. Paragraph H(b)
[6] relates to apportioning the price to the different authors
[7] whose books are sold and packaged, whereas H(a)(iv) relates to
[8] the royalty rate to apply where the book itself is abridged in
[9] some manner. And that's why we think it's, again, a very clear
[10] question of contract interpretation, that for books that are
[11] abridged, which are the only books that are -- where that
[12] 10 percent royalty rate is used that are being complained
[13] about, that that's the provision that applies and it's not the
[14] larger 17 percent that would apply had it been a sale of the
[15] entire book, and we think that's definitional and very clear.
[16]     If I may turn back, your Honor, to the foreign sales
[17] question, which is the only remaining claim. And again, does
[18] your Honor have the '97 agreement there? I can give --
[19]     THE COURT: I do, I do.
[20]     MR. LEICHTMAN: Okay. If you look at Exhibit E to my
[21] affidavit and if you look at the first page of that, you'll see
[22] at the top it defines Prentice-Hall, Inc. as the,
[23] quote-unquote, publisher.
[24]     THE COURT: Yes.
[25]     MR. LEICHTMAN: Okay. Prentice-Hall, Inc. is a

Page 18

[1] corporate entity. It's the -- that's the publisher that does
[2] not include Prentice-Hall, Inc. subsidiaries, does not include
[3] Prentice-Hall, Inc.'s affiliates. Prentice-Hall Inc., which is
[4] now known as Pearson Education, Inc., is ultimately a
[5] subsidiary of Pearson PLC, which is a British company. There
[6] are many layers in between Pearson Education, Inc. and Pearson
[7] PLC. There are subsidiaries of Pearson Education, Inc., but
[8] there are also around the world various affiliates of Pearson
[9] Education, Inc. who are sister companies, all underneath
[10] Pearson PLC but that are not, quote-unquote, subsidiaries of
[11] Pearson Education, Inc.
[12]     So what we have here is a situation -- they're
[13] complaining about a very narrow category of sales. Maybe we
[14] have somewhere between 15 and $20,000 in dispute on this issue
[15] and -- and what it is is, again, if you're looking at the first
[16] page, if you look at the last phrase in the grant of rights
[17] provision, paragraph 1, at the end you see it says, and Pearson
[18] has the right to license others to exercise any and all rights
[19] in and to the work. Okay. And then you'll see in the royalty
[20] provision for regular sales of work, there's an 18¾ percent
[21] royalty rate. But that is subject, of course, to the
[22] additional royalty provisions which begin in this contract at
[23] paragraph I, which is on the bottom of the fourth page in the
[24] contract.
[25]     THE COURT: I have that.

Page 19

[1]     MR. LEICHTMAN: Okay. And at paragraph I(a), it
[2] provides an exception to that general royalty rate. It
[3] provides that the rights granted to the publisher under this
[4] agreement include but are not limited to the following
[5] subsidiary rights, and it has -- there's a laundry list there.
[6] And among the things that are included there, it says making
[7] foreign or other adaptations or derivative works and other
[8] versions. And it says, the inclusion in anthologies and so
[9] forth, quoting and otherwise utilizing the work. And then it
[10] says, if the publisher itself exercises a subsidiary right,
[11] it's 10 percent, if the publisher licenses any of the
[12] subsidiary rights, it's 50 percent of the net amount received
[13] by Pearson.
[14]     And that's the royalty provision under which we pay
[15] for these sales.
[16]     And we've attached to our papers a copy of the book,
[17] and what you can see is, these are the kinds of books that are
[18] sold where this royalty provision is used. It is -- rather
[19] than being hard copy and full color, these are black and white,
[20] cheap editions of the book that are sold in India and China.
[21] It's very clear on the cover of the book, this edition
[22] manufactured in India, authorized for sale only in India,
[23] Bangladesh, Bhutan and so forth. Circulation of this edition
[24] outside of these territories is unauthorized. In our view this
[25] clearly is another version or a foreign version or a derivative

