Bijan Amini (BA 3533)
Lita Beth Wright (LW 0442)
Jason Levin (JL 8009)
STORCH AMINI & MUNVES PC
140 E. 45th St., 25th Floor
New York, New York 10017
(212) 490-4100
Attorneys for Plaintiff
Bovee & Thill LLC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------x

BOVEE & THILL LLC, a Nevada limited    :
liability company,    :
   :
       Plaintiff,    :      08-CV-00119 (MGC)
   :      (ECF Case)
           v.    :
   :
   :
PEARSON EDUCATION, INC.,    :
A Delaware corporation and PRENTICE-    :
HALL, INC., A Delaware Corporation    :
   :
       Defendants.    :
------------------------------------------------------x

**MEMORANDUM OF LAW IN OPPOSITION TO PEARSON EDUCATION, INC. AND
PRENTICE-HALL, INC.'S MOTION TO PARTIALLY DISMISS
BOVEE AND THILL LLC'S AMENDED COMPLAINT**

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................... i-iii

PRELIMINARY STATEMENT ............................................................................... 1

STATEMENT OF FACTS ....................................................................................... 2

    A.    Sales Through Foreign Affiliates and Subsidiaries ................................. 3

    B.    Custom Publishing ................................................................................... 4

          1.    The 1997 Agreements ................................................................... 5

          2.    The 1999 and 2001 Agreements .................................................. 6

ARGUMENT .......................................................................................................... 8

  I.    STANDARDS ON THE MOTIONS ............................................................ 8

    A.    Pleading Standard Under FRCP 12(b)(6) .............................................. 8

    B.    Rules of Contract Interpretation ............................................................ 9

  II.  DEFENDANTS' PARTIAL MOTION TO DISMISS SHOULD BE DENIED ............. 10

    A.    The Complaint Adequately Alleges a Breach of Contact
        in Connection With Custom Publishing ................................................ 11

          1.    Custom Books Sold in Hard Copy Format ............................... 11

          2.    Custom Books Sold in Electronic Format ................................ 14

              i.    The 1997 Agreements .................................................... 14

             ii.    The 1999 and 2001 Agreements ................................... 16

    B.    The Complaint Adequately Alleges a Breach of Contract Based on
        Defendants' Improper Application of the Royalty Provisions
        Governing Sales Through Foreign Affiliates and Subsidiaries ............. 17

    C.    In The Alternative, Leave to Amend Should Be Granted ..................... 21

CONCLUSION ...................................................................................................... 21

## TABLE OF AUTHORITIES

<u>**Cases**</u>                                                                                                 <u>**Page:**</u>

*AFSCME v. County of Nassau,*
    609 F. Supp. 695, 700 (E.D.N.Y. 1985) ................................................................. 17

*Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's,*
    136 F.3d 82 (2d Cir. 1998) ............................................................................. 9

*Alternative Thinking Systems, Inc. v. Simon & Schuster, Inc.,*
    853 F. Supp. 791 S.D.N.Y. 1994) ..................................................................... 9

*Bank & Trust Co. v. Federal Deposit Ins. Corp.,*
    967 F. Supp. 81, 90 (W.D.N.Y. 1997) ............................................................. 10

*Bell Atlantic Corp. v. Twombly,*
    U.S, 127 S. Ct. 1955, 1965 (2007) ............................................................. 8, 9

*Breed v. Ins. Co. of N. Am.,*
    46 N.Y.2d 351, N.Y.S.2d 352, N.E.2d 1280 (1978) .................................... 9

*California Motor Transp. Co. v. Trucking Unlimited,*
    404 U.S. 508 (1972) ..................................................................................... 8

*Carte Blanche (Singapore) Pte., Ltd. v. Diner's Club Int'l, Inc.,*
    2 F.3d 24 (2d Cir. 1993) .............................................................................. 19

*DKR Capital, Inc. v. AIG Int'l W. Broadway Fund, Ltd.,*
    No. 03 Civ. 1568(JGK), 2003 WL 22283836, *4 (S.D.N.Y. Oct. 2, 2003) ..................... 10, 13

*Diaz v. NBC Universal, Inc.,*
    No. 08 Civ. 401(CM), 2008 WL 465135*4 (S.D.N.Y. Feb. 14, 2008) ................................. 8

*Empire Props. Corp. v. Mfrs. Trust Co.,*
    288 N.Y. 242, 248-49 (1942) ...................................................................... 10

*Enron Creditors Recovery Corp. v. Martin,*
    376 B.R. 442,(Bankr. S.D.N.Y. 2007 ......................................................... 19

*Erickson v. Pardus*, --- U.S. ---,
    127 S. Ct. 2197, 2200 (2007) ...................................................................... 9

*Frasier v. General Elec. Co.,*
    930 F.2d 1004 (2d Cir. 1991 ....................................................................... 8

*Godfrey v. Eastman Kodak Co.,*
    No. 89 Civ. 7489(PNL), 1991 WL 64463, *4 (S.D.N.Y. April 10, 1991) ........................9, 18

*Granite Partners, L.P. v. Bear, Stearns & Co., Inc.,*
    17 F. Supp.2d 275 (S.D.N.Y. 1998) ................................................................................10

*Hunt Ltd. v. Lifschultz Fast Freight, Inc.,*
    889 F.2d 1274 (2d Cir. 1989) .........................................................................................9

*Iqbal v. Hasty,*
    490 F.3d 143, 157 (2d Cir. 2007) ...................................................................................8

*Merritt Assocs. v. Scollard,*
161 A.D. 2d 502, 502 (1st Dep't 1990) ............................................................................14

*Micalden Investments S.A. v. Rostropovich,*
    No. 07 Civ. 2395(VM), 2008 WL 534819, *3 (S.D.N.Y. Feb. 25, 2008)............................ 20

*New Windsor Volunteer Ambulance Corps, Inc. v. Meyers,*
    442 F.3d 101 (2d Cir. 2006) .........................................................................................18

*Old Colony Trust Co. v. Omaha,*
    230 U.S. 100 (1913) ....................................................................................................18

*Record Club of America, Inc. v. United Artists Records, Inc.,*
    No. 72 Civ. 5234(WCC), 1991 WL 73838, (S.D.N.Y. April 29, 1991)....................10, 14, 16

