Bijan Amini (BA 3533)
Lita Beth Wright (LW 0442)
Jason Levin (JL 8009)
STORCH AMINI & MUNVES PC
Two Grand Central Tower
140 East 45th Street, 25th Floor
New York, New York 10017
(212) 490-4100
*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------x

BOVEE & THILL LLC, a Nevada limited   :
liability company,   :
  :
  :
     Plaintiff,   :     08-CV-00119 (MGC)
  :
       v.   :     ECF CASE
  :
PEARSON EDUCATION, INC.,   :     **DECLARATION OF**
A Delaware corporation and PRENTICE-   :     **JASON LEVIN**
HALL, INC., A Delaware Corporation   :
  :
     Defendants.   :
------------------------------------------------------x

     JASON LEVIN, hereby declares, pursuant to 28 U.S.C. § 1746, under penalty of

perjury, as follows:

     1.    I am an attorney associated with the law firm of Storch Amini & Munves

PC, counsel to plaintiff, Bovee & Thill LLC ("Plaintiff") in the above-captioned matter.  I am a

member in good standing of the Bar of the State of New York and of this Court.  I submit this

declaration in opposition to defendants Pearson Education, Inc. ("Pearson Education") and

Prentice Hall, Inc.'s ("Prentice-Hall") (collectively, "Defendants") partial motion to dismiss the

amended complaint (the "Complaint") pursuant to F.R.C.P. 12(b)(6).

     2.    Attached hereto as Exhibit A is a true and correct copy of Plaintiff's

Amended Complaint, filed on or about May 8, 2008.

       3.     Attached hereto as Exhibit B is a true and correct copy of the docket sheet for the action filed in the Nevada district court by Plaintiff on or about August 3, 2005.

       4.     Attached hereto as Exhibit C is a true and correct copy of the standstill agreement between Plaintiff and Pearson filed on or about October 27, 2005 in the Nevada district court.

       5.     Attached hereto as Exhibit D is a true and correct copy of an author agreement dated April 18, 1997 between Courtland L. Bovee and John V. Thill ("Authors") on the one hand, and Prentice-Hall on the other, concerning a work entitled "Business Communication Today."

       6.     Attached hereto as Exhibit E is a true and correct copy of an author agreement dated April 18, 1997 between Authors and Prentice-Hall concerning a work entitled "Excellence in Business Communication."

       7.     Attached hereto as Exhibit F is a true and correct copy of an author agreement dated July 25, 1997 between Authors and Prentice-Hall concerning a work entitled "Business Today."

       8.     Attached hereto as Exhibit G is a true and correct copy of an author agreement dated March 23, 1999 between Plaintiff and Prentice-Hall concerning a work entitled "Excellence in Business."

       9.     Attached hereto as Exhibit H is a true and correct copy of an author agreement dated October 12, 2001 between Plaintiff and Pearson concerning a work entitled "Essentials of Business Communication."

       10.     Attached hereto as Exhibit I is a true and correct copy of a letter from

David Leichtman, Esq. to Bijan Amini, Esq., dated January 30, 2008. The last page of the letter is substantially redacted in the attached copy.

Dated: June 11, 2008
     New York, New York

Jason Levin (JL 8009)

**EXHIBIT A**

Bijan Amini (BA 3533)
Lita Beth Wright (LW 0442)
Jason Levin (JL 8009)
STORCH AMINI & MUNVES PC
140 East 45th St., 25th Floor
New York, New York 10017
(212) 490-4100
Attorneys for Plaintiff
Bovee & Thill LLC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x
BOVEE & THILL LLC, a Nevada limited          :
liability company,                            :
                                              :
          Plaintiff,                          :          08-CV-00119 (MGC)
                                              :          ECF CASE
          v.                                  :
                                              :          **AMENDED**
                                              :          **COMPLAINT**
PEARSON EDUCATION, INC.,                      :
A Delaware corporation and PRENTICE-          :
HALL, INC., A Delaware Corporation            :          **(With Jury Demand)**
                                              :
          Defendants.                         :
-------------------------------------------------------x

Plaintiff Bovee & Thill LLC ("B&T" or "Plaintiff"), by and through its attorneys

Storch Amini & Munves PC, as and for its Amended Complaint in this action, alleges as

follows:

## NATURE OF ACTION

1.     This action seeks monetary damages for the systematic breaches and bad

faith performance of author agreements whereby defendant Pearson Education, Inc.

("Pearson"), through its wholly owned subsidiary and predecessor in interest, Prentice-

Hall, Inc. ("Prentice Hall," collectively with Pearson hereinafter "Defendants"), has

withheld, at a minimum, hundreds of thousands of dollars of royalty income generated by

the sale of Plaintiff's academic texts in the fields of business communication and introduction to business.

2.    This action concerns three improper accounting practices employed by Defendants to reduce Plaintiff's royalties and to increase Defendants' profits.  As explained in more detail below, Defendants (i) applied a drastically reduced royalty rate to sales of Plaintiff's works through Defendants' foreign affiliates and subsidiaries which would only apply if those foreign affiliates and subsidiaries were third parties (which they are not) who entered into license agreements with Defendants, instead of the contractually required royalty rates of 15% and 10% on such sales; (ii) unilaterally altered their method of calculating high discount sales several years after the execution of the author agreements in order to capture more sales as high discounts, on which a reduced royalty rate of 5% was paid instead of the default royalty rates of 17% to 18.75%, depending on the work; and (iii) applied a reduced royalty rate of 10% to custom published works (i.e., works in which Defendants' customers customize books by combining portions of several different textbooks or original material into one book or electronic work) as if such works were "other versions" or "abridgements" (which they are not), instead of the proper royalty rate—the default rates (between 17% and 18.75%) or the 17.75% royalty rate for sales of electronic versions of the works.

3.    In derogation of their contractual obligations, Defendants have refused to provide Plaintiff with adequate access to Defendants' books and records, thereby denying Plaintiff its contractual right to review relevant records and the opportunity to discover the true nature and extent of Defendants' improprieties.

4.    Defendants' improper accounting practices have resulted in Defendants retaining untold sums for their own account, to Plaintiff's detriment.

## PARTIES

5.    B&T is a limited liability company duly organized and existing under the laws of the State of Nevada, with its principal place of business in Clark County, Nevada.

6.    Pearson is a corporation organized under the laws of the State of Delaware, with its principal place of business in Upper Saddle River, New Jersey. Pearson is the parent company of Prentice-Hall and the successor in interest to all of Plaintiff's contracts with Prentice-Hall.

7.    Prentice Hall is a corporation organized under the laws of the State of Delaware, with its principal place of business in Upper Saddle River, New Jersey. Prentice Hall is a wholly owned subsidiary of Pearson.

## JURISDICTION AND VENUE

8.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000 exclusive of interests and costs.

9.    This Court has personal jurisdiction over Pearson and Prentice Hall as both entities regularly conduct business within this judicial district.

10.    Venue in this judicial district is proper as the parties to this action have contractually agreed to the Southern District of New York as the sole venue for any disputes between them.

## FACTUAL ALLEGATIONS

11.     John Thill ("Thill") and Courtland Bovee ("Bovee") are prominent authors of business communication and introduction to business textbooks.

12.     Thill and Bovee have authored more than five textbooks together on business communication and introduction to business.

13.     All of those works have been published by Defendants pursuant to various iterations of Defendants' form contract entitled "Author Agreement." By these Author Agreements, Plaintiff granted Prentice-Hall the right to print, publish, sell and distribute multiple editions of Plaintiff's works, including but not limited to Business Communication Today, Excellence in Business Communication, Business Today (later renamed Excellence in Business), Excellence in Business (later renamed Business in Action), Essentials of Business Communication (later renamed Business Communication Essentials), Activebook Excellence in Business Communication, Activebook Business Today, and Business Communication Activebook (collectively the "Works").

14.     Plaintiff, on an ongoing basis, reviews, revises and updates the Works, resulting in new editions of the Works being issued regularly.

**The Author Agreements**

**A. The 1997 Agreements**

15.     On or about April 18, 1997, Bovee and Thill entered into an Author Agreement with Prentice-Hall for the work entitled "Business Communication Today." Pursuant to that agreement, Bovee and Thill granted Prentice-Hall, among other things, the exclusive right to print, publish and sell the work. In exchange, Prentice-Hall agreed to pay Bovee and Thill royalties on sales of the work. Pursuant to paragraph 3 of the

agreement, the royalty rate is 18.75% of the net cash received by Prentice-Hall for sales

of the work, except as otherwise provided in paragraph I.  Paragraph I of the agreement

provides different royalty rates for certain types of sales of the work, as set forth in

greater detail below.  Paragraph O of the agreement also provides a different royalty rate

for electronic versions of the work.

16.    Also on or about April 18, 1997, Bovee and Thill entered into an Author

Agreement with Prentice-Hall for the work entitled "Excellence in Business

Communication."  Pursuant to that agreement, Bovee and Thill granted Prentice-Hall,

among other things, the exclusive right to print, publish and sell the work.  In exchange,

Prentice-Hall agreed to pay Bovee and Thill royalties on sales of the work.  Pursuant to

paragraph 3 of the agreement, the royalty rate is 18.75% of the net cash received by

Prentice-Hall for sales of the work, except as otherwise provided in paragraph I.

Paragraph I of the agreement provides different royalty rates for certain types of sales of

the work, as set forth in greater detail below.  Paragraph O of the agreement also provides

a different royalty rate for electronic versions of the work.

17.    On or about July 25, 1997, Bovee and Thill entered into an Author

Agreement with Prentice-Hall for the work entitled "Business Today," which was later

renamed "Excellence in Business."  Pursuant to that agreement, Bovee and Thill granted

Prentice-Hall, among other things, the exclusive right to print, publish and sell the work.

In exchange, Prentice-Hall agreed to pay Bovee and Thill royalties on sales of the work.

Pursuant to paragraph 3 of the agreement, the royalty rate is 17% of the net cash received

by Prentice-Hall for sales of the work, except as otherwise provided in paragraph I.

Paragraph I of the agreement provides different royalty rates for certain types of sales of

the work, as set forth in greater detail below.  Paragraph O of the agreement also provides

a different royalty rate for electronic versions of the work.

18.    Collectively, the three Author Agreements executed in 1997 are referred

to herein as the "1997 Agreements."

19.    On or around March 16, 1998, Bovee and Thill assigned all of the rights to

the 1997 Agreements to Plaintiff.

**B.  The 1999 Agreement**

20.    On or about March 23, 1999, Plaintiff entered into an Author Agreement

with Prentice-Hall for the work entitled "Excellence in Business," which was later

renamed "Business in Action" (the "1999 Agreement").  Pursuant to that agreement,

Bovee and Thill granted Prentice-Hall, among other things, the exclusive right to print,

publish and sell the work.  In exchange, Prentice-Hall agreed to pay Bovee and Thill

royalties on sales of the work.  Pursuant to paragraph 3 of the agreement, the royalty rate

is 17.75% of the net cash received by Prentice-Hall for sales of the work, except as

otherwise provided in paragraph H.  Paragraph H of the agreement provides different

royalty rates for certain types of sales of the work, as set forth in greater detail below.

**C.  The 2001 Agreement**

21.    On or about October 12, 2001, Plaintiff entered into an Author Agreement

with Prentice-Hall for the work entitled "Essentials of Business Communication," which

was later renamed "Business Communication Essentials" (the "2001 Agreement").

Pursuant to that agreement, Bovee and Thill granted Prentice-Hall, among other things,

the exclusive right to print, publish and sell the work.  In exchange, Prentice-Hall agreed

to pay Bovee and Thill royalties on sales of the work.  Pursuant to paragraph 3 of the

agreement, the royalty rate is 17% of the net cash received by Prentice-Hall for sales of

the work, except as otherwise provided in paragraph H.  Paragraph H of the agreement

provides different royalty rates for certain types of sales of the work, as set forth in

greater detail below.

22.    Pearson is the successor in interest to all of the Author Agreements.

23.    Prentice-Hall continues to be an active corporation.

24.    All of the Author Agreements contain merger clauses, which provide that

each agreement constitutes the entire understanding of the parties relating to the subject

matter therein and shall not be changed or amended in whole or in part except by a

writing signed by the parties.  The merger clauses also provide that no course of dealing

between the parties and no delay or failure of a party in exercising any rights shall

operate as a waiver of that party's rights.

**The Royalty Statements**

25.    Under paragraph 4 of each of the Author Agreements, Defendants agreed

to report on the sales of the Works by March 31 and September 30 of each year for the

six month period ending in December and June of each respective year.  With each report

of sales, Defendants agreed to remit all amounts then owed to Plaintiff.

26.    Defendants prepare the royalty statements based on information

exclusively in their possession.  Plaintiff does not play any role in the preparation of the

royalty statements.

27.    The royalty statements prepared exclusively by the Defendants contain

summary sales information for each of the Works.  Typically, the statements provide the

gross units, return units, net units and net revenue for various categories of sales of the

Works, such as "US Regular," "Canada," "Export," "High Discount" and "Subsidiary Rights." The statements also provide the royalty rate and Plaintiff's royalty payment attributable to each category of sales.

28.    Each of the Author Agreements provides a mechanism for Plaintiff to object to the royalty statements. That mechanism is embodied in Paragraph I(i) of the 1997 Agreements and Paragraph H(c) of the 1999 and 2001 Agreements, which state, in pertinent part:

> The Publisher will maintain relevant records with respect to any royalty statement provided to the Author under the Agreement for a two year period from the date of the statement. Royalty statements will be final and binding upon the Author unless, within two years from the date of the statement, the Author objects to such statement in a writing which states the specific objection and the basis for such objection.

29.    As explained in greater detail below, Plaintiff sent numerous written objections to the royalty statements concerning Defendants' improper royalty accounting practices. Plaintiff's objections that could not be resolved informally with Defendants form the basis of this action.

**Defendants' Improper Royalty Accounting Practices**

30.    Through three improper royalty accounting practices described below, Defendants routinely remitted fewer royalties to the Plaintiff than required under the Author Agreements.

**A.  Sales Through Foreign Subsidiaries and Affiliates**

31.    One of the benefits available to authors such as Plaintiff who enter into publishing agreements with Defendants is access to international markets.

32.    According to filings with the Securities and Exchange Commission (the "SEC"), Pearson Education is the most profitable operating division of England-based

Pearson PLC, a "global media company with its principal operations in the education, business information and consumer publishing markets." According to Pearson PLC's Form 20-F for the fiscal year ended December 31, 2000, which was filed with the SEC on or about June 7, 2001, "Pearson Education is one of the world's largest publishers of textbooks and paper and online teaching materials… Pearson Education has three principal operating divisions—US school, US higher education and professional and international." Pearson PLC's Form 20-F also states:

> Pearson Education has sales, distribution and publishing operations in 35
> countries throughout the world. We produce textbooks, English language
> teaching materials (in which we are a global leader) and professional
> publications. Our international division also offers translations and
> imprints of our US higher education and professional publications.

33.    Pearson's international presence has grown significantly since 2000. At the time of the filing of this Amended Complaint, Pearson advertises on its web-site: "Educating 100 million people worldwide, Pearson is the global leader in educational publishing…" From Pearson's home-page, a computer user who clicks the tab labeled "International Customers" is led to a web-page that reads, in part: "Pearson Education is the world's leading education company. The International group has offices in over 55 countries around the world." That web-page goes on to identify seven "Pearson International Group Regions," including Canada, India, Asia and Benelux (Netherlands).

34.    Consistent with Defendants' growing presence in international book publishing markets, the Author Agreements authorize Defendants to publish and sell the Works not only in the United States, but in other countries, as well. For example, in Paragraph 1 of the Author Agreements, Plaintiff granted to Defendants, among other things, all rights in the Works throughout the world. As made explicitly clear in the 1997

Agreements, "[t]his grant includes, but is not limited to, the exclusive right to print, publish and sell the Work, under the Publisher's own name and under other imprints or trade names."

35.    Defendants do, in fact, publish and sell the Works in countries other than the United States under their own names, or under other imprints or trade names.

36.    The royalty rates applied to sales in countries other than the United States vary in the Author Agreements. The proper royalty rate for such sales is a function of which agreement governs and the particulars of the sales.

37.    For example, under the 1997 Agreements, there are at least three royalty provisions that may be applied to sales outside of the United States. Those provisions are:

   a.    Paragraph I(d): "On copies of book versions of the Work sold through any of the Publisher's subsidiaries…the Publisher will pay the Author a royalty of 15% of the net cash received from such sales."

   b.    Paragraph I(b): "On copies of book versions of the Work or sheets sold by the Publisher outside the United States, the Publisher will pay the Author a royalty of 10% of the net cash received by the Publisher from such sales."

   c.    Paragraph I(a): "The rights granted to the Publisher under this Agreement include, but are not limited to, the following subsidiary rights: publishing in all languages; broadcasting by radio; making audio and video recordings; publishing book club editions; making foreign or other adaptations or derivative works and other versions; inclusion in anthologies; showing by motion picture or by television; syndicating, quoting and otherwise utilizing the Work; and material based on the Work ("Subsidiary Rights"). The Publisher shall pay the Author royalties as follows on the exercise of Subsidiary Rights:

      i.    If the Publisher itself exercises a Subsidiary Right in the Work, 10% of the net cash received from such use.

      ii.    If the Publisher licenses any of the Subsidiary Rights, 50% of the net amount of royalty compensation received from such license."

- 10 -

38.    Under the 1999 and 2001 Agreements, there are also at least three royalty provisions that may be applied to sales outside of the United States (but those three provisions are somewhat different than the ones contained in the 1997 Agreements). Those provisions are:

    a.   Paragraph H(a)(i): "Export Sales: 10%, for the sale of copies of the Work by the Publisher or its affiliate outside the United States and its possessions and territories, except as set forth below."

    b.   Paragraph H(a)(iv): "Other Print Versions, Adaptations and Derivative Works: 10%, for the sale of copies of special print editions of the Work by the publisher or its affiliate, including, without limitation, book club editions, large print editions, and print adaptations or derivative works of the Work, including, without limitation, translations, abridgements, and adaptations for export markets."

    c.   Paragraph H(a)(vii): "Licenses of Subsidiary Rights: 50% of the net amount received by the Publisher from (a) any license permitting a third party to publish and sell or otherwise commercially exploit a version of the Work in any format or medium, where the Publisher has no involvement in modifying, enhancing, or marketing the Work for or with such third party; or (b) any license permitting a third party to use or quote portions of the Work for use in the third party's publication."

39.    In summary, under the 1997 Agreements, Plaintiff's royalty rate on sales of the Works outside of the United States is either 15% from sales through the Publisher's subsidiaries, 10% on sales by the Publisher outside the United States or where the Publisher itself exercises a Subsidiary Right, or 50% of the license fee if the Publisher licenses a Subsidiary Right.  Under the 1999 and 2001 Agreements, Plaintiff's royalty rate on sales of the Works outside of the United States is either 10% on sales by the Publisher or its affiliate outside of the United States or for sales of translations, abridgements, and adaptations for export markets, or where the Publisher itself exercises a Subsidiary Right, or 50% of the license fee if the Publisher licenses a Subsidiary Right to a third party.

40.    Defendants misapplied these royalty rate provisions to a certain category of sales outside of the United States in order to take advantage of the lowest available royalty rate.  Indeed, Defendants purport to have entered into licensing arrangements with their own foreign affiliates and subsidiaries for sales of the Works or for the exercise of Subsidiary Rights.  On account of those transactions, Defendants remitted 50% of the license fees to Plaintiff, rather than 15% or 10% of the net cash received from sales of the Works or for the exercise of Subsidiary Rights.  Defendants kept for themselves the remainder of the amounts owed to Plaintiff.

41.    The statements prepared by Defendants for the royalty periods between January 2003 and December 2007 contain at least 44 entries in which Defendants claim to have licensed the exercise of a Subsidiary Right to their own affiliates and subsidiaries—entities with names such as "Pearson Education Canada," "Pearson Education Asia" and "Pearson Education Benelux BV."  These are some of the very entities contained on Pearson's web-site as being "Pearson International Group Regions."

42.    The 44 entries on the royalty statements between January 2003 and December 2007 account for sales of at least 80,034 net units of the Works (inexplicably, six of the 44 entries do not indicate the number of units sold).

43.    According to the royalty statements prepared by Defendants, the licenses corresponding with those 80,034 units generated $108,009.57 in license fee revenue.  Defendants remitted 50% of those license fees, or $54,004.79, to Plaintiff, claiming that the applicable royalty provisions were paragraph I(a)(ii) of the 1997 Agreements and paragraph H(a)(vii) of the 1999 and 2001 Agreements.

44.    Defendants applied the wrong provisions to those sales.  For example, paragraph H(a)(vii) of the 1999 and 2001 Agreements only applies where the license is with a "third party."  The licenses associated with the 44 entries on the royalty statements were not with third parties—they were with Defendants' affiliates and subsidiaries or, as Pearson's web-site states, with "Pearson International Group Regions."

45.    Defendants' sale of the Works through their own affiliates and subsidiaries is consistent with the right granted by Plaintiff to Defendants in paragraph 1 of the Author Agreements to print, publish and sell the Works anywhere in the world under other imprints or trade names, such as "Pearson Education Asia," but Defendants cannot plausibly claim that those other imprints or trade names are third parties.

46.    Indeed, in a letter dated April 22, 2005 to Bovee and Thill, Harriet L. Goldberg, Pearson's Vice President and Deputy General Counsel, explicitly referred to Pearson's "international affiliates" and its "Asian subsidiaries."

47.    Not only were the licenses associated with the 44 entries on the royalty statements not with third parties, but Pearson's editors represented to Plaintiff that the same Pearson employee, Will Ethridge, had oversight and approval authority for the purported licenses on behalf of both the alleged licensor (Pearson) and the alleged licensee (Pearson's affiliate or subsidiary).  That was because Mr. Ethridge held senior positions with both Pearson US Publishing and Pearson International Publishing.  Thus, the licensing arrangements at issue were not made at arms' length.

48.    The royalty rates that should have been applied to those sales are 15% and 10% (depending on the particulars of each transaction which must be provided by

- 13 -

Defendants) of the net revenues received by Defendants' affiliates and subsidiaries from sales of the Works.

49.     As a result of Defendants' improper accounting practice for sales through foreign affiliates and subsidiaries, Plaintiff has been damaged in the amount of the difference between what it should have received on account of such sales (15% or 10% of the net revenues received by Defendants' affiliates and subsidiaries) and what it actually received (50% of the so-called license fees).

50.     Plaintiff requires more specific information from Defendants about the sales at issue to plead a precise damages figure. As described in greater detail below, Plaintiff previously requested from Defendants access to information that would be helpful in determining those damages, but Defendants refused to provide the specific information that was requested. As Defendants have conceded, should Plaintiff prevail on this claim, Defendants owe Plaintiff at least an additional $73,000 in royalties. Plaintiff believes the actual damages may be far in excess of that figure.

**B.  Custom Published Books**

51.     Defendants' practice of "custom publishing" enables their customers, such as educational institutions and professors, to electronically "customize" course books or textbooks to fit their teaching needs.

52.     To facilitate custom publishing, Defendants provide their customers with access to digital information stored on an electronic database using Pearson's custom publishing web-site (www.pearsoncustom.com).

53.     To create custom published books, customers access Defendants' electronic database of existing books and chapters published by Defendants. Customers

then search the database and select the books or chapters published by Defendants which the customers would like to customize. Customers may select certain chapters of a particular book, combine several chapters of several different books, or combine books with chapters of other books. Customers may then re-order and/or combine those books and chapters with original customer material or third party content (content prepared by non-Pearson authors). Once customers choose the order of the content and determine the cover design and layout, Defendants publish the customized products and make them available in hard copy, electronic formats (such as on the internet or on CD-ROM or DVD), and in other media. All of these actions are performed electronically.

