LOVELLS LLP
David Leichtman (DL-7233)
Ilanit Dodiuk (ID-2072)
590 Madison Avenue
New York, New York 10027
Telephone: (212) 909-0600
Facsimile: (212) 909-0660
david.leichtman@lovells.com

*Attorneys for Defendants Pearson Education, Inc., and Prentice Hall Inc.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **BOVEE & THILL LLC,**<br><br>       Plaintiff,<br><br>    -against-<br><br>**PEARSON EDUCATION, INC. and PRENTICE HALL INC.,**<br><br>       Defendants. | 08-CV-00119 (MGC)<br>ECF Case |

**REPLY MEMORANDUM IN SUPPORT OF PEARSON EDUCATION, INC. AND PRENTICE HALL INC.'S MOTION TO PARTIALLY DISMISS BOVEE & THILL LLC'S AMENDED COMPLAINT FOR FAILURE TO STATE A CLAIM**

Pearson submits this Reply Memorandum to respond to a number of egregious legal errors and factual mischaracterizations made in B&T's response brief ("Response").[1]

As a threshold matter, B&T continually misuses the contractually defined term "Works," an error that then infects its entire analysis. As unambiguously provided in each Agreement, the "Work" is the full version of the book published in the United States in book form. That version is the only form of the book to which the "default" royalty rate applies; all other versions of the "Work" are subject to contractually agreed royalty rates different than those "default" rates. For example, on page 3 of its Response, B&T states that there are allegedly 44 transactions involving "sales of the Works in foreign countries," but it includes within those 44 transactions sales of versions of the books that B&T acknowledges are derivative works comprehended within the definitions of Subsidiary Rights in the 1997 Contracts – such as translations and adaptations – which are self-evidently and uncontestedly not sales of the "Works." B&T's threshold error distorts each of its attempts to rationalize its claims; viewed through the correct lens, B&T's arguments – and so its Amended Complaint – collapse like a house of cards.

## I. B&T's "Custom Books" Claim Fails As A Matter of Law

With respect to B&T's "Custom Books" claim, B&T relies in its Response upon a distinction between the 1997 Contracts and the 1999 and 2001 Contracts that is not made clear in the Amended Complaint. Specifically, B&T now appears to claim that since the 1997 Contracts don't use the word "abridgment," Pearson cannot use the Subsidiary Rights clause in the 1997 Contracts (Leichtman Decl. Exs. E-G at

---

[1] The fact that Pearson does not address every factual allegation made by B&T does not mean that Pearson concedes any unaddressed allegation is correct. Defined terms herein coincide with defined terms in Pearson's Opening Memorandum of Law.

1

Paragraph I(a)(i)), as the basis for paying royalties on "Custom Books," and therefore must pay the "default" rate. But this argument fundamentally mischaracterizes the reason why Pearson pays royalties on "Custom Books" pursuant to the Subsidiary Rights clause. Pearson does not rely solely on the particular term "abridgment" but on the undisputable fact that "Custom Books" – even as described in the Amended Complaint by B&T itself at paragraphs 51-69 – are clearly not the "Work."

Whether "Custom Books" are characterized as "derivative works," "other adaptations," "other versions," "inclusion in anthologies," or "otherwise utilizing the Work," the definition of "Subsidiary Rights" in the 1997 Contracts (Paragraph I(a)) is comprehensive enough to include "Custom Books" as described by B&T. The absence of the word "abridgment" in the 1997 Contracts is simply irrelevant.[2]

Thus, the actual question posed here does not raise a "question of fact," but rather a legal question that the Court can readily decide on this motion. Of course, in considering a motion to dismiss, courts "are not bound to accept as true a legal conclusion couched in a factual allegation." *Papasain v. Allain*, 478 U.S. 265, 286 (1986). Stated simply, B&T's Amended Complaint describes the sale of certain versions of B&T's books that B&T itself characterizes as "Custom Books," and the Subsidiary Rights clauses in both the 1997 Contracts and the 1999 and 2001 Contracts unambiguously apply to such derivative versions, which are clearly not the "Work" as defined under any of the contracts. That is a purely legal – not factual -- question, and freed of B&T's misstatements and irrelevancies, not a particularly difficult one.