Page 20

[1] work off of the original US book, which, of course, sells for a
[2] lot more in the US.
[3]     Now the provision that the plaintiff wants you to
[4] apply is on the next page. It's paragraph (d). And it says,
[5] on copies of book versions of the work sold through any of the
[6] publisher's subsidiaries, or to elementary and secondary
[7] schools and school districts, the publisher will pay the author
[8] a royalty of 15 percent of the net cash received from such
[9] sales.
[10]     So the dispute here really is whether or not, as a
[11] matter of law, or whether there are fact questions about
[12] whether or not sales of these foreign editions of the work,
[13] which are not published in the United States, are published
[14] abroad, and for which Pearson sells through a license that it
[15] has with its affiliate sister company, not a subsidiary,
[16] whether or not those fall within (d) or I(a). And the only
[17] conceivable thing that we could see there being something that
[18] might be in all of these three claims that we discussed today
[19] where there conceivably could be some limited discovery that
[20] would help the Court on this motion would be the question,
[21] okay, of whether or not --
[22]     First of all, we don't think (d) would apply because
[23] it's not a sale of the book itself, it's a sale of the foreign
[24] version of the book. That's something that's easy, that your
[25] Honor could decide without any discovery.

Page 21

[1] But the only other question that could possibly be
[2] relevant would be whether or not these sales are made in fact
[3] by subsidiaries of Pearson Education, Inc. or whether they're
[4] made by affiliates of Pearson Education, Inc. who are also
[5] under Pearson PLC. Because if they're affiliates, they don't
[6] fall within the 15 percent in paragraph (d) and they would
[7] clearly fall within (a)(ii), which is licenses and other
[8] subsidiary rights for which 50 percent of what Pearson
[9] Education, Inc. itself receives is paid to the authors.
[10] Now the amount of difference here is not very large.
[11] We pointed out in the papers -- and again, this may go beyond
[12] the pleadings a little bit, but the difference between the
[13] 15 percent and what they get when I(a)(ii) is applied is the
[14] difference between 15 percent and 8½ percent in most instances
[15] or 5 percent in other instances, which at the end of the day,
[16] since this is a very small number of books that are sold and
[17] because the books are sold for very little money in China and
[18] India, which are the only places where these editions are at
[19] issue, we're talking here about, you know, somewhere, again,
[20] between 15 and $20,000 that's at issue.
[21] THE COURT: I understand. But the question is, who
[22] foots the bill?
[23] MR. LEICHTMAN: I understand that. But if that's all
[24] that's at issue, there's no reason that this case couldn't go
[25] to a magistrate for settlement conference. In other words, if

Page 22

[1] that's all we end up at the end of the day with --
[2] THE COURT: I don't understand why you haven't worked
[3] out a settlement anyhow, but that's neither here nor there.
[4] There's always a lot to be said for working out business
[5] differences.
[6] MR. LEICHTMAN: Understood. But -- so we still think
[7] it's a legal question and can be determined as a matter of law
[8] that this book and this book are not the same. This is a book,
[9] this is a foreign edition of the book, and the foreign edition
[10] of the book --
[11] THE COURT: It's not in a foreign language though, is
[12] it?
[13] MR. LEICHTMAN: It's not in a foreign language.
[14] THE COURT: Well, that's an ambiguous term, foreign
[15] edition, isn't it?
[16] MR. LEICHTMAN: Well, it's only sold abroad. That, I
[17] don't think it could be any clearer. But we understand, your
[18] Honor, that --
[19] THE COURT: Aren't some of the others sold abroad?
[20] MR. LEICHTMAN: Some of the others are sold abroad but
[21] they're not -- that clause is not used, because --
[22] THE COURT: All right. That's your position. I
[23] understand.
[24] MR. LEICHTMAN: No, it's not just our position. It's
[25] alleged in the complaint, because the only thing they're