*Revson v. Cinque & Cinque, P.C.,*
    221 F.3d 59 2d Cir. 2000)..............................................................................................9

*Seiden Assocs. v. ANC Holdings,*
    959 F.2d 425 (2d Cir. 1992) .........................................................................................9

*S.S. Silberblatt, Inc. v. East Harlem Pilot Block,*
    608 F.2d 28, 42 (2d Cir. 1979) .....................................................................................20

*Swierkiewicz v. Sorema  N.A.,*
    534 U.S. 506 (2002) ......................................................................................................8

*Two Guys From Harrison-N.Y., Inc. v. S.F.R. Realty Assocs.,*
    63 N.Y.2d 396 N.E.2d 315 N.Y.S.2d 465  (1984) ........................................................10, 16

*United States v. Herman,*
    No. 03 Civ. 4416(RMB), 2005 WL 66894, *4 (S.D.N.Y. Jan 12, 2005)................................12

*W.B. David and Co., Inc. v. DWA Commc'ns, Inc.,*
    No. 02 Civ. 8479(BSJ), 2004 WL 369147, *2 (S.D.N.Y. Feb. 26, 2004)...............................11

*Zim v. Western Publishing Co.,*
    573 F.2d 1318 (5th Cir. 1978)................................................................................................ 19

Plaintiff, Bovee & Thill LLC ("B&T" or "Plaintiff"), submits this memorandum of law in opposition to the motion of defendants Pearson Education, Inc. ("Pearson Education") and Prentice-Hall, Inc. ("Prentice-Hall") (collectively, "Defendants") to partially dismiss the amended complaint (the "Complaint"),[1] pursuant to F.R.C.P. 12(b)(6).

## PRELIMINARY STATEMENT

Defendants' motion to dismiss does not even purport to challenge the sufficiency of Plaintiff's allegations underlying both causes of action of the Complaint that Defendants underpaid royalties of at least $150,000 on account of high discount sales. Thus, regardless of the outcome of Defendants' motion—which in any event is meritless—this action will proceed.

Nevertheless, Defendants urge that Plaintiff's allegations regarding Defendants' underpayment of royalties on custom publishing and sales through foreign affiliates and subsidiaries are deficient. They contend that, as a matter of law, the contracts at issue preclude the royalties Plaintiff seeks. Defendants are wrong.[2] The language of Defendants' form contracts supports Plaintiff's reasonable interpretation thereof. To the extent Defendants' interpretation differs, that conflict raises questions of fact which must be resolved by extrinsic evidence not appropriate on a motion addressed to the pleading. Thus, Defendants' partial motion to dismiss should be denied and the Complaint upheld.

---

[1] The Complaint is attached as Exhibit A to the Declaration of Jason Levin, Esq., dated June 11, 2008 ("Levin Dec."), submitted herewith in opposition.

[2] Similarly, Defendants' repeated claim that Plaintiff has failed in three prior attempts to state viable claims is not true. Plaintiff filed an action in Nevada district court in 2005. The docket sheet for that action is annexed as Exhibit B to the Levin Dec. Defendants moved to dismiss that complaint on the grounds of lack of jurisdiction and improper venue (and not on F.R.C.P. grounds). *Id.* Plaintiff amended its complaint to assert class action claims. *Id.* Defendants again moved to dismiss on the same grounds. *Id.* Prior to any decision on Defendants' motion, the parties entered into a standstill agreement, pursuant to which the Nevada action was dismissed without prejudice, to be re-filed in New York if the parties could not resolve the issues among themselves. Levin Dec., Ex.C. The first time a court ever issued a ruling concerning Plaintiff's allegations was this Court's decision on April 10, 2008.

## STATEMENT OF FACTS

Plaintiff is a party to several author agreements with Defendants for the publication and sale of five college textbooks on business communication and introduction to business (the "Works"). (Compl. ¶¶ 12-13). The five relevant author agreements are dated April 18, 1997 (two agreements); July 25, 1997 (collectively, the "1997 Agreements"); March 23, 1999 (the "1999 Agreement"); and October 12, 2001 (the "2001 Agreement") (collectively, the "Author Agreements"). (*Id.* ¶¶ 15-21).[3] Under all of the Author Agreements, Defendants must pay Plaintiff a specified royalty rate of between 17% and 18.75% on sales of the Works "except as otherwise provided" in the royalty rate provisions (the "Default Rate"). *See* Levin Dec., Exs. D - F, ¶ 3 ("The Publisher will pay the Author a royalty on sales of the Work, except as otherwise provided in Paragraph I, based on the net cash received by the Publisher from sales of the Work"); *see also id.*, Exs. G and H.

The Complaint alleges three types of improper calculations of royalties under the Author Agreements: high discount sales,[4] custom publishing and sales through foreign affiliates and subsidiaries. Plaintiff also alleges a breach of contract based on Defendants' refusal, in violation

---

[3] Copies of the Author Agreements are attached as Exhibits D - H to the Levin Dec.

[4] On this motion, Defendants do not challenge the portions of the Complaint concerning high discount sales. Briefly, high discount sales are sales of the Works for a discount of 50% (or 51%) or greater off the single copy price. (*Id.* ¶¶ 71-72). High discount sales of the Works were extremely rare until July 2004, when the number of high discount sales in a six month period increased 1400% as compared to the prior seven years. (*Id.* ¶¶ 74-75). When Plaintiff inquired about this exponential increase, Defendants' employee threatened that if Plaintiff continued to ask questions, Defendants would continue to increase the number of high discount sales in order to reduce the amount of royalties paid to Plaintiff. (*Id.* ¶¶ 77-78). Another employee of Defendants' attributed the increase of high discount sales to Defendants' management's recent decision to change the methodology for calculating whether sales were made at high discount. (*Id.* ¶¶ 80-81). Plaintiff avers that the change in Defendants' methodology was a breach of contract (or, in the alternative, a breach of the covenant of good faith and fair dealing), for which Plaintiff has been damaged in an amount believed to be greater than $150,000. (*Id.* ¶ 85).

of the Author Agreements, to permit Plaintiff adequate access to relevant books and records. (*Id.*

¶¶ 100-102).