54.     At any point in the process, customers may save their customized product on Defendants' database and log back into the system at a later time to finish preparing the customized product or completing their order.

55.     Custom published books are prepared, modified, retrieved, stored and published electronically.

56.     According to information provided by representatives of the Defendants, they have calculated Plaintiff's royalties for custom published work at a rate of 10%. Under the 1997 Agreements, Defendants contend the relevant provision is paragraph I(a)(i), which provides the 10% royalty rate for, among other things, "making foreign or other adaptations or derivative works and other versions" (even though the royalty statements do not report any sales under the category of "other versions"). Under the 1999 and 2001 Agreements, Defendants contend the relevant provision is paragraph H(a)(iv), which provides the 10% royalty rate for, among other things, "print adaptations

or derivative works of the Works, including, without limitation, translations, abridgements, and adaptations for export markets."

57.    Defendants applied the wrong royalty rate provisions to sales of custom published books. For example, custom published works are not "abridgements." In the publishing industry, the term "abridgement" generally means a shortened or condensed version of a book. The decision of which content goes into the abridged version is made by the publisher and the editors. By way of illustration of what an abridgement is, consider Leo Tolstoy's classic novel *War and Peace*, which originally exceeded 1300 pages. Due to the length and complexity of the novel, some publishers and editors determined to prepare shorter versions of it. One such example is a condensed version of *War and Peace* that is approximately 500 pages shorter than Tolstoy's original work. Copies of these abridged versions were printed and sold by the publishers to bookstores and the public.

58.    Custom published books, however, are typically combinations of chapters of different books and original material from the customer, all of which are selected by the customer and published by a publishing company only for the purpose of filling that particular customer's order. With custom publishing, the customer is empowered to make critical decisions about the content of the book, and also has the ability to control the cover, design and layout of the custom book. That is how the customer "customizes" the book. Thus, there are clear and significant differences between abridged versions of books and custom published books.

59.    In an effort to revise the Author Agreements without the consent of Plaintiff, and in violation of the merger clauses contained in the Author Agreements,

Defendants attempted to change the plain meaning of the term "abridgement" in the 1999 and 2001 Agreements (Defendants also attempted to change the meaning of "abridgement" in the 1997 Agreements, but since that term does not appear in those agreements, their attempt was completely futile). Thus, at a time not precisely known but believed by Plaintiff to be in 2005, Defendants began appending a "Glossary" to Plaintiff's royalty statements. The Glossary purports to change the definition of Abridgement to include custom published books. Defendants' attempt to change the meaning of "abridgement" in the 1999 and 2001 Agreements, several years after the execution of the agreements, violates the merger clauses.

60.    As explained below, the proper royalty rate provisions for custom books vary depending upon whether the finished product was sold in print or as an electronic version. Defendants' royalty statements, however, do not provide Plaintiff with any information about how many custom books were sold in print and how many were sold as electronic versions.

61.    Since custom published books are combinations of portions of multiple works usually prepared by multiple authors, the Author Agreements provide that Defendants must determine the fair value of each work to the finished product as a whole, and then apply the applicable royalty rates to those values to determine each author's royalty payment. That provision is found in paragraph I(e) of the 1997 Agreements and paragraph H(b)(i) of the 1999 and 2001 Agreements. The royalty statements prepared by Defendants do not contain sufficient information to determine whether Defendants performed this function.

- 17 -

62.     With respect to custom published books that contain portions of the Works, Defendants must determine the fair value of Plaintiff's Works to the overall product. Once that determination is made, Defendants must apply the contractual royalty rates to determine Plaintiff's royalty payment.

63.     Under the 1997 Agreements, the proper royalty rate for sales of print versions of custom published books is the default rate. The default royalty rate applies unless otherwise specified in the agreements. No other provision in the 1997 Agreements provides a royalty rate for custom published books, which is a well-known industry term the Defendants could have included in the royalty rate provisions but did not do so.

64.     Under the 1997 Agreements, the proper royalty rate for sales of electronic versions of custom published books is 18% under paragraph O, which states:

> The rights granted to the Publisher under this Agreement include (in addition to all other rights described herein) the right to prepare, publish, reproduce, sell and otherwise distribute electronic versions of the Work. As used herein, the term "electronic versions" shall mean any and all methods of copying, recording, storage, retrieval, or delivery of all or any portion of the Work, alone or in combination with other works, including in any multimedia work or electronic book; by any means now known or hereafter devised, including, without limitation, by electronic or electromagnetic means, or by analog or digital signal; whether in sequential or non-sequential order, on any and all physical media, now known or otherwise devised including, without limitation, magnetic tape, floppy disks, CD-I, CD-ROM, laser disk, optical disk, IC card or chip, and any other human or machine readable medium, whether or not permanently affixed in such media (excluding the electronic versions specifically described in paragraph I(a)); and the broadcast and/or transmission of the foregoing by any and all means now known or hereafter devised.

> The Publisher shall pay the Author royalties as follows on the electronic versions:

> (i)     If the Publisher itself creates and sells that electronic version, 18% of the net cash received from such use.

(ii)    If the Publisher licenses the right to create and sell the electronic version, 50% of the net amount of royalty compensation received from such license.

65.    Under the 1999 and 2001 Agreements, the proper royalty rate for sales of print versions of custom published books is the default rate provided in each of those agreements. That default royalty rate applies unless otherwise specified in the agreements. No other provision in those agreements provides a royalty rate for custom published books, which is a well-known industry term the Defendants could have included in the royalty rate provisions but did not do so. In fact, the Defendants included the term "custom published work" in another part of the agreements but chose not to provide a royalty rate other than the default rate for such books.

66.    Under the 1999 and 2001 Agreements, the proper royalty rate for sales of electronic versions of custom published books is 17.75% under paragraph H(a)(v). That paragraph provides the 17.75% rate for "transmission of the Work via radio or television broadcast, cable, satellite, on-line or other electronic or electromagnetic transmission."

67.    As a result of Defendants' improper accounting practice for custom published books, Plaintiff has been damaged in the amount of the difference between what it should have received on account of such sales (anywhere between 17% and 18.75% of the net revenues received by Defendants, which are the default royalty rates and the rates for electronic versions of the Works) and what it actually received (10% of the net revenues).

68.    Plaintiff requires more specific information from Defendants about the sales at issue to plead a precise damages figure. For example, the royalty statements prepared by Defendants do not provide the number of units that were sold as custom

published works, other versions or abridgements, even though the statements provide those figures for all other sales categories. While the royalty statements contain a net revenue figure for sales of abridged versions of the Works, the statements provide no information about those abridged versions that would enable Plaintiff to make reliable determinations of which sales were of custom published books. Also excluded from the royalty statements is information about the number of custom books that were sold in print and the number that were sold as electronic versions. As described in greater detail below, Plaintiff previously requested from Defendants access to information that would be helpful in determining Plaintiff's damages, but Defendants refused to provide the specific information that was requested.

69.     Additionally, Plaintiff is entitled to damages for all sales of the Works under the 1997 Agreements that were classified by Defendants as sales of abridged versions. There is simply no provision in the 1997 Agreements for a 10% royalty rate for abridgements—indeed, the term "abridgements" does not even appear in those agreements. The appropriate royalty rate for such sales should have been the default rate, which is either 17% or 18.75% depending on which Works covered by the 1997 Agreements were sold. Based on the royalty statements prepared by Defendants, between January 2003 and December 2007, Defendants earned more than $780,000 on sales of abridgements of the Works covered by the 1997 Agreements. Plaintiff earned a royalty of approximately $77,000 on those sales. Applying the two relevant default royalty rates for Works covered by the 1997 Agreements, Plaintiff should have received royalty payments between $132,600 and $146,250. Taking into account the approximately $77,000 already received by Plaintiff, Plaintiff's damages for sales of

abridged versions of Works covered by the 1997 Agreements are approximately between $55,600 and $69,250.

## C. High Discount Sales

70.    High discount sales are sales of the Works at steep discounts.  Typically, high discount sales are made of remaindered books, or books that remained unsold in the publisher's warehouse for a long period of time and are sold in bulk at greatly reduced prices in order to liquidate old inventory.

71.    Under paragraph I(c) of the 1997 Agreements, high discount sales are sales of copies of the Works by any means at a discount of 50% or greater off the single copy price.  Plaintiff is entitled to a royalty payment of 5% of the net revenues generated by high discount sales.

72.    Under paragraph H(a)(iii) of the 1999 and 2001 Agreements, high discount sales are sales of copies of the Work by the Publisher or its affiliate by any means and channel at a discount of 51% or greater off the single copy price.  Plaintiff is entitled to a royalty payment of 5% under the 1999 Agreement and 15% under the 2001 Agreement of the net revenues generated by high discount sales.

73.    High discount sales of the Works were extremely rare until 2004.  Based on the royalty statements prepared by Defendants, from 1997 through June 2004, a total of only 360 units of the Works were sold at high discounts.  That amount of high discount sales is negligible (approximately 0.086% of net reported units sold) in comparison to the net reported total of more than 420,000 units of the Works sold during the same period.

74.    Suddenly, beginning in July 2004, the number of high discount sales of the Works changed dramatically.

75.     Based on the royalty statement prepared by the Defendants for the period of July 2004 through December 2004, there were 5,164 high discount sales in that six-month period (approximately 7.18% of net reported units sold in that period). In comparison to the high discount sales made over approximately the prior seven years, the high discount sales in that six-month period increased exponentially to 1400%.

76.     Shortly after receiving the royalty statement for the second-half of 2004, Plaintiff noticed the dramatic increase in the number of high discount sales and contacted Defendants to inquire into the situation.

77.     As a result, on April 5, 2005, Thill sent an email to Jeff Shelstad, who is believed to have been at that time the Editorial Director of Prentice Hall Business Publishing. In that email, Thill objected to, among other things, the high discount sales contained in the royalty statement. Thill challenged Defendants' calculation of high discounts. Specifically, Thill noted that certain high discount sales were made at less than the 50% discount required for a high discount sale. Thill also asked for an explanation why newer editions of the Works were being sold at high discounts.

78.     Subsequently, Shelstad telephoned Thill. Shelstad expressed uncertainty about the precise calculation of high discounts, but he used the term "list price." During that conversation, Shelstad threatened Thill that if he did not stop asking questions about the high discount sales, Pearson would simply sell more of the Works at high discounts or treat more of the sales as high discount sales in order to reduce the amount of royalties paid to Plaintiff.

79.     At some point subsequent to the call with Shelstad, Thill reviewed the Author Agreements and did not find any mention of the phrase "list price." Instead, he

observed that the Author Agreements state that the high discount calculation is based on the "single copy price."

80.    Subsequently, Thill contacted David Parker.  Parker is believed to have been at that time either an Editor or Acquisitions Editor at Prentice Hall Business Publishing.  Over the prior several years, Thill and Parker had developed a trusting relationship.

81.    In that conversation, and in follow-up conversations, Thill expressed to Parker his concerns about the drastically increased high discount sales.  Thill and Parker discussed the confusion surrounding the calculation of high discount sales.  During those conversations, Parker informed Thill that the reason high discount sales of the Works increased dramatically was that management had recently decided that the term "single copy price" in the Author Agreements meant the "list price."  Thus, by basing the high discount calculation on the list price instead of the single copy price, Defendants captured many more sales as high discounts.  Consequently, Plaintiff received a reduced royalty rate on far more sales of the Works than ever before.

82.    In subsequent periods, perhaps making good on Shelstad's threat, Defendants continued to report extremely high numbers of high discount sales on Plaintiff's royalty statements.

83.    The following chart shows the trend of dramatically increasing high discount sales of the Works that began in July 2004:

| Net Units Sold at High Discount by Period | |
|---|---|
| Period | Net Units Sold at High Discount |
| Jul-Dec 1997 | 0 |
| Jan-Jun 1998 | 0 |
| Jul-Dec 1998 | 15 |
| Jan-Jun 1999 | 0 |
| Jul-Dec 1999 | 14 |
| Jan-Jun 2000 | 0 |
| Jul-Dec 2000 | 0 |
| Jan-Jun 2001 | 0 |
| Jul-Dec 2001 | 2 |
| Jan-Jun 2002 | 130 |
| Jul-Dec 2002 | 140 |
| Jan-Jun 2003 | 33 |
| Jul-Dec 2003 | 25 |
| Jan-Jun 2004 | 1 |
| Beginning in July 2004, the number of high discount sales increased dramatically | |
| Jul-Dec 2004 | 5,164 |
| Jan-Jun 2005 | 7,587 |
| Jul-Dec 2005 | 6,854 |
| Jan-Jun 2006 | 6,673 |
| Jul-Dec 2006 | 4,391 |
| Jan-Jun 2007 | 2,787 |
| Jul-Dec 2007 | 3,872 |

← In or about April 2005, Shelstad's threat to Thill

84.    In summary, between July 1997 and June 2004, there were a total of 360 high discount sales of the Works.  Then, Defendants changed their method of calculating high discount sales under the Author Agreements.  As a result of Defendants' changed methodology, between July 2004 and December 2007, there were a total of 37,328 high discount sales.

85.    As a result of Defendants' improper accounting practice for high discount sales, Plaintiff has been damaged in the amount of royalties it should have earned on sales that were improperly classified as high discount sales after Defendants' method of

- 24 -

calculating high discount sales changed.  Based on the information currently available to

Plaintiff, Plaintiff has been damaged in an amount greater than $150,000.

**Plaintiff Interposes Numerous Objections to the Royalty Statements**

86.    Paragraph I(i) of the 1997 Agreements and paragraph H(c) of the 1999 and

2001 Agreements provide, in part, that a royalty statement prepared by Defendants will

be final and binding upon Plaintiff unless, within two years from the date of the

statement, Plaintiff objects to such statement in a writing which states the specific

objection and the basis for such objection.

87.    Plaintiff interposed numerous written objections to the royalty statements

concerning Defendants' improper royalty accounting practices.  Each of these objections

complied with the notice requirements of the Author Agreements.  At various times,

Defendants' own writings and conversations confirm its awareness of Plaintiff's

objections.

88.    For example, as explained above, on April 5, 2005, Thill emailed Jeff

Shelstad after receiving the royalty statement for the period July 2004 through December

2004 to express several objections.  In particular, Thill objected to certain high discount

sales and designations of subsidiary rights (for Works sold through Defendants' foreign

affiliates and subsidiaries).  Shelstad confirmed receipt of that email in a subsequent

telephone call, and Thill had a follow-up telephone call with Parker.

89.    On or about April 22, 2005, Harriet L. Goldberg, Vice President and

Deputy General Counsel of Pearson Education, Inc., sent a letter to Thill and Bovee.

Goldberg acknowledged receipt of an email written by Bovee that objects to the royalties

paid on sales of the Works through Defendants' foreign affiliates and subsidiaries.

90.    On June 15, 2005, Thill sent an email to Parker in response to Parker's inquiry about preparing a new version plan for one of the Works. Thill wrote that Pearson must honor the provision in the Author Agreements governing sales through foreign affiliates and subsidiaries before Thill participates in discussions about new projects. In particular, Thill stated that "[a]s discussed many times, for years now Pearson has refused to pay us our royalties on copies of book versions of our Works sold through any of the Publisher's subsidiaries."

91.    On or about August 3, 2005, Plaintiff commenced an action against Pearson in the United States District Court, District of Nevada (Case No. 1:08-cv-00119-MGC) (the "Nevada Action") objecting to, among other things, sales to foreign affiliates and subsidiaries. On or about September 13, 2005, Plaintiff amended the complaint filed in the Nevada Action, again objecting to, among other things, sales to foreign affiliates and subsidiaries. The complaint and the amended complaint put Defendants on notice of the objections raised therein.

92.    Subsequent to the commencement of the Nevada Action, the royalties paid to Plaintiff increased. The improper accounting practices complained of herein continued, but in varying degrees.

93.    On or about August 16, 2005, Thill sent a letter to Pearson PLC's Board of Directors informing them, among other things, that Pearson was engaging in two different schemes to deprive authors of their royalties. Thill requested that the Board of Directors arrange for an outside audit of how authors' royalties were being calculated and the amount of money that was still owed to authors.

94.    On or about September 2, 2005, counsel for Defendants and Pearson PLC sent a letter to counsel for Plaintiff. Among other things, Defendants' counsel acknowledged Pearson PLC's receipt of Thill's letter to the Board of Directors. Defendants' counsel wrote that Thill's letter "purport[s] to provide notice of Mr. Thill's allegations regarding his view of certain of Pearson Education, Inc.'s business practices in respect of royalties." After noting that the substance of Thill's letter mirrored the allegations made in the Nevada Action, Defendants' counsel further wrote that "[y]our client's concerns have been noted and the allegations will be referred to the Audit Committee of the Board for review and consideration."

95.    At various times throughout 2006 and 2007, there were verbal discussions between Plaintiff and Defendants (or their respective representatives) during which Defendants acknowledged their awareness that Plaintiff objected to sales through foreign affiliates and subsidiaries, high discount sales and custom published books. In a particular communication in May 2006, Defendants' counsel noted Plaintiff's objections concerning certain types of sales, including sales through foreign affiliates and subsidiaries, high discount sales and custom publishing.

96.    On October 17, 2007, Parker sent an email to Bovee and Thill. In that email, Parker specifically referenced Plaintiff's objections to sales through foreign affiliates and subsidiaries and high discount sales.

97.    On October 25, 2007, Parker sent an email to Thill. In that email, Parker specifically referenced Plaintiff's objections to high discount sales.

98.    On December 31, 2007, Thill sent an email to Parker. In that email, Thill objected to high discount sales and custom publishing.

99.     On January 1, 2008, Parker responded to Thill's email from the prior day and specifically referenced Plaintiff's objections to high discount sales and custom publishing.

100.     Beginning in 2005, Plaintiff attempted to exercise its right to review relevant records under the Author Agreements.  In particular, paragraph I(i) permits Plaintiff, at its own expense, to review Defendants' records no more than once each calendar year for the purpose of verifying the accuracy of the royalty statements. Plaintiff and Defendants could not agree on the scope of the records subject to the review. Defendants provided access to certain documents but refused to provide access to the underlying records Plaintiff sought to review.  Indeed, the refusal of Defendants to turn over the underlying sales records of the Works is the reason Plaintiff is unable to plead precise damages figures with respect to certain categories of sales at this time.

101.     By way of example, on or about March 2006, Plaintiff's counsel requested at least seven categories of documents in order to conduct a review of the relevant records.  On or about April 4, 2006, Defendants' counsel objected to the list for a variety of reasons including relevancy (and on the grounds that one category of documents was supposedly already produced) and agreed to provide a sampling of documents in response to only one of the seven categories.

102.     By way of further example, on or about January 17, 2007, Plaintiff's counsel sent a letter to Defendants' counsel objecting that Defendants' refusal to provide back-up sales information is preventing Plaintiff's forensic accountant from performing a meaningful audit that complies with generally accepted accounting principles.

## AS AND FOR A FIRST CLAIM FOR RELIEF
### (Breach of Contract)

103.    Plaintiff repeats and reasserts all allegations contained in prior paragraphs as if fully set forth herein.

104.    Plaintiff entered into the Author Agreements with Prentice-Hall for the publishing, sale, distribution and other exploitation of the Works.  Pearson is the successor in interest to Prentice-Hall.

105.    Plaintiff has performed all of its obligations under the Author Agreements.

106.    In derogation of their obligations under the Author Agreements, Defendants have systematically breached their obligations to pay Plaintiff royalties pursuant to the terms of the Author Agreements.

107.    Thus, in order to avoid paying Plaintiff the royalty rates required under paragraphs I(a)(i), I(b) and I(d) of the 1997 Agreements and under paragraphs H(a)(i), H(a)(iv) and H(a)(vii) of the 1999 and 2001 Agreements, Defendants purport to have entered into licenses with their own foreign affiliates and subsidiaries to pay a reduced royalty rate under paragraph I(a)(ii) of the 1997 Agreements and paragraph H(a)(vii) of the 1999 and 2001 Agreements.  The provisions relied on by Defendants do not apply to these transactions, however, because the licenses were with Defendants' own affiliates and subsidiaries.

108.    With respect to custom published books, Defendants applied a 10% royalty rate to such sales (purportedly under paragraph I(a)(i) of the 1997 Agreements and paragraph H(a)(iv) of the 1999 and 2001 Agreements) instead of the royalty rates required under the Author Agreements.  The proper royalty rates, depending upon the specifics of each sale of custom published works which have not been provided by

- 29 -

Defendants, are either the default rates of between 17% and 18.75% in paragraph 3 of the Author Agreements, or the royalty rates for sales of electronic versions of custom published books under paragraph O of the 1997 Agreements (18%) and paragraph H(a)(v) of the 1999 and 2001 Agreements (17.75%).

109.    Defendants also breached the 1997 Agreements by applying the royalty rate for abridgements to sales of the Works covered by those agreements because the 1997 Agreements do not provide a specific royalty rate for abridgement sales. Indeed, the phrase "abridgement" does not even appear in those agreements.

110.    With respect to high discount sales, several years after the execution of the Author Agreements, Defendants changed their method of calculating high discount sales in order to capture more sales in the high discount category. Defendants then paid Plaintiff a reduced royalty rate of 5% on such sales, purportedly under paragraph I(c) of the 1997 Agreements and paragraph H(a)(iii) of the 1999 and 2001 Agreements. However, Defendants did not comply with those provisions because they did not base the high discount sales calculation on the "single copy price."

111.    Finally, in derogation of their contractual obligations, and despite repeated requests from Plaintiff, Defendants have denied Plaintiff adequate access to Defendants' books and records to permit Plaintiff to exercise its contractual right to review relevant records.

112.    As a result of these breaches of the Author Agreements, Plaintiff has been damaged in an amount to be determined at trial of this matter but believed to be no less than $278,600.

## AS AND FOR A SECOND CLAIM FOR RELIEF
### (Breach of the Covenant of Good Faith and Fair Dealing)

### (In the alternative to the First Claim for Relief, but only as that claim relates to High Discount Sales)

113.    Plaintiff repeats and realleges each of the allegations contained in the prior paragraphs as if fully set forth herein.

114.    Plaintiff entered into the Author Agreements with Prentice-Hall for the publishing, sale, distribution and other exploitation of the Works.  Pearson is the successor in interest to Prentice-Hall.

115.    As parties to those contracts, Defendants are required to comply with the covenant of good faith and fair dealing.

116.    Under the Author Agreements, Defendants prepare Plaintiff's royalty statements.  Defendants exclusively control the information necessary to perform the royalty calculations.

117.    Several years after the execution of the Author Agreements, Defendants unilaterally changed their method of calculating high discount sales in order to capture more sales in the high discount category.  Defendants then paid Plaintiff a reduced royalty rate of 5% on such sales, purportedly under paragraph I(c) of the 1997 Agreements and paragraph H(a)(iii) of the 1999 and 2001 Agreements.  However, Defendants did not comply with those provisions because they did not base the high discount sales calculation on the "single copy price."

118.    Defendants changed their method of calculating high discount sales in order to deprive Plaintiff of part of its bargain.  When Plaintiff objected to the massive increase in high discount sales and the commensurate reduction in Plaintiff's royalties,

Defendants' employee threatened Plaintiff that Defendants would increase the number of high discount sales that were reported if Plaintiff continued to complain.

119.    Defendants have also refused to permit Plaintiff to review relevant books and records related to the high discount sales.