---

[2] In any event, even if Pearson were solely relying on a Custom Book as described by B&T in the Amended Complaint as being an "abridgement," the definition of a derivative work clearly and unambiguously includes abridgments and condensations. *See* 17 U.S.C. s. 101; *see also* Black's Law Dictionary (6th edition, published in 1990), in addition to defining "derivative work" by reference to the definition in 17 U.S.C. s. 101, confirming the broad meaning of the word "derivative" itself, defining it as "Coming from another; taken from something preceding; secondary. That which has not its origin in itself, but owes its existence to something foregoing. Anything obtained or deduced from another."

B&T's remaining assertions to support incorrectly the application of the "default" rate or the rate for electronic versions of the "Work" do not save the Amended Complaint, for the following reasons:

- B&T makes much of its allegation that "Custom Books" are shown on its royalty statements as "abridgments." (Response at 12-13.) This contention is a mere red herring. Even if the terminology on Pearson's royalty statements does not correlate line for line with every author's individualized and individually negotiated contract, that would neither give rise to nor support a plausible legal claim that payment of the 10% Subsidiary Rights royalty rate is a breach of contract.

- It is also irrelevant who selects the chapters for inclusion in the so-called "Custom Books." Without any specific allegations regarding its own books, B&T's Response makes much of an allegation in the Amended Complaint that a section of the Pearson Custom web site shows that customers have the ability to select materials for inclusion in a collective work or anthology, and then assemble the "Custom Book" electronically themselves, rather than having a Pearson employee select the content and assemble the book. (Amended Complaint at paras. 51-55.) Therefore, B&T claims, the publisher is not exercising a Subsidiary Right and thus, the "default" rate or the electronic version rate should apply. B&T does not go so far as to allege its own "Custom Books" are created in that manner. And even if B&T's factual allegations were true, there is no distinction in either the law or the contracts that would support different treatment based on which party to the "Custom Book" transaction selects the chapters for inclusion.

- Next, trying to support its claim that the electronic versions rate should apply to these "Custom Books" allegedly assembled electronically, B&T appears to argue that even a print "Custom Book" is subject to the electronic versions rate, simply because the customer has the ability to select the material from the Pearson Custom web site. Again, however, there is no allegation that B&T's books are actually created in that manner, but in any event, B&T conflates the issue by arguing that the Subsidiary Rights exclusion in the electronic version royalty rate provision in the 1997 Contracts (Paragraph O) should not apply because that exclusion is somehow limited to broadcasting and audio visual media specified in the Subsidiary Rights clause. (Response at 15.) That claim has no basis in the contracts.

- Further, B&T's argument that the subsidiary rights clause (paragraph H(a)(iv)) in the 1999 and 2001 Contracts) is only applicable to derivative works in "print" (Response at 16) is also unsupportable and implausible; the word "print" modifies "adaptations," it does not modify the phrase "derivative works." (*See* Leichtman Decl. Exs. H-I, at Paragraph H(a)(iv).)

3

- Finally, there has not been any effort by Pearson to amend the contracts unilaterally by appending a glossary to the royalty statements (Response at footnote 9); putting aside that the glossary is simply a guide to help authors understand their royalty statements, Pearson is not in this motion relying on a glossary, nor has it ever done so, in its interpretation of the contracts.

II. **B&T's Claim Concerning Foreign Sales Made Pursuant To Licenses With Pearson's Affiliates Fails As A Matter of Law**

In its Response B&T seems to argue now that the 1997 Contracts are ambiguous as to payments for sales made through licenses with Pearson's affiliates and subsidiaries. The only support B&T points to as "extrinsic evidence" is language in the wholly separate, wholly distinct 1999 and 2001 Contracts; it argues that because those agreements have different provisions that provide specific royalty provisions for sales by affiliates (*e.g.*, Leichtman Decl. at Exs. H-I, at Paragraphs H(a) and H(a)(i)-H(a)(vi)), those provisions somehow should be imported into the 1997 Contracts which do not contain that language. (Leichtman Decl, at Exs. E-G, at Paragraph I(a)(i)).