Page 23

[1] complaining about in the complaint are the small number of
[2] sales that are sold through licenses with the affiliates.
[3] There's no allegation, for example --
[4] THE COURT: If you want to settle that claim, go
[5] ahead.
[6] MR. LEICHTMAN: There's no claim, for example, that
[7] the licenses with the affiliates are not done at market rates
[8] that you could get from a third party in --
[9] THE COURT: I understand there's not a claim of bad
[10] faith, it's a claim of misapplication of a contract.
[11] MR. LEICHTMAN: That's right. And so I guess what
[12] we're saying is, we do think it's clear, we do think these are
[13] foreign versions of the work and that that clause is one that
[14] applies.
[15] And here's one thing that I did want to point out
[16] about the difference now between the '99 and '01 contract, and
[17] the '07 contract. If you look at the '99 contract, for
[18] example, which is the same as the '01 contract on this issue,
[19] and you look at the paragraph H(a)(i) in that contract, it
[20] talks about export sales, and it says -- or even just looking
[21] at H(a) itself, the predicate to all of it, where it says, "The
[22] following royalty rates shall apply to the net cash received by
[23] the publisher (or its corporate affiliates if the sale is made
[24] by an affiliate) with respect to the following sales and issues
[25] of the work."

Page 24

[1] So in 1999 and 2001, the parties recognized that as
[2] times had changed, Pearson was making sales through affiliates
[3] rather than subsidiaries. And so when the parties wanted to
[4] broaden the phrase, Pearson or its subsidiaries, it knew how,
[5] the parties knew how to do that, and they said, or its
[6] corporate affiliates. So under the '99 and 2001 contracts,
[7] there are no sales pursuant to licenses and so there are no
[8] sales on this foreign sales issue that are at issue based on
[9] the complaint as a result of the '99 or '01 contracts, but what
[10] the '99 and '01 contracts do show is that there was a distinct
[11] difference in the parties' minds between a subsidiary and an
[12] affiliate, and so we think that, again, clause is clear and
[13] that if your Honor does think the case should proceed on this
[14] issue at all, what we should do is have very limited discovery
[15] of whether or not these licenses are in fact with actual
[16] subsidiaries or just with affiliates, because if they're just
[17] with affiliates, we think there's no case. If they turn out to
[18] be subsidiaries -- and I know that's not going to be the
[19] case -- then maybe they have -- then maybe they have an
[20] argument about an ambiguity between the clauses or an ambiguity
[21] about what -- what is a foreign work or not a foreign work.
[22] THE COURT: You're talking about the plaintiff taking
[23] discovery.
[24] MR. LEICHTMAN: That's right.
[25] THE COURT: You know what your own publishing is.

Page 25

[1]  MR. LEICHTMAN: That's right. We'd be happy to give
[2] them, you know, one deposition and probably 50 pages of
[3] documents that show the parties --
[4]  THE COURT: Why, as part of the initial disclosure,
[5] don't you give them your records of what you've published?
[6]  MR. LEICHTMAN: Well, we've done that, but what we
[7] need is some kind of confidentiality agreement with regard to
[8] the licenses and the corporate structure, and if we can work
[9] that out, we're happy to give them that information. And we
[10] can have very limited discovery on whether or not these are in
[11] fact subsidiaries or if they're affiliates, and we think, with
[12] some guidance from the Court, if the Court agrees that they
[13] must be subsidiaries in order to fall within that clause, we
[14] think we can come back in a relatively short period of time and
[15] put the rest of the case to bed.
[16]  THE COURT: All right. I understand your position.
[17] Now let me hear from the other side.
[18]  MR. LEICHTMAN: Thank you.
[19]  MR. AMINI: Good morning, your Honor.
[20]  In terms of the resolution, because I know that my
[21] opponent spoke about resolution and I know your Honor indicated
[22] also, as I understand it, the only thing that has held off a
[23] resolution of this matter is that the plaintiffs have
[24] consistently, for a period of at least three years, said, happy
[25] to sit down and resolve it, we would like to see records, the