## A.    <u>Sales Through Foreign Affiliates and Subsidaries</u>[5]

Defendants sell the Works in countries other than the United States. (Compl. ¶ 35).

Under the 1997 Agreements, there are three royalty rate provisions that apply to such sales:

> Paragraph I(d): "On copies of book versions of the Work sold through any of the Publisher's subsidiaries…the Publisher will pay the Author a royalty of 15% of the net cash received from such sales."
>
> Paragraph I(b): "On copies of book versions of the Work or sheets sold by the Publisher outside the United States, the Publisher will pay the Author a royalty of 10% of the net cash received by the Publisher from such sales."
>
> Paragraph I(a): "The rights granted to the Publisher under this Agreement include, but are not limited to, the following subsidiary rights: publishing in all languages; broadcasting by radio; making audio and video recordings; publishing book club editions; making foreign or other adaptations or derivative works and other versions; inclusion in anthologies; showing by motion picture or by television; syndicating, quoting and otherwise utilizing the Work; and material based on the Work ("Subsidiary Rights"). The Publisher shall pay the Author royalties as follows on the exercise of Subsidiary Rights:
>
> > i. If the Publisher itself exercises a Subsidiary Right in the Work, 10% of the net cash received from such use.
> >
> > ii. If the Publisher licenses any of the Subsidiary Rights, 50% of the net amount of royalty compensation received from such license."

(*Id.* ¶37).

Plaintiff alleges that it was underpaid royalties with respect to 44 transactions, which

together aggregated at least 80,034 net units sold. (*Id.* ¶ 42). Plaintiff alleges that those 44

transactions involved sales of the Works in foreign countries to which the 15% rate under

paragraph I(d) or the 10% rate under paragraph I(b) should have applied. (*Id.* ¶ 40). Plaintiff

also alleges that, to the extent the 44 transactions involved the exercise of Subsidiary Rights (as

---

[5] Based on the information currently available to Plaintiff, only the 1997 Agreements are pertinent to Plaintiff's claim concerning sales through foreign affiliates and subsidiaries.

defined in paragraph I(a)) in the Works, the 10% royalty rate under paragraph I(a)(i) should have applied. (*Id.*).

Defendants did not apply those royalty rates. Instead, Plaintiff alleges that Defendants improperly applied the reduced royalty rate of 50% of license fees under paragraph I(a)(ii). (*Id.*). Defendants applied that rate because they purported to have licensed the exercise of Subsidiary Rights in the Works to their own foreign affiliates and subsidiaries (such as "Pearson Education Asia"). (*Id.* ¶ 41). However, those licenses were not made at arms' length to independent third parties; Defendants editors represented to Plaintiff that a single employee of Pearson Education had oversight and approval authority for the purported licenses on behalf of both the alleged licensors <u>and</u> licensees. (*Id.* ¶ 47).[6]

Defendants breached the 1997 Author Agreements by applying the wrong royalty rates to sales through foreign affiliates and subsidiaries. Although Plaintiff requires more specific information from Defendants about the sales at issue to plead a precise damages figure, Defendants have conceded that, should Plaintiff prevail on this claim, Defendants owe Plaintiff at least an additional $73,000 in royalties. (*Id.* ¶ 50).

## B.    **Custom Publishing**

Defendants' practice of custom publishing enables educational institutions and professors to electronically customize textbooks to fit their teaching needs by, for example, combining into one book portions of the Works, other products sold by the Defendants, and original content from the professor. (Compl. ¶¶ 51, 53). Customers prepare these books electronically using Defendants' custom publishing web-site (www.pearsoncustom.com). (*Id.* ¶ 52). Once customers choose the content, they set the order of the materials and determine the cover design

---

[6] A glance at one of the license agreements shows that Pearson Education had substantial involvement in the modification of the Works and in the Subsidiary Rights which were supposedly transferred to the licensee.

and layout. (*Id.* ¶ 53). Defendants then publish the customized products and make them available in hard copy, electronic formats and in other media. (*Id.*). Plaintiff alleges that the applicable royalty rate to sales of custom books varies depends on the applicable Author Agreement and whether the final product is in print or electronic formats. (*Id.* ¶ 60).

### 1.    <u>The 1997 Agreements</u>

The 1997 Agreements do not refer to custom publishing and do not provide a royalty rate for sales of custom books. (*Id.* ¶ 63). With respect to custom books sold in hard copy format, Plaintiff alleges that the Default Rate applies to such sales because the 1997 Agreements do not provide a specific royalty rate. (*Id.*); *see, e.g.,* Levin Aff., Exs. D - F, ¶ 3. With respect to custom books sold in electronic format, Plaintiff alleges that the applicable royalty rate provision in the 1997 Agreements is paragraph O, which concerns sales of electronic versions of the Works. (*Id.,* ¶ 64). That provision states:

> The rights granted to the Publisher under this Agreement include (in addition to all other rights described herein) the right to prepare, publish, reproduce, sell and otherwise distribute electronic versions of the Work. As used herein, the term "electronic versions" shall mean any and all methods of copying, recording, storage, retrieval, or delivery of all or a portion of the Work, alone or in combination with other works, including in any multimedia work or electronic book; by any means now known or hereafter devised, including, without limitation, by electronic or electromagnetic means, or by analog or digital signal, whether in sequential or non-sequential order, on any and all physical media, now known or hereafter devised including, without limitation, magnetic tape, floppy disks, CD-I, CD-ROM, laser disk, optical disk, IC card or chip, and any other human or machine readable medium, whether or not permanently affixed in such media (excluding the electronic versions specifically described in paragraph I(a)); and the broadcast and/or transmission of the foregoing or by any and all means now known or hereafter devised.

> The Publisher shall pay the Author royalties as follows on electronic versions:

>> (i)    If the Publisher itself creates and sells that electronic version, 18% of the net cash received from such use.

      (ii)      If the Publisher licenses the right to create and sell the electronic
version, 50% of the net amount of royalty compensation received
from such license.

Levin Dec., Exs. D - F, ¶ O.  Pursuant to paragraph O, Plaintiff alleges that an 18%

royalty rate applies to sales of electronic versions of custom books.  (Compl., ¶ 64).

However, Defendants did not apply the appropriate provisions of the 1997

Agreements to sales of hard copy and electronic versions of custom books.  (*Id.*, ¶ 56).

Instead, to <u>all</u> such sales under the 1997 Agreements, Defendants applied a 10% royalty

rate to all custom books under paragraph I(a)(i), contending that all custom books are

exercises of Subsidiary Rights, as "foreign or other adaptations or derivative works and

other versions."  Levin Dec., Exs. D - F; *see supra*, p. 3.  But Defendants' royalty

statements do not report any sales of custom books under the categories of "Subsidiary

Rights" or "other versions," and the application of paragraph I(a)(i) to custom books sold

in electronic formats contradicts the plain language of paragraph O.  (Compl. ¶ 56).

**2.**    <u>**The 1999 and 2001 Agreements**</u>

The 1999 and 2001 Agreements, while referring to "custom published work" in a

provision concerning the allocation of price among several works, also do not provide a

royalty rate for sales of custom books.  (*Id.* ¶ 65).  With respect to custom books sold in

hard copy format, Plaintiff alleges that the Default Rate applies to such sales because the

1999 and 2001 Agreements do not provide a specific royalty rate.  (*Id.*).  With respect to

custom books sold in electronic format, paragraph H(a)(v) of the 1999 and 2001

Agreements is applicable.  (*Id.* ¶ 66).  That provision provides a 17.75% and 17% royalty

rate, respectively, for "transmission of the Work via radio or television broadcast, cable,

satellite, on-line or other electronic or electromagnetic transmission."  Levin Dec., Exs. G

and H.  Paragraph H(a)(vi) also applies to sales of electronic versions of custom books. That provision provides the same 17.75% and 17% royalty rates for the "distribution, sale or license of copies of the Work in non-print media…"  (*Id.*).

Defendants did not apply any of the aforementioned provisions of the 1999 and 2001 Agreements to sales of either hard copy or electronic versions of custom books. (*Id.* ¶ 56).  To all such sales, without distinction, Defendants applied a 10% royalty rate under paragraph H(a)(iv), contending that custom books are covered by the following portion of that paragraph: "print adaptations or derivative works of the Work, including, without limitation, translations, abridgements, and adaptations for export markets." Levin Dec., Exs. D - F; *see supra*, p. 3.  However, paragraph H(a)(iv) does not apply because custom books are not abridgements, the electronic versions of custom books were not in print, and the custom books at issue were not for export markets.  (*See* Compl. ¶ 57).

Defendants implicitly acknowledged the improper application of paragraph H(a)(iv) to sales of custom books when they attempted to revise the Author Agreements *nunc pro tunc* in violation of the merger clauses by appending a glossary to Plaintiff's royalty statements purportedly defining abridgements as custom books.  (*Id.* ¶ 59).

Because the royalty statements prepared by Defendants do not refer specifically to custom books, Plaintiff is unable to determine how many custom books were sold in print or in electronic format and so cannot plead a precise damages figure.  (*Id.* ¶ 60).  However, Plaintiff can plead precise damages with respect to one alleged category of custom books which Defendants improperly classified as abridgements and applied a 10% royalty rate under the 1997 Agreements.  (*Id.* ¶ 69).  The 1997 Agreements do not provide for royalties for abridgements

(*Id.*) and as described below custom books are not abridgments. Therefore, the Default Rate in the 1997 Agreements is applicable to those sales which gives rise to additional royalties to Plaintiff between $55,600 and $69,250. (*Id.*).

## ARGUMENT

### I.    STANDARDS ON THE MOTIONS

#### A.    Pleading Standard Under FRCP 12(b)(6)

When considering a motion to dismiss for failure to state a claim under FRCP 12(b)(6), a court is required to accept the material facts alleged in the complaint as true. *Diaz v. NBC Universal, Inc.*, No. 08 Civ. 401(CM), 2008 WL 465135, *4 (S.D.N.Y. Feb. 14, 2008) (*citing Frasier v. General Elec. Co.*, 930 F.2d 1004, 1007 (2d Cir. 1991)). The court must also read the complaint generously, drawing all reasonable inferences from its allegations in favor of the plaintiff. *Id.* (*citing California Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 515 (1972)).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, --- U.S. ---, 127 S. Ct. 1955, 1965 (2007) (quotation marks and brackets omitted). A court should apply "a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible*." *Iqbal v. Hasty*, 490 F.3d 143, 157-58 (2d Cir. 2007) (emphasis in original); *see also Bell Atlantic*, 127 S. Ct. at 1974 (explicitly disclaiming that the Court was "requir[ing] heightened fact pleading of specifics") ((*citing Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002) (rejecting heightened pleading standard)).

8

Rule 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." "Specific facts are not necessary; the statement need only 'give the defendant fair notice of what the … claim is and the grounds upon which it rests.'" *Erickson v. Pardus*, --- U.S. ---, 127 S. Ct. 2197, 2200 (2007) (*quoting Bell Atlantic*, 127 S. Ct. at 1964) (internal quotations omitted).

### B.     Rules of Contract Interpretation

Under New York law, "the initial interpretation of a contract is a matter of law for the court to decide." *Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's*, 136 F.3d 82, 86 (2d Cir. 1998). "The court's objective in construing the terms of a contract is to give effect to the intention of the parties." *Alternative Thinking Systems, Inc. v. Simon & Schuster, Inc.*, 853 F. Supp. 791, 795 (S.D.N.Y. 1994). "A party's subsequent conduct might provide evidence of [sic] that party's intent at the time of contracting." *Godfrey v. Eastman Kodak Co.*, No. 89 Civ. 7489(PNL), 1991 WL 64463, *4 (S.D.N.Y. April 10, 1991). "The threshold question in a dispute over the meaning of a contract is whether the contract terms are ambiguous." *Revson v. Cinque & Cinque, P.C.*, 221 F.3d 59, 66 (2d Cir. 2000).

The language of a contract is not ambiguous when it has "a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference in opinion." *Hunt Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1277 (2d Cir. 1989) (*quoting Breed v. Ins. Co. of N. Am.*, 46 N.Y.2d 351, 355, 413 N.Y.S.2d 352, 385 N.E.2d 1280 (1978)). Contractual language is ambiguous if it is "capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement." *Seiden Assocs. v. ANC Holdings*, 959 F.2d 425, 428 (2d Cir. 1992) (quotation marks omitted). Where a

contract is susceptible to more than one reasonable interpretation, there is an ambiguity that cannot be resolved on a motion to dismiss under Rule 12(b)(6). *DKR Capital, Inc. v. AIG Int'l W. Broadway Fund, Ltd.*, No. 03 Civ. 1568(JGK), 2003 WL 22283836, *4 (S.D.N.Y. Oct. 2, 2003); *see also Bank & Trust Co. v. Federal Deposit Ins. Corp.*, 967 F. Supp. 81, 90 (W.D.N.Y. 1997) ("[T]he construction of ambiguous contract provisions is a factual determination that precludes dismissal on a motion for failure to state a claim") (citations omitted). In that circumstance, "[c]onsideration of extrinsic evidence of the parties' intent is properly left to a later time, with the benefit of a fully-developed factual record." *Granite Partners, L.P. v. Bear, Stearns & Co., Inc.*, 17 F. Supp.2d 275, 305 (S.D.N.Y. 1998).

"A written contract will be read as a whole, and every part will be interpreted with reference to the whole; and if possible it will be so interpreted as to give effect to its general purpose." *Empire Props. Corp. v. Mfrs. Trust Co.*, 288 N.Y. 242, 248-49 (1942) (quotation marks omitted). In construing a contract, "one of a court's goals is to avoid an interpretation that would leave contractual clauses meaningless." *Two Guys From Harrison-N.Y., Inc. v. S.F.R. Realty Assocs.*, 63 N.Y.2d 396, 403, 472 N.E.2d 315, 482 N.Y.S.2d 465 (1984). Generally, contracts are construed against the drafter. *See id.* This rule is particularly favored in the interpretation of standard form contracts. *Record Club of America, Inc. v. United Artists Records, Inc.*, No. 72 Civ. 5234(WCC), 1991 WL 73838, *7 (S.D.N.Y. April 29, 1991).

## II.   **DEFENDANTS' PARTIAL MOTION TO DISMISS SHOULD BE DENIED**

Supported by detailed factual allegations, the Complaint states plausible claims for relief under the applicable pleading standard.

A.    **The Complaint Adequately Alleges a Breach of Contract
in Connection With Custom Publishing**

To state a claim for breach of contract under New York law, a complaint must allege: (1) the existence of a contract; (2) the plaintiff's performance of his obligations thereunder; (3) the defendant's failure to perform his obligations; and (4) resulting damages to the plaintiff. *W.B. David and Co., Inc. v. DWA Commc'ns, Inc.*, No. 02 Civ. 8479(BSJ), 2004 WL 369147, *2 (S.D.N.Y. Feb. 26, 2004). Here, the Complaint alleges that Defendants improperly performed under the Author Agreements by applying the wrong royalty rate provisions to custom books and that Plaintiff sustained damages.

1.    **Custom Books Sold in Hard Copy Format**

The plain language of the Author Agreements mandates that the Default Rate (which varies between 17% and 18.75%) applies to sales of custom books sold in hard copy format. Levin Dec., Exs. D – H, ¶ 3. On its face, the Default Rate applies to all sales "unless otherwise specified" in the royalty rate provisions of the Author Agreements. *Id.* None of the royalty rate provisions in any of the Author Agreements refer to custom books. Custom publishing is a well-known industry practice and term. (Compl. ¶ 63). If Defendants had wanted to provide a non-Default Rate to custom books in their form contracts, they could have done so in the royalty rate provisions. The 1997 Agreements contain no reference whatsoever to custom books and the only reference in the 1999 and 2001 Agreements to custom published works is in paragraph H(b)(i), which, however, only concerns the allocation of price among several works and is not a royalty rate provision.[7] Levin Dec., Exs. G and H. Clearly, Defendants were aware of the term, having used it in the 1999 and 2001 Agreements, but declined to provide a royalty rate to that

---

[7] Nowhere in the Complaint is paragraph H(b)(i) (or a somewhat similar provision in the 1997 Agreements) cast as a "royalty rate provision." Defendants' repeated assertions otherwise (*see* Defs. Mem. 7, 9-10) are bewildering.

category of sales. *See Reiss v. Financial Performance Corp.*, 97 N.Y.2d 195, 199 (2001) (courts will "not imply a term where the circumstances surrounding the formation of the contract indicate that the parties, when the contract was made, must have foreseen the contingency at issue").

Defendants, however, argue that a 10% royalty rate applies to sales of custom books because of the reference to "foreign or other adaptations or derivative works and other versions…" in paragraph I(a) of the 1997 Agreements. *See* Levin Dec., Exs. D - F. Paragraph I(a) concerns the exercise of Subsidiary Rights in the Works. *See* n.3, *supra*. If paragraph I(a) applied to custom books, the royalty statements prepared by Defendants should have included sales of custom books in the section labeled "Subsidiary Rights" section. But even Defendants acknowledge they did not capture sales of custom books in that section. Instead, they claim to have included sales of custom books under the section labeled "Abridgements." Like the phrase "custom books," however, the term "abridgements" does not appear in the 1997 Agreements, so Defendants could not have properly treated custom books as abridgements—even if they were abridgements, which they are not—or properly applied a 10% royalty rate.[8] Defendants' interpretation of royalty rates applicable to custom books in print is not supported by the plain language of the Author Agreements and, therefore, is untenable. *See United States v. Herman*, No. 03 Civ. 4416(RMB), 2005 WL 66894, *4 (S.D.N.Y. Jan. 12, 2005) (noting that where a contract is reasonably susceptible to only one interpretation, that interpretation should govern).

---

[8] Defendants' motion does not address Plaintiff's argument that all sales classified by Defendants as abridgements under the 1997 Agreements were improper. (*Id.* ¶ 69). The 1997 Agreements do not provide a reduced royalty rate for abridgements. Instead, the Default Rate is applicable to those sales. *See* Levin Dec., D – F, ¶ 3. Thus, at a minimum, this aspect of Plaintiff's breach of contract claim should proceed.

With respect to the 1999 and 2001 Agreements, Defendants argue that a 10% royalty rate applies to sales of custom books because of the reference to "…print adaptations or derivative works of the Work, including, without limitation, translations, abridgements, and adaptations for export markets" in paragraph H(a)(iv) of those agreements. *See* Levin Dec., Exs. G and H. Defendants insist that that provision is applicable because, allegedly, custom books are abridgements. However, it is the allegations of the Complaint that are assumed to be true for the purposes of this motion, and Plaintiff alleges in detail the significant and fundamental differences between custom books and abridgements demonstrating that custom books are <u>not</u> abridgements. (*See* Compl. ¶¶ 57-58).

Among the many differences, an abridgement, by definition, is always a single, shortened work. In stark contrast, a custom book need not consist of either a single work, or a shortened work. Indeed, a custom book can contain multiple works, or a full-length work of one author (which would obviously not be an abridgement of that author's work) and portions of works of other authors, or even original content written by the customer. That is because while the decision of what content goes into an abridgement is made by the publisher, the decision of what content goes into a custom book is made by the customer. Consequently, custom books come in all shapes and sizes. (*Id.*). To the extent the Court determines that Defendants' argument has any substance, the Court must deem the Author Agreements ambiguous and deny the motion to dismiss, and the resolution of the parties' conflicting interpretations must await full discovery.[9]

_____

[9] As publishers, Defendants are well aware that custom books and abridgements are distinct. That is why Defendants sought to unilaterally amend the Author Agreements in violation of the merger clauses. (Compl. ¶ 59). As noted, several years after the Author Agreements were executed, Defendants began appending a "Glossary" to Plaintiff's royalty statements which purported to define abridgement to include custom published books. (*Id.*). This conduct reflects Defendants' knowledge that the plain language of the royalty rate provisions in the Author Agreements did not provide a non-Default Rate for custom books. Plaintiff should be entitled to explore this issue in discovery.

*See DKR Capital,* 2003 WL 22283836, *4; *see also Merritt Assocs. v. Scollard*, 161 A.D.2d 502, 502 (1st Dept. 1990) (where agreement was ambiguous in not defining the term "selling price," court needed to resort to extrinsic evidence).

### 2.    Custom Books Sold in Electronic Format

#### i.    The 1997 Agreements

Under the plain language of the 1997 Agreements, custom books sold in electronic format are subject to the royalty rates for electronic versions of the Works.[10]  As noted above, paragraph O provides an 18% royalty rate to sales of electronic versions of the Works.[11]  That paragraph applies because custom books typically contain "all or a portion of the Work, alone or in combination with other works," and, when sold in electronic format, custom books are delivered "on any physical media…including, without limitation, magnetic tape, floppy disks, CD-I, CD-ROM, laser disk [etc.]."  Levin Dec., Exs. D - F.  Plaintiff's interpretation is the only reasonable interpretation of the royalty rate for electronic versions of the Work.

---

[10] Nowhere in the Complaint does Plaintiff allege that a printed book is an electronic product. Defendants' assertion otherwise (Defs. Mem. p. 8) is disingenuous and improper on a motion to dismiss.

[11] Paragraph O of the 1997 Agreements provides:

The rights granted to the Publisher under this Agreement include (in addition to all other rights described herein) the right to prepare, publish, reproduce, sell and otherwise distribute electronic versions of the Work.  As used herein, the term "electronic versions" shall mean any and all methods of copying, recording, storage, retrieval, or delivery of all or a portion of the Work, alone or in combination with other works, including in any multimedia work or electronic book; by any means now known or hereafter devised, including, without limitation, by electronic or electromagnetic means, or by analog or digital signal, whether in sequential or non-sequential order, on any and all physical media, now known or hereafter devised including, without limitation, magnetic tape, floppy disks, CD-I, CD-ROM, laser disk, optical disk, IC card or chip, and any other human or machine readable medium, whether or not permanently affixed in such media (excluding the electronic versions specifically described in paragraph I(a)); and the broadcast and/or transmission of the foregoing or by any and all means now known or hereafter devised.

Levin Dec., Exs. D - F (emphasis added).

Defendants argue, however, that paragraph O of the 1997 Agreements does not apply to electronic versions of custom books because the definition of "electronic versions" allegedly excludes <u>all</u> electronic versions of the Subsidiary Rights described in paragraph I(a). (Defs. Mem. p. 8); *see* Levin Dec., Exs. D - F, ¶¶ I(a) and O.  Defendants' interpretation contradicts the express terms of the exclusion.  Paragraph O, after defining electronic versions, states that the definition "exclude[s] the electronic versions <u>specifically</u> described in paragraph I(a)."  Levin Dec., Exs. D - F (emphasis added).  Thus, the definition of electronic versions excludes <u>only</u> those electronic versions that are <u>specifically</u> described in paragraph I(a).  The only electronic versions specifically described in paragraph I(a) are "broadcasting by radio," "making audio and video recordings," and "showing by motion picture or by television."  *Id.*; *see supra*, n.3.  The other Subsidiary Rights described in paragraph I(a) are not excluded from the definition of electronic versions in paragraph O.  One of the Subsidiary Rights that is not excluded from the definition of electronic versions is the one Defendants argue includes custom books ("foreign or other adaptations or derivative works and other versions").  Thus, electronic versions of custom books fall under paragraph O and are subject to the 18% royalty rate.  *See* Levin Dec., Exs. D-F.

Defendants' interpretation of the exclusion is problematic for another critical reason. Again, Defendants argue that the definition of electronic version in paragraph O excludes all electronic versions of the Subsidiary Rights described in paragraph I(a).  Additionally, Defendants argue that the Subsidiary Rights described in paragraph I(a) cover all possible sales except the sale of the "the original Work in book form" (Defs. Mem. p. 15).  Combining those two arguments, Defendants' position is that the definition of electronic version in paragraph O excludes everything except the original Work in book form.  But the original Work in book is obviously not an electronic version.  Thus, in Defendants' view, there are no electronic versions

15

to which paragraph O applies.  Defendants' construction must be rejected because it renders an entire provision of the contract meaningless.  *See Two Guys From Harrison,* 63 N.Y.2d at 403, 472 N.E.2d 315.

ii.    <u>The 1999 and 2001 Agreements</u>

With respect to the 1999 and 2001 Agreements, the royalty rates for custom books in electronic format are plainly found in paragraphs H(a)(v) and H(a)(vi).  Paragraph H(a)(v) applies to "transmission of the Work via radio or television broadcast, cable, satellite, on-line or other electronic or electromagnetic transmission."  Levin Dec., Exs. G and H.  Paragraph H(a)(vi) applies to the "distribution, sale or license of copies of the Work in non-print media…" (*Id.*).  The royalty rate under both paragraphs in the 1999 Agreements is 17.75% and the royalty rate under both paragraphs in the 2001 Agreements is 17%.

Defendants disagree that those provisions apply to electronic versions of custom books. They argue that paragraph H(a)(iv) of the 1999 and 2001 Agreements is applicable.  That paragraph, however, is expressly limited to "<u>print</u> adaptations or derivative works of the Work, including, without limitation, translations, abridgements, and adaptations for export markets." Levin Dec., Exs. G and H (emphasis added).  Clearly, electronic versions of custom books are not in "print," so Defendants' argument fails.  Thus, Plaintiff has properly pled a breach of contract with respect to custom publishing.  Even were Defendants' argument somehow deemed reasonable, it is plain that Plaintiff's interpretation is eminently reasonable, and the Complaint will have to be sustained.  *See DKR Capital, Inc. v. AIG Int'l W. Broadway Fund, Ltd.*, No. 03 Civ. 1568(JGK), 2003 WL 22283836, *4 (S.D.N.Y. Oct. 2, 2003).

**B.     The Complaint Adequately Alleges a Breach of Contract Based on Defendants' Improper Application of the Royalty Provisions Governing Sales Through Foreign Affiliates and Subsidiaries**

As noted, the 1997 Agreements show that Defendants applied the wrong royalty rate to sales of the Works through Defendants' foreign affiliates and subsidiaries.[12]  The particular sales at issue are 44 transactions between January 2003 and December 2007 in which Defendants purport to have entered into license agreements with their foreign affiliates and subsidiaries— entities with names such as "Pearson Education Canada" and "Pearson Education Asia." Contrary to the Defendants' uniform application of the lowest possible royalty rate, there are three higher royalty rate provisions in the 1997 Agreements that should have been applied to sales outside of the United States.  (Compl. ¶ 37).  Although it is not possible to determine which royalty rate applies without the particulars of each sale (*Id.* ¶ 36), it is clear that Plaintiff's allegations that Defendants applied the wrong rate are sufficient sustain the Complaint on this motion to dismiss.

The first applicable royalty rate is paragraph I(d), which provides a 15% royalty rate for "copies of book versions of the Work sold through any of the Publisher's subsidiaries."  Levin Dec., Exs. D - F.  Defendants argue that this provision does not apply as a matter of law because in all 44 transactions the product sold was allegedly something other than the Work as defined in paragraph 1.  S*ee id.*  Whether the product sold was the Work (or something other than the Work) is an issue of fact that cannot be decided on this motion.[13]  Defendants also argue that the

---

[12] Based on the information currently available to Plaintiff, it appears that all of the 44 transactions concerned sales of Works covered by the 1997 Agreement.

[13] In any event, according to the royalty statements prepared by Defendants, at least some of the 44 transactions involved sales of the Work that contained all of the exact same words Plaintiff wrote. Defendants believe that since they allegedly changed the cover and paper quality of the Work, without changing the actual words, the end product is no longer considered the Work under the contracts. Plaintiff's interpretation is that so long as its words are unchanged, the end product is the Work regardless

products were not sold "through any of the Publisher's subsidiaries."[14] However, that is also an issue of fact that cannot be resolved on this motion. Rather, Plaintiff's allegation that at least some of the 44 transactions involved sales of the Works through the Publisher's subsidiaries (Compl. ¶¶ 40-41) is sufficient to withstand Defendants' motion. Defendants' simple disagreement with the allegations of the Complaint cannot be a basis for dismissal.

The second applicable royalty rate is paragraph I(b), which provides a 10% royalty rate for "copies of book versions of the Work or sheets sold by the Publisher outside the United States." Levin Dec., Exs. D - F. Defendants again raise an issue of fact by arguing that this provision does not apply because the product sold was something other than the Work. Defendants also argue that the Publisher did not sell the product outside the United States because allegedly the Publisher's affiliates sold the product. This argument raises yet other issues of fact, namely, who sold the product and through whom, that cannot be resolved on this motion.

Defendants' argument also attempts to draw a clear distinction between the Publisher and its affiliates. But Defendants have not drawn that distinction in the past. As alleged, since the inception of the contracts approximately 11 years ago, Defendants have applied paragraph I(b)— which expressly refers to sales by the "Publisher"—to sales made by the Publisher's affiliates. Defendants' counsel confirmed this fact in a letter dated January 30, 2008.[15] Defendants'

---

of what cover or paper quality Defendants use. The meaning of these words in the context of industry custom and usage should be left for discovery.

[14] In fact, Defendants' argue they have no foreign subsidiaries. Defendants cannot introduce "facts" that do not appear in the pleadings. *See AFSCME v. County of Nassau*, 609 F. Supp. 695, 700 (E.D.N.Y. 1985). In any event, that claim is flatly contradicted by the reference to Defendants' "Asian subsidiaries" in an April 22, 2005 letter from Defendants' Deputy General Counsel to Plaintiff. (Compl. ¶ 46).
[15] According to the letter from David Leichtman, Esq. to Bijan Amini, Esq., Pearson International Editions ("PIEs") are "sold abroad only by foreign affiliates." *See* Levin Dec., Ex. I, at 2. The letter explains that "[w]ith regard to PIEs, under the three 1997 contracts Pearson US [defendant Pearson

conduct over the past 11 years provides evidence of Defendants' intent at the time they entered into the contract. *See Godfrey*, 1991 WL 64463, *4 ("A party's subsequent conduct might provide evidence of [sic] that party's intent at the time of contracting"); *see also New Windsor Volunteer Ambulance Corps, Inc. v. Meyers*, 442 F.3d 101, 112 (2d Cir. 2006) (*citing Old Colony Trust Co. v. Omaha*, 230 U.S. 100, 118 (1913) ("Generally speaking, the practical interpretation of a contract by the parties to it for any considerable period of time before it comes to be the subject of controversy is deemed of great, if not controlling, influence")). Based on their conduct prior to the litigation, Defendants' intent was clearly quite different from the position they have recently adopted.   To the extent Defendants contest their intent, again, that is subject to extrinsic evidence not appropriate on a motion to dismiss.

   The final applicable royalty rate is paragraph I(a), which refers to the subsidiary right of "making foreign or other adaptations or derivative works and other versions," and provides a 10% royalty rate if the "Publisher itself" exercises a subsidiary right in the Work, or a rate of 50% of the license fee if the "Publisher" licenses a subsidiary right in the Work. Levin Dec., Exs. D - F. Whether the sales at issue involved "foreign or other adaptations or derivative works and other versions" is itself a fact issue that cannot be resolved on this motion. Defendants' motion raises another issue of fact by arguing that the Publisher itself—as opposed to its affiliates or subsidiaries—did not exercise subsidiary rights with respect to the sales at issue.[16]

---

Education, Inc.] has applied the 10% export royalty rate" under paragraph I(b). *Id.* Thus, Defendants have applied paragraph (I)b to sales by the Publisher's foreign affiliates.

[16] The cases cited by Defendants in support of the proposition that an entity is legally distinct from its affiliates and subsidiaries are easily distinguishable. Plaintiff is not seeking to hold a parent company responsible for its subsidiary or affiliate's obligation by piercing the corporate veil. *See Carte Blanche (Singapore) Pte., Ltd. v. Diner's Club Int'l, Inc.*, 2 F.3d 24, 25-26 (2d Cir. 1993) (finding plaintiff was entitled to enforce previously obtained arbitration award against parent company of judgment debtor). Nor is Plaintiff suing a subsidiary for breach of a contract which the subsidiary's corporate parent signed. *See Enron Creditors Recovery Corp. v. Martin*, 376 B.R. 442, 467-68 (Bankr. S.D.N.Y. 2007) (applying

Defendants take the position that the only applicable royalty rate provision as a matter of law is 50% of the license fees under paragraph I(a). *Id.* Plaintiff's allegation, however, which must be accepted as true for purposes of this motion, is that the royalty rate for license fees does not apply to licenses with Defendants' foreign affiliates and subsidiaries. Under the 1997 Agreements, "Publisher" is defined as Prentice-Hall. *Id.*, at 1. The provisions of the 1997 Agreements concerning the rights and obligations of the Publisher were written with respect to Prentice-Hall, its practices and its corporate structure. The application of those provisions to Prentice-Hall's alleged successor—Pearson Education—which has its own practices and corporate structure, creates significant contractual interpretation issues. Guidance with those issues can be found in the 2001 Agreement, to which Pearson Education is a named party.

Under the 1999 and 2001 Agreements, the reduced royalty rate for licensing only applies where the licensee is a "third party" and where "the Publisher has no involvement in modifying, enhancing, or marketing the Work for or with such third party." Levin Dec., Exs. G and H, ¶ H(b)(i). It was the parties' clear intent that the reduced royalty rate for licenses apply only where Pearson Education had no involvement with changing or marketing the licensed Work. This is consistent with the rationale for reducing the royalty returns where an independent third party is involved. Thus, even if the licenses relating to the 44 transactions were with third parties, whether Pearson Education had any involvement in modifying, enhancing, or marketing the Works is paramount—and an issue of fact. Defendants' motion should be denied and Plaintiff should be permitted to present extrinsic evidence—such as the license agreements—to

---

Texas law and holding, *inter alia*, that certain affiliates could not have breached a contract to which they were not parties). Moreover, both cases were decided on motions for summary judgment or post-trial motions, where issues of fact may properly be determined. Defendants' reliance on *Zim v. Western Publishing Co.*, 573 F.2d 1318 (5th Cir. 1978) is similarly unavailing. In *Zim*, the Court found that the definition of "Western" in the publishing agreement excluded Western's affiliates and subsidiaries. 573 F.2d at 1322. In that case, however, the original party under the contract (Western Publishing Co.) was still the party-in-interest.

20

demonstrate that Pearson Education's interest in assuming the 1997 Agreements was the same as in the 1999 and 2001 Agreements, so that any involvement in modifying, enhancing and marketing the Works rendered the reduced royalty rate inapplicable.

### C.    In the Alternative, Leave to Amend Should Be Granted

If this Court finds that the Complaint fails to state a claim for relief in any respect, leave to amend should be granted pursuant to FRCP 15.  Under Rule 15(a), leave to amend should be freely given when justice requires.  *Micalden Investments S.A. v. Rostropovich*, No. 07 Civ. 2395(VM), 2008 WL 534819, *3 (S.D.N.Y. Feb. 25, 2008).  "If the plaintiff has at least colorable grounds for relief, justice does so require unless the plaintiff is guilty of undue delay or bad faith or unless permission to amend would unduly prejudice the opposing party." *S.S. Silberblatt, Inc. v. East Harlem Pilot Block*, 608 F.2d 28, 42 (2d Cir. 1979) (citations omitted). Here, there is no suggestion that Plaintiff is guilty of undue delay or bad faith, and Defendants will not be prejudiced by any amendment.

Contrary to Defendants' disingenuous representation, Plaintiff has not had four bites at the apple (*see* n.2, *supra*).  This Court's ruling on April 10, 2008 was the *first* time any court issued a decision concerning Plaintiff's allegations.  The parties conducted extensive discussions over several years to attempt to resolve their differences.  (Compl. ¶¶ 87-102).  It simply cannot be said that Plaintiff's claims are devoid of any merit.

### CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court (1) deny the partial motion to dismiss; and (2) order any further and other relief it deems just and proper.

Dated: New York, New York
       June 11, 2008

STORCH AMINI & MUNVES PC

By _____

Bijan Amini (BA 3533)
Lita Beth Wright (LW 0442)
Jason Levin (JL 8009)
Two Grand Central Tower
140 East 45th Street, 25th Floor
New York, New York  10017
(212) 490-4100
*Attorneys for Plaintiff*