120.    Defendants failed to act in conformity with the covenant of good faith and fair dealing.

121.    By reason of Defendants aforementioned acts and conduct, Plaintiff has been damaged in an amount to be proven at trial in this matter, but believed to be in excess of $150,000.

**WHEREFORE,** Plaintiff respectfully requests judgment of the following:

    a.  On the First Claim for Relief, damages in an amount to be proven at trial in this matter, but in no event less than $278,600;

    b.  On the Second Claim for Relief, damages in an amount to be proven at trial in this matter, but in no event less than $150,000;

    c.  On all Causes of Action, that Defendant be Ordered to pay Plaintiff's reasonable attorney's fees associated with this action;

    d.  On all Causes of Action, other such further relief as is just and proper, including attorneys' fees and costs associated with this action.

## <u>JURY DEMAND</u>

Plaintiff hereby demands a trial by Jury.

Dated: New York, New York
      May 8, 2008

STORCH AMINI & MUNVES PC

By: _____

     Bijan Amini (BA 3533)
     Lita Beth Wright (LW 0422)
     Jason Levin (JL 8009)
140 East 45th Street, 25th Floor
New York, New York 10017
Tel: (212) 490-4100
Fax: (212) 490-4208
Attorneys for Plaintiff
Bovee & Thill LLC

**EXHIBIT B**

# United States District Court
## District of Nevada (Las Vegas)
## CIVIL DOCKET FOR CASE #: 2:05-cv-00940-JCM-PAL

Bovee & Thill LLC. VS Pearson Education. Inc.

Assigned to: Judge James C. Mahan

Referred to: Magistrate Judge Peggy A. Leen

Cause: 28 USC 133

Date Filed: 08/03/2005

Date Terminated: 11/03/2005

Jury Demand: Plaintiff

Nature of Suit: 190 Contract: Other

Jurisdiction: Diversity

**Plaintiff**

**Bovee & Thill LLC**                     represented by **Dustin A Johnson**

Albright, Stoddard, Warnick & Albright

801 S. Rancho Drive
Suite D-4
Las Vegas, NV 89106
702-384-7111
Fax: 702-384-0605
Email: djohnson@albrightstoddard.com

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Mark Albright**
Albright Stoddard Warnick & Albright
801 South Rancho Drive
Suite D-4
Las Vegas, NV 89106
(702) 384-7111
Fax: (702) 384-0605
Email: gma@albrightstoddard.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Pearson Education, INC**                represented by **David Leichtman**

Morgan Lewis & Bockius
One Market Street
Spear Street Tower
San Francisco, CA 94105-
415-442-0900
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Gary R. Goodheart**
Jones Vargas
3773 Howard Hughes Pkwy.
3rd Floor So.
Las Vegas, NV 89109-
(702) 862-3300
Fax: (702) 737-7705
Email: grg@jonesvargas.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 08/02/2005 | | SUMMONS ISSUED to pearson, obo P. (Entered: 08/12/2005) |
| 08/03/2005 | 1 | COMPLAINT Complaint, with jury demand. Obo P. (s) (Entered: 08/12/2005) |
| 08/16/2005 | 2 | SUMMONS RETURNED EXECUTED upon Dft on 8/10/05. (Entered: 08/19/2005) |
| 08/26/2005 | | MISCELLANEOUS DOCUMENT vp/desig by David Leichtman - JCM (Entered: 08/26/2005) |
| 08/29/2005 | 3 | MOTION TO DISMISS by Dft to dism/transfer. (s)DISPO: memo (#4), non-oppo (#9), reply (#10) (Entered: 09/06/2005) |
| 08/29/2005 | 4 | MEMORANDUM by Dft to Dft's mtn to dism (#3). (s) (Entered: 09/06/2005) |
| 08/29/2005 | 5 | CERTIFICATE OF INTERESTED PARTIES by Dft. (Entered: 09/06/2005) |
| 09/02/2005 | 6 | DESIGNATION OF LOCAL COUNSEL by Dft of atty Gary Goodheart for atty David Leichtman. (cps dist) (Entered: 09/08/2005) |
| 09/02/2005 | 7 | VERIFIED PETITION FOR PERMISSION TO PRACTICE PRO HAC VICE by Dft of atty David Leichtman. (cps dist) (Entered: 09/08/2005) |
| 09/13/2005 | 8 | AMENDED COMPLAINT by Plf w/jury demand. (Entered: 09/14/2005) |
| 09/13/2005 | 9 | NON-OPPOSITION by Plf to Dft's mtn to transfer (#3). (s) (Entered: 09/14/2005) |
| 09/23/2005 | 10 | REPLY TO RESPONSE TO MOTION by Dft to Dft's mtn to dism/transfer (#3). (s) (Entered: 09/26/2005) |
| 09/23/2005 | | SUMMONS ISSUED (1) as to Dft. (Entered: 09/26/2005) |
| 10/07/2005 | 11 | MOTION TO DISMISS by Dft. (s)DISPO: (Entered: 10/13/2005) |
| 10/27/2005 | | MISCELLANEOUS DOCUMENT Standstill agreement. (JCM) (Entered: 10/30/2005) |
| 10/28/2005 | | MISCELLANEOUS DOCUMENT Stip of voluntary dism. (JCM) (Entered: 10/28/2005) |

| 11/03/2005 | 12 | ORDER ON STIPULATION that action is dism w/out prej. (cps dist) (Entered: 11/03/2005) |
| 12/15/2005 | 13 | ORDER Dismissing Case. Signed by Judge James C. Mahan on 11/8/05. (AXM, ) Modified on 1/12/2006 (AXM, ). (Entered: 12/15/2005) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 06/09/2008 16:52:57 | | |
| **PACER Login:** | sa0131 | **Client Code:** 2345.01 |
| **Description:** | Docket Report | **Search Criteria:** 2:05-cv-00940-JCM-PAL |
| **Billable Pages:** | 1 | **Cost:** 0.08 |

**EXHIBIT C**



ORIGINAL

1  Gary R. Goodheart, Esq.
   JONES VARGAS
2  3773 Howard Hughes Parkway
   Third Floor South
3  Las Vegas, NV 89109
   702-862-3330 (telephone)
4  702-737-7705 (facsimile)

5  David Leichtman, Esq.
   MORGAN, LEWIS & BOCKIUS LLP
6  101 Park Avenue
   New York, New York 10178
7  (212) 309-6000 (telephone)
   (212) 309-6001 (facsimile)
8  *admitted pro hac vice*

9  Attorneys for Defendant, Pearson Education, Inc.

10

11              UNITED STATES DISTRICT COURT
12                   DISTRICT OF NEVADA

13  ------------------------------------X
14                                      :    CV-S-05-0940-JCM-PAL
    BOVEE & THILL LLC, a Nevada limited liability
15  company,                            :
16                                      :
                   Plaintiff,           :
17                                      :
         VS.                            :
18                                      :
19  PEARSON EDUCATION, INC., a Delaware :
    corporation,                        :
20                                      :
                   Defendant.           :
21                                      :
22  ------------------------------------X

23              **STANDSTILL AGREEMENT**

24       THIS STANDSTILL AGREEMENT ("Standstill Agreement") is made and entered into as

25  of October ___, 2005, by and between Bovee & Thill LLC ("B&T"), and Pearson Education, Inc.

26  f/k/a Prentice-Hall, Inc. ("Pearson").

27  . . .

28  . . .

                              1

JONES VARGAS
3773 Howard Hughes Parkway · Third Floor South
Las Vegas, Nevada 89109
Tel: (702) 862-3300    Fax: (702) 737-7705

WITNESSETH:

WHEREAS, B&T and Pearson are the parties in the action captioned <u>Bovee & Thill LLC v. Pearson Education, Inc. and Prentice-Hall, Inc.</u>, Civ. No. S-05-0940 (D. Nev.) (the "Action");

WHEREAS, Pearson has moved to dismiss or transfer the Action to the United States District Court For The Southern District of New York (the "Dismissal/Transfer Motion");

WHEREAS, the parties desire to end the Action without prejudice to engage in settlement discussions to determine whether their dispute can be amicably resolved and to also resolve the dispute between the parties concerning the proper venue of the Action;

NOW, THEREFORE, in consideration of the mutual promises and covenants set forth herein and other good and valuable consideration, the parties agree as follows:

1.    <u>Dismissal Without Prejudice</u>.    Concurrently with the execution of this Standstill Agreement, the parties, through their counsel, shall execute a stipulation of dismissal without prejudice of the Action (including the Complaint filed on August 3, 2005 and the Amended Complaint filed on September 13, 2005), in the form annexed as <u>Exhibit A</u> (the "Dismissal Stipulation"), and thereafter shall cause the Dismissal Stipulation to be filed promptly in the United States District Court for the District of Nevada.

2.    <u>Settlement Period</u>.    After the Court in the District of Nevada enters the Dismissal Stipulation, the parties shall engage in settlement discussions for a period of sixty (60) days from the date of entry of the Dismissal Stipulation, during which they will attempt to resolve the dispute, which time period may be extended by mutual agreement in writing (the "Settlement Period").

3.    <u>Re-Filing Of Claims</u>.    If, at the conclusion of the Settlement Period, a settlement is not reached and B&T determines to re-file its claims against Pearson, it shall do so only in the United States District Court For The Southern District of New York, or in the Supreme Court Of The State of New York, County of New York if federal jurisdiction is determined to be lacking. While the Settlement Period is in effect, and until the complaint may be re-filed under this Paragraph, no party shall take any steps to litigate the parties' dispute, including the filing with any court of any complaints, claims, counterclaims, motions or petitions of any kind.

4.    Parties To Bear Own Costs. The parties agree that, as long as B&T complies with Paragraphs 2 and 3 hereof, each party shall bear its own costs and expenses in connection with the Dismissal/Transfer Motion.

5.    Statute Of Limitations Tolling.    During the Settlement Period, the statute of limitations of any cause of action that was brought or could have been brought in the Action shall be tolled.

6.    No Use Of This Standstill Agreement. This Standstill Agreement is not intended to be and shall not be construed or deemed an admission adverse to any of the parties hereto of (a) liability to or of any person and/or entity, (b) the commission of any act or wrong which was or could have been alleged by either party, or (c) any violation of any law or regulation. This Standstill Agreement shall not be introduced by any party in any proceeding for any purpose, other than to enforce its terms.

7.    Amendments In Writing. Any amendment or modification of any provision of this Standstill Agreement must be in writing.

8.    Governing Law and Venue. This Standstill Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, without reference to choice of laws principles. All disputes arising hereunder shall be resolved by the United States District Court for the Southern District of New York, or by the Supreme Court Of The State of New York, County of New York if federal jurisdiction is determined to be lacking.

9.    Counterparts. This Standstill Agreement may be executed in any number of counter-parts and each such counterpart shall be deemed to be an original. Any party which transmits an executed copy of this Standstill Agreement by facsimile machine or e-mail shall promptly provide the other party with a copy of this Standstill Agreement that includes an original signature.

10.    Confidentiality.    This Standstill Agreement, including its existence, and any information provided by either party to the other for the purpose of settlement discussions shall be treated with the utmost confidence and shall not be disclosed by the recipient to any other person or entity except in the following circumstances:

3

1      a)    As required by law;

2      b)    By written consent of the disclosing party; or

3      c)    As necessary for any accounting or tax purposes.

4      In addition, neither party shall seek to publicize anything about the Action during the

5 Settlement Period.

6      IN WITNESS WHEREOF, the parties have executed this Standstill Agreement as of the date

7 set forth on page one hereof.

8 ALBRIGHT, STODDARD, WARNICK &
ALBRIGHT

9

10

11 By: G. MARK ALBRIGHT, ESQ.
Nevada Bar No. 001394

12 801 South Rancho Dr., Suite D-4
Las Vegas, NV 89106

13 (702) 384-7111

14 DAVID R. MARKHAM, ESQ.
BLUMENTHAL & MARKHAM

15 2255 Calle Clara
La Jolla, CA 92037

16 (858) 551-1223

17 Attorneys for Plaintiff Bovee & Thill LLC

18

JONES VARGAS

By: GARY R. GOODHEART, ESQ.
Nevada Bar No. 001203
3773 Howard Hughes Parkway
Third Floor South
Las Vegas, NV 89109
(702) 862-3330

DAVID LEICHTMAN, ESQ.
MORGAN, LEWIS & BOCKIUS LLP
101 Park Avenue
New York, New York 10178-0060
(212) 309-6000
*admitted pro hac vice*

Attorneys for Defendants Pearson Education,
Inc. and Prentice-Hall, Inc.

19

20

21

22

23

24

25

26

27

28

4

EXHIBIT A

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

------------------------------------------------X

BOVEE & THILL LLC, a Nevada limited liability
company,

                 Plaintiff,

v.

PEARSON EDUCATION, INC., a Delaware
corporation, and PRENTICE-HALL INC., a
Delaware corporation,

                 Defendants.

------------------------------------------------X

CV-S-05-0940-JCM-PAL

## STIPULATION OF VOLUNTARY DISMISSAL AND ORDER THEREON

    Pursuant to Fed. R. Civ. P. 41(a)(1), the parties hereby stipulate that all claims which were raised or could have been raised in this action shall be dismissed without prejudice.

ALBRIGHT, STODDARD, WARNICK &
ALBRIGHT

By: G. MARK ALBRIGHT, ESQ.
Nevada Bar No. 001394
801 South Rancho Dr., Suite D-4
Las Vegas, NV 89106
(702) 384-7111

DAVID R. MARKHAM, ESQ.
BLUMENTHAL & MARKHAM
2255 Calle Clara
La Jolla, CA 92037
(858) 551-1223

Attorneys for Plaintiff Bovee & Thill LLC

JONES VARGAS

By: GARY R. GOODHEART, ESQ.
Nevada Bar No. 001203
3773 Howard Hughes Parkway
Third Floor South
Las Vegas, NV 89109
(702) 862-3330

DAVID LEICHTMAN, ESQ.
MORGAN, LEWIS & BOCKIUS LLP
101 Park Avenue
New York, New York 10178-0060
(212) 309-6000
*admitted pro hac vice*

Attorneys for Defendants Pearson Education,
Inc. and Prentice-Hall, Inc.

JONES VARGAS
3773 Howard Hughes Parkway · Third Floor South
Las Vegas, Nevada 89109
Tel: (702) 862-3330    Fax: (702) 737-7705

1    SO ORDERED.                     Dated: Nov 18 2005

2

3

4                                    UNITED STATES DISTRICT JUDGE

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

JONES VARGAS
3773 Howard Hughes Parkway · Third Floor South
Las Vegas, Nevada 89109
Tel: (702) 862-3300    Fax: (702) 737-7705

2

# ORIGINAL

_ FILED    _ RECEIVED
_ ENTERED _ SERVED ON
COUNSEL/PARTIES OF RECORD

✓ FILED      _ RECEIVED
_ ENTERED    _ SERVED ON
COUNSEL/PARTIES OF RECORD

NOV - 3 2005

CLERK US DISTRICT COURT
DISTRICT OF NEVADA
BY:          DEPUTY

EXHIBIT A

2005 OCT 27 P □ UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA

CLERK US DISTRICT COURT
DISTRICT OF NEVADA

BY          DEPUTY

---------------------------------------X

BOVEE & THILL LLC, a Nevada limited liability
company,

                          Plaintiff,

v.

PEARSON EDUCATION, INC., a Delaware
corporation, and PRENTICE-HALL INC., a
Delaware corporation,

                          Defendants.

---------------------------------------X

CV-S-05-0940-JCM-PAL

## STIPULATION OF VOLUNTARY DISMISSAL AND ORDER THEREON

Pursuant to Fed. R. Civ. P. 41(a)(1), the parties hereby stipulate that all claims which were

raised or could have been raised in this action shall be dismissed without prejudice.

ALBRIGHT, STODDARD, WARNICK &
ALBRIGHT

By: G. MARK ALBRIGHT, ESQ.
Nevada Bar No. 001394
801 South Rancho Dr., Suite D-4
Las Vegas, NV 89106
(702) 384-7111

DAVID R. MARKHAM, ESQ.
BLUMENTHAL & MARKHAM
2255 Calle Clara
La Jolla, CA 92037
(858) 551-1223

Attorneys for Plaintiff Bovee & Thill LLC

JONES VARGAS

By: GARY R. GOODHEART, ESQ.
Nevada Bar No. 001203
3773 Howard Hughes Parkway
Third Floor South
Las Vegas, NV 89109
(702) 862-3330

DAVID LEICHTMAN, ESQ.
MORGAN, LEWIS & BOCKIUS LLP
101 Park Avenue
New York, New York 10178-0060
(212) 309-6000
_admitted pro hac vice_

Attorneys for Defendants Pearson Education,
Inc. and Prentice-Hall, Inc.

JONES VARGAS
3773 Howard Hughes Parkway - Third Floor South
Las Vegas, Nevada 89109
Tel: (702) 862-3300   Fax: (702) 737-7705

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

12

SO ORDERED.

Dated: JUL 1, 2005

UNITED STATES DISTRICT JUDGE

**EXHIBIT D**

# *A*uthor Agreement

AN AGREEMENT made between <u>Courtland L. Bovee</u>, a citizen of <u>the U.S.</u>
whose address is:
2950 East Flamingo Rd. Suite B
Las Vegas, Nevada 89121
and
<u>John V. Thill</u> a citizen of the U.S.
whose address is:
2950 East Flamingo Rd. Suite B
Las Vegas, Nevada 89121
(the "Author") and

PRENTICE-HALL, INC. (the "Publisher") with offices at One Lake Street, Upper Saddle River, New Jersey 07458
on <u>April 18,1997</u>.

THE AUTHOR AND THE PUBLISHER AGREE THAT

*Grant of Rights*   1. The Author has prepared the First through Fourth Editions of a work currently entitled <u>**BUSINESS COMMUNICATION TODAY**</u> and will prepare the Fifth and any subsequent editions of such work for publication (all editions shall hereinafter be referred to collectively as the "Work"). The Author grants this Work and assigns solely and exclusively to the Publisher all rights in the Work throughout the world, in all languages for the full term of copyright and all renewals and extensions thereof. This grant includes, but is not limited to, the exclusive right to print, publish and sell the Work, under the Publisher's own name and under other imprints or trade names; to secure copyright in the Author's name which shall not affect the grant of rights to the Publisher hereunder; to use the Work as a basis for derivative works in all formats and by all media; and to license others to exercise any and all rights in and to the Work.

*Delivery of Manuscript*   2. The Author agrees to prepare a Fifth Edition of the Work, containing about <u>304,200</u> words or their equivalent, which will be delivered by the Author to the Publisher by April ___,1997. The Publisher and the Author agree that the Work will consist of approximately ~~676~~ printed book pages.
768

*Royalties*   3. The Publisher will pay the Author a royalty on sales of the Work, except as otherwise provided in Paragraph I, based on the net cash received by the Publisher from sales of the Work of 18 3/4%.

*Payments*   4. The Publisher will report on the sale of the Work by March 31 and September 30 of each year for the six-month period ending in December and June of each year respectively. With each report of sales, the Publisher will make settlement for any balance due.

*Entire Agreement*   5. Paragraphs A-X inclusive are parts of this Agreement as though placed before the signatures.

552 – 62 – 0095
U.S. Taxpayer Identification No.

395 – 52 – 7398
U.S. Taxpayer Identification No.

_Courtland L. Bovee_
Author

_John V. Thill_
Author

PRENTICE HALL, INC.

by _____

NJ32618.1

*Submission of*  A.  (i)   The Author will deliver the Fifth and any subsequent editions of the Work in hard copy form,
*Work/Changes*   double-spaced on 8 1/2" X 11" sheets on one side only, and, if the Publisher and the Author agree in
*in Proofs*      writing, in electronic or other format. The Author will retain a complete duplicate copy of the Work. The
                 Work will be of such content, form, and length as the Publisher is willing to publish.

(ii)  If the Author is unable or unwilling to deliver the Fifth Edition of the Work on time or if the Fifth
Edition of the Work is not acceptable to the Publisher, in its editorial and marketing judgment, in length,
form or content, the Publisher may elect either to (a) terminate the Agreement and recover from the Author
any and all monies paid to or on behalf of the Author in connection with the Work or (b) have the Fifth and
any subsequent editions of the Work prepared by others and charge the cost, including, without limitation,
fees and royalties, against any amounts otherwise due the Author including, without limitation, the
Author's royalties.  In such event, the Author will receive no less than 50% of the royalties that would
otherwise be due to the Author on the sale of the first such revised edition, 25% of such royalties on the
second such revised edition, and 15% of such royalties on the third such revised edition.  The Author shall
not be entitled to receive royalties on any such subsequent revised editions of the Work.  The Author may
not have the Work published elsewhere unless and until the Publisher terminates this Agreement, the
Author repays all monies paid to or on behalf of the Author in connection with the Work, and the Publisher
expressly reverts all rights in the Work to the Author.

(iii) The Author will read and correct the proofs and promptly return one set to the Publisher.  If the
Author  has not returned a corrected proof of the Work to the Publisher within a reasonable time period to
be specified by the Publisher at the time the material is sent to the Author for correction, such material
will be considered approved as is.  The Author will be responsible for the completeness and accuracy of
corrections and will bear the costs of alterations in the proofs (other than those resulting from printer's
errors) exceeding 15% of the cost of typesetting.  These costs will be deducted from payments otherwise
due the Author.

*Items Furnished*  B.   The Author is responsible for furnishing the following items as part of the Fifth and any subsequent
*by the Author*    editions of the Work: title page; preface; foreword (if any); table of contents; index; and suggestions and
                   drafts for all photographs, illustrations and other art (collectively, "art work"). The Publisher will be
                   responsible for obtaining the photographs or for the preparation of the illustrations for illustrating the Fifth
                   and any subsequent editions of the Work. As between the Publisher and the Author, the Publisher shall
                   possess the rights in and to such art work, without any restrictions, reservations or limitations whatsoever.
                   The Author shall not have any right or interest in such art work before or after termination of the
                   Agreement.

At Publisher's request, the Author will also prepare and furnish to the Publisher, within a reasonable
time from such request, any instructional aids and other ancillary materials for the Fifth and any subsequent
editions of the Work, including, up to the equivalent of five pages of content for a web site that relates to,
or is on the same or similar subject as, the Work (collectively, the "Ancillaries"). The Publisher will bear
the cost of manufacturing any Ancillaries. If the Author fails to deliver any requested Ancillaries
(including the web site content) to the Publisher within the time specified, the Publisher may have such
items prepared and charge the costs of preparation against any sums otherwise due to the Author under this
Agreement or otherwise.

The Author hereby assigns and transfers to the Publisher all of rights, title and interest in any and all art
work and any and all Ancillaries contained within the Work.

NJ32618.1

*The Author's Warranty*  C.  (i) The Author warrants that the Author (a) has full authority to make this Agreement; (b) that the Work will be original; (c) that the Fifth Edition of the Work has not been published; (d) that the Author is the sole owner of the Work and has full power and authority to copyright it (except for material in the public domain or material for which permission has been obtained from the copyright owner); (e) that the Work will not infringe any copyright, violate any property rights, or contain any scandalous, libelous, or unlawful matter or any formula or instruction that is inaccurate or injurious to the user, (f) that nothing set forth in the Settlement Agreement and General Release dated January 6, 1997 ("Settlement Agreement") or any other document limits or restricts in any way the rights granted or assigned to the Publisher hereunder; (g) no disposition of rights in the Work have been made or approved or are still effective: (h) no third party, including, without limitation, McGraw-Hill, Inc. has, or will have, the right: to dispose of any copies of the Work (including, without limitation, bound or unbound copies of the Work), except by destruction or purchase by the Publisher, or to exercise any other rights, or to license any rights, in the Work; (i) the Author is not a party to, subject to, or bound by, any judgment, injunction or decree of any agreement or court or government authority which may restrict or interfere with the performance of this Agreement; (j) the Author is the sole proprietor of the Work, none of which is in the public domain;(k) all permissions required for any copyrighted materials contained in the Work have been obtained from the copyright proprietors of such materials, all permissions fees have been paid and all permissions are assignable to the Publisher; (l) all expenses related to the Items (as defined in paragraph R) have been fully paid; (m) except for those that were the subject of the Settlement Agreement, there have not been, nor are there now, any demands, actions, suits, claims, proceedings inquiries or investigations pending or threatened with respect to the Work, at law or in equity, nor does the Author know of any facts which would provide a justifiable basis for any such demand, action, suit, claim, proceeding , investigation or inquiry; (n) other than the Settlement Agreement, there are no orders, judgments or decrees of any United States or foreign, federal, state or local court or governmental authority or agency which apply to the Work; (o) other than any notice required to be sent to third parties to obtain the Items (as defined in paragraph R), no approval or consent of any person or entity is needed which has not been obtained, and no notice to any person or entity is required to be sent, in order to execute this Agreement and perform its obligations; (p) except as specifically set forth in this Agreement, there are no obligations to pay any monies, including, without limitation, royalties in connection with the Work.

(ii) The Author will indemnify and hold harmless the Publisher against all claims, suits, costs, damages, and expenses, including reasonable attorneys' fees, that the Publisher may sustain or incur by reason of any breach or alleged breach of the foregoing warranties. The Publisher will have the right to assume and control the defense of any and all claims, and until a claim or suit has been settled or withdrawn, the Publisher may withhold any sums due the Author under this Agreement. The Author will cooperate with the Publisher and provide reasonable assistance in defending against any such claim.

(iii) Notwithstanding the foregoing sentence, except as set forth in paragraph C (iv), in the event a claim is brought by a third party against the Publisher for which the Publisher is entitled to indemnification, the Publisher agrees to be responsible for the first $5,000 in Costs. The Author shall be responsible for all Costs in excess of $5,000. As used herein, "Costs" shall mean all judgments, settlements, and costs of defense, including reasonable attorneys' fees and other costs of such claim.

(iv) The terms set forth in paragraph C(iii) shall not apply to any and all claims, suits, costs, damages, and expenses, including reasonable attorneys' fees, that the Publisher may sustain or incur by reason of any breach or alleged breach of the warranties set forth in paragraph (c) (i)(k) or the inclusion of third party materials in the Fourth Edition of the Work, all of which the Author shall be entirely responsible for as set forth in paragraph C(ii).

(v) The warranties and indemnities contained in this paragraph will survive termination of this Agreement.

*Copyrighted Material*  D.  The Author will not include in the Fifth and any subsequent editions of the Work material from other copyrighted works without both the Publisher's consent and the written consent of the owner of such copyrighted material. The Publisher will be responsible, in connection with each edition, for obtaining the

written consents and for paying permission fees in an amount not to exceed an aggregate of $7,500. The Publisher will pay on the Author's behalf the permission fees which exceed $7,500 and will recover such amounts so paid from amounts otherwise payable to the Author under this Agreement or otherwise.

*Editing*  E.    The Publisher will have the right to edit the Work for the first printing and for any reprinting, provided that the meaning of the text is not materially altered.

*Publishing Details*  F.    After acceptance of the manuscript, the Publisher will have the right to make final determinations concerning publication and marketing of the Work based upon editorial and marketing concerns, including selecting suitable styles of paper, printing, and binding, and fixing for altering the title, cover content, and presentation, and price and other terms of sale. The Publisher agrees to consult with the Author in connection with the preparation of the interior and cover design of the book version of the Work, provided that the Publisher shall have the right to make the final determinations in connection therewith. The Publisher may display the name and likeness of the Author on the Work and in any promotional materials used to market the Work.

*Author's Copies*  G.    The Publisher will furnish fifty copies of the Work to the Author without charge. Additional copies may be purchased at the Publisher's net price. The Author shall not resell the copies provided or purchased hereunder.

*Revisions*  H.    The Author agrees to revise the Work as requested by the Publisher if the Publisher considers it in the best interests of the Work. Except as expressly set forth herein, the provisions of this Agreement shall apply to each revision of the Work by the Author as though that revision were the Work being published for the first time under this Agreement. If, in the Publisher's reasonable judgment, the Author is unable or unwilling to provide a satisfactory revision within the time period established by the Publisher, the Publisher may have such revision (and any subsequent revisions) prepared and charge the cost, including, without limitation, fees or royalties, against the Author's royalties. The Publisher agrees to consult with the Author about the time period in which the revision must be provided, although the Publisher shall have the right to make the final determination in connection therewith. In the event the Publisher has a revision prepared by another or others as set forth herein, the Author will receive no less than 50% of the royalties that would otherwise be due to the Author on the sale of the first such revised edition, 25% of such royalties on the second such revised edition, and 15% of such royalties on the third such revised edition. The Author shall not be entitled to receive royalties on any such subsequent revised editions of the Work. The Publisher reserves the right to display the Author's name and the name of the person or persons who revise the Work in revised editions of the Work and in promotional materials.

*Additional Royalty Provisions*  I.    (a)    The rights granted to the Publisher under this Agreement include, but are not limited to, the following subsidiary rights: publishing in all languages; broadcasting by radio; making audio and video recordings; publishing book club editions; making foreign or other adaptations or derivative works and other versions; inclusion in anthologies; showing by motion picture or by television; syndicating, quoting, and otherwise utilizing the Work; and material based on the Work ("Subsidiary Rights"). The Publisher shall pay the Author royalties as follows on the exercise of Subsidiary Rights:

(i) If the Publisher itself exercises a Subsidiary Right in the Work, 10% of the net cash received from such use.
(ii) If the Publisher licenses any of the Subsidiary Rights, 50% of the net amount of royalty compensation received from such license.

The Publisher may itself exercise any Subsidiary Right without compensation to the Author and may license such use by others without compensation to the Author if, in the Publisher's judgment, such use may benefit sales of the Work and the Publisher does not charge for such use.

NJ32618.1

(b) On copies of book versions of the Work or sheets sold by the Publisher outside the United States, the Publisher will pay the Author a royalty of 10% of the net cash received by the Publisher from such sales.

*15 %*

(c) On copies of book versions of the Work sold by mail order or coupon advertising direct to the consumer, or by radio or television; or on copies sold by any means at a discount of 50% or greater off the single copy price, the Publisher will pay the Author a royalty of 5% of the net cash received from such sales.



(d) On copies of book versions of the Work sold through any of the Publisher's subsidiaries, or to elementary and secondary schools and school districts, the Publisher will pay the Author a royalty of 15% of the net cash received from such sales.

(e) If the Publisher packages or sells the entire Work or any part of the Work together with other products or as a segment of another product, in determining the net price of the Work for purposes of calculating royalty payments, the Publisher will allocate to the Work that portion of the proceeds of the sale which it determines to be the Work's fair value to the entire product sold.

(f) If the Publisher sells any stock of the Work at a price below manufacturing cost plus royalties, no royalties shall be paid.

(g) If the balance due the Author for any settlement period is less than fifty dollars, the Publisher will make no accounting or payment until the next settlement period at the end of which the cumulative balance has reached fifty dollars. If, after the expiration of two years following publication, the sales in any calendar year do not exceed a total of 500 copies, the royalty on such sales shall be one-half the stipulated royalty, this reduction in royalty being agreed upon to enable the Publisher to keep the Work in print as long as possible.

(h) The Publisher may deduct from any funds due the Author, under this or any other agreement between the Author and the Publisher, any sum that the Author may owe the Publisher under this or any other agreement.

(i) The Publisher will maintain relevant records with respect to any royalty statement provided to the Author under the Agreement for a two year period from the date of the statement. Royalty statements will be final and binding upon the Author unless, within two years from the date of the statement, the Author objects to such statement in a writing which states the specific objection and the basis for such objection. The Author, at the Author's expense, may review such records no more than once each calendar year at a mutually convenient time to the Author and the Publisher, during regular business hours, for the purpose of verifying the accuracy of such royalty statement. The Author agrees to keep confidential all information relating to the business affairs of the Publisher and to impose such obligation on the Author's representatives.

*Discontinuing*   J.   When the Publisher decides that the public demand for the Work no longer warrants its continued
*Manufacture*      publication in a format or medium, the Publisher may discontinue or suspend such publication, and destroy such format or medium of the Work without liability to the Author, and without prejudice to any license or other arrangement. If the Publisher ceases to publish the Work in all formats and media and does not publish the Work in any format or medium, now known or hereafter known, within six months of the Author's written request for the Publisher to publish the Work, this Agreement will terminate and the Publisher will revert to the Author all rights granted to the Publisher herein by the Author (except as to the art work prepared or obtained at the Publisher's expense, which shall remain the property of the Publisher for its own use and benefit), subject to the Publisher's right to sell-off or otherwise dispose of any inventory of the Work and to all licenses previously granted.

NJ32618.1

**Competing Publications** K. During the term of this Agreement the Author will not agree to publish or furnish to any other publisher any work on the same subject which, in the Publisher's judgment, will conflict or interfere with the sale of the Work.

**Amendments and Waivers** L. This Agreement constitutes the entire understanding of the parties relating to its subject matter and shall not be changed or amended, in whole or in part, except in a writing signed by the parties. No course of dealing between the Publisher and the Author and no delay or failure of a party in exercising any rights hereunder shall operate as a waiver of that party's rights.

**Construction, Heirs** M. This Agreement shall be construed and interpreted according to the laws of the State of New York as if executed and fully performed therein, and exclusive jurisdiction over all disputes hereunder shall be in the federal and state courts of the State of New York located in New York County. This Agreement shall be binding upon the parties hereto, their heirs, successors, assigns, and personal representatives; and references to the Author and to the Publisher shall include their heirs, successors, assigns, and personal representatives. The Author may not delegate any duty hereunder without the prior written consent of the Publisher.

**Joint Authors** N. For purposes of this Agreement, whenever the term "the Author" refers to more than one person, all such persons are collectively referred to as the "Author." Unless otherwise indicated in this Agreement, the rights and liabilities of the Author are joint and several. Further, whenever the term "the Author" refers to more than one person, those persons will be deemed to share equally in the grants, advances, royalties and expenses arising under this Agreement, until written notice to the contrary, signed by each person referred to as "Author" under this Agreement, has been actually received by the Publisher. The Publisher may exercise any or all of its rights and remedies with respect to the authors individually or collectively. Any one Author (and an alternate) may be designated under this Agreement to act on behalf of all the Authors jointly, and the Publisher may rely on the acts of the Author or the alternate so designated as representative of and binding upon all the Authors. In the absence of such designation, the Publisher may deal with any one of the Authors as the agent and representative of all, and may rely on the acts of such as representative as binding on all the Authors. Any such designation may be modified only upon written notice to the Publisher, signed by each person referred to as "Author" under this Agreement.

**Electronic Versions** O. The rights granted to the Publisher under this Agreement include (in addition to all other rights described herein) the right to prepare, publish, reproduce, sell and otherwise distribute electronic versions of the Work. As used herein, the term "electronic versions" shall mean any and all methods of copying, recording, storage, retrieval, or delivery of all or any portion of the Work, alone or in combination with other works, including in any multimedia work or electronic book; by any means now known or hereafter devised, including, without limitation, by electronic or electromagnetic means, or by analog or digital signal; whether in sequential or non-sequential order, on any and all physical media, now known or hereafter devised, including, without limitation, magnetic tape, floppy disks, CD-I, CD-ROM, laser disk, optical disk, IC card or chip, and any other human or machine readable medium, whether or not permanently affixed in such media (excluding the electronic versions specifically described in paragraph I (a)); and the broadcast and/or transmission of the foregoing by any and all means now known or hereafter devised.

The Publisher shall pay the Author royalties as follows on the electronic versions:

    (i) If the Publisher itself creates and sells that electronic version, 18% of the net cash received from such use.

    (ii) If the Publisher licenses the right to create and sell the electronic version, 50% of the net amount of royalty compensation received from such license.

P. <u>Grant</u>. The Publisher agrees to pay the Author a grant in the amount of $400,000, upon the written request of the Author, subject to the following payment schedule and terms and conditions. The terms of

this paragraph regarding the payment of the grant shall not apply to any revised, subsequent or new editions of the Work.

(i) $150,000 upon execution of this Agreement by the Author and the Publisher and the delivery of all of the Items (as defined in paragraph R) to the Publisher as set forth herein.

(ii) $100,000 on or about January 31, 1998.

(iii) $100,000 on or about June 1, 1999.

(iv) $50,000 on or about June 1, 2000.

Q. _Advance_. The Publisher agrees to pay the Author an advance in the amount of $100,000, on or about June 1, 2000. The amount of the advance shall be fully recoverable by the Publisher from any amounts otherwise due the Author. The terms of this paragraph regarding the payment of the advance shall not apply to any revised, subsequent or new editions of the Work.

R. _Delivery of Items_. Upon execution of this Agreement by the Author and the Publisher, the Author shall deliver to the Publisher, at the address or location designated by the Publisher, at the Authors expense, the items relating to the Work and to the Study Guide, Instructor's Manual, Text Banks, Videocassette, and Overhead Transparencies (collectively, the "Supplementary Materials"), all as set forth in subparagraphs (i) through (vi) below (collectively, the "Items"). The Author hereby assigns and transfers to the Publisher all of rights, title and interest in any and all Supplementary Materials (including, without limitation, a transfer of all copyrights) and any and all trademarks relating to the Work and Supplementary Materials, except for the McGraw Hill marks ("Trademarks"). The terms and conditions set forth in paragraphs B and C of this Agreement shall apply with equal force and effect to the Supplementary Materials and the Trademarks as if the words "Supplementary Materials" and "Trademarks" were substituted therein for the word "Work".

one (1)
(i) With respect to the Work: ~~two (2)~~ copies of the Work; 4/c Film RRED Negatives for the text and cover; book blues or Ekta prints (or equivalent 4/c film proof) for the text; film proofs for the cover; electronic files for the text and cover; all permission files, including but not limited to, all contracts, agreements, licenses, instruments, understandings and other legally binding arrangements with third party copyright owners whose material is included in the Work; copyright records; supplier lists; "adoption" lists and any other similar files and records; and any and all other contracts, agreements, licenses, instruments, understandings, and other legally binding arrangements arising from or related to the Work and the Supplements (including, without limitation, all unfilled customer orders, and contracts with Publishers, licensees and other third parties with respect to the exploitation or disposition of rights in and to the Work including translation rights and other subsidiary rights).

(ii) With respect to the Study Guide: ~~two (2) copies of the Study Guide~~; electronic files or camera ready copy or film for the Study Guide; all permission files, including but not limited to, all contracts, agreements, licenses, instruments, understandings and other legally binding arrangements with third party copyright owners whose material is included in the Study Guide; and copyright records.

(iii) With respect to the Instructor's Manual: ~~two (2) copies of the Instructor's Manual~~; electronic files or camera ready copy or film for the Instructor's Manual; all permission files, including but not limited to, all contracts, agreements, licenses, instruments, understandings and other legally binding arrangements with third party copyright owners whose material is included in the Instructor's Manual; and copyright records.

one (1)
(iv) With respect to the Test Banks: ~~two (2)~~ copies of each version of the computerized Text Bank and ~~one (1)~~ ~~two (2)~~ copies of the printed Test Bank; masters for each version of the computerized Test Bank and electronic files or camera ready copy or film for the printed Test Bank; all permission files, including

but not limited to, all contracts, agreements, licenses, instruments, understandings and other legally binding arrangements with third party copyright owners whose material is included in the computerized or printed Test Banks; and copyright records.

(v) With respect to the Videocassette: ~~two (2) copies of the Videocassette~~ master for the Videocassette; all permission files, including but not limited to, all contracts, agreements, licenses, instruments, understandings and other legally binding arrangements with third party copyright owners, artists, talent, and other performers whose material, image, performance, or voice is included in the Videocassette; and copyright records.

(vi) With respect to the Overhead Transparencies: ~~two (2)~~ one (1) copies of each Overhead Transparency; electronic files or camera ready copy or film for the Overhead Transparencies; all permission files, including but not limited to, all contracts, agreements, licenses, instruments, understandings and other legally binding arrangements with third party copyright owners whose material is included in the Overhead Transparencies; and copyright records.

In the event the Author shall fail to deliver any or all of the Items to the Publisher, at such location or address designated by the Publisher, upon execution of this Agreement by the Parties, the Author shall not receive, and the Publisher shall have no obligation to make the payments described in paragraph (P) (i) of both this Agreement and the Agreement dated April 18,1997 between the Author and the Publisher covering the work entitled Excellence in Business Communication ("Excellence Contract"), thereby reducing the total amount of the grant payable to the Author under this Agreement and the Excellence Contract by $300,000 ($150,000 under this Agreement and $150,000 under the Excellence Contract).

S. Other Works. The Author hereby grants to the Publisher a right of first refusal with respect to any new * works created by the Author, or each of them, whether with or without the cooperation or assistance of a third party (the "New Work(s)"). The Author shall offer each New Work to the Publisher in writing, at the earliest time reasonable, in the form of a detailed proposal. The Publisher shall have ninety days from its receipt of such written proposal to consider it and communicate to the Author the rights, if any it wishes to acquire. If the Publisher notifies the Author in writing that it desires to acquire rights to the New Work, the Author shall negotiate exclusively and in good faith with the Publisher, for a period of no less than ninety days from the Authors receipt of such written notice, commercially reasonable terms for the Publisher's acquisition thereof. In the event that, following such ninety-day period, the Publisher determines that it does not wish to acquire rights to the New Work or the Author and the Publisher are unable to agree upon the terms of an agreement, the Author may offer the New Work to a third party, subject to the terms of paragraph K of this agreement, provided that the terms made available to the third party are not more favorable to such third party than those made available to the Publisher. If the Author does desire to enter into an agreement on terms more favorable to such third party, The Author shall submit such terms to the Publisher and the Publisher shall have a right, but not an obligation, to match with respect thereto.

T. Inventory. The Publisher agrees to purchase from McGraw-Hill the Then-Current Inventory of the Fourth Edition of the Work, at their Printing Invoice Cost, provided that the Publisher shall have the right to recover the Total Cost of such purchase from any royalties otherwise due the Author. The Author acknowledges and agrees that the Publisher shall have the right to dispose of such Inventory in any manner it sees fit (including without limitation by destruction), provided that the name and mark of McGraw-Hill on the outside cover or jacket of the book version of the Fourth Edition of the Work is covered or not otherwise displayed to customers As used herein, "Then-Current Inventory" shall mean McGraw-Hill's inventory of the book version of the Fourth Edition of the Work, as of the date of execution of this Agreement, that is in saleable condition; "Printing Invoice Cost" shall mean the actual invoiced printing cost for the printing of each unit of the book version of the Work; and "Total Cost" shall mean the Printing Invoice Cost for all of the Then-Current Inventory of the Fourth Edition of the Work plus the costs associated with transporting such Inventory from a McGraw-Hill location to a location designated by the Publisher including, without limitation, shipping, handling and insurance costs.

NJ32618.1   * post-secondary education market

U. Returns. The Author shall obtain McGraw-Hill's binding agreement that McGraw-Hill will promptly destroy any and all of its inventory of the Work not purchased by the Publisher including, without limitation, any and all returns that McGraw-Hill may receive following the Publisher's purchase of the Then-Current Inventory. If McGraw-Hill refuses to enter into such binding agreement, the Author shall petition a court of competent jurisdiction to require McGraw-Hill to do so.

V. Future Orders. The Author will require McGraw-Hill to provide prompt notice to any individual, entity, potential adopter, retailer or wholesaler or other potential customer ("Customer") that inquires about obtaining a complimentary copy of the Work or any Supplementary Materials or placing an order therefor that such Customer should contact the Publisher's Faculty and Field Services at (800) 526-0485 to do so.

W. Mailing List. Upon execution of this Agreement, the Author will provide to the Publisher all of the names contained on McGraw-Hill's internal Bovee-Thill business communication update newsletter mailing list

X. Newsletter. If the Publisher, in its reasonable judgment, believes it is a productive use of resources, it will publish a newsletter about the Work no more than two time each year in form, content and length determined by the Publisher, in its discretion.

Y. Overnight Mail. If the Publisher requests that the Author deliver materials due under this Agreement via overnight carrier, the Publisher agrees to reimburse the Author such expense, upon receipt of adequate documentation evidencing such expenditure.

NJ32618.1

AMENDMENT
TO THE AGREEMENT
DATED APRIL 18, 1997

This Amendment, dated as of November 18, 2002, between PEARSON EDUCATION, INC. (the "Publisher"), publishing as Prentice Hall and Bovee & Thill, LLC (the "Author") will serve to amend the agreement between the Publisher and the Author dated April 18, 1997 (the "Agreement") for the preparation and publication of the work entitled *Business Communication Today* (the "Work").

Whereas the Publisher and the Author are parties to the Agreement for the preparation and publication of the Work; and

Now Therefore, in consideration of the mutual premises and other good and valuable consideration, the receipt of which is hereby acknowledged, the parties hereby agree and the Agreement is hereby amended as follows:

1.    Capitalized terms used herein and not otherwise defined shall have their respective meanings specified in the Agreement.

2.    Pursuant to Paragraph Q of the Agreement, the parties acknowledge and agree that the Publisher paid, and the Author received, an advance in the amount of $100,000 (the "Advance"). Notwithstanding anything set forth in the Agreement to the contrary, the Publisher hereby agrees that it will recover the Advance from amounts otherwise payable to the Author in connection with the Seventh Edition of the Work ("Seventh Edition"); *provided, however,* that if, within the three-year period immediately following the Publisher's initial publication of the Seventh Edition, the Publisher has not so recovered the total amount of the Advance, the Publisher shall have the right to recover, in addition to any other amounts recoverable by the Publisher pursuant to the Agreement, that portion of the Advance that has not been recovered from any amounts otherwise payable to the Author in connection with the Agreement (including, but not limited to, other editions of the Work) or any other agreement between the parties. The parties acknowledge and agree that in order to implement the terms of this Paragraph 2, the Publisher has repaid, and the Author has received, the sum of $53,080.95 (the "Re-stored Advance"), which constitutes the amount of the Advance recovered by the Publisher from sources other than the Seventh Edition, which Restored Advance shall be recoverable by the Publisher pursuant to the terms of this Paragraph 2.

3.    Except as set forth herein, the terms and conditions of the Agreement shall remain in full force and effect and each party hereto agree to be bound to the terms thereof.

IN WITNESS WHEREOF, the parties hereto have executed this Amendment as of the day and year first above written.

PEARSON EDUCATION, INC.

By: _____

Title: _____ ETC _____ .

BOVEE & THILL, LLC

By: _____

Title: Precident

By: _____

Title: Vice President

1076613

**EXHIBIT E**

# *A*uthor Agreement

AN AGREEMENT made between Courtland L. Bovee, a citizen of the U.S.
whose address is:
2950 East Flamingo Rd. Suite B
Las Vegas, Nevada 89121
and
John V. Thill a citizen of the U.S.
whose address is:
2950 East Flamingo Rd. Suite B
Las Vegas, Nevada 89121
(the "Author") and

PRENTICE-HALL, INC. (the "Publisher") with offices at One Lake Street, Upper Saddle River, New Jersey 07458 on April 18,1997.

### THE AUTHOR AND THE PUBLISHER AGREE THAT

*Grant of Rights*  **1.** The Author has prepared the First through Third Editions of a work currently entitled **EXCELLENCE IN BUSINESS COMMUNICATION** and will prepare the Fourth and any subsequent editions of such work for publication (all editions shall hereinafter be referred to collectively as the "Work"). The Author grants this Work and assigns solely and exclusively to the Publisher all rights in the Work throughout the world, in all languages for the full term of copyright and all renewals and extensions thereof. This grant includes, but is not limited to, the exclusive right to print, publish and sell the Work, under the Publisher's own name and under other imprints or trade names; to secure copyright in the Author's name which shall not affect the grant of rights to the Publisher hereunder; to use the Work as a basis for derivative works in all formats and by all media; and to license others to exercise any and all rights in and to the Work.

*Delivery of Manuscript*  **2.** The Author agrees to prepare a Fourth Edition of the Work, containing about 232,200 words or their equivalent, which will be delivered by the Author to the Publisher by December 15, 1997. The Publisher and the Author agree that the Work will consist of approximately 510 printed book pages.
608

*Royalties*  **3.** The Publisher will pay the Author a royalty on sales of the Work, except as otherwise provided in Paragraph I, based on the net cash received by the Publisher from sales of the Work of 18 3/4%

*Payments*  **4.** The Publisher will report on the sale of the Work by March 31 and September 30 of each year for the six-month period ending in December and June of each year respectively. With each report of sales, the Publisher will make settlement for any balance due.

*Entire Agreement*  **5.** Paragraphs A-X inclusive are parts of this Agreement as though placed before the signatures.

552 – 62 – 0095
U.S. Taxpayer Identification No.

Courtland L. Bovee
Author

395 – 52 – 7398
U.S. Taxpayer Identification No.

John V. Thill
Author

*PRENTICE HALL, INC.*

by

NJ32698-1

*Submission of Work/Changes in Proofs*

A. (i)   The Author will deliver the Fourth and any subsequent editions of the Work in hard copy form, double-spaced on 8 1/2" X 11" sheets on one side only, and, if the Publisher and the Author agree in writing, in electronic or other format. The Author will retain a complete duplicate copy of the Work. The Work will be of such content, form, and length as the Publisher is willing to publish.

(ii)   If the Author is unable or unwilling to deliver the Fourth Edition of the Work on time or if the Fourth Edition of the Work is not acceptable to the Publisher, in its editorial and marketing judgment, in length, form or content, the Publisher may elect either to (a) terminate the Agreement and recover from the Author any and all monies paid to or on behalf of the Author in connection with the Work or (b) have the Fourth and any subsequent Editions of the Work prepared by others and charge the cost, including, without limitation, fees and royalties, against any amounts otherwise due the Author including, without limitation, the Author's royalties. In such event, the Author will receive no less than 50% of the royalties that would otherwise be due to the Author on the sale of the first such revised edition, 25% of such royalties on the second such revised edition, and 15% of such royalties on the third such revised edition. The Author shall not be entitled to receive royalties on any such subsequent revised editions of the Work. The Author may not have the Work published elsewhere unless and until the Publisher terminates this Agreement, the Author repays all monies paid to or on behalf of the Author in connection with the Work, and the Publisher expressly reverts all rights in the Work to the Author.

(iii)   The Author will read and correct the proofs and promptly return one set to the Publisher. If the Author has not returned a corrected proof of the Work to the Publisher within a reasonable time period to be specified by the Publisher at the time the material is sent to the Author for correction, such material will be considered approved as is. The Author will be responsible for the completeness and accuracy of corrections and will bear the costs of alterations in the proofs (other than those resulting from printer's errors) exceeding 15% of the cost of typesetting. These costs will be deducted from payments otherwise due the Author.

*Items Furnished by the Author*

B.   The Author is responsible for furnishing the following items as part of the Fourth and any subsequent editions of the Work: title page; preface; foreword (if any); table of contents; index; and suggestions and drafts for all photographs, illustrations and other art (collectively, "art work"). The Publisher will be responsible for obtaining the photographs or for the preparation of the illustrations for illustrating the Fourth and any subsequent edition of the Work. As between the Publisher and the Author, the Publisher shall possess the rights in and to such art work, without any restrictions, reservations or limitations whatsoever. The Author shall not have any right or interest in such art work before or after termination of the Agreement.

At Publisher's request, the Author will also prepare and furnish to the Publisher, within a reasonable time from such request, any instructional aids and other ancillary materials for the Fourth and any subsequent editions of the Work, including, up to the equivalent of five pages of content for a web site that relates to, or is on the same or similar subject as, the Work (collectively, the "Ancillaries"). The Publisher will bear the cost of manufacturing any Ancillaries. If the Author fails to deliver any requested Ancillaries (including the web site content) to the Publisher within the time specified, the Publisher may have such items prepared and charge the costs of preparation against any sums otherwise due to the Author under this Agreement or otherwise.

The Author hereby assigns and transfers to the Publisher all of rights, title and interest in any and all art work and any and all Ancillaries contained within the Work.

NJ32698-1

*The Author's*
*Warranty*

C.   (i) The Author warrants that the Author (a) has full authority to make this Agreement; (b) that the Work will be original; (c) that the Fourth Edition of the Work has not been published; (d) that the Author is the sole owner of the Work and has full power and authority to copyright it (except for material in the public domain or material for which permission has been obtained from the copyright owner); (e) that the Work will not infringe any copyright, violate any property rights, or contain any scandalous, libelous, or unlawful matter or any formula or instruction that is inaccurate or injurious to the user, (f) that nothing set forth in the Settlement Agreement and General Release dated January 6, 1997 ("Settlement Agreement") or any other document limits or restricts in any way the rights granted or assigned to the Publisher hereunder; (g) no disposition of rights in the Work have been made or approved or are still effective: (h) no third party, including, without limitation, McGraw-Hill, Inc. has, or will have, the right: to dispose of any copies of the Work (including, without limitation, bound or unbound copies of the Work), except by destruction or purchase by the Publisher, or to exercise any other rights, or to license any rights, in the Work; (i) the Author is not a party to, subject to, or bound by, any judgment, injunction or decree of any agreement or court or government authority which may restrict or interfere with the performance of this Agreement; (j) the Author is the sole proprietor of the Work, none of which is in the public domain; (k) all permissions required for any copyrighted materials contained in the Work have been obtained from the copyright proprietors of such materials, all permissions fees have been paid and all permissions are assignable to the Publisher; (l) all expenses related to the Items (as defined in paragraph R) have been fully paid; (m) except for those that were the subject of the Settlement Agreement, there have not been, nor are there now, any demands, actions, suits, claims, proceedings inquiries or investigations pending or threatened with respect to the Work, at law or in equity, nor does the Author know of any facts which would provide a justifiable basis for any such demand, action, suit, claim, proceeding , investigation or inquiry; (n) other than the Settlement Agreement, there are no orders, judgments or decrees of any United States or foreign, federal, state or local court or governmental authority or agency which apply to the Work; (o) other than any notice required to be sent to third parties to obtain the Items (as defined in paragraph R), no approval or consent of any person or entity is needed which has not been obtained, and no notice to any person or entity is required to be sent, in order to execute this Agreement and perform its obligations; (p) except as specifically set forth in this Agreement, there are no obligations to pay any monies, including, without limitation, royalties in connection with the Work.

(ii) The Author will indemnify and hold harmless the Publisher against all claims, suits, costs, damages, and expenses, including reasonable attorneys' fees, that the Publisher may sustain or incur by reason of any breach or alleged breach of the foregoing warranties. The Publisher will have the right to assume and control the defense of any and all claims, and until a claim or suit has been settled or withdrawn, the Publisher may withhold any sums due the Author under this Agreement. The Author will cooperate with the Publisher and provide reasonable assistance in defending against any such claim.

(iii) Notwithstanding the foregoing sentence, except as set forth in paragraph C (iv), in the event a claim is brought by a third party against the Publisher for which the Publisher is entitled to indemnification, the Publisher agrees to be responsible for the first $5,000 in Costs. The Author shall be responsible for all Costs in excess of $5,000. As used herein, "Costs" shall mean all judgments, settlements, and costs of defense, including reasonable attorneys' fees and other costs of such claim.

(iv) The terms set forth in paragraph C(iii) shall not apply to any and all claims, suits, costs, damages, and expenses, including reasonable attorneys' fees, that the Publisher may sustain or incur by reason of any breach or alleged breach of the warranties set forth in paragraph (c) (i)(k) or the inclusion of third party materials in the Third Edition of the Work, all of which the Author shall be entirely responsible for as set forth in paragraph C(ii).

(v) The warranties and indemnities contained in this paragraph will survive termination of this Agreement.

*Copyrighted*      D.   The Author will not include in the Fourth and any subsequent editions of the Work material from other
*Material*         copyrighted works without both the Publisher's consent and the written consent of the owner of such copyrighted material. The Publisher will be responsible, in connection with each edition, for obtaining the

written consents and for paying permission fees in an amount not to exceed an aggregate of $7,500. The Publisher will pay on the Author's behalf the permission fees which exceed $7,500 and will recover such amounts so paid from amounts otherwise payable to the Author under this Agreement or otherwise.

*Editing*    E.    The Publisher will have the right to edit the Work for the first printing and for any reprinting, provided that the meaning of the text is not materially altered.

*Publishing Details*    F.    After acceptance of the manuscript, the Publisher will have the right to make final determinations concerning publication and marketing of the Work based upon editorial and marketing concerns, including selecting suitable styles of paper, printing, and binding, and fixing for altering the title, cover content, and presentation, and price and other terms of sale. The Publisher agrees to consult with the Author in connection with the preparation of the interior and cover design of the book version of the Work, provided that the Publisher shall have the right to make the final determinations in connection therewith. The Publisher may display the name and likeness of the Author on the Work and in any promotional materials used to market the Work.

*Author's Copies*    G.    The Publisher will furnish fifty copies of the Work to the Author without charge. Additional copies may be purchased at the Publisher's net price. The Author shall not resell the copies provided or purchased hereunder.

*Revisions*    H.    The Author agrees to revise the Work as requested by the Publisher if the Publisher considers it in the best interests of the Work. Except as expressly set forth herein, the provisions of this Agreement shall apply to each revision of the Work by the Author as though that revision were the Work being published for the first time under this Agreement. If, in the Publisher's reasonable judgment, the Author is unable or unwilling to provide a satisfactory revision within the time period established by the Publisher, the Publisher may have such revision (and any subsequent revisions) prepared and charge the cost, including, without limitation, fees or royalties, against the Author's royalties. The Publisher agrees to consult with the Author about the time period in which the revision must be provided, although the Publisher shall have the right to make the final determination in connection therewith. In the event the Publisher has a revision prepared by another or others as set forth herein, the Author will receive no less than 50% of the royalties that would otherwise be due to the Author on the sale of the first such revised edition, 25% of such royalties on the second such revised edition, and 15% of such royalties on the third such revised edition. The Author shall not be entitled to receive royalties on any such subsequent revised editions of the Work. The Publisher reserves the right to display the Author's name and the name of the person or persons who revise the Work in revised editions of the Work and in promotional materials.

*Additional Royalty Provisions*    I.    (a)    The rights granted to the Publisher under this Agreement include, but are not limited to, the following subsidiary rights: publishing in all languages; broadcasting by radio; making audio and video recordings; publishing book club editions; making foreign or other adaptations or derivative works and other versions; inclusion in anthologies; showing by motion picture or by television; syndicating, quoting, and otherwise utilizing the Work; and material based on the Work ("Subsidiary Rights"). The Publisher shall pay the Author royalties as follows on the exercise of Subsidiary Rights:

(i) If the Publisher itself exercises a Subsidiary Right in the Work, 10% of the net cash received from such use.
(ii) If the Publisher licenses any of the Subsidiary Rights, 50% of the net amount of royalty compensation received from such license.

The Publisher may itself exercise any Subsidiary Right without compensation to the Author and may license such use by others without compensation to the Author if, in the Publisher's judgment, such use may benefit sales of the Work and the Publisher does not charge for such use.

NJ32698-1

(b) On copies of book versions of the Work or sheets sold by the Publisher outside the United States, the Publisher will pay the Author a royalty of 10% of the net cash received by the Publisher from such sales.

15%

(c) On copies of book versions of the Work sold by mail order or coupon advertising direct to the consumer, or by radio or television; or on copies sold by any means at a discount of 50% or greater off the single copy price, the Publisher will pay the Author a royalty of 5% of the net cash received from such sales.

(d) On copies of book versions of the Work sold through any of the Publisher's subsidiaries, or to elementary and secondary schools and school districts, the Publisher will pay the Author a royalty of 15% of the net cash received from such sales.

(e) If the Publisher packages or sells the entire Work or any part of the Work together with other products or as a segment of another product, in determining the net price of the Work for purposes of calculating royalty payments, the Publisher will allocate to the Work that portion of the proceeds of the sale which it determines to be the Work's fair value to the entire product sold.

(f) If the Publisher sells any stock of the Work at a price below manufacturing cost plus royalties, no royalties shall be paid.

(g) If the balance due the Author for any settlement period is less than fifty dollars, the Publisher will make no accounting or payment until the next settlement period at the end of which the cumulative balance has reached fifty dollars. If, after the expiration of two years following publication, the sales in any calendar year do not exceed a total of 500 copies, the royalty on such sales shall be one-half the stipulated royalty, this reduction in royalty being agreed upon to enable the Publisher to keep the Work in print as long as possible.

(h) The Publisher may deduct from any funds due the Author, under this or any other agreement between the Author and the Publisher, any sum that the Author may owe the Publisher under this or any other agreement.

(i) The Publisher will maintain relevant records with respect to any royalty statement provided to the Author under the Agreement for a two year period from the date of the statement. Royalty statements will be final and binding upon the Author unless, within two years from the date of the statement, the Author objects to such statement in a writing which states the specific objection and the basis for such objection. The Author, at the Author's expense, may review such records no more than once each calendar year at a mutually convenient time to the Author and the Publisher, during regular business hours, for the purpose of verifying the accuracy of such royalty statement. The Author agrees to keep confidential all information relating to the business affairs of the Publisher and to impose such obligation on the Author's representatives.

*Discontinuing Manufacture*  J.   When the Publisher decides that the public demand for the Work no longer warrants its continued publication in a format or medium, the Publisher may discontinue or suspend such publication, and destroy such format or medium of the Work without liability to the Author, and without prejudice to any license or other arrangement. If the Publisher ceases to publish the Work in all formats and media and does not publish the Work in any format or medium, now known or hereafter known, within six months of the Author's written request for the Publisher to publish the Work, this Agreement will terminate and the Publisher will revert to the Author all rights granted to the Publisher herein by the Author (except as to the art work prepared or obtained at the Publisher's expense, which shall remain the property of the Publisher for its own use and benefit), subject to the Publisher's right to sell-off or otherwise dispose of any inventory of the Work and to all licenses previously granted.

NJ32698-1

**Competing Publications**  K.  During the term of this Agreement the Author will not agree to publish or furnish to any other publisher any work on the same subject which, in the Publisher's judgment, will conflict or interfere with the sale of the Work.

**Amendments and Waivers**  L.  This Agreement constitutes the entire understanding of the parties relating to its subject matter and shall not be changed or amended, in whole or in part, except in a writing signed by the parties.  No course   of dealing between the Publisher and the Author and no delay or failure of a party in exercising any rights   hereunder shall operate as a waiver of that party's rights.

**Construction, Heirs**  M.  This Agreement shall be construed and interpreted according to the laws of the State of New York as if executed and fully performed therein, and exclusive jurisdiction over all disputes hereunder shall be in the federal and state courts of the State of New York located in New York County.  This Agreement shall be binding upon the parties hereto, their heirs, successors, assigns, and personal representatives; and references to the Author and to the Publisher shall include their heirs, successors, assigns, and personal representatives.  The Author may not delegate any duty hereunder without the prior written consent of the Publisher.

**Joint Authors**  N.  For purposes of this Agreement, whenever the term "the Author" refers to more than one person, all such persons are collectively referred to as the "Author." Unless otherwise indicated in this Agreement, the rights and liabilities of the Author are joint and several.  Further, whenever the term "the Author" refers to more than one person, those persons will be deemed to share equally in the grants, advances, royalties and expenses arising under this Agreement, until written notice to the contrary, signed by each person referred to as "Author" under this Agreement, has been actually received by the Publisher.  The Publisher may exercise any or all of its rights and remedies with respect to the authors individually or collectively.  Any one Author (and an alternate) may be designated under this Agreement to act on behalf of all the Authors jointly, and the Publisher may rely on the acts of the Author or the alternate so designated as representative of and binding upon all the Authors.  In the absence of such designation, the Publisher may deal with any one of the Authors as the agent and representative of all, and may rely on the acts of such as representative as binding on all the Authors.  Any such designation may be modified only upon written notice to the Publisher, signed by each person referred to as "Author" under this Agreement.

**Electronic Versions**  O.  The rights granted to the Publisher under this Agreement include (in addition to all other rights described herein) the right to prepare, publish, reproduce, sell and otherwise distribute electronic versions of the Work.  As used herein, the term "electronic versions" shall mean any and all methods of copying, recording, storage, retrieval, or delivery of all or any portion of the Work, alone or in combination with other works, including in any multimedia work or electronic book; by any means now known or hereafter devised, including, without limitation, by electronic or electromagnetic means, or by analog or digital signal; whether in sequential or non-sequential order, on any and all physical media, now known or hereafter devised including, without limitation, magnetic tape, floppy   disks, CD-I, CD-ROM, laser disk, optical disk, IC card or chip, and any other human or machine readable medium, whether or not permanently affixed in such media (excluding the electronic versions specifically described in paragraph I (a)); and the broadcast and/or transmission of the foregoing by any and all means now known or hereafter devised.

The Publisher shall pay the Author royalties as follows on the electronic versions:

18%

(i)  If the Publisher itself creates and sells that electronic version, ~~15%~~ of the net cash received from such use.

(ii)  If the Publisher licenses the right to create and sell the electronic version, 50% of the net amount of royalty compensation received from such license.

P.  Grant.  The Publisher agrees to pay the Author a grant in the amount of $400,000, upon the written request of the Author, subject to the following payment schedule and terms and conditions.  The terms of

NJ32.698-1

this paragraph regarding the payment of the grant shall not apply to any revised, subsequent or new editions of the Work.

(i) $150,000 upon execution of this Agreement by the Author and the Publisher and the delivery of all of the Items (as defined in paragraph R) to the Publisher as set forth herein.

(ii) $100,000 on or about January 31, 1998.

(iii) $100,000 on or about June 1, 1999.

(iv) $50,000 on or about June 1, 2000.

Q.  Advance.  The Publisher agrees to pay the Author an advance in the amount of $100,000, on or about June 1, 2000. The amount of the advance shall be fully recoverable by the Publisher from any amounts otherwise due the Author. The terms of this paragraph regarding the payment of the advance shall not apply to any revised, subsequent or new editions of the Work.

R.  Delivery of Items.  Upon execution of this Agreement by the Author and the Publisher, the Author shall deliver to the Publisher, at the address or location designated by the Publisher, at the Authors expense, the items relating to the Work and to the Study Guide, Instructor's Manual, Text Banks, and Overhead Transparencies (collectively, the "Supplementary Materials"), all as set forth in subparagraphs (i) through (v) below (collectively, the "Items"). The Author hereby assigns and transfers to the Publisher all of rights, title and interest in any and all Supplementary Materials (including, without limitation, a transfer of all copyrights) and any and all trademarks relating to the Work and Supplementary Materials, except for the McGraw Hill marks ("Trademarks"). The terms and conditions set forth in paragraphs B and C of this Agreement shall apply with equal force and effect to the Supplementary Materials and the Trademarks as if the words "Supplementary Materials" and "Trademarks" were substituted therein for the word "Work".

(i) With respect to the Work: two (2) <ins>one (1)</ins> copies of the Work; 4/c Film RRED Negatives for the text and cover; book blues or Ekta prints (or equivalent 4/c film proof) for the text; film proofs for the cover; electronic files for the text and cover; all permission files, including but not limited to, all contracts, agreements, licenses, instruments, understandings and other legally binding arrangements with third party copyright owners whose material is included in the Work; copyright records; supplier lists; "adoption" lists and any other similar files and records; and any and all other contracts, agreements, licenses, instruments, understandings, and other legally binding arrangements arising from or related to the Work and the Supplements (including, without limitation, all unfilled customer orders, and contracts with Publishers, licensees and other third parties with respect to the exploitation or disposition of rights in and to the Work including translation rights and other subsidiary rights).

(ii)  With respect to the Study Guide: two (2) copies of the Study Guide; electronic files or camera ready copy or film for the Study Guide; all permission files, including but not limited to, all contracts, agreements, licenses, instruments, understandings and other legally binding arrangements with third party copyright owners whose material is included in the Study Guide; and copyright records.

(iii) With respect to the Instructor's Manual: two (2) copies of the Instructor's Manual; electronic files or camera ready copy or film for the Instructor's Manual; all permission files, including but not limited to, all contracts, agreements, licenses, instruments, understandings and other legally binding arrangements with third party copyright owners whose material is included in the Instructor's Manual; and copyright records.

(iv) With respect to the Test Banks: two (2) <ins>one (1)</ins> copies of each version of the computerized Text Bank and two (2) copies of the printed Test Bank; masters for each version of the computerized Text Bank and electronic files or camera ready copy or film for the printed Test Bank; all permission files, including

but not limited to, all contracts, agreements, licenses, instruments, understandings and other legally binding arrangements with third party copyright owners whose material is included in the computerized or printed Test Banks; and copyright records.

(v) With respect to the Overhead Transparencies: ~~two (2) copies of each Overhead Transparency;~~ electronic files or camera ready copy or film for the Overhead Transparencies; all permission files, including but not limited to, all contracts, agreements, licenses, instruments, understandings and other legally binding arrangements with third party copyright owners whose material is included in the Overhead Transparencies; and copyright records.

In the event the Author shall fail to deliver any or all of the Items to the Publisher, at such location or address designated by the Publisher, upon execution of this Agreement by the Parties, the Author shall not receive, and the Publisher shall have no obligation to make the payments described in paragraph (P) (i) of both this Agreement and the Agreement dated April 18, 1997 between the Author and the Publisher covering the work entitled Business Communication Today ("Business Communication Contract"), thereby reducing the total amount of the grant payable to the Author under this Agreement and the Business Communication Contract by $300,000 ($150,000 under this Agreement and $150,000 under the Business Communication Contract).

S. Other Works. The Author hereby grants to the Publisher a right of first refusal with respect to any new * works created by the Author, or each of them, whether with or without the cooperation or assistance of a third party (the "New Work(s)"). The Author shall offer each New Work to the Publisher in writing, at the earliest time reasonable, in the form of a detailed proposal. The Publisher shall have ninety days from its receipt of such written proposal to consider it and communicate to the Author the rights, if any it wishes to acquire. If the Publisher notifies the Author in writing that it desires to acquire rights to the New Work, the Author shall negotiate exclusively and in good faith with the Publisher, for a period of no less than ninety days from the Authors receipt of such written notice, commercially reasonable terms for the Publisher's acquisition thereof. In the event that, following such ninety-day period, the Publisher determines that it does not wish to acquire rights to the New Work or the Author and the Publisher are unable to agree upon the terms of an agreement, the Author may offer the New Work to a third party, subject to the terms of paragraph K of this agreement, provided that the terms made available to the third party are not more favorable to such third party than those made available to the Publisher. If the Author does desire to enter into an agreement on terms more favorable to such third party, The Author shall submit such terms to the Publisher and the Publisher shall have a right, but not an obligation, to match with respect thereto.

T. Inventory. The Publisher agrees to purchase from McGraw-Hill the Then-Current Inventory of the Third Edition of the Work, at their Printing Invoice Cost, provided that the Publisher shall have the right to recover the Total Cost of such purchase from any royalties otherwise due the Author. The Author acknowledges and agrees that the Publisher shall have the right to dispose of such Inventory in any manner it sees fit (including without limitation by destruction), provided that the name and mark of McGraw-Hill on the outside cover or jacket of the book version of the Third Edition of the Work is covered or not otherwise displayed to customers As used herein, "Then-Current Inventory" shall mean McGraw-Hill's inventory of the book version of the Third Edition of the Work, as of the date of execution of this Agreement, that is in saleable condition; "Printing Invoice Cost" shall mean the actual invoiced printing cost for the printing of each unit of the book version of the Work; and "Total Cost" shall mean the Printing Invoice Cost for all of the Then-Current Inventory of the Third Edition of the Work plus the costs associated with transporting such Inventory from a McGraw-Hill location to a location designated by the Publisher including, without limitation, shipping, handling and insurance costs.

U. Returns. The Author shall obtain McGraw-Hill's binding agreement that McGraw-Hill will promptly destroy any and all of its inventory of the Work not purchased by the Publisher including, without limitation, any and all returns that McGraw-Hill may receive following the Publisher's purchase of the

NJ32698-1      * post-secondary education market

APR.18.1997   1:08PM   PH BUSINESS PUB 201 236 7172                    NO.386   P.19

Then-Current Inventory. If McGraw-Hill refuses to enter into such binding agreement, the Author shall petition a court of competent jurisdiction to require McGraw-Hill to do so.

V. Future Orders. The Author will require McGraw-Hill to provide prompt notice to any individual, entity, potential adopter, retailer or wholesaler or other potential customer ("Customer") that inquires about obtaining a complimentary copy of the Work or any Supplementary Materials or placing an order therefor that such Customer should contact the Publisher's Faculty and Field Services at (800) 526-0485 to do so.

W. Mailing List. Upon execution of this Agreement, the Author will provide to the Publisher all of the names contained on McGraw-Hill's internal Bovee-Thill business communication update newsletter mailing list

X. Newsletter. If the Publisher, in its reasonable judgment, believes it is a productive use of resources, it will publish a newsletter about the Work no more than two time each year in form, content and length determined by the Publisher, in its discretion.

Y. Overnight Mail. If the Publisher requests that the Author deliver materials due under this Agreement via overnight carrier, the Publisher agrees to reimburse the Author such expense, upon receipt of adequate documentation evidencing such expenditure.

**EXHIBIT F**

# *A*uthor Agreement

AN AGREEMENT made between **Courtland L. Bovee**, a citizen of **the U.S.**
whose address is:
2950 East Flamingo Rd. Suite B
Las Vegas, Nevada 89121
and
**John V. Thill** a citizen of the U.S.
whose address is:
2950 East Flamingo Rd. Suite B
Las Vegas, Nevada 89121
(the "Author") and

PRENTICE-HALL, INC. (the "Publisher") with offices at One Lake Street, Upper Saddle River, New Jersey 07458
on July 25, 1997.

### THE AUTHOR AND THE PUBLISHER AGREE THAT

*Grant of Rights*

1. The First through Eighth Editions of a work currently entitled **BUSINESS TODAY** have been prepared and the Authors will prepare the Ninth and any subsequent editions of such work for publication (all editions shall hereinafter be referred to collectively as the "Work" ). The Author grants this Work and assigns solely and exclusively to the Publisher all rights in the Work throughout the world, in all languages for the full term of copyright and all renewals and extensions thereof. This grant includes, but is not limited to, the exclusive right to print, publish and sell the Work, under the Publisher's own name and under other imprints or trade names; to secure copyright in the Author's name which shall not affect the grant of rights to the Publisher hereunder; to use the Work as a basis for derivative works in all formats and by all media; and to license others to exercise any and all rights in and to the Work.

*Delivery of Manuscript*

2. The Author agrees to prepare a Ninth Edition of the Work, containing about **360,000** words or their equivalent, which will be delivered by the Author to the Publisher by **October 1, 1998**. The Publisher and the Author agree that the Work will consist of approximately 800 printed book pages.

*Royalties*

3. The Publisher will pay the Author a royalty on sales of the Work, except as otherwise provided in Paragraph I, based on the net cash received by the Publisher from sales of the Work of 17% unless sales of a particular edition of the Work exceed 45,000 copies within the first copyright year, in which event, the royalty rate on all copies of such edition of the Work sold pursuant to this paragraph 3 shall be 18.5%. As used herein, "the first copyright year" shall commence as of the date of first distribution of each edition of the Work and shall continue until December 31st of the copyright year of such edition of the Work.

*Payments*

4. The Publisher will report on the sale of the Work by March 31 and September 30 of each year for the six-month period ending in December and June of each year respectively. With each report of sales, the Publisher will make settlement for any balance due.

*Entire Agreement*

5. Paragraphs A-U inclusive are parts of this Agreement as though placed before the signatures.

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
_____
U.S. Taxpayer Identification No.

*Courtland Bovee*
_____
Author

395-52-789 ✗

U.S. Taxpayer Identification No.

Author

PRENTICE HALL, INC.

by

**Submission of Work Changes in Proofs**

*A.* (i)    The Author will deliver the Ninth and any subsequent editions of the Work in hard copy form, double-spaced on 8 1/2" X 11" sheets on one side only, and, if the Publisher and the Author agree in writing, in electronic or other format. The Author will retain a complete duplicate copy of the Work. The Work will be of such content, form, and length as the Publisher is willing to publish.

(ii)  If the Author is unable or unwilling to deliver the Ninth Edition of the Work on time or if the Ninth Edition of the Work is not acceptable to the Publisher, in its editorial and marketing judgment, in length, form or content, the Publisher may elect either to (a) terminate the Agreement and recover from the Author any and all monies paid to or on behalf of the Author in connection with the Work or (b) have the Ninth and any subsequent editions of the Work prepared by others and charge the cost, including, without limitation, fees and royalties, against any amounts otherwise due the Author including, without limitation, the Author's royalties. The Author may not have the Work published elsewhere unless and until the Publisher terminates this Agreement, the Author repays all monies paid to or on behalf of the Author in connection with the Work, and the Publisher expressly reverts all rights in the Work to the Author.

(iii) The Author will read and correct the proofs and promptly return one set to the Publisher. If the Author has not returned a corrected proof of the Work to the Publisher within a reasonable time period to be specified by the Publisher at the time the material is sent to the Author for correction, such material will be considered approved as is. The Author will be responsible for the completeness and accuracy of corrections and will bear the costs of alterations in the proofs (other than those resulting from printer's errors) exceeding 15% of the cost of typesetting. These costs will be deducted from payments otherwise due the Author.

**Items Furnished by the Author**

*B.*    The Author is responsible for furnishing the following items as part of the Ninth and any subsequent editions of the Work: title page; preface; foreword (if any); table of contents; index; and suggestions and drafts for all photographs, illustrations and other art (collectively, "art work"). The Publisher will be responsible for obtaining the photographs or for the preparation of the illustrations for illustrating the Ninth and any subsequent edition of the Work. As between the Publisher and the Author, the Publisher shall possess the rights in and to such art work, without any restrictions, reservations or limitations whatsoever. The Author shall not have any right or interest in such art work before or after termination of the Agreement.

At Publisher's request, the Author will also prepare and furnish to the Publisher, within a reasonable time from such request, any instructional aids and other ancillary materials for the Ninth and any subsequent editions of the Work, including, to the equivalent of five pages of content for a web site that relates to, or is on the same or similar subject as, the Work (collectively, the "Ancillaries"). The Publisher will bear the cost of manufacturing any Ancillaries. If the Author fails to deliver any requested Ancillaries (including the web site content) to the Publisher within the time specified, the Publisher may have such items prepared and charge the costs of preparation against any sums otherwise due the Author under this Agreement or otherwise.

The Author hereby assigns and transfers to the Publisher all of rights, title and interest in any and all art work and any and all Ancillaries contained within the Work.

NJ33966.1

*The Author's Warranty*

C. (I) The Author warrants that the Author (a) has full authority to make this Agreement;(b) that the Work will be original;(c) that the Ninth edition of the Work has not been published;(d) that the Author is the sole owner of the Work and has full power and authority to copyright it (except for material in the public domain or material for which permission has been obtained from the copyright owner);(e) That David Rachman and Michael Mescon, and each of them, have relinquished any rights they or each of them, may have in the work to the Author pursuant to a separate written agreement and that the Author is solely responsible for any compensation to Messrs. Rachman and Mescon, if any (f) that the Work will not infringe any copyright, violate any property rights, or contain any scandalous, libelous, or unlawful matter or any formula or instruction that is inaccurate or injurious to the user, (g). That nothing set forth in the Settlement Agreement and General Release dated January 6, 1997 ("Settlement Agreement") or any other document limits or restricts in any way the rights granted or assigned to the Publisher hereunder; (h) no disposition of rights in the Work have been made or approved or are still effective;(i) no third party, including, without limitation, Mcgraw Hill, Inc. has, or will have, the right to dispose of any copies of the Work (including, without limitation, bound or unbound copies of the work), except by destruction or purchase by Publisher, or to exercise any other rights, or to license any rights, in the work; (j) the Author is not a part to, subject to. or bound by, any judgment, injunction or decree of any agreement or court or government authority which may restrict or interfere with the performance of this Agreement; (k) the author is the sole proprietor of the Work, non of which is in the public domain, (l) all permissions required for any copyrighted materials contained in the Work have been obtained from the copyright proprietors of such material, all permissions fees have been paid and all permissions are assignable to the Publisher; (m) all expenses related to the Items (as defined in paragraph P) have been fully paid; (n) except fro those that were the subject of the Settlement Agreement, there have not been, nor are there now, any demands, actions, suits, claims, proceedings inquiries or investigations pending or threatened with respect to the Work, at law or in equity, nor does the Author know of any facts which would provide a justifiable basis for any such demand, action, suit, claim, proceeding, investigation or inquiry; (o) other than the Settlement Agreement, there are no orders, judgments or decrees of any United States or foreign, federal, state or local court or governmental authority or agency which apply to the Work; (p) other than any notice required to be sent to third parties to obtain the Items (as defined in paragraph P), no approval or consent of any person or entity is needed which has not been obtained, and no notice to any person or entity is required to be sent, in order to execute this Agreement and perform its obligations; (q) except as specifically set forth in the Agreement, there are no obligations to pay any monies, including, without limitation, royalties in connection with the Work.

(ii) The Author will indemnify and hold harmless the Publisher against all claims, suits, costs, damages, and expenses, including reasonable attorneys' fees, that the Publisher may sustain or incur by reason of any breach or alleged breach of the foregoing warranties. The Publisher will have the right to assume and control the defense of any such claim, and until such claim or suit has been settled or withdrawn, the Publisher may withhold any sums due the Author under this Agreement. The Author will cooperate with the Publisher and provide reasonable assistance in defending against any such claim.

(iii) Notwithstanding the foregoing sentence, except as set forth in paragraph C (iv), in the event a claim in brought by a third party against the Publisher for which the Publisher is entitled to indemnification, the Publisher agrees to be responsible for the first $5,000 in Costs. The Author shall be responsible for all Costs in excess of $5,000. As used herein, "Costs" shall mean all judgments, settlements, and costs of defense, including reasonable attorney' fees and other costs of such claim.

(iv) The terms set forth in paragraph c(iii) shall not apply to any and all claims, suits, costs, damages, and expenses, including reasonable attorney' feed, that the Publisher may sustain or incur by reason of any breach or alleged breach of the warranties set forth in paragraph (c) (i) (l) or the inclusion of third party

materials in the Ninth Edition of the Work, all of which the Author shall be entirely responsible for as set forth in paragraph C(ii).

(v) The warranties and indemnities contained in this paragraph will survive termination of this agreement.

*Copyrighted Material* D.  The Author will not include in the Ninth and any subsequent edition of the Work material from other copyrighted works without both the Publisher's consent and the written consent of the owner of such copyrighted material. The Publisher will be responsible, in connection with each edition, for obtaining the written consents and paying permission fees in an amount not to exceed an aggregate of $7,500. The Publisher will pay on the author's behalf the permission fees which exceed $7,500 and will recover such amounts so paid from amounts otherwise payable to the Author under this agreement or otherwise.

*Editing* E.  The Publisher will have the right to edit the Work for the first printing and for any reprinting, provided that the meaning of the text is not materially altered.

*Publishing Details* F.  After acceptance of the manuscript, the Publisher will have the right to make final determinations concerning publication and marketing of the Work based upon editorial and marketing concerns, including selecting suitable styles of paper, printing, and binding, and fixing for altering the title, cover content, and presentation, and price and other terms of sale. The Publisher agrees to consult with the Author in connection with the preparation of the interior and cover design of the book version of the Work, provided that the Publisher shall have the right to make the final determinations in connection therewith. The Publisher may display the name and likeness of the Author on the Work and in any promotional materials used to market the Work.

*Author's Copies* G.  The Publisher will furnish fifty copies of the Work to the Author without charge. Additional copies may be purchased at the Publisher's net price. The Author shall not resell the copies provided or purchased hereunder.

*Revisions* H.  The Author agrees to revise the Work as requested by the Publisher if the Publisher considers it in the best interests of the Work. Except as expressly set forth herein, the provisions of this Agreement shall apply to each revision of the Work by the Author as though that revision were the Work being published for the first time under this Agreement. If, in the Publisher's reasonable judgment, the Author is unable or unwilling to provide a satisfactory revision within the time period established by the Publisher, the Publisher may have such revision (and any subsequent revisions) prepared and charge the cost, including, without limitation, fees or royalties, against the Author's royalties. The Publisher reserves the right to display the Author's name and the name of the person or persons who revise the Work in revised editions of the Work and in promotional materials.

*Additional Royalty Provisions* I.  (a)  The rights granted to the Publisher under this Agreement include, but are not limited to, the following subsidiary rights: publishing in all languages, broadcasting by radio; making audio and video recordings; publishing book club editions; making foreign or other adaptations or derivative works and other versions; inclusion in anthologies; showing by motion picture or by television; syndicating, quoting, and otherwise utilizing the Work ;and material based on the Work ("Subsidiary Rights"). The Publisher shall pay the Author royalties as follows on the exercise of Subsidiary Rights:

(i)  If the Publisher itself exercises a Subsidiary Right to the Work, 10% of the net cash received from such use.

(ii)  If the Publisher licenses any of the Subsidiary Rights, 50% of the net amount of royalty compensation received from such license.

The publisher may itself exercise any Subsidiary Right without compensation to the Author and may license such use by others without compensation to the Author if, in the Publisher's judgment, such use may benefit sales of the Work and the Publisher does not change for such use.

    (b) On copies of book versions of the Work or sheets sold by the Publisher outside the United States, the Publisher will pay the Author a royalty of 10% of the net cash received by the Publisher from such sales.

    (c) 15% on copies of book versions of the Work sold by mail order or coupon advertising direct to the consumer, or by radio or television on copies sold by any means at a discount of 50% or greater off the single copy price; or on copies sold through any of the Publisher's subsidiaries, or to elementary and secondary schools and school districts, the Publisher will pay the Author a royalty of 5% of the net cash received from such sales.

    (d) On copies of the book versions of the Work sold through any of the Publisher's subsidiaries or to elementary and secondary schools and school districts, the Publisher will pay the Author a royalty of 15% of the net cash received from such sales.

    (e) If the Publisher packages or sells the entire Work or any part of the Work together with other products or as a segment of another product, in determining the net price of the Work for purposes of calculating royalty payments, the Publisher will allocate to the Work that portion of the proceeds of the sale which it determines to be the Work's fair value to the entire product sold.

    (f) If the Publisher sells any stock of the Work at a price below manufacturing cost plus royalties, no royalties shall be paid.

    (g) If the balance due the Author for any settlement period is less than fifty dollars, the Publisher will make no accounting or payment until the next settlement period at the end of which the cumulative balance has reached fifty dollars. If, after the expiration of two years following publication, the sales in any calendar year do not exceed a total of 500 copies, the royalty on such sales shall be one-half the stipulated royalty, this reduction in royalty being agreed upon to enable the Publisher to keep the Work in print as long as possible.

    (h) The Publisher may deduct from any funds due the Author, under this or any other agreement between the Author and the Publisher, any sum that the Author may owe the Publisher under this or any other agreement.

    (i) The Publisher will maintain relevant records with respect to any royalty statement provided to the Author under the Agreement for a two year period from the date of the statement. Royalty statements will be final and binding upon the Author unless, within two years from the date of the statement, the Author objects to such statement in a writing which states the specific objection and the basis for such objection. The Author, at the Author's expense, may review such records no more than once each calendar year at a mutually convenient time to the Author and the Publisher, during   regular business hours, for the purpose of verifying the accuracy of such royalty statement, The Author agrees to keep confidential all information relating to the business affairs of the Publisher and to impose such obligation on the Author's representatives.

**Discontinuing Manufacture**   J.  When the Publisher decides that the public demand for the Work no longer warrants its continued publication, in a format or medium, the Publisher may discontinue or suspend such publication, and destroy such format or medium of the Work without liability to the Author, and without prejudice to any license or other arrangement. If the Publisher ceases to publish the Work in all formats and media and does not publish the Work in any format or medium, now known or hereafter known, within six months of the Author's written request for the Publisher to publish the Work, this Agreement will terminate and the Publisher will revert to the Author all rights granted to the Publisher herein by the Author (except as to the art work prepared or obtained at the Publisher's expense which shall remain the property of the Publisher for its own use and benefit), subject to the Publisher's right to sell off or otherwise dispose of any inventory of the Work and to all licenses previously granted.

**Competing Publications**   K.  During the term of this Agreement the Author will not agree to publish or furnish to any other publisher any work on the same subject which, in the Publisher's judgment, will conflict or interfere with the sale of the Work.

*Amendments and Waivers*

L.  This Agreement constitutes the entire understanding of the parties relating to its subject matter and shall not be changed or amended, in whole or in part, except in a writing signed by the parties. No course of dealing between the Publisher and the Author and no delay or failure of a party in exercising any rights hereunder shall operate as a waiver of that party's rights.

*Construction, Heirs*

M.  This Agreement shall be construed and interpreted according to the laws of the State of New York as if executed and fully performed therein, and exclusive jurisdiction over all disputes hereunder shall be in the federal and state courts of the State of New York located in New York County. This Agreement  shall be binding upon the parties hereto, their heirs, successors, assigns, and personal representatives; and references to the Author and to the Publisher shall include their heirs, successors, assigns, and personal representatives. The Author may not delegate any duty hereunder without the prior written consent of the Publisher.

*Joint Authors*

N.  For purposes of this Agreement, whenever the term "the Author" refers to more than one person, all such persons are collectively referred to as the "Author." Unless otherwise indicated in this Agreement, the rights and liabilities of the Author are joint and several. Further, whenever the term "the Author" refers to more than one person, those persons will be deemed to share equally in the grants, advances, royalties and expenses arising under this Agreement, until written notice to the contrary, signed by each person referred to as "the Author" under this Agreement, has been actually received by the Publisher. The Publisher may exercise any or all of its rights and remedies with respect to the Authors individually or collectively. Any one author "and an alternate" may be designated under this Agreement to act on behalf of all the authors jointly, and the Publisher may rely on the acts of the Author or the alternate so designated as representative of and binding upon all the Authors. In the absence of such designation the Publisher may deal with any one of the Authors as the agent and representative of all and may rely on the acts of such as representative as binding on all the Authors. Any such designation may be modified only upon written notice to the Publisher, signed by each person referred to as "Author" under this Agreement.

*Electronic Versions*

O.  The rights granted to the Publisher under this Agreement include (in addition to all other rights described herein) the right to prepare, publish, reproduce, sell and otherwise distribute electronic versions of the Work. As used herein, the term "electronic versions" shall mean any and all methods of copying, recording, storage, retrieval, or delivery of all or any portion of the Work, alone or in combination with other works, including in any multimedia work or electronic book; by any means now known or hereafter devised, including, without limitation, by electronic or electromagnetic means, or by analog or digital signal; whether in sequential or non-sequential order, on any and all physical media, now known or hereafter devised including, without limitation, magnetic tape, floppy  disks, CD-I, CD-ROM, laser disk, optical disk, IC card or chip, and any other human or machine readable medium, whether or not permanently affixed in such media( excluding the electronic versions specifically described in paragraph I (a)); and the broadcast and/or transmission of the foregoing by any and all means now known or hereafter devised.

The Publisher shall pay the Author royalties as follows on the electronic versions:
   (i)  If the Publisher itself creates and sells that electronic version, _18_% of the net cash received from such use.
   (ii)  If the Publisher licenses the right to create and sell the electronic version, 50% of the net amount of royalty compensation received from such license.

P.  Delivery of items. Upon execution of this Agreement by the Author and the Publisher, the Author shall deliver to the Publisher, at the address or location designated by the Publisher, at the Authors expense, the items relating to the work and to the Study Guide, Instructors Manual, Test Banks,

Q. <u>Other Works</u>. The Author hereby grants to the Publisher a right of first refusal with respect to any new ✱ works created by the Author, or each of them, whether with or without the cooperation or assistance of a third party (the "New Work(s)"). The Author shall offer each New Work to the Publisher in writing, at the earliest time reasonable, in the form of a detailed proposal. The Publisher shall have ninety days from its receipt of such written proposal to consider it and communicate to the Author the rights, if any it wishes to acquire. If the Publisher notifies the Author in writing that it desires to acquire rights to the New Work, the Author shall negotiate exclusively and in good faith with the Publisher, for a period of no less than ninety days from the Authors receipt of such written notice, commercially reasonable terms for the Publisher's acquisition thereof. In the event that, following such ninety-day period, the Publisher determines that it does not wish to acquire rights to the New Work or the Author and the Publisher are unable to agree upon the terms of an agreement, the Author may offer the New Work to a third party, subject to the terms of paragraph K of this agreement, provided that the terms made available to the third party are not more favorable to such third party than those made available to the Publisher. If the Author does desire to enter into an agreement on terms more favorable to such third party, The Author shall submit such terms to the Publisher and the Publisher shall have a right, but not an obligation, to match with respect thereto.

R. <u>Inventory</u>. The Publisher agrees to purchase from McGraw-Hill the Then-Current Inventory of the Eighth Edition of the Work, at their Printing Invoice Cost, provided that the Publisher shall have the right to recover the Total Cost of such purchase from any royalties otherwise due the Author. The Author acknowledges and agrees that the Publisher shall have the right to dispose of such Inventory in any manner it sees fit (including without limitation by destruction), provided that the name and mark of McGraw-Hill on the outside cover or jacket of the book version of the Eighth Edition of the Work is covered or not otherwise displayed to customers. As used herein, "Then-Current Inventory" shall mean McGraw-Hill's inventory of the book version of the Eighth Edition of the Work, as of the date of execution of this Agreement, that is in saleable condition; "Printing Invoice Cost" shall mean the actual invoiced printing cost for the printing of each unit of the book version of the Work; and "Total Cost" shall mean the Printing Invoice Cost for all of the Then-Current Inventory of the Eighth Edition of the Work plus the costs associated with transporting such Inventory from a McGraw-Hill location to a location designated by the Publisher including, without limitation, shipping, handling and insurance costs.

S. <u>Returns</u>. The Author shall obtain McGraw-Hill's binding agreement that McGraw-Hill will promptly destroy any and all of its inventory of the Work not purchased by the Publisher including, without limitation, any and all returns that McGraw-Hill may receive following the Publisher's purchase of the Then-Current Inventory. If McGraw-Hill refuses to enter into such binding agreement, the Author shall petition a court of competent jurisdiction to require McGraw-Hill to do so.

T. <u>Future Orders</u>. The Author will require McGraw-Hill to provide prompt notice to any individual, entity, potential adopter, retailer or wholesaler or other potential customer ("Customer") that inquires about obtaining a complimentary copy of the Work or any Supplementary Materials or placing an order therefor that such Customer should contact the Publisher's Faculty and Field Services at (800) 526-0485 or such other telephone number provided by the Publisher to do so.

U. <u>Overnight Mail</u>. If the Publisher requests that the Author deliver materials due under this Agreement via overnight carrier, the Publisher agrees to reimburse the Author such expense, upon receipt of adequate documentation evidencing such expenditure.

✱ Post-secondary education market

**EXHIBIT G**

*Title changed to: Business in Action*

# AUTHOR AGREEMENT

THIS AGREEMENT, made and entered into as of this 23 day of March 199 9, by and between

PRENTICE-HALL, INC. ("Publisher"), a Delaware corporation having offices at One Lake Street,

Upper Saddle River, NJ 07458 and Bovee & Thill LLC    a limited liability company ~~xxxxxxxxxxxxxxxx~~ of

Nevada _____ residing at 2950 E. Flamingo Road, Suite B
Las Vegas, Nevada 89121

are hereinafter collectively referred to as "the parties".

**GRANT OF RIGHTS**

1. The Author will prepare a work on EXCELLENCE IN BUSINESS (the "Work"). The Author grants and assigns solely and exclusively to the Publisher this Work and all rights in the Work and all derivative works throughout the world, in all languages, for the full term of copyright and all renewals and extensions thereof, and the right to secure copyright in the Publisher's name *of Bovee + Thill LLC* ~~or Author's name~~. This grant includes, but is not limited to, the exclusive rights to reproduce, print, distribute, market, promote, publish, sell, license, broadcast, or transmit, in all channels of distribution, the Work and derivative works, in whole or in part, in all forms, formats, media and versions, now known or hereafter developed, including, without limitation, by any electronic or electromagnetic means or analog or digital signal, or on any human or machine readable medium, including as part of an electronic database, and to license others to exercise any and all such rights. This grant of rights includes, without limitation, all rights specified in Paragraphs E and H below.

**DELIVERY**

2. The Work, containing about 175,000 words or their equivalent, will be delivered by the Author in acceptable final form by November 30, 1999. The Publisher and the Author agree that, in print form, the Work will consist of approximately 500 printed book pages.

**ROYALTY**

3. Based on the net cash received by the Publisher from the sale of the Work, except as otherwise provided in paragraph H, the Publisher will pay the Author a royalty of ~~10%~~ 17.75%.

**ROYALTY STATEMENT**

4. The Publisher will furnish the Author with a royalty statement on or about March 31 and September 30 of each year for the six-month period ending in December and June of each year respectively. With each statement, the Publisher will make settlement for any balance due.

**ADDITIONAL TERMS**

5. Paragraphs A - Q inclusive are part of this Agreement as though placed before the signatures.

88-0378594

US Taxpayer Information No.

Bovee & Thill LLC
Author

By: _____

By: _____
AUTHOR

PRENTICE-HALL, INC.

By: _____



**SUBMISSION OF THE WORK**

*PLEASE INITIAL*

A. (a) The Author shall deliver the Work, and any required preliminary versions or portions of the Work, in hard copy form, double-spaced on 8-1/2" x 11" paper on one side only, and in an electronic format agreed upon by the parties. The Author will retain at least one copy of each item delivered to the Publisher under this Agreement. The Work will be of such content, form and length as the Publisher is willing to publish. The Publisher may request modifications to the Work, in which event the Author will revise and resubmit the Work, or portion(s) of the Work, within the reasonable period of time requested by the Publisher.

(b) If the Author is unable or unwilling to deliver the Work on time, or if the Work is not acceptable to the Publisher, in its editorial and marketing judgment, in length, form or content, the Publisher may elect to terminate the Agreement and recover from the Author any moneys paid to or on behalf of the Author in connection with the Work. Upon Publisher's termination, and only if the Author repays any and all moneys previously paid to the Author, the Author shall have the right to publish the Work elsewhere.

(c) The Author will read and correct the proofs or other final copy of the Work, if any, and promptly return one set to the Publisher. If the Author does not return a corrected proof of the Work to the Publisher within a reasonable time period to be specified by the Publisher, such material will be considered approved as is. The Author will be responsible for the completeness and accuracy of corrections and will bear the cost of alterations of the proofs or other final copy (other than those resulting from printers or other production errors) exceeding ~~10%~~ of the cost of typesetting or other formatting. These costs may be deducted from payments otherwise due the Author    15%

**ITEMS FURNISHED BY THE AUTHOR**

B. (a) The Author will be responsible for furnishing the following items as part of the Work: information for the title page; a preface; a table of contents or its equivalent; an index or its equivalent; and ~~XXXXXXXXXXXXXXXXXXXXXXXXXX~~ ~~XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX~~ as requested by the Publisher, or in any other format ~~XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX~~

suggestions and drafts    (b) If requested by the Publisher, the Author will (i) furnish the following to the Publisher, in a format agreed upon by or all photographs,    the Author and the Publisher, within a reasonable time specified by the Publisher: a foreword; a glossary ~~XXXXXXXXXXXX~~ illustrations, and    ~~XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX~~ other art    ~~XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX~~ and (ii) provide assistance to and consult with collectively, "art    the Publisher or any third parties engaged by the Publisher to provide development or production services in connection with ork").    the publication of the Work, including the Supplementary Materials or any part(s) of the Work. The Publisher will have all rights to the Supplementary Materials as are granted with respect to the Work.



*PLEASE INITIAL*

(c) If the Author fails to deliver any item or perform any service specified in this paragraph within the time specified by the Publisher, the Publisher may have such items prepared or services performed and charge the costs thereof against any sums otherwise due by the Publisher to the Author. The Publisher will pay the cost of manufacture of Supplementary Materials.

**THE AUTHOR'S WARRANTY**



*PLEASE INITIAL*

C. The Author warrants that: the Author has full authority to make this Agreement; the Work will be original; the Work has not been published; the Author is the sole owner of the Work; the Author has identified any material in the public domain; the Author has identified, ~~XXXXXXXXXXXXXXXXXXXXXX~~ material from other copyrighted works; the Author is not currently working on any project which may compete with or lessen the value of the Work; the Work, and any part of the Work, will not infringe any copyright or violate any proprietary rights or rights of publicity or privacy, or contain any scandalous, libelous, or unlawful matter or any formula or instruction that is injurious to a person or property. These warranties also apply to other items furnished by the Author pursuant to paragraph B. The Author will hold harmless and indemnify the Publisher against any demand, claim, suit, action, proceeding, cost, damages, and expenses, including reasonable attorneys' fees, arising from any breach or alleged breach of the Author's warranties. The Publisher will have the right to assume and control the defense and settlement of any such claim, and until such claim or suit has been settled or withdrawn, the Publisher may withhold a reasonable amount to cover such claims from any sums due to the Author. The Author will cooperate with the Publisher and provide reasonable assistance in defending against any such claim. The warranties and indemnities contained in this paragraph will survive termination of this Agreement.

**COPYRIGHTED MATERIALS**

*** see page 4**



*PLEASE EDITING AND PUBLISHING DETAILS*

D. The Author will not include in the Work material (text or illustrations) from other copyrighted works without both the Publisher's consent and the written permission of the owner of such copyrighted material. The ~~XXXXXX~~ will be responsible for obtaining the written permission for use of such material in the Work as contemplated by this Agreement and for the costs and fees related to such permissions and will file the permissions with the Publisher by no later than the final submission of the Work. ~~XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX~~ "Publisher" ~~XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX~~
** in an amount not to exceed an aggregate of $7,500
E. The Publisher will have the right, with respect to the Work, including reprints, revisions and new editions, to (a) edit the Work, provided that the meaning of the text is not materially altered; (b) publish the printed Work in one or several volumes and in a style deemed suitable by the Publisher as to paper, printing and binding, under the Publisher's own name and/or under any other imprints; (c) decide on the formats and media in which to publish the Work; (d) fix or alter the wording, format and style of the title, interior design, packaging and/or cover presentation and the prices at which the Work shall be sold and the quantities printed or produced; and (e) determine the methods and means of advertising, marketing and selling the Work. The Publisher will have the right to display the Author's name and likeness in connection with the Work and any part of the Work and in promotional materials.

50

F. The Publisher will furnish to the Author (each author, if there are multiple authors) xix copies of the Work as it is first published by the Publisher without charge. Additional copies may be purchased by the Author at the net price.



AUTHOR'S COPIES

G. The Author agrees to revise the Work, or any part of the Work, as requested by the Publisher if the Publisher considers it in the best interests of the Work. The provisions of this Agreement shall apply to each revision by the Author as though that revision were the Work being published for the first time under this Agreement. If, in the Publisher's judgment, the Author is unable or unwilling to provide a satisfactory revision within the time period established by the Publisher, the Publisher may have such revision (and any subsequent revisions) prepared by others, and charge the cost, including, without limitation, fees and royalties, against the Author's royalties. The Publisher reserves the right to display the Author's name and the name of the person or persons who prepare the revision in connection with the revision and in promotional materials.

REVISIONS

reasonable

H. (a) Other Royalty Rates. The following royalty rates shall apply to the net cash received by the Publisher (or its corporate affiliates, if the sale is made by an affiliate) with respect to the following sales and uses of the Work:

PLEASE
INITIAL

ADDITIONAL
ROYALTY TERMS

(i) Export Sales: 10%, for the sale of copies of the Work by the Publisher or its affiliate outside the United States and its possessions and territories, except as set forth below.

(ii) Direct Marketing to Consumers: ~~XX%~~ 15% for the sale of copies of the Work resulting from direct marketing by the Publisher or its affiliate to the consumer anywhere in the world.

(iii) Special Sales: ~~XX%~~ 15%, for the sale of copies of the Work by the Publisher or its affiliate to elementary or secondary schools or school districts XX for any sale of copies of the Work by the Publisher or its affiliate by any means and channel at a discount of 51% or greater off the single copy price. *5%



PLEASE
INITIAL

(iv) Other Print Versions, Adaptations and Derivative Works: ~~XX%~~ 15% 10% JCB, for the sale of copies of special print editions of the Work by the Publisher or its affiliate, including, without limitation, book club editions, large print editions, and print adaptations or derivative works of the Work, including, without limitation, translations, abridgments, and adaptations for export markets.

PLEASE
INITIAL

(v) Electronic Transmissions of the Work: ~~XX%~~ 17.75%, based on net cash received by the Publisher or its affiliate for transmission of the Work via radio or television broadcast, cable, satellite, on-line or other electronic or electromagnetic transmission.

(vi) Other Media Versions of the Work: ~~XX%~~ 17.75% based on the net cash received by the Publisher or its affiliate for distribution, sale or license of copies of the Work in non-print media, including, without limitation, audio, video, motion picture or multimedia versions.

(vii) Licenses of Subsidiary Rights: 50% of the net amount received by the Publisher from (a) any license permitting a third party to publish and sell or otherwise commercially exploit a version of the Work in any format or medium, where the Publisher has no involvement in modifying, enhancing, or marketing the Work for or with such third party; or (b) any license permitting a third party to use or quote portions of the Work for use in the third party's publication.

(b) Accounting. (i) For uses of portions of, or quotations from, the Work, including in a collective work or custom published work, and for sales of the Work as part of a package together with other works, or in electronic products or transmissions incorporating other works (the "Package"), including, without limitation, for purposes set forth in subsections a(iv) - (vii) above, the Publisher shall determine the net cash received for the Work on which the applicable royalty will be paid by allocating to the Work that portion of the proceeds for the Package which it determines to be the proportionate and fair value of the Work to the entire Package, provided, however, that if only small portions or quotes from the Work are taken, the Author will receive a permission fee comparable to the permission fee the Publisher would have paid to the Author upon the grant of permission to an unrelated third party to use the portion or quote. (ii) If the balance due the Author for any settlement period is less than fifty dollars, the Publisher may make no accounting or payment until the next settlement period at the end of which the cumulative unpaid balance equals at least fifty dollars. (iii) The Publisher may deduct from any amounts due the Author under this or any other agreement any sum that the Author may owe the Publisher under this or any other agreement. (iv) No royalties or other payments will be due to the Author with respect to any copies of the Work, or any part of the Work, furnished by the Publisher to others for the purpose of promotion, publicity or for any other similar purpose deemed appropriate by the Publisher; any copies of the Work, or any part of the Work, sold at a price below manufacturing cost plus royalties; ~~and xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx~~ xxxx

free



PLEASE
INITIAL

(c) Records. The Publisher will maintain relevant records with respect to any royalty statement provided to the Author under the Agreement for a two year period from the date of the statement. Royalty statements will be final and binding upon the Author unless, within two years from the date of the statement, the Author objects to such statement in a writing which states the specific objection and the basis for such objection.

**DISCONTINUING PUBLICATION**

I. If the Publisher decides that continued publication of the Work in any or all particular forms or media is unwarranted, the Publisher may discontinue or suspend such publication, and destroy such copies of the Work without liability to the Author, and without prejudice to other rights the Publisher has in the Work or any then-existing license or other arrangement.

**COMPETING PUBLICATIONS**

J. During the term of this Agreement, the Author will not publish or agree to publish or furnish to any other publisher any work on the same subject matter of the Work which will, in the Publisher's judgment, conflict or interfere with any of the Publisher's rights to sell, distribute or use the Work under this Agreement.

**ENTIRE AGREEMENT AMENDMENTS AND WAIVERS**

K. This Agreement, together with any Addenda and Exhibit(s) annexed to it, constitutes the entire understanding of the parties relating to its subject matter and shall not be changed or amended in whole or in part except by a writing signed by the parties. No waiver or breach of any term or condition of this Agreement shall be deemed a waiver of any other term or condition or any later breach. No course of dealing between the Publisher and the Author and no delay or failure of a party in exercising any rights shall operate as a waiver of that party's rights. Publication and payments to the Author shall not constitute or imply any waiver of the Author's warranties or obligations or the Publisher's defenses, rights or remedies.

**CONSTRUCTION, HEIRS, ASSIGNS**

L. THIS AGREEMENT SHALL BE CONSTRUED AND INTERPRETED ACCORDING TO THE LAWS OF THE STATE OF NEW YORK AS IF EXECUTED AND FULLY PERFORMED THEREIN, AND EXCLUSIVE JURISDICTION OVER ALL DISPUTES ARISING IN CONNECTION WITH THE AGREEMENT SHALL BE IN THE FEDERAL AND STATE COURTS OF THE STATE OF NEW YORK LOCATED IN NEW YORK COUNTY. This Agreement shall be binding upon the parties hereto, their heirs, successors, assigns, and personal representatives. The Author may not delegate any duty hereunder without the prior written consent of the Publisher.

**JOINT AUTHORS**

M. For purposes of this Agreement, all authors are collectively referred to as the "Author." Whenever the term "the Author" refers to more than one person, those persons will be deemed to share equally in the royalties and expenses arising under this Agreement until written notice to the contrary, signed by all authors, has been actually received by the Publisher. The rights, obligations and liabilities of the Author are joint and several, but the Publisher may exercise any or all of its rights and remedies with respect to the authors individually or collectively. If any author does not perform the obligations required, the Publisher shall have the right to proceed with the other author(s) without obligation to the non-performing author.

**PARTIES' RELATIONSHIP**

N. The Author does not, and will not, have any power, right or authority to bind the Publisher, or to assume or create any obligation or responsibility, express or implied, on behalf of the Publisher.

**CONFIDENTIALITY**

O. The Author shall keep confidential and shall not disclose the terms of this Agreement except to the Author's authorized legal and financial representatives with a need to know and then only for purposes of representing the Author's interests hereunder.

**HEADINGS**

P. All titles, subject headings and similar items set forth in this Agreement are provided for the purpose of reference and convenience only and are not intended to be inclusive, definitive or to affect the meaning, content or scope of this Agreement.

**RIGHT OF FIRST REFUSAL**

Q. The Author grants to the Publisher an exclusive option to publish the Author's next textbook. The Author shall deliver a written proposal for the new work to the Publisher, and the Publisher shall have 60 days to give written notice to the Author as to whether the Publisher will exercise the option.



PLEASE INITIAL

```
*** from page 2 COPYRIGHTED MATERIALS D
The publisher will pay on the authors' behalf the permissions fees
which exceed $7,500 and will recover such amounts so paid from the amounts
otherwise payable to the auhtor under this agreement or otherwise.
```

## INDIVIDUAL GUARANTY

In order to induce Publisher to enter the attached
Agreement for publication of a work tentatively entitled

_____Excellence in Business_____

and in consideration thereof, I,

__Courtland Bovee__ and __John Thill_____

unconditionally guarantee to Publisher the due performance by

_____Bovee & Thill_____, LLC

(herein the "Company") of all the terms and conditions thereof on its part to be performed and guarantee that the Company is a validly existing corporation incorporated under the laws of the state of _Nevada_____. This guaranty will be construed as absolute, continuing and unlimited, and shall be enforceable against me, my heirs, and assigns, without the obligation to first proceed against the Company. I waive notice of any and all defaults on the part of Company, and I agree that waiver by Publisher of any rights against the Company under the said Agreement shall not in any way limit or discharge my obligations under this guaranty. To the extent that any provisions in said Agreement affect me, I consent to such provisions and agree to perform and render all services set forth in the Agreement. I represent that there is a valid and subsisting employment agreement between that Company as an employer and me as an employee under the terms of which the Company has the right to enter into the foregoing Agreement and to lend my services as therein provided.

I agree that exclusive jurisdiction for determination of any dispute solely between or among me and any party or parties to the Agreement relating to or arising out of this guaranty is hereby vested in the Supreme Court, New York County, or, at the election of any party if the jurisdictional prerequisites at the time exist, in the United States District Court for the Southern District of New York, and I agree to submit to the jurisdiction of either such court in the City and State of New York for the determination of any such dispute, and hereby consent (in addition to service of process by any other means provided at the time by law) to service of process on me by registered mail, first class postage prepaid, return receipt requested, addressed to me at the address to which notices may be given to the Company pursuant to the Agreement, and that service by mail so given shall be deemed to confer jurisdiction upon such court.

This Guaranty shall be construed in accordance with the laws of the State of New York applicable to agreements made out fully performed therein.

_____6/8/99_____          By _____
Date

_____6/8/99_____          By _____
Date

**EXHIBIT H**

*Title Changed to:*
*Business Communication*
*Essentials*

# Author Agreement

THIS AGREEMENT, made and entered into as of this __12__ day of __October__, 20 __01__, by and between PEARSON

EDUCATION, INC. ("Publisher"), a Delaware corporation, publishing as PRENTICE HALL, having offices at One Lake

Street, Upper Saddle River, NJ 07458 and __Bovee & Thill, LLC_____ ("the Author"), a ~~person~~

\* __limited liability company__  of __Nevada_____, residing at __2950 East Flamingo Rd, Suite E-5__
__Las Vegas, NV 89121_____, hereinafter

collectively referred to as "the parties."

### ESSENTIALS OF BUSINESS

1. The Author will prepare a work on __COMMUNICATION_____ (the "Work"). The Author grants and assigns solely and exclusively to the Publisher this Work and all rights in the Work and all derivative works throughout the world, in all languages, for the full term of copyright and all renewals and extensions thereof, and the right to secure copyright in the Publisher's name or any other name. This grant includes, but is not limited to, the exclusive rights to reproduce, print, distribute, market, promote, publish, sell, license, broadcast, or transmit, in all channels of distribution, the Work and derivative works, in whole or in part, in all forms, formats, media and versions, now known or hereafter developed, including, without limitation, by any electronic or electromagnetic means or analog or digital signal, or on any human or machine readable medium, including as part of an electronic database, and to license others to exercise any and all such rights. This grant of rights includes, without limitation, all rights specified in Paragraphs E and H below.

2. The Work, containing about __212,500__ words or their equivalent, will be delivered by the Author in acceptable final form by __July 15, 2002__. The Publisher and the Author agree that, in print form, the Work will consist of approximately __500__ printed book pages.

PLEASE INITIAL

3. Based on the net cash received by the Publisher from the sale of the Work, except as otherwise provided in paragraph H, the Publisher will pay the Author a royalty of ~~XX~~% . __17%__

4. The Publisher will furnish the Author with a royalty statement on or about March 31 and September 30 of each year for the six-month period ending in December and June of each year respectively. With each statement, the Publisher will make settlement for any balance due.

PLEASE INITIAL

S/page 5

5. Paragraphs A -~~XX~~ inclusive are part of this Agreement as though placed before the signatures.

__88-0427542__
US Taxpayer Information No.

By: _____ *President*
Bovee & Thill, LLC                    Author

PEARSON EDUCATION, INC.

By _____



(a) The Author shall deliver the Work, and any required preliminary versions or portions of the Work, in hard copy form, double-spaced on 8-1/2" x 11" paper on one side only, and in an electronic format agreed upon by the parties. The Author will retain at least one copy of each item delivered to the Publisher under this Agreement. The Work will be of such content, form and length as the Publisher is willing to publish. The Publisher may request modifications to the Work, in which event the Author will revise and resubmit the Work, or portion(s) of the Work, within the reasonable period of time requested by the Publisher.

(b) If the Author is unable or unwilling to deliver the Work on time, or if the Work is not acceptable to the Publisher, in its editorial and marketing judgment, in length, form or content, the Publisher may elect to terminate the Agreement and recover from the Author any moneys paid to or on behalf of the Author in connection with the Work. Upon Publisher's termination, and only if the Author repays any and all moneys previously paid to the Author, the Author shall have the right to publish the Work elsewhere.

(c) The Author will read and correct the proofs or other final copy of the Work, if any, and promptly return one set to the Publisher. If the Author does not return a corrected proof of the Work to the Publisher within a reasonable time period to be specified by the Publisher, such material will be considered approved as is. The Author will be responsible for the completeness and accuracy of corrections and will bear the cost of alterations of the proofs or other final copy (other than those resulting from printers or other production errors) exceeding 10% of the cost of typesetting or other formatting. These costs may be deducted from payments otherwise due the Author    15%



suggestions and drafts
all photographs,
strations, and other

1. (a) The Author will be responsible for furnishing the following items as part of the Work: information for the title page; a preface; a table of contents or its equivalent; an index or its equivalent; and XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX, XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

(b) If requested by the Publisher, the Author will (i) furnish the following to the Publisher, in a format agreed upon by the Author and the Publisher, within a reasonable time specified by the Publisher: a foreword; a glossary; XXXXXXXXXXXXXXX. XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX; and (ii) provide assistance to and consult with the Publisher or any third parties engaged by the Publisher to provide development or production services in connection with the publication of the Work, including the Supplementary Materials or any part(s) of the Work. The Publisher will have all rights to the Supplementary Materials as are granted with respect to the Work.

(c) If the Author fails to deliver any item or perform any service specified in this paragraph within the time specified by the Publisher, the Publisher may have such items prepared or services performed and charge the costs thereof against any sums otherwise due by the Publisher to the Author. The Publisher will pay the cost of manufacture of Supplementary Materials.



PLEASE
INITIAL

• The Author warrants that: the Author has full authority to make this Agreement; the Work will be original; the Work has not been published; the Author is the sole owner of the Work; the Author has identified any material in the public domain; the Author has identified XXXXXXXXXXXXXXXXXXXXXXXX material from other copyrighted works; the Author is not currently working on any project which may compete with or lessen the value of the Work; the Work, and any part of the Work, will not infringe any copyright or violate any proprietary rights or rights of publicity or privacy, or contain any scandalous, libelous, or unlawful matter or any formula or instruction that is injurious to a person or property. These warranties also apply to other items furnished by the Author pursuant to paragraph B. The Author will hold harmless and indemnify the Publisher against any demand, claim, suit, action, proceeding, cost, damages, and expenses, including reasonable attorneys' fees, arising from any breach or alleged breach of the Author's warranties. The Publisher will have the right to assume and control the defense and settlement of any such claim, and until such claim or suit has been settled or withdrawn, the Publisher may withhold a reasonable amount to cover such claims from any sums due to the Author. The Author will cooperate with the Publisher and provide reasonable assistance in defending against any such claim. The warranties and indemnities contained in this paragraph will survive termination of this Agreement.



PLEASE
INITIAL

/Publisher

• The Author will not include in the Work material (text or illustrations) from other copyrighted works without both the Publisher's consent and the written permission of the owner of such copyrighted material. The XXXXXX will be responsible for obtaining the written permission for use of such material in the Work as contemplated by this Agreement and for the costs and fees related to such permissions and will file the permissions with the Publisher by no later than the final submission of the Work. XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

*in an amount not to exceed an aggregate of $7, 500

• The Publisher will have the right, with respect to the Work, including reprints, revisions and new editions, to (a) edit the Work, provided that the meaning of the text is not materially altered; (b) publish the printed Work in one or several volumes and in a style deemed suitable by the Publisher as to paper, printing and binding, under the Publisher's own name and/or under any other imprints; (c) decide on the formats and media in which to publish the Work; (d) fix or alter the wording, format and style of the title, interior design, packaging and/or cover presentation and the prices at which the Work shall be sold and the quantities printed or produced; and (e) determine the methods and means of advertising, marketing and selling the Work. The Publisher will have the right to display the Author's name and likeness in connection with the Work and any part of the Work and in promotional materials.

PLEASE INITIAL

The Publisher will furnish to the Author (each author, if there are multiple authors) 50 copies of the Work as it is first published by the Publisher without charge. Additional copies may be purchased by the Author at the net price.

AUTHOR'S COPIES

PLEASE INITIAL

The Author agrees to revise the Work, or any part of the Work, as requested by the Publisher if the Publisher considers it in the best interests of the Work. The provisions of this Agreement shall apply to each revision by the Author as though that revision were the Work being published for the first time under this Agreement. If, in the Publisher's judgment, the Author is unable or unwilling to provide a satisfactory revision within the time period established by the Publisher, the Publisher may have such revision (and any subsequent revisions) prepared by others, and charge the cost, including, without limitation, fees and royalties, against the Author's royalties. The Publisher reserves the right to display the Author's name and the name of the person or persons who prepare the revision in connection with the revision and in promotional materials.

REVISIONS *reasonable

PLEASE INITIAL

(a) Other Royalty Rates. The following royalty rates shall apply to the net cash received by the Publisher (or its corporate affiliates, if the sale is made by an affiliate) with respect to the following sales and uses of the Work:

ADDITIONAL ROYALTY TERMS

(i) Export Sales: 10%, for the sale of copies of the Work by the Publisher or its affiliate outside the United States and its possessions and territories, except as set forth below.

(ii) Direct Marketing to Consumers: 15%, for the sale of copies of the Work resulting from direct marketing by the Publisher or its affiliate to the consumer anywhere in the world.

(iii) Special Sales: 15%, for the sale of copies of the Work by the Publisher or its affiliate to elementary or secondary schools or school districts, or for any sale of copies of the Work by the Publisher or its affiliate by any means and channel at a discount of 51% or greater off the single copy price.

(iv) Other Print Versions, Adaptations and Derivative Works: 10%, for the sale of copies of special print editions of the Work by the Publisher or its affiliate, including, without limitation, book club editions, large print editions, and print adaptations or derivative works of the Work, including, without limitation, translations, abridgments, and adaptations for export markets.

(v) Electronic Transmissions of the Work: 17%, based on net cash received by the Publisher or its affiliate for transmission of the Work via radio or television broadcast, cable, satellite, on-line or other electronic or electromagnetic transmission.

(vi) Other Media Versions of the Work: 17%, based on the net cash received by the Publisher or its affiliate for distribution, sale or license of copies of the Work in non-print media, including, without limitation, audio, video, motion picture or multimedia versions, or in formats or versions for radio or television broadcast, cable, satellite, or on-line or other electronic or electromagnetic transmission.

(vii) Licenses of Subsidiary Rights: 50% of the net amount received by the Publisher from (a) any license permitting a third party to publish and sell or otherwise commercially exploit a version of the Work in any format or medium, where the Publisher has no involvement in modifying, enhancing, or marketing the Work for or with such third party; or (b) any license permitting a third party to use or quote portions of the Work for use in the third party's publication.

(b) Accounting. (i) For uses of portions of, or quotations from, the Work, including in a collective work or custom published work, and for sales of the Work as part of a package together with other works, or in electronic products or transmissions incorporating other works (the "Package"), including, without limitation, for purposes set forth in subsections a(iv) - (vi) above, the Publisher shall determine the net cash received for the Work on which the applicable royalty will be paid by allocating to the Work that portion of the proceeds for the Package which it determines to be the proportionate and fair value of the Work to the entire Package, provided, however, that if only small portions or quotes from the Work are taken, the Author will receive a permission fee comparable to the permission fee the Publisher would have paid to the Author upon the grant of permission to an unrelated third party to use the portion or quote. (ii) If the balance due the Author for any settlement period is less than fifty dollars, the Publisher may make no accounting or payment until the next settlement period at the end of which the cumulative unpaid balance equals at least fifty dollars. (iii) The Publisher may deduct from any amounts due the Author under this or any other agreement any sum that the Author may owe the Publisher under this or any other agreement. (iv) No royalties or other payments will be due to the Author with respect to any copies of the Work, or any part of the Work, furnished by the Publisher to others for the purpose of promotion, publicity or for any other similar purpose deemed appropriate by the Publisher; any copies of the Work, or any part of the Work, sold at a price below manufacturing cost plus royalties; xxxxxxxxxx xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

(c) Records. The Publisher will maintain relevant records with respect to any royalty statement provided to the Author under the Agreement for a two year period from the date of the statement. Royalty statements will be final and binding upon the Author unless, within two years from the date of the statement, the Author objects to such statement in a writing which states the specific objection and the basis for such objection.

<table>
<tr><td>

Dis<br>
Pub<br>
<br>
<br>
Competing<br>
Publications<br>
<br>
Entire<br>
Agreement,<br>
Amendments And<br>
Waivers<br>
<br>
<br>
Construction,<br>
Heirs, Assigns<br>
<br>
<br>
<br>
Joint Authors<br>
<br>
<br>
<br>
Parties<br>
Relationship<br>
<br>
Confidentiality<br>
<br>
<br>
Headings<br>
<br>
<br>
Right Of<br>
First Refusal

</td><td>

· If the Publisher decides that continued publication of the Work in any or all particular forms or media is unwarranted, the Publisher may discontinue or suspend such publication, and destroy such copies of the Work without liability to the Author, and without prejudice to other rights the Publisher has in the Work or any then-existing license or other arrangement.

During the term of this Agreement, the Author will not publish or agree to publish or furnish to any other publisher any work on the same subject matter of the Work which will, in the Publisher's judgment, conflict or interfere with any of the Publisher's rights to sell, distribute or use the Work under this Agreement.

This Agreement, together with any Addenda and Exhibit(s) annexed to it, constitutes the entire understanding of the parties relating to its subject matter and shall not be changed or amended in whole or in part except by a writing signed by the parties. No waiver or breach of any term or condition of this Agreement shall be deemed a waiver of any other term or condition or any later breach. No course of dealing between the Publisher and the Author and no delay or failure of a party in exercising any rights shall operate as a waiver of that party's rights. Publication and payments to the Author shall not constitute or imply any waiver of the Author's warranties or obligations or the Publisher's defenses, rights or remedies.

THIS AGREEMENT SHALL BE CONSTRUED AND INTERPRETED ACCORDING TO THE LAWS OF THE STATE OF NEW YORK AS IF EXECUTED AND FULLY PERFORMED THEREIN, AND EXCLUSIVE JURISDICTION OVER ALL DISPUTES ARISING IN CONNECTION WITH THE AGREEMENT SHALL BE IN THE FEDERAL AND STATE COURTS OF THE STATE OF NEW YORK LOCATED IN NEW YORK COUNTY. This Agreement shall be binding upon the parties hereto, their heirs, successors, assigns, and personal representatives. The Author may not assign this Agreement or delegate any duty hereunder without the prior written consent of the Publisher. The Publisher may assign this Agreement .

M For purposes of this Agreement, all authors are collectively referred to as the "Author." Whenever the term "the Author" refers to more than one person, those persons will be deemed to share equally in the royalties and expenses arising under this Agreement until written notice to the contrary, signed by all authors, has been actually received by the Publisher. The rights, obligations and liabilities of the Author are joint and several, but the Publisher may exercise any or all of its rights and remedies with respect to the authors individually or collectively. If any author does not perform the obligations required, the Publisher shall have the right to proceed with the other author(s) without obligation to the non-performing author.

N The Author does not, and will not, have any power, right or authority to bind the Publisher, or to assume or create any obligation or responsibility, express or implied, on behalf of the Publisher.

O The Author shall keep confidential and shall not disclose the terms of this Agreement except to the Author's authorized legal and financial representatives with a need to know and then only for purposes of representing the Author's interests hereunder.

P All titles, subject headings and similar items set forth in this Agreement are provided for the purpose of reference and convenience only and are not intended to be inclusive, definitive or to affect the meaning, content or scope of this Agreement.

Q The Author grants to the Publisher an exclusive option to publish the Author's next textbook. The Author shall deliver a written proposal for the new work to the Publisher, and the Publisher shall have 60 days to give written notice to the Author as to whether the Publisher will exercise the option.

</td></tr>
</table>

Agreement dated October 12, 2001
Between Pearson Education, Inc, publishing as Prentice Hall and
Bovee & Thill, LLC
Page 5



R. The Publisher agrees to pay the Author an advance in the amount of
    $52,000 payable as set forth below.  All such advance payments shall be
fully recoverable by the
    Publisher from amounts otherwise due to the Author:

      i       $26,000 upon execution of this Agreement;

      ii      $26,000 on January 4, 2002.

The obligation to pay an advance shall not apply to revised editions of the
Work.



S. The Publisher agrees to pay to the Author $2,500 as a grant for direct
    expenses incurred by the Author in the preparation of the Work.  Such
    amount will be paid upon the execution of this Agreement:

The obligation to pay a grant shall not apply to revised editions of the Work.

**EXHIBIT I**

Lovells LLP
590 Madison Avenue
New York NY 10022
Tel:  +1 212 909 0600
Fax:  +1 212 909 0660

# Lovells

January 30, 2008

Direct line 212-909-0678
Direct fax 212-909-0660
email david.leichtman@lovells.com

**VIA E-MAIL AND HAND DELIVERY**

Mr. Bijan Amini
Storch Amini & Munves PC
140 E. 45th Street, 25th Floor
New York, NY 10017

RE:    PEARSON EDUCATION, INC. ADV. BOVEE & THILL, LLC

Dear Mr. Amini:

As you are aware, we represent Pearson Education, Inc. ("Pearson US ") in connection with the above referenced matter.  We are writing in an effort that we hope will avoid the need for further litigation with Bovee & Thill, LLC ("B&T"), as it appears to us that you could not have in good faith drafted the Complaint that you served upon us if your client had explained all of the facts to you in an accurate and detailed manner.

You are now B&T's fourth set of attorneys.  We have previously explained to the prior sets of counsel why the allegations in your complaint are inaccurate and unfounded, and we now do so yet again.  We are enclosing with this letter our prior correspondence in an effort to avoid repetition -- but we briefly outline the issues in this letter.  As we have done with B&T's prior sets of attorneys, we are willing to meet with you to fully discuss your client's claims, and to further demonstrate to your satisfaction why the claims are meritless; please let us know by Tuesday, February 5th if you agree it would useful for us to meet, and we can then discuss a schedule for discussions which may help us both avoid engaging in wasteful and pointless litigation.  Below we discuss each of the three claims made in your complaint and outline the facts and the history of our discussions with your client.  First, however, there are two important points beyond the likelihood of success of your client's theories of liability that must be borne in mind:  that all of your client's claims are limited by the two year review limitation period provided in each of their Agreements; and that even if B&T were to prevail on their claims, the amounts at issue will not justify the vigorous litigation that will follow any failure to reasonably and cooperatively resolve this matter.  In short, there is very little money at issue in this case.

Lovells LLP is a limited liability partnership registered in England and Wales with registered number OC323639.  Registered office and principal place of business: Atlantic House, Holborn Viaduct, London EC1A 2FG.  The word "partner" is used to refer to a member of Lovells LLP, or an employee or consultant with equivalent standing and qualifications.

Lovells LLP and its affiliated businesses have offices in:  Alicante  Amsterdam  Beijing  Brussels  Chicago  Dubai  Dusseldorf  Frankfurt  Hamburg  Ho Chi Minh City  Hong Kong  London  Madrid  Milan  Moscow  Munich  New York  Paris  Prague  Rome  Shanghai  Singapore  Tokyo  Warsaw      Associated offices:  Budapest  Zagreb

Lawyers(USA) Solicitors Rechtsanwälte Avocats Advocaten Notarissen Avvocati Abogados

1099929.1

Mr. Bijan Amini

- 3 -

January 30, 2008

**3. Foreign Sales.**

Generally, Pearson US makes its US works available in foreign markets in four ways:  (A.) Pearson US itself exports the US edition of the work;  (B.)  Pearson US licenses the publication of adaptations or translations specific to certain foreign countries;  (C.)  Pearson International Editions ("PIEs") are manufactured in the US but exported to and sold abroad only by foreign affiliates ("Pearson Affiliates"); and (D.)  Pearson US licenses the publication of foreign reprints that are manufactured and sold only within India or Asia.  We have never understood there to be any dispute with regard to the royalty rate applied to the first two categories of sales as those sales have clear and unambiguous royalty clauses under all of B&T's contracts: under the three 1997 contracts, paragraph I(b) for export sales (10%), and paragraph I(a)(ii) (50% of net royalties to Publisher) for foreign adaptations and translations; under the 1999 and 2001 agreements, paragraph H(a)(i) for export sales (10%), and H(a)(iv) (10%) for foreign adaptations and translations.  While we believe it is also clear and unambiguous what royalty rate applies to the latter two types of foreign sales (PIEs and Reprints), we understand that your client has been confused about what royalty rate applies to those sales under the three contracts your client entered into in 1997.

**A. PIEs**

"PIEs," which are published by Pearson US, are essentially lower-cost reprints of US works that are intended only to be sold outside North America.  While PIEs are higher quality (in terms of paper quality, color palette. and binding) than Indian and Asian foreign reprints (see below), they are of lesser-quality than the US works.  PIEs are created because the markets into which they are sold will not purchase the higher quality and higher priced US editions.  With regard to PIEs, under the three 1997 contracts Pearson US has applied the 10% export royalty rate (paragraph I(b), not paragraph I(a) as you allege in the complaint).  That rate is appropriate and applicable because PIEs are manufactured in the US and exported by Pearson US in lieu of the US edition.  The US edition would not sell at any higher price within the PIE markets, and your client, therefore receives no less from PIE sales than would have been earned from US edition exports.  In any event, the difference in the royalties that would be due even if, as you claim, Paragraph I(d) should apply to PIE sales by Pearson US affiliates as though they were "subsidiaries" – which they are unequivocally not -- is small: even without discounting for the two year incontestability clause, the difference on these sales between the 15% royalty rate in paragraph I(d) and the export rate in Paragraph I(b) is roughly $56,000 from inception through your client's most recent royalty statement which includes sales though June 30, 2007.  A spreadsheet showing this was given to B&T's former counsel Wendy Rogovin at a meeting on May 8, 2006 (at which time the difference was roughly $40,000), a copy of which is attached to this letter.

Most importantly, and directly contrary to the allegations in your Complaint, the sales prices upon which B&T's reported and paid royalties on all sales of PIEs are based are the actual sales prices received by the applicable Pearson US affiliate from the *end purchaser* -- the royalties are not paid on an intercompany transfer price between Pearson US and a foreign affiliate.  In a series of letters and attachments to another of your client's former attorneys David Markham (dated January 10, 20, 27 and February 7, 2006), we sent spreadsheets from each foreign affiliate of their sales to end users, along with applicable exchange rates, that indisputably demonstrate this is the case.  (We are attaching the letters herewith, please advise us if you need additional copies of the spreadsheets.)

Lovells

Accordingly, the only amount in dispute with regard to sales of PIEs (sometimes referred to as PHIPES on the royalty statements) is the difference, on the three 1997 contracts, between 10% and 15% of the end sale price -- a mere $56,000 in dispute at most. Once again, the amount at issue here -- even under the best of all possible worlds for B&T -- is small.

### B. Foreign Reprints in China and India

"Foreign reprints" are extremely low cost black and white reprints on low-quality paper, the publication of which is licensed by Pearson US to, and manufactured in Asia or India by foreign affiliates. They are sold by vendors or affiliates in those territories only, at extremely low prices within those markets. There are only a limited number of sales of Foreign Reprints at issue here.

On two of the 1997 contracts, there have been a small number of such sales. Since these books are neither published in, nor exported from, the US, the export rate under the 1997 contracts is not applicable. Rather, Pearson US licenses reprint rights to foreign affiliates in those countries and Pearson US itself receives only a royalty rate of 17%[1] on these low-priced sales. Accordingly, this very small category is the only category of works to which Pearson US has applied the subsidiary rights license clause in the 1997 contracts (paragraph I(a)(ii)) and that we understand to be in issue. Pearson US has done so consistently, and B&T has received 50% of what Pearson US itself receives.[2] As explained next, this results -- effectively, in an 8.5% royalty being paid to B&T for sales of these reprints.

As before, B&T's royalties for these reprints are not paid based on an intercompany transfer price between Pearson US and the foreign affiliate. Rather, B&T receives 50% of all amounts received by Pearson US under the applicable reprint license, which amounts are themselves based on the actual sales price by the applicable foreign affiliate to the *end purchaser*. (See, again, letters and attachments sent to David Markham dated January 10, 20, 27 and February 7, 2006.) Accordingly, the subsidiary rights income that your client has received is the equivalent of a royalty of 8.5% (plus 5% on the small printing of BCT 5th Ed. Edition noted in footnote 1) on the actual sales price to the end purchasers, not a royalty based on an intercompany selling price, and never 1% of the price to the end purchaser as alleged in your complaint.

Again, there is absolutely no basis to apply the 15% royalty rate under paragraph I(d) as your client claims, but even if there were, the difference from inception through June 30, 2007 is approximately a mere $17,000 (as shown on the May 8, 2006 charts given to Ms. Rogovin, at which time the difference was approximately $12,000). This amount is obviously not close to the $400,000 claimed in your complaint. Even combined with the PIE issue described above (as discussed above royalties on PIEs are *not* paid under the subsidiary rights clause as erroneously set forth in your complaint), the amount at stake is small -- and in any event does not even come close to approximating what you have alleged.

---

[1]     Plus 10% on one small printing of BCT 5th Ed.

[2]     Under the 1999 and 2001 contracts, paragraph H(a)(iv) clearly specifies 10% as the applicable rate on end sales of such foreign reprints and we note there was one printing of BCE, Ed. 1 under the 2001 contract where that rate was correctly paid as set forth in my May 12, 2006 e-mail to Ms. Rogovin and which we do not understand to be at issue.

\* \* \*

As I think you can see from the prior correspondence and the details in this letter, Pearson US has made significant efforts and expended a large amount of resources trying to explain and resolve the issues raised. Likewise, and contrary to unfortunate public statements made by you, Pearson US has previously produced substantial documentation and analysis in our attempts to satisfy your client and its prior counsel – notwithstanding the fact that your client has yet to even request an audit as provided under their Agreements. Nevertheless, while our prior attempts at rationally resolving your client's claims have succeeded in causing each of your client's three previous teams of attorneys to abandon these claims, all of our prior efforts to settle with your client itself have failed because your client continuously has argued that arbitrary prices significantly higher than the prices the books actually sold for should be applied to retroactively "correct" the royalty statements. It is unclear where these arbitrary prices come from, but it should be obvious to you that such are not a basis for either meaningful settlement discussions or a successful -- from your perspective -- litigation outcome.

The reality is that in some markets, publishing is done at extremely low prices, particularly where foreign sales and incremental sales into certain high discount markets. It may be that in certain markets the books actually sell at prices that are lower than what your client may believe to be acceptable: that discontent is not a legal claim. Fortunately, these are incremental sales that otherwise simply would not be made and your client is receiving the royalty rate it contracted for on these sales.

As a legal matter, each of your client's contracts gives Pearson US the full discretion and right to market and price these works; your client has no viable claim that Pearson US cannot set the price at that which it has concluded the books can command in each market.   *See, e.g., Franconero v. Universal Music Group*, Case No. 02 Civ. 1963 (RO), 2003 WL 2299060 (S.D.N.Y. Dec. 19, 2003) (holding that contractual provision granting "exclusive rights" to products meant that defendant could do as it saw fit absent contractual restrictions to the contrary); *Teachers Ins. & Annuity Assoc. of Am. v. Wometco Enter., Inc.*, 834 F. Supp. 344, 349 ("an implied obligation of good faith cannot negate the express terms of a contract"); *VTR, Inc. v. Goodyear Tire & Rubber Co.*, 303 F. Supp. 773, 778 (S.D.N.Y. 1969) (holding that there can be no breach of New York's implied covenant of good faith and fair dealing "where a party to a contract has done what the provisions of the contract expressly give him the right to do").

Furthermore, your client has never responded to Pearson US's requests that it more specifically detail and tailor its requests, or Pearson US's suggestion that it proceed with a normal GAAP compliant audit on the sales actually at issue, and it has refused to pay for such an audit even though the contracts specify that audits shall be at B&T's sole expense. B&T also has never detailed with specificity the basis for a challenge to any of the royalty statements; accordingly at this point, the two year incontestability clause in each contract bars any further re-examination of sales made prior to those reported on the December 31, 2005 royalty statement received in March 2006. *See, e.g., Allman v. UMG Recordings*, Case No. 06 Civ. 8327, 2008 WL 131216 (S.D.N.Y. Jan. 10, 2008) (holding that since the objections letters to the royalty statements were untimely, the incontestability clause served as a complete bar); *Franconero v. Univ. Music Group*, No. 02 Civ. 1963 (LAK DFE), 2002 WL 31682648 (S.D.N.Y. Nov. 25, 2002) (holding that incontestability clause barred all claims for any period antedating limitation period, "otherwise contract would be without purpose or effect" (citing *Miller v. Columbia Records*, 10 A.D.2d 517, 415 N.Y.S.2d 869 (1st Dep't 1979))).

Mr. Bijan Amini
- 6 -
January 30, 2008

* * *

THIS PORTION OF LETTER IS FOR SETTLEMENT PURPOSES ONLY PURSUANT TO F.R.E. 408

REDACTED

Sincerely,

David Leichtman

enclosures

Lovells