As a matter of law – and simple logic – language from the later contracts simply cannot be imported into the earlier agreements, and the fact that they are different cannot inject an ambiguity into the earlier contracts where there is none. B&T cites one case for the proposition that extrinsic evidence of a party's subsequent can be considered occasionally to determine a party's intent at the time of contracting, *Godfrey v. Eastman Kodak Co.*, No. 89 Civ. 7489, 1991 WL 64463, at *4 (S.D.N.Y. Apr. 10, 1991). But B&T overlooks the central twin points made in the *Godfrey* decision that first there has to be an ambiguity in the contract to get to the point of considering such extrinsic evidence, and second a party's subsequent conduct under a *different* contract cannot "support an interpretation at variance with the Agreement's express language." *Id.* at * 4

4

Here, the later contracts shed any light on the intent of the parties at the time of the earlier contracts. There is no ambiguity in the language "the Publisher itself," in the 1997 Contracts. Moreover, B&T here acknowledges, albeit buried within footnote 5, that "only the 1997 Agreements are pertinent to Plaintiff's claim concerning sales through foreign affiliates and subsidiaries." Thus, the provisions of the 1999 and 2001 Contracts are simply – and wholly – irrelevant to B&T's arguments concerning the provisions of the 1997 Contracts.

Even if the 1999 and 2001 Contracts were pertinent and could be considered in divining the parties' intent in 1997, B&T's argument actually proves the opposite of what it intends to demonstrate. Where the parties intended to include specific provisions about sales made through or licenses to affiliates or subsidiaries, they actually did include those provisions – in the 1997 Contracts in paragraph I(d) and more extensively in the 1999 and 2001 Contracts throughout Paragraph H. B&T agrees, as it must, that a contract has to be interpreted as a whole and cannot be construed to render clauses meaningless or superfluous (Response at 10, citing cases). But it leaves that doctrine behind when it ignores the use of the term "subsidiaries" in the 1997 Contracts, and even if the use of the term "affiliates" in the 1999 and 2001 Contracts could be considered in somehow divining the parties' intent in 1997, it only shows that where the parties meant to use that term, they knew how to do so.

Briefly, Pearson also points out the following additional flaws in B&T's Response concerning its claim regarding foreign sales:

- In footnote 13, B&T argues that foreign mass market reprint editions are really the "Work" because the words of the book are unchanged. This argument mischaracterizes the reason why these versions of the books fall under the Subsidiary Rights clause. While it is true that these reprints are of a totally different quality than the Work and cannot be considered to be the Work, in addition these reprints are not created by Pearson itself but by others, pursuant to license of Subsidiary Rights. It is undisputed that these "foreign" versions are published in foreign countries (India or China), in some cases by

5

Pearson's affiliates or by third parties pursuant to licenses, and "foreign" versions are unambiguously within the definition of Subsidiary Rights in the 1997 Contracts.

- In footnote 15, B&T continues to muddy the waters by mixing up two separate and distinct versions of the books. B&T appears to argue its challenge to the application of the Subsidiary Rights license rate cannot be dismissed as to the foreign mass market reprint editions because Pearson pays the export rate (10%) for versions of books referred to as Pearson International Editions (or "PIEs"), which are not at issue in this case. There is no dispute that PIEs are editions of the books prepared by Pearson itself in the United States for export in lieu of the US edition. Although they are sold through Pearson's foreign affiliates, PIEs are thus not "foreign" versions published in a foreign country under license by a party other than Pearson itself, and thus do not fall under the Subsidiary Rights clause. (*See* Levin Decl., Ex. I, at page 3, first full paragraph under heading "PIEs.").

- B&T's next contention that dismissal is inappropriate because there is a "question of fact," as to whether certain foreign sales are translations or foreign adaptations or not (Response at 19) also fails. It can't be seriously argued that this assertion states a legal claim. There is simply no dispute and no allegation made in the Amended Complaint or that could be made in good faith that those books are not what Pearson says they are and no such allegation can plausibly rise to a breach of contract claim to be addressed in this Court.

- Finally, equally unavailing is B&T's assertion, in footnote 6, that an unspecified license agreement between Pearson and one of its foreign affiliates demonstrates that Pearson may have had some "involvement" in the preparation of a particular derivative works, and therefore creates an "issue of fact." B&T's argument apparently rests on one of the subsidiary rights clauses in the 1999 and 2001 Contracts. That clause applies only to licenses to third parties "where the Publisher has no involvement in the modifying, enhancing or marketing the Work for or with such third party." (Leichtman Decl. Exs. H-I, Paragraph H(a)(vii).) That clause does not apply to Pearson's affiliates. More importantly, no such language appears in the 1997 Contracts. Thus, whether or not Pearson had involvement in the preparation of a derivative work prepared by its affiliate has no affect on the applicability of the Subsidiary Rights clause of the 1997 Contracts. Again there can be no legal basis to import language from the 1999 and 2001 Contracts into the 1997 Contracts. Finally, since as B&T acknowledges, in footnote 5, "only the 1997 Agreements are pertinent to Plaintiff's claim concerning sales through foreign affiliates and subsidiaries," this language from the 1999 and 2001 Contracts is of no import regarding this motion to dismiss addressing the foreign sales claims that pertain solely to the 1997 Contracts.

### III. The Amended Complaint Should Be Dismissed With Prejudice As To The Claims To Be Decided On This Motion

Last, B&T makes no real argument as to why it should be permitted a fifth bite at the apple. B&T's only position here seems to be that its claims have only been dismissed once and that Pearson has tried to mislead the Court by claiming the first two complaints were dismissed by the Court in Nevada. But Pearson never said or implied that. Indeed, Pearson attached with its motion papers the very standstill agreement on which B&T relies. (*See* Leichtman Decl. at Ex. C). Moreover, Pearson also submitted the letter from one of B&T's many prior counsel in May 2006 announcing the expiration in May 2006 of that standstill agreement. (Leichtman Decl. at Ex. D). The point is not that all the prior complaints were dismissed. It is that B&T has repeatedly tried to assert a claim, varying its allegations each time, and that now that this fourth effort still fails to assert the claims that are the subject of this motion, leave to amend those claims yet another time should be denied.

Furthermore, B&T's first complaint in this latest B&T action was filed in January 2008 – over 18 months after the standstill agreement expired. B&T cannot seriously claim there is no prejudice to Pearson by the passage of time in which B&T delayed seeking a prompt resolution of any issues it had with its royalty statements. Indeed, since prior to filing the Nevada Complaints up until today B&T has engaged in numerous stratagems to publicize its ever-changing but always false allegations against Pearson as a means of attempting to force Pearson to accede to its unfounded claims, from mass e-mails to press conferences to anonymous mailing campaigns directed at Pearson's authors. When the substantial burden and expense of Pearson having to engage in discovery with serial counsel and to file four motions to dismiss thus far are added into the equation, there can be only one conclusion: B&T should

7

not be permitted any further amendments to its non-meritorious, implausible claims.

## CONCLUSION

For the foregoing reasons and for those asserted in Pearson's opening brief, B&T's claims concerning custom books and foreign sales should be dismissed, with prejudice.

Dated: New York, New York
      June 17, 2008

        **LOVELLS LLP**

        By:   /s/ David Leichtman
             David Leichtman (DL-7233)
             Ilanit Dodiuk (ID-2072)

        590 Madison Avenue
        New York, New York
        Telephone: (212) 909-0600
        Facsimile: (212) 909-0660
        david.leichtman@lovells.com

        *Attorneys for Pearson Education, Inc. and Prentice Hall Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the Reply Memorandum in Support of Pearson Education, Inc.'s and Prentice Hall Inc.'s Motion to Dismiss Bovee & Thill LLC's Complaint for Failure to State a Claim, was served on this 17th day of June 2008, via the Court's ECF filing system and via e-mail and regular mail on the following counsel:

Bijan Amini (BA-3533)
Lita Beth Wright (LW-0442)
Benjamin L. Felcher-Leavitt (BL-7363)
STORCH AMINI & MUNVES PC
140 E. 45th Street, 25th Floor
New York, New York 10017

By:    /s/ David Leichtman
     David Leichtman (DL-7233)
LOVELLS LLP
590 Madison Avenue
New York, New York
Telephone: (212) 909-0600
Facsimile: (212) 909-0660
david.leichtman@lovells.com

*Attorneys for Pearson Education, Inc. and Prentice Hall Inc.*