Page 26

[1] records of the sales. If you'll show us records of the sales,
[2] we'll sit down and work it out. And we have not ever been
[3] shown. Now it's a highly technical matter, your Honor, that I
[4] as a lawyer can't testify to or give evidence on.
[5]  THE COURT: Well, of course not. Of course not.
[6] Your sales documents have not been turned over?
[7]  MR. LEICHTMAN: Yes, they have, your Honor. This is a
[8] complete -- this is actually why the matter can't be resolved
[9] is because we've made a lot of effort over the last three years
[10] to produce many, many documents that show what our sales --
[11]  THE COURT: Why haven't you simply produced all of the
[12] publishing records for the sale of the books at issue?
[13]  MR. LEICHTMAN: We've done that. We've produced all
[14] of the sales records.
[15]  THE COURT: Well, then I can't decide this as a
[16] factual matter. One says you have and the other says you
[17] haven't.
[18]  MR. LEICHTMAN: They wanted all kinds of things that
[19] went way beyond that which we told them they weren't entitled
[20] to, but with regard to the records of the sales --
[21]  THE COURT: Have you provided all of the sales records
[22] relating to these two books?
[23]  MR. LEICHTMAN: Yes, for the period, for the period of
[24] time --
[25]  THE COURT: I didn't ask you about the period of time.

Page 27

[1] I asked you about these books.
[2]  MR. LEICHTMAN: With regard to the books, up until the
[3] point in time when the last negotiation broke down, we produced
[4] all the records.
[5]  THE COURT: Well, when did the last negotiation break
[6] down?
[7]  MR. LEICHTMAN: Almost two years ago now.
[8]  THE COURT: Well, then produce the rest.
[9]  MR. LEICHTMAN: That's fine. We can do that.
[10]  MR. AMINI: And there are five books, your Honor, five
[11] contracts, and I think each contract is a separate book, so
[12] there's five.
[13]  THE COURT: There's no question you have to produce
[14] the sales records for all of those books.
[15]  MR. LEICHTMAN: And that's with regard to the ones
[16] they're complaining about because if we're talking about --
[17] this is the other issue is --
[18]  THE COURT: Are there any books here that you're not
[19] complaining about? No, no, I'm talking about all the sales.
[20] Don't you give them royalty statements?
[21]  MR. LEICHTMAN: Yes.
[22]  THE COURT: Which show sales?
[23]  MR. LEICHTMAN: That's right.
[24]  THE COURT: Well, then what is it that you can't give
[25] them?

Page 28

[1]  MR. LEICHTMAN: Well, there are royalty statements
[2] that show sales of millions of copies of these books, and they
[3] want every last invoice and every last inventory record and so
[4] on about sales, for example, of the book in the US that they're
[5] not complaining about.
[6]  THE COURT: Don't you have annual records?
[7]  MR. AMINI: It's all computer --
[8]  MR. LEICHTMAN: We have annual records that show what
[9] the sales are in aggregate, but to produce invoices for each
[10] individual sale --
[11]  THE COURT: Have you asked for an invoice of each
[12] individual sale?
[13]  MR. AMINI: I don't believe so, your Honor.
[14]  THE COURT: That's not what they need or want.
[15]  MR. LEICHTMAN: Well, that's what they've asked for
[16] and that's what they --
[17]  THE COURT: That's neither here nor there. Do you
[18] have audited statements of what books you sell and what you
[19] receive for each book you sell?
[20]  MR. LEICHTMAN: Each sale itself. Each particular
[21] sale is not audited.
[22]  THE COURT: I'm not talking about each sale. I'm
[23] talking about the total sales of this book to -- of a
[24] particular type that you have shortened at somebody's request;
[25] customized, you